**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
08/07/2019

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| MONITRONICS INTERNATIONAL, | § | Case No. 19-33650 (DRJ) |
| INC., *et al.*,[1] | § | |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**ORDER APPROVING DEBTORS' DISCLOSURE STATEMENT AND CONFIRMING**
**DEBTORS' JOINT PARTIAL PREPACKAGED PLAN OF REORGANIZATION**

[Relates to Docket Nos. 13 and 18]

WHEREAS, on June 30, 2019 (the "**Petition Date**"), the above-captioned debtors and

debtors-in-possession (collectively, the "**Debtors**") commenced their chapter 11 bankruptcy cases

in this United States Bankruptcy Court for the Southern District of Texas (the "**Court**") and filed

their proposed *Disclosure Statement for Joint Partial Prepackaged Plan of Reorganization of*

*Monitronics International, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy*

*Code*, dated June 3, 2019 [Docket No. 18] (the "**Disclosure Statement**") and the *Joint Partial*

*Prepackaged Plan of Reorganization of Monitronics International, Inc. and Its Debtor Affiliates*

*Under Chapter 11 of the Bankruptcy Code*, dated June 3, 2019 [Docket No. 18, Exhibit A] (as may

be amended, modified, or supplemented, the "**Plan**").[2]

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Monitronics International, Inc. (9343), Security Networks LLC (8893), MIBU Servicer Inc. (5978), LiveWatch Security, LLC (3274), Platinum Security Solutions, Inc. (3850), Monitronics Canada, Inc. (9545), MI Servicer LP, LLC (N/A), Monitronics Security LP (6524), and Monitronics Funding LP (6754).  The location of the Debtors' corporate headquarters and the Debtors' service address is:  1990 Wittington Place, Farmers Branch, Texas 75234.

[2]     Capitalized terms used herein and not otherwise defined have the meanings set forth in the Plan, and if not defined in the Plan then as defined in the Disclosure Statement.  If there is any conflict between the terms of the Plan or Disclosure Statement and the terms of this Confirmation Order, the terms of this Confirmation Order shall control.

WHEREAS, prior to the Petition Date, the Debtors solicited votes to accept or reject the Plan from Holders of Class 3 Prepetition Term Loan Claims and Eligible Holders of Class 4 Prepetition Notes Claims;

WHEREAS, as attested to by James Daloia in the *Affidavit of Service of Solicitation Materials* filed on July 1, 2019 [Docket No. 44] (the "**Prepetition Daloia Affidavit of Service**"), prior to the Petition Date, on June 3, 2019, Prime Clerk LLC, the Debtors' Solicitation Agent (the "**Solicitation Agent**") transmitted (a) the Disclosure Statement, the Plan, the Class 4 Beneficial Holder Cover Letter, the Class 4 Notes Master Ballot and the Class 4 Notes Beneficial Ballot to the Nominees (each as defined in the Prepetition Daloia Affidavit of Service), (b) the Disclosure Statement, the Plan, and the Class 3 Prepetition Term Loan Claims Ballot to the Holders of Prepetition Term Loan Claims, and (c) as a courtesy, the Disclosure Statement, the Plan, the Class 4 Beneficial Holder Cover Letter, the Class 4 Notes Master Ballot, and the Class 4 Notes Beneficial Ballot to the parties identified on the "Nominees and Depository Service List," as identified in the Prepetition Daloia Affidavit of Service.

WHEREAS, on July 1, 2019, the Solicitation Agent filed the *Preliminary Declaration of James Daloia of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Partial Prepackaged Plan of Reorganization of Monitronics International, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 42] (the "**Prepetition Vote Certification**"), attesting to the results of the tabulation of all Ballots received by the Solicitation Agent on or before the Prepetition Voting Deadline (June 24, 2019) from Holders of Class 3 Prepetition Term Loan Claims and Eligible Holders of Class 4 Prepetition Notes Claims.

WHEREAS, after holding a hearing on July 1, 2019 to consider, among other things, the Debtors' Solicitation Motion (as defined below), on July 3, 2019, the Court entered its *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Fixing Deadline to Object to Disclosure Statement and Plan; (III) Approving (A) Solicitation Procedures, (B) Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline, (C) Cash Opt Out Election Form, (D) Notice of Non-Voting Status and Opt Out Opportunity, and (E) Rights Offering Materials; (IV) Approving Procedures for Assumption of Contracts and Leases and Form and Manner of Cure Notice; (V) Conditionally Approving Disclosure Statement; (VI) Conditionally (A) Directing the United States Trustee Not to Convene Section 341 Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities; and (VII) Granting Related Relief* [Docket No. 92] (the "**Solicitation Order**") which, among other things, (a) approved the solicitation procedures with respect to the Plan, including the forms of Ballots and Cover Letters (each as defined in the Solicitation Motion) and provided that the Ballots and Cover Letters constituted adequate information, disclosure and a sufficient summary of the Plan, and good and sufficient notice of the procedures, for Holders of Prepetition Term Loan Claims and Prepetition Notes Claims to vote on the Plan and elect to opt out of the voluntary Third-Party Releases set forth in Article X.C of the Plan, if so desired, and that no further notice need be given to Holders of Prepetition Term Loan Claims and Prepetition Notes Claims, (b) approved the form of the Cash Opt Out Election Form and the procedures used by the Debtors for distribution of the Cash Opt Out Election Form and for recording elections of Holders of Prepetition Notes Claims that opt out of the Cash Payout, (c) approved the form of the Notice of Non-Voting Status and Opt Out Opportunity (as defined in the Solicitation Motion) and the procedures used by the Debtors for

distribution of the Notice of Non-Voting Status and Opt Out Opportunity and for recording elections of Holders of Claims and Equity Interests in Non-Voting Classes that opt out of the voluntary Third-Party Releases set forth in Article X.C of the Plan, (d) approved the Rights Offering and the Rights Offering Materials, and authorized the Debtors to commence the Rights Offering, (e) approved the form and manner of the Combined Notice (as defined below), which provided notice of the commencement of the Debtors' Chapter 11 Cases, the combined hearing on the adequacy of the Disclosure Statement and confirmation of the Plan, and the objection deadline with respect to the approval of the Disclosure Statement and confirmation of the Plan, and (f) conditionally approved the Disclosure Statement.

WHEREAS, as attested by James Daloia in the *Affidavit of Service of Post Petition Solicitation Materials* [Docket No. 139] (the "**Postpetition Daloia Affidavit of Service**"), on July 3, 2019, the Solicitation Agent transmitted (a) the *Notice of (I) Commencement of Partial Prepackaged Case Under Chapter 11 of the Bankruptcy Code, (II) Combined Hearing on the Disclosure Statement, Confirmation of the Partial Prepackaged Chapter 11 Plan, and Related Matters, and (III) Objection Deadlines and Summary of Partial Prepackaged Chapter 11 Plan* (the "**Combined Notice**"), the Class 4 Beneficial Holder Cover Letter, the Class 4 Notes Beneficial Ballot, and the Class 4 Notes Master Ballot to the Nominees (each as defined in the Postpetition Daloia Affidavit of Service), (b) the Combined Notice and Notice of Non-Voting Status and Opt Out Opportunity to Holders or potential Holders of Claims and Equity Interests in Non-Voting Classes, as identified in the Postpetition Daloia Affidavit of Service, (c) the Disclosure Statement, the Plan, the Combined Notice, and the Notice of Non-Voting Status and Opt Out Opportunity to the parties identified on the "Core/2002 Service List," as identified in the Postpetition Daloia Affidavit of Service, (d) the Combined Notice to the Holders of Class 3

4

Prepetition Term Loan Claims, and (e) as a courtesy, the Combined Notice, the Class 4 Beneficial Holder Cover Letter, the Class 4 Notes Beneficial Ballot, and the Class 4 Notes Master Ballot to the parties identified on the "Nominees and Depository Service List," as identified in the Postpetition Daloia Affidavit of Service.

WHEREAS, as attested by Ryan Vyskocil in the *Affidavit of Service* [Docket No. 138] (the "**Rights Offering Affidavit of Service**"), on July 3, 2019, the Solicitation Agent transmitted the Cash Opt Out Notice, the Monitronics Rights Offering Procedures, the Monitronics Subscription Form, and the Backstop Commitment Party Addendum (each as defined in the Rights Offering Affidavit of Service) to (i) the Nominees (as defined in the Rights Offering Affidavit of Service), and (ii) via email to the parties identified on Exhibit F to the Rights Offering Affidavit of Service.

WHEREAS, on July 17, 2019, the Debtors published the Combined Notice in *USA Today*, as attested to in the *Affidavit of Publication* filed with the Court on July 22, 2019 [Docket No. 153] (the "**Affidavit of Publication**").

WHEREAS, as attested in the affidavits of service filed on July 19, 2019 [Docket No. 152] and July 26, 2019 [Docket No. 155] (the "**Cure Notice Affidavits of Service**," and together with the Prepetition Daloia Affidavit of Service, the Postpetition Daloia Affidavit of Service and the Rights Offering Affidavit of Service, the "**Affidavits of Service**"), the Solicitation Agent served the Cure Notice (as defined in the Debtors' motion for, among other things, entry of the Solicitation Order [Docket No. 13] (the "**Solicitation Motion**")) on the Contract Parties (as defined in the Solicitation Motion) set forth in Cure Notice Affidavits of Service.

WHEREAS, on July 28, 2019, the Debtors filed their *Notice of Filing of Plan Supplement for the Joint Partial Prepackaged Plan of Reorganization of Monitronics International, Inc. and*

5

*Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, together with certain schedules and exhibits to the Plan [Docket No. 157] (as amended from time to time, the "**Plan Supplement**").

WHEREAS, on August 3, 2019, the Solicitation Agent filed the *Declaration of James Daloia of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Partial Prepackaged Plan of Reorganization of Monitronics International, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 169] (the "**Postpetition Vote Certification**" and together with the Prepetition Vote Certification, the "**Vote Certifications**"), attesting to (a) the results of the tabulation of all Ballots received by the Solicitation Agent on or before the Postpetition Voting Deadline (July 31, 2019) from Non-Eligible Holders of Class 4 Prepetition Notes Claims and (b) the cumulative results of the tabulation of all Ballots received by the Solicitation Agent from (i) Holders of Class 3 Prepetition Term Loan Claims and Eligible Holders of Class 4 Prepetition Notes Claims on or before the Prepetition Voting Deadline and (ii) Non-Eligible Holders of Class 4 Prepetition Notes Claims on or before the Postpetition Voting Deadline.

WHEREAS, on August 6, 2019, the Debtors filed the *Debtors' Memorandum of Law in Support of (I) Approval of the Disclosure Statement and (II) Confirmation of the Joint Partial Prepackaged Plan of Reorganization of Monitronics International, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No.    ] (the "**Confirmation Brief**").

WHEREAS, a hearing to consider the Debtors' compliance with the Bankruptcy Code's disclosure requirements and confirmation of the Plan was held before this Court on August 7, 2019 (the "**Combined Hearing**").

NOW, THEREFORE, based upon this Court's review of the Disclosure Statement, Plan, the briefs, affidavits and declarations submitted in support of confirmation of the Plan, including,

without limitation, (i) the Confirmation Brief, (ii) the *Declaration of Fred A. Graffam III, Chief Financial Officer and Senior Vice President of the Debtors, in Support of (I) Approval of the Disclosure Statement and (II) Confirmation of the Joint Partial Prepackaged Plan of Reorganization of Monitronics International, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "**Graffam Declaration**"), (iii) the *Declaration of Chad Coben in Support of Confirmation of the Joint Partial Prepackaged Plan of Reorganization of Monitronics International, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "**Coben Declaration**"), and (iv) the *Declaration of William Derrough in Support of Confirmation of the Joint Partial Prepackaged Plan of Reorganization of Monitronics International, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "**Derrough Declaration**," together with the Graffam Declaration and the Coben Declaration, the "**Confirmation Declarations**"), and upon all of the evidence proffered or adduced at, and arguments of counsel made at the Combined Hearing, and upon the entire record of these Chapter 11 Cases, and after due deliberation thereon, **THE COURT HEREBY FINDS AND CONCLUDES THAT:**

I.      **Findings of Fact; Conclusions of Law**

A. The findings and conclusions set forth herein and in the record of the Combined Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

II.     **Jurisdiction; Venue; Core Proceeding**

B. The Court has jurisdiction over the Chapter 11 Cases pursuant to Section 1334 of title 28 of the United States Code.  Venue is proper before this Court pursuant to Sections 1408 and

1409 of title 28 of the United States Code.  Approval of the Disclosure Statement and confirmation

of the Plan are core proceedings pursuant to Section 157(b)(2) of title 28 of the United States Code.

This Court has jurisdiction to enter a final order determining that the Disclosure Statement and the

Plan comply with all of the applicable provisions of the Bankruptcy Code and should be approved

and confirmed, respectively.

III.    **Eligibility for Relief; Proper Plan Proponents**

C.  The Debtors were and are eligible for relief under Section 109 of the Bankruptcy Code

and the Debtors were and are proper plan proponents under Section 1121(a) of the Bankruptcy

Code.

IV.    **Commencement and Joint Administration of the Chapter 11 Cases**

D.  On the Petition Date, each of the above-captioned Debtors commenced a voluntary case

under chapter 11 of the Bankruptcy Code.  By prior order of the Court, the Chapter 11 Cases have

been consolidated for procedural purposes only and are being jointly administered pursuant to

Bankruptcy Rule 1015 [Docket No. 50].  Since the Petition Date, the Debtors have operated their

businesses and managed their properties as debtors in possession pursuant to Sections 1107(a) and

1108 of the Bankruptcy Code.  No official statutory committee, trustee or examiner has been

appointed in the Chapter 11 Cases.

V.    **Judicial Notice**

E.  The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by

the clerk of the Court, including, without limitation, all pleadings and other documents filed and

orders entered thereon.  The Court also takes judicial notice of all hearing transcripts, evidence

proffered or adduced and all arguments made at the hearings held before the Court during the

pendency of these Chapter 11 Cases.

VI.    **Burden of Proof**

F.   The Debtors, as proponents of the Plan, have met their burden of proving the elements of Sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for confirmation of the Plan.

## VII.   **Transmittal and Mailing of Materials; Notice**

G.   As evidenced by the Affidavits of Service, due, timely, adequate and sufficient notice of the Disclosure Statement, the Plan, the Plan Supplement, the Combined Hearing, the opportunity to opt out of the Third-Party Releases, and other dates and deadlines described in the Solicitation Order, together with all deadlines for voting to accept or reject the Plan as well as objecting to the Disclosure Statement and the Plan, has been given in substantial compliance with the Court's orders, all applicable Bankruptcy Rules, and all other applicable rules, laws, and regulations, and no other or further notice is or shall be required.   All parties in interest had the opportunity to appear and be heard at the Combined Hearing, and no other or further notice is required.

H.   The Debtors published the Combined Notice in *USA Today*, in substantial compliance with the Solicitation Order and Bankruptcy Rule 2002(*l*), as evidenced by the Affidavit of Publication.

## VIII.   **Solicitation**

I.   Votes for acceptance and rejection of the Plan were solicited in good faith and in compliance with Sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, all other applicable provisions of the Bankruptcy Code and all other applicable rules, laws, and regulations.   Specifically, the Disclosure Statement, the Plan, the Combined Notice, the Ballots and other materials constituting the solicitation materials approved by the Court in the Solicitation Order, were transmitted to and served on all Holders of Claims in the Voting Classes, and the solicitation materials (not including Ballots) were also provided to the key parties in interest in the

Chapter 11 Cases, in compliance with Section 1125 of the Bankruptcy Code, the Bankruptcy Rules and the Solicitation Order.  The Combined Notice and Notice of Non-Voting Status and Opt Out Opportunity were provided to Holders or potential Holders of Claims and Equity Interests in Non-Voting Classes.  Such transmittal and service were adequate and sufficient, and no other or further notice is or shall be required.  All procedures used to distribute the solicitation materials and other notices and documents described in the Solicitation Order were fair and conducted in accordance with the Bankruptcy Code, the Bankruptcy Rules and all other applicable rules, laws, and regulations.

J.   The solicitation of votes on the Plan complied with the Solicitation Procedures (as defined in the Solicitation Motion), was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Solicitation Order, and applicable non-bankruptcy law.  To the extent that the Debtors' prepetition solicitation was deemed to constitute an offer of new securities, such solicitation is exempt from registration pursuant to section 4(a)(2), Regulation D and/or Regulation S of the Securities Act, as applicable to any recipient deemed an offeree.  Specifically, section 4(a)(2) and Regulation D of the Securities Act create an exemption from the registration requirements under the Securities Act for transactions not involving a "public offering," and Regulation S creates an exemption from the registration requirements under the Securities Act for offerings deemed to be executed outside of the United States.  15 U.S.C. § 77d(a)(2); 17 C.F.R. § 230.501 *et seq.*; 17 C.F.R. § 230.901 *et seq*.  The Debtors have complied with the requirements of section 4(a)(2), Regulation D and Regulation S of the Securities Act (as applicable), in order to address the scenario where the prepetition solicitation of acceptances would be deemed a private placement of securities.  The prepetition solicitation was made only to those

10

holders of Class 4 Prepetition Notes Claims who certified that they were (i) for Prepetition Noteholders located in the United States, a "qualified institutional buyer" (as defined in Rule 144A of the Securities Act of 1933, as amended (the "Securities Act")) or an "accredited investor" (as defined in Rule 501 of Regulation D of the Securities Act); or (ii) for Prepetition Noteholders located outside the United States, a person other than a "U.S. person" (as defined in Rule 902(k) of Regulation S of the Securities Act) and not participating on behalf of or on account of a U.S. person.

IX.     **Adequacy of Disclosure Statement**

K. The Disclosure Statement (i) contains sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable nonbankruptcy rules, laws, and regulations, including the Securities Act, and (ii) contains "adequate information" (as such term is defined in Section 1125(a) of the Bankruptcy Code and used in Section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein, and (iii) is hereby approved in all respects.

X.     **Vote Certification**

L. Before the Combined Hearing, the Debtors filed the Vote Certifications. All procedures used to tabulate the Ballots were fair and conducted in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Solicitation Order, and all other applicable rules, laws and regulations.

M. As evidenced by the Vote Certifications, Class 3 (Prepetition Term Loan Claims) voted as follows: 208 claims in the aggregate amount of $979,155,578.04 voted to accept the Plan, and 0 claims in the amount of $0.00 voted to reject the Plan. Accordingly, 100% of the voting Class 3 creditors voted to accept the Plan, and those creditors in the aggregate held 100% of the total dollar amount of the claims held by such voting Class 3 creditors. Therefore, Class 3 has accepted

11

the Plan pursuant to Section 1126(c) of the Bankruptcy Code.   As evidenced by the Vote Certifications, Class 4 (Prepetition Notes Claims) voted as follows: 465 claims in the aggregate amount of $478,450,000.00 voted to accept the Plan, and 64 claims in the aggregate amount of $797,000.00 voted to reject the Plan.   Accordingly, 87.9% of the voting Class 4 creditors voted to accept the Plan, and those creditors, in the aggregate, held 99.83% of the total dollar amount of the claims held by such voting Class 4 creditors.   Therefore, Class 4 has accepted the Plan pursuant to Section 1126(c) of the Bankruptcy Code.

XI.   **Bankruptcy Rule 3016**

N.   The Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a).   The filing of the Disclosure Statement with the clerk of the Court satisfied Bankruptcy Rule 3016(b).

XII.   **Adequate Assurance**

O.   The Debtors have cured, or provided adequate assurance that the Reorganized Debtors will cure, defaults (if any) under or relating to each of the contracts and leases that are being assumed by the Debtors pursuant to the Plan.   The Debtors also have provided adequate assurance of the Reorganized Debtors' future performance under such contracts and leases.

XIII.   **Valuation**

P.   The Debtors' Valuation Analysis included as Exhibit E to the Disclosure Statement and the estimated enterprise value, as described therein, is reasonable, proposed in good faith, and supported by the Confirmation Declarations and the evidence presented at or prior to the Combined Hearing.   All parties in interest have been given the opportunity to challenge the Valuation Analysis.   The Valuation Analysis (i) is reasonable, persuasive, and credible as of the date such analysis was prepared, presented, or proffered, and (ii) uses reasonable and appropriate methodologies and assumptions.

XIV.   **Section 1129(a)(1)—Compliance of the Plan with Applicable Provisions of the Bankruptcy Code**

       (i)       <u>Section 1122 and 1123(a)(1)—Proper Classification</u>.

Q.   The classification of Claims and Equity Interests under the Plan is proper under the Bankruptcy Code.  Pursuant to Sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan provides for the separate classification of Claims and Equity Interests into eight Classes, based on differences in the legal nature or priority of such Claims and Equity Interests (other than Administrative Claims, DIP Facility Claims, Priority Tax Claims, Other Priority Claims, and Statutory Fees, which are addressed in Article II of the Plan and which have not been classified in accordance with Section 1123(a)(1) of the Bankruptcy Code).  Valid business, factual and legal reasons exist for the separate classification of the various Classes of Claims and Equity Interests created under the Plan, the classifications were not done for any improper purpose, and the creation of such Classes does not unfairly discriminate between or among Holders of Claims or Equity Interests.  As required by Section 1122(a) of the Bankruptcy Code, each Class of Claims and Equity Interests contains only Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests within that Class.

       (ii)      Section 1123(a)—Compliance.

R.   In accordance with Section 1123(a) of the Bankruptcy Code, the Court finds and concludes that the Plan: (a) designates Classes of Claims and Equity Interests, other than Claims of a kind specified in Sections 507(a)(2) and 507(a)(8) of the Bankruptcy Code; (b) specifies Classes of Claims and Equity Interests that are not Impaired under the Plan; (c) specifies the treatment of Classes of Claims and Equity Interests that are Impaired under the Plan; (d) provides the same treatment for each Claim or Equity Interest of a particular Class, unless the Holder of a particular Claim or Equity Interest agrees to less favorable treatment of their respective Claim or

Equity Interest; (e) provides for adequate means for the Plan's implementation; (f) prohibits the issuance of non-voting securities; and (g) contains only provisions that are consistent with the interests of Holders of Claims and Equity Interests and with public policy with respect to the manner of selection of any officer or director of the Reorganized Debtors on and after the Effective Date. Therefore, the Plan satisfies the requirements of Section 1123(a) of the Bankruptcy Code.

(iii)   Section 1123(b)—Discretionary Contents of the Plan.

S.  The Plan contains various provisions that may be construed as discretionary but are not required for confirmation under the Bankruptcy Code. As set forth below, such discretionary provisions comply with Section 1123(b) of the Bankruptcy Code and are not inconsistent in any way with the applicable provisions of the Bankruptcy Code. As a result thereof, the requirements of Section 1123(b) of the Bankruptcy Code have been satisfied.

(A)   *Section 1123(b)(1)-(2)—Claims and Equity Interests; Executory Contracts and Unexpired Leases.*

T.  Pursuant to Sections 1123(b)(1) and 1123(b)(2) of the Bankruptcy Code, respectively, Article III of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims and Equity Interests, and Article VI of the Plan provides for the assumption or rejection of the Executory Contracts and Unexpired Leases of the Debtors not previously assumed or rejected pursuant to Section 365 of the Bankruptcy Code and appropriate authorizing orders of the Court.

(B)   *Section 1123(b)(3)—Release, Exculpation, Third-Party Release, Injunction and Preservation of Claims Provisions*

U.  **Releases by the Debtors**. The releases of Claims and Causes of Action by the Debtors and Reorganized Debtors described in Article X.B of the Plan (the "**Debtor Releases**") are a necessary and important aspect of the Plan. The Debtor Releases are based on sound business judgment, are in the best interests of the Debtors, the Estates, and all holders of Claims and Equity Interests, are fair, equitable, and reasonable, and are acceptable pursuant to the standards that

14

courts in this district generally apply.  Each Released Party played an integral role in the Chapter 11 Cases and made substantial concessions that underpin the consensual resolution reached in these Chapter 11 Cases and embodied in the Plan that will allow the Debtors to expeditiously exit bankruptcy and continue their operations, and/or may be unwilling to support the Plan without the Debtor Releases.   Additionally, the Plan, including the Debtor Releases, was vigorously negotiated by sophisticated entities that were represented by able counsel and financial advisors.

V. **Exculpation**.  The Exculpation described in Article X.D of the Plan is appropriate under applicable law because it is part of a Plan, has been proposed in good faith, was vital to the Plan formulation process and is appropriately limited in scope.  The Exculpation, including its carve-out for fraud, gross negligence, willful misconduct or criminal misconduct, is consistent with established practice in this jurisdiction and others.

W. **Releases by Holders of Claims and Equity Interests**.  The releases of Claims and Causes of Action by Holders of Claims and Equity Interests described in Article X.C of the Plan, including the releases of non-Debtors (the "**Third-Party Releases**"), are an important aspect of the Plan.  The Third-Party Releases are designed to provide finality for the Released Parties with respect to such parties' respective obligations under the Plan.  The Ballots and the Notice of Non-Voting Status and Opt Out Opportunity clearly direct Holders of Claims or Equity Interests to Article X of the Plan for further information about the Third-Party Releases and how to opt-out of the voluntary Third-Party Releases.  Thus, Holders of Claims or Equity Interests were given due and adequate notice that they would be consenting to the Third-Party Releases by voting to accept the Plan or choosing not to opt out of the Third-Party Releases, as applicable.  The Third-Party Releases are appropriate, important to the success of the Plan and consistent with established practice in this jurisdiction and others.  The provisions of the Plan, including the Third-Party

15

Releases, were vigorously negotiated prepetition, and the Debtors' key stakeholders are unwilling to support the Plan without the Third-Party Releases.

X. Further, the Third-Party Releases were provided in exchange for significant consideration. First, the Ad Hoc Lender Group and the other Consenting Term Lenders engaged with the Debtors, Ascent and the Ad Hoc Noteholder Group in good faith, spent significant time and effort negotiating the terms of the Restructuring Support Agreement and the Plan and agreed to enter into the Takeback Exit Term Loan Facility with the Reorganized Debtors, which they were not otherwise obligated to do. The Ad Hoc Noteholder Group and the other Consenting Noteholders also engaged the Debtors, Ascent and the Ad Hoc Lender Group in good faith and spent significant time and effort negotiating the terms of the Restructuring Support Agreement and the Plan. Moreover, those Consenting Noteholders who are (i) Backstop Commitment Parties agreed to backstop the Rights Offering and purchase any Unsubscribed Shares, Ascent Default Shares, and/or Net Cash Shortfall Shares, as applicable, and (ii) Equity Commitment Parties agreed to purchase the Equity Commitment Shares by exchanging Contributed Term Loans, in each case, on the terms and conditions set forth in the Backstop and Equity Commitment Documents. The DIP Facility Agent and DIP Facility Lenders spent significant time and effort negotiating the DIP/Exit Facility Commitment, have funded these Chapter 11 Cases pursuant to the DIP Facility and have agreed to enter into the New Exit Facilities with the Reorganized Debtors. Ascent engaged the Debtors in good faith and spent significant time and effort negotiating the terms of the Restructuring Support Agreement, the Plan and the Merger Agreement, and Ascent will either consummate the Merger or make the Toggle Contribution. And with respect to Holders of Claims or Equity Interests that elected not to opt out of the Third-Party Releases, such parties agreed to the release of any and all of their claims against the other Released

16

Parties.  Finally, the Debtors' directors and officers, and their employees more broadly, spent countless hours on double-duty during this process, driving the Debtors' smooth transition into chapter 11 and imminent emergence after a successful balance sheet restructuring.  In short, the contributions, concessions, and efforts by the Released Parties in formulating the Plan and putting the Debtors on a path for success fully support approving the Third-Party Releases.

Y.  **Injunction**.  The injunction provision set forth in Article X.F of the Plan is necessary to preserve and enforce the discharge provision set forth in Article X.E of the Plan and is narrowly tailored to achieve that purpose.

Z.  Thus, each of the release, exculpation, third-party release, discharge and injunction provisions set forth in the Plan:  (a) is within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) is an essential means of implementing the Plan pursuant to Section 1123(a)(6) of the Bankruptcy Code; (c) is an integral element of the transactions incorporated into the Plan; (d) confers material benefits on, and is in the best interests of, the Debtors, their Estates and the Holders of Claims and Equity Interests; (e) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors; and (f) is consistent with Sections 105, 1123, 1129 of the Bankruptcy Code, and other applicable provisions of the Bankruptcy Code.  The record of the Combined Hearing and the Chapter 11 Cases is sufficient to support the release, exculpation, third-party release, discharge and injunction provisions contained in Article X of the Plan.

AA.    **Preservation of Rights of Action**.  Article V.V of the Plan appropriately provides for the preservation by the Debtors of the Causes of Action in accordance with Section 1123(b)(3)(B) of the Bankruptcy Code.  The provisions regarding Causes of Action in the Plan are appropriate and are in the best interests of the Debtors, their Estates and Holders of Claims and

Equity Interests.

XV.   **Section 1129(a)(2)—Compliance of the Debtors and Others with the Applicable Provisions of the Bankruptcy Code**

BB.   The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, including Sections 1123, 1125, and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018 and 3019.  As a result thereof, the requirements of Section 1129(a)(2) of the Bankruptcy Code have been satisfied.

(i)   Section 1129(a)(3)—Proposal of Plan in Good Faith.

CC.   The Debtors have proposed the Plan in good faith and not by any means forbidden by law.  In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself and the process leading to its formulation.  The good faith of each of the entities who negotiated the Plan is evident from the facts and records of the Chapter 11 Cases and the record of the Combined Hearing and other proceedings held in the Chapter 11 Cases.  The Plan is the product of arm's-length negotiations among the Debtors, the Ad Hoc Lender Group, the Ad Hoc Noteholder Group, and Ascent.  The Plan itself, and the process leading to its formulation, provide independent evidence of the good faith of the entities who negotiated the Plan, serve the public interest and assure fair treatment of Holders of Claims and Equity Interests.  The Debtors, the Ad Hoc Lender Group, the Ad Hoc Noteholder Group, and Ascent negotiated the terms and provisions of the Plan with the legitimate and honest purposes of maximizing the value of the Debtors' estates for the benefit of all creditors and shareholders and of emerging from bankruptcy with a capital structure that will permit the Debtors to satisfy their obligations.  Consistent with the overriding purpose of chapter 11 of the Bankruptcy Code, the Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to reorganize and emerge from bankruptcy

with a capital structure that will allow them to satisfy their obligations while maintaining sufficient liquidity and capital resources.

DD.     Based on the record before this Court in the Chapter 11 Cases:  (a) the Debtors; (b) the Prepetition First Lien Agent; (c) the Prepetition Revolving Lenders; (d) the Consenting Term Lenders; (e) the Indenture Trustee; (f) the Consenting Noteholders; (g) the Commitment Parties; (h) the DIP Facility Agent; (i) the DIP Facility Lenders; (j) Ascent; (k) the Solicitation Agent; and (l) all of the foregoing Entities' respective current and former Affiliates, and each of the current and former directors, officers, managers, managing members, principals, partners, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, other professionals, managed accounts, and managed funds of each of the foregoing Entities and their Affiliates (in each case in his, her or its capacity as such), as of or after the Petition Date have acted in good faith and will continue to act in good faith if they proceed to: (i) consummate the Plan and the agreements, including without limitation the agreements contained in the Plan Supplement, settlements, transactions and transfers contemplated thereby; and (ii) take the actions authorized and directed by this Confirmation Order.

(ii)     Section 1129(a)(4)—Bankruptcy Court
Approval of Certain Payments as Reasonable.

EE.The procedures set forth in the Plan for the Court's review and ultimate determination of the fees and expenses to be paid by the Debtors in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, satisfy the objectives of, and are in compliance with, Section 1129(a)(4) of the Bankruptcy Code.  As a result thereof, the requirements of Section 1129(a)(4) of the Bankruptcy Code have been satisfied.

(iii)    Section 1129(a)(5)—Disclosure of Identity of Proposed
Management, Compensation of Insiders and Consistency of
Management Proposals with the Interests of Creditors and Public Policy.

FF. To the extent required by Section 1129(a)(5) of the Bankruptcy Code, (1) the Debtors have disclosed the identity and affiliations of each individual initially proposed to serve, after the Effective Date, as a director or officer of any of the Reorganized Debtors; (2) the appointment of the individuals disclosed to serve, after the Effective Date, as directors and officers of the Reorganized Debtors is consistent with the interests of Holders of Claims and Equity Interests and with public policy; and (3) the Debtors have disclosed all insiders that will be employed by the Reorganized Debtors and the nature of compensation for such insiders.  As a result thereof, the requirements of Section 1129(a)(5) of the Bankruptcy Code have been satisfied.

(iv)    Section 1129(a)(6)—No Rate Changes.

GG.    In accordance with Section 1129(a)(6) of the Bankruptcy Code, the Court finds and concludes that the Debtors are not subject to any governmental regulation of any rates. Therefore, Section 1129(a)(6) of the Bankruptcy Code is not applicable.

(v)    Section 1129(a)(7)—Best Interests of Holders of Claims and Equity
Interests.

HH.    The Liquidation Analysis included as Exhibit C to the Disclosure Statement and the other evidence related thereto that was proffered or adduced at or prior to the Combined Hearing: (a) are reasonable, persuasive and credible; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that, with respect to each Impaired Class, each Holder of an Allowed Claim or Equity Interest in such Class has voted to accept the Plan or will receive under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date, that is not less than the amount such Holder would receive if the Debtors were liquidated on the Effective Date under

20

chapter 7 of the Bankruptcy Code.

(vi)     Section 1129(a)(8)—Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Each Non-Affiliate Impaired Class.

II.   Classes 1, 2, 5, and 7 are composed of Unimpaired Claims and Equity Interests and are conclusively presumed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code.

JJ.   Classes 3 and 4 are composed of Impaired Claims that have voted to accept the Plan.

KK.     [Reserved]

(vii)    Section 1129(a)(9)—Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.

LL.      Allowed Administrative Claims, Allowed DIP Facility Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims are Unimpaired under Article II of the Plan.  As a result thereof, the requirements of Section 1129(a)(9) of the Bankruptcy Code with respect to such Classes have been satisfied.

(viii)   Section 1129(a)(10)—Acceptance by At Least One Impaired Class.

MM.   As set forth in the Vote Certifications, Classes 3 and 4 have voted to accept the Plan.  As such, at least one Class of Claims that is Impaired under the Plan has accepted the Plan at each Debtor, determined without including any acceptance of the Plan by any insider.  As a result thereof, the requirements of Section 1129(a)(10) of the Bankruptcy Code have been satisfied.

(ix)     Section 1129(a)(11)—Feasibility of the Plan.

NN.       The evidence proffered or adduced at, or prior to, the Combined Hearing in connection with the feasibility of the Plan, including the Financial Projections included as Exhibit D to the Disclosure Statement, is reasonable, persuasive and credible.  As a result thereof, the requirements of Section 1129(a)(11) of the Bankruptcy Code have been satisfied.

21

     (x)     <u>Section 1129(a)(12)—Payment of Bankruptcy Fees</u>.

OO.    The Plan provides that the Debtors or the Reorganized Debtors shall pay all fees payable under section 1930 of title 28, United States Code on and after the Effective Date until the entry of a final decree in each Debtor's Chapter 11 Case or until such Chapter 11 Case is converted or dismissed.  As a result thereof, the requirements of Section 1129(a)(12) of the Bankruptcy Code have been satisfied.

     (xi)     <u>Section 1129(a)(13)—Retiree Benefits</u>.

PP. Section 1129(a)(13) of the Bankruptcy Code requires a plan to provide for retiree benefits at levels established pursuant to Section 1114 of the Bankruptcy Code.  The Debtors do not have obligations to pay retiree benefits and, therefore, Section 1129(a)(13) of the Bankruptcy Code, to the extent applicable to the Debtors, is satisfied.

     (xii)     Sections 1129(a)(14), (15), and (16)—
               Domestic Support Obligations; Unsecured Claims
               <u>Against Individual Debtors; Transfers by Nonprofit Organizations</u>.

QQ.    None of the Debtors have domestic support obligations, are individuals or are nonprofit organizations.  Therefore, Sections 1129(a)(14), (15), and (16) of the Bankruptcy Code do not apply to the Chapter 11 Cases.

     (iv)     <u>Section 1129(b)—No Unfair Discrimination; Fair and Equitable</u>.

RR.     The Debtors have demonstrated that the Plan complies with Section 1129(b) of the Bankruptcy Code.

     (xiii)   <u>Section 1129(c)—Only One Plan</u>.

SS. Other than the Plan (including any previous versions thereof), which Plan constitutes a separate chapter 11 plan for each of the nine Debtors, no other plan has been filed in the Chapter 11 Cases.  As a result thereof, the requirements of Section 1129(c) of the Bankruptcy Code have been satisfied.

22

(xiv)   Section 1129(d)—Principal Purpose
of the Plan Is Not Avoidance of Taxes.

TT. No governmental unit has requested that the Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.  As evidenced by its terms, the principal purpose of the Plan is not such avoidance.  As a result thereof, the requirements of Section 1129(d) of the Bankruptcy Code have been satisfied.

## XVI.   **Satisfaction of Confirmation Requirements**

UU.   Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in Section 1129 of the Bankruptcy Code.

## XVII.   **Disclosure:  Agreements and Other Documents**

VV.   The Debtors have disclosed all material facts regarding:  (a) the adoption of the Amended Organizational Documents, or similar constituent documents; (b) the selection of directors and officers for the Reorganized Debtors; (c) the potential Merger; (d) the Rights Offering; (e) the New Exit Facilities Documents; (f) the Takeback Exit Term Loan Facility Documents; (g) the Backstop Commitments and the Put Option Agreement; (h) the Registration Rights Agreement; (i) the Information Sharing Agreement; (j) distributions in accordance with the Plan; (k) the issuance and distribution of the New Common Stock, which is duly authorized, validly issued, fully paid and non-assessable; (l) the adoption, execution and implementation of the other matters provided for under the Plan involving corporate action to be taken by or required of the Reorganized Debtors; and (m) the adoption, execution and delivery of all contracts, leases, instruments, releases, indentures and other agreements related to any of the foregoing.

## XVIII. **Transfers by the Debtors; Vesting of Assets**

WW.   All transfers of property of the Debtors, including, but not limited to, the

23

issuance and distribution of the New Common Stock, shall be free and clear of all Liens, charges, Claims, encumbrances and other interests of creditors, except as expressly provided in the Plan. Except as otherwise provided in the Plan or this Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into or delivered in connection with the Plan, pursuant to Sections 1141(b) and (c) of the Bankruptcy Code, all property in each Estate, all Causes of Action (except those released by the Debtors pursuant to the Plan or otherwise) and any property acquired by any of the Debtors pursuant to the Plan (other than the Professional Fee Claims Reserve) shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or interests of creditors, other encumbrances (except for Liens granted to secure the obligations under the New Exit Facilities Documents and the Takeback Exit Term Loan Facility Documents). Such vesting does not constitute a voidable transfer under the Bankruptcy Code or applicable nonbankruptcy law. Each distribution and issuance of New Common Stock under the Plan shall be governed by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

XIX.   **Satisfaction of Conditions Precedent**

XX.   Each of the conditions precedent to confirmation of the Plan, as set forth in Article IX.A of the Plan, has been satisfied or waived in accordance with the provisions of the Plan.

XX.   **Implementation**

YY.   All documents and agreements necessary to implement the Plan, including those contained in the Plan Supplement, have been negotiated in good faith, at arm's-length, and are in the best interests of the Debtors and the Reorganized Debtors and shall, upon completion of documentation and execution, be valid, binding and enforceable documents and agreements not in conflict with any federal or state law.

24

XXI.   **Rights Offering**

ZZ. The Debtors conducted the Rights Offering and distributed the Rights in good faith in accordance with the Rights Offering Procedures.

XXII.   **Approval of the New Exit Facilities Documents and the Takeback Exit Term Loan Facility Documents**

AAA.   Each of the New Exit Facilities Documents and the Takeback Exit Term Loan Facility Documents is an essential element of the Plan, necessary for confirmation and consummation of the Plan, and critical to the overall success and feasibility of the Plan.  Entry into and consummation of the transactions contemplated by the New Exit Facilities Documents and the Takeback Exit Term Loan Facility Documents are in the best interests of the Debtors, the Debtors' Estates and Holders of Claims and Equity Interests and are approved in all respects.  The Debtors have exercised reasonable business judgment in determining to enter into the New Exit Facilities Documents and the Takeback Exit Term Loan Facility Documents and have provided sufficient and adequate notice of the New Exit Facilities Documents and the Takeback Exit Term Loan Facility Documents.  The Debtors or the Reorganized Debtors, as applicable, are authorized, without any further notice to or action, order or approval of this Court, to execute and deliver all agreements, documents, instruments and certificates relating thereto and to perform their obligations thereunder, including, without limitation, obligations relating to the payment or reimbursement of any fees, expenses, losses, damages, or indemnities.  The terms and conditions of the New Exit Facilities Documents and the Takeback Exit Term Loan Facility Documents have been negotiated in good faith, at arm's-length, are fair and reasonable and are approved.  The New Exit Facilities Documents and the Takeback Exit Term Loan Facility Documents shall, upon execution, be valid, binding and enforceable and shall not be in conflict with any federal or state law.

## XXIII. **Implementation of Other Necessary Documents and Agreements**

BBB.   All other documents and agreements necessary to implement the Plan, including, without limitation, those contained in the Plan Supplement, are in the best interests of the Debtors, the Reorganized Debtors and Holders of Claims and Equity Interests and have been negotiated in good faith and at arm's-length.   The Debtors have exercised reasonable business judgment in determining to enter into all such documents and agreements and have provided sufficient and adequate notice of such documents and agreements.   The terms and conditions of such documents and agreements are fair and reasonable and are approved.   The Debtors or the Reorganized Debtors, as applicable, are authorized, without any further notice to or action, order, or approval of this Court, to execute and deliver all such agreements, documents, instruments and certificates relating thereto and perform their obligations thereunder.

## XXIV. **Executory Contracts and Unexpired Leases**

CCC.        The Debtors have exercised reasonable business judgment in determining whether to assume or reject each of their Executory Contracts and Unexpired Leases as set forth in Article VI of the Plan, the Plan Supplement, this Confirmation Order or otherwise.   Each assumption or rejection of an Executory Contract or Unexpired Lease in accordance with Article VI of the Plan, the Plan Supplement, this Confirmation Order or otherwise shall be legal, valid, and binding upon the applicable Debtor and all non-Debtor counterparties to such Executory Contract or Unexpired Lease, all to the same extent as if such assumption or rejection had been authorized and effectuated pursuant to a separate order of the Court that was entered pursuant to Section 365 of the Bankruptcy Code prior to Confirmation.

## XXV.  **The Reorganized Debtors Will Not Be Insolvent or Left With Unreasonably Small Capital**

DDD. As of the occurrence of the Effective Date and after taking into account the

transactions contemplated by the Plan: (a) the present fair value of the property of the Reorganized Debtors and the cash flow generated by such assets will be not less than the amount that will be required to pay the probable liabilities on the Reorganized Debtors' then-existing debts as they become absolute and matured; and (b) the Reorganized Debtors' capital will not be unreasonably small in relation to their business or any contemplated or undertaken transaction.

## **ORDER**

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    <u>Confirmation</u>.  The Plan and Plan Supplement (as such may be amended by this Confirmation Order or in accordance with the Plan, and which amendments are hereby incorporated into and constitute a part of the Plan) and each of the provisions thereof, as may be modified by this Confirmation Order, are confirmed in each and every respect pursuant to Section 1129 of the Bankruptcy Code.  The documents contained in the Plan Supplement, and any amendments, modifications and supplements thereto, and all documents and agreements related thereto (including all exhibits and attachments thereto), and the execution, delivery and performance thereof by the Debtors or the Reorganized Debtors, as applicable, are authorized and approved.  Without any further notice to or action, order or approval of the Court, the Debtors, the Reorganized Debtors and their successors are authorized and empowered to make all modifications to all documents included as part of the Plan Supplement that are consistent with and subject to the Plan.  As set forth in the Plan, once finalized and executed, the documents comprising the Plan Supplement and all other documents contemplated by the Plan shall constitute legal, valid, binding and authorized rights and obligations of the respective parties thereto, enforceable in accordance with their terms and, to the extent applicable, shall create, as of the Effective Date, all Liens and other security interests purported to be created thereby.

US-DOCS\109671198.8

2.      <u>Disclosure Statement Approved</u>.  The Disclosure Statement (i) contains adequate information of a kind generally consistent with the disclosure requirements of all applicable non-bankruptcy law, including the Securities Act, (ii) contains "adequate information" (as such term is defined in section 1125(a)(1) and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein, and (iii) is approved in all respects.

3.      <u>Objections</u>.  Based upon the record of the Combined Hearing and the Chapter 11 Cases, any objections that have not been consensually resolved or withdrawn are overruled on the merits pursuant to this Confirmation Order.

4.      <u>Compromise of Controversies</u>.  For the reasons stated herein, the Plan constitutes a good faith, arm's-length compromise and settlement of all Claims or controversies relating to the rights that a holder of a Claim or Equity Interest, or any assignees thereof, may have with respect to any Allowed Claim or Equity Interest or any distribution to be made or obligation to be incurred pursuant to the Plan, and the entry of this Confirmation Order constitutes approval of all such compromises and settlements.

5.      <u>Binding Effect; Federal Rule of Civil Procedure 62(a)</u>.  Immediately upon the entry of this Confirmation Order: (a) this Confirmation Order and the provisions of the Plan shall be binding upon (i) the Debtors, (ii) the Reorganized Debtors, (iii) all Holders of Claims against and Equity Interests in the Debtors, whether or not Impaired under the Plan and whether or not, if Impaired, such Holders accepted the Plan, (iv) each Person acquiring property under the Plan, (v) any other party-in-interest, (vi) any Person making an appearance in these Chapter 11 Cases, and (vii) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, or

US-DOCS\109671198.8

guardians; and (b) the Debtors are authorized to consummate the Plan immediately upon entry of this Confirmation Order in accordance with the terms of the Plan.

6.    <u>Appointment of Board of Directors of Reorganized Debtors</u>.  Upon the Effective Date, the New Boards shall take office and replace the then-existing boards of directors, boards of managers or similar governing bodies of the Reorganized Debtors.  All members of such existing boards shall cease to hold office or have any authority from and after the Effective Date to the extent not expressly included in the roster of the New Boards.

7.    <u>Effectuating Documents; Further Transactions</u>.  On and after the Effective Date, the Reorganized Debtors and the officers and members of the New Boards are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan, the corporate actions and transactions contemplated under the Plan, and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations or consents except for those expressly required pursuant to the Plan or the Amended Organizational Documents.

8.    <u>Findings of Fact and Conclusions of Law</u>.  The findings of fact and the conclusions of law stated in this Confirmation Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the proceeding by Bankruptcy Rule 9014. To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

9.      Incorporation by Reference.  The terms of the Plan, the Plan Supplement and the exhibits and schedules thereto are incorporated by reference into, and are an integral part of, this Confirmation Order.  The terms of the Plan, the documents contained in the Plan Supplement, all exhibits thereto, and all other relevant and necessary documents, shall be effective and binding as of the Effective Date.

10.      Plan Classifications Controlling.  The classification of Claims and Equity Interests for purposes of distributions made under the Plan shall be governed solely by the terms of the Plan. The classifications set forth on the Ballots tendered to or returned by the creditors in connection with voting on the Plan (a) were set forth on the Ballots solely for purposes of voting to accept or reject the Plan, (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims under the Plan for distribution purposes and (c) shall not be binding on the Debtors.

11.      Cancellation of Securities and Agreements.  On the Effective Date, except as otherwise specifically provided for in the Plan or this Confirmation Order: (1) the obligations of the Debtors under the Prepetition Credit Agreement, the Prepetition Notes and any other Certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such Certificates, notes or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar

documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, Certificates, notes or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any agreement that governs the rights of the Holder of a Claim or Equity Interest shall continue in effect solely for purposes of (a) the Replacement First Lien Agent and the Indenture Trustee to make distributions to Holders as provided in the Plan and (b) permitting the Replacement First Lien Agent and the Indenture Trustee to maintain or assert any rights or charging liens it may have on distributions to the Prepetition Revolving Lenders, Prepetition Term Lenders or the Prepetition Noteholders pursuant to the terms of the Prepetition Credit Agreement or the Prepetition Notes Indenture, as applicable.  For the avoidance of doubt, (i) nothing in this paragraph shall apply to or affect or impair the New Exit Facilities Documents or the Takeback Exit Term Loan Facility Documents, which shall be in full force and effect as of and after the Effective Date, and (ii) nothing herein shall override any provision of the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No.    ] relating to the payment of fees and expenses of Professionals, including, without limitation, paragraph 40(ii) thereof.

12.    New Exit Facilities Documents.  On the Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall be authorized to execute and deliver, and to consummate the transactions contemplated by, the New Exit Facilities Documents, in form and substance

acceptable to the Required Consenting Term Lenders and the Required Consenting Noteholders (such acceptance not to be unreasonably withheld), without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the New Exit Facilities Documents or the Plan). On the Effective Date, the New Exit Facilities Documents shall constitute legal, valid, binding and authorized indebtedness and obligations of the Reorganized Debtors, enforceable in accordance with their respective terms and such indebtedness and obligations shall not be, and shall not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under the Plan, this Confirmation Order or on account of the Confirmation or Consummation of the Plan.

13.   <u>Takeback Exit Term Loan Facility Documents</u>.

a.   On the Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall be authorized to execute and deliver, and to consummate the transactions contemplated by, the Takeback Exit Term Loan Facility Documents, in form and substance acceptable to the Required Consenting Term Lenders and the Required Consenting Noteholders (such acceptance not to be unreasonably withheld), without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the Takeback Exit Term Loan Facility Documents or the Plan).  On the Effective Date, the Takeback Exit Term Loan Facility Documents shall constitute legal, valid, binding and authorized indebtedness and obligations of the Reorganized Debtors, enforceable in accordance with their respective terms and such indebtedness and obligations shall not be, and shall not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under the Plan, this Confirmation Order or on account of the Confirmation or Consummation of the Plan.

US-DOCS\109671198.8

b.      On and as of the Effective Date, subject to the consent rights set forth in the Plan, all Holders of Prepetition Term Loans as of the Effective Date (after giving effect to the Effective Date Pay Down and the exchange of the Contributed Term Loans for the Equity Commitment Shares) shall be deemed to be parties to, and bound by, the Takeback Exit Term Loan Facility Credit Agreement, without the need for execution thereof by any such applicable Holder of Prepetition Term Loans.  Each Prepetition Term Lender is deemed to have instructed and directed the Replacement First Lien Agent and the Takeback Exit Term Loan Facility Agent (as applicable), to (i) act as Disbursing Agent to the extent required by the Plan, (ii) execute and deliver the Takeback Exit Term Loan Facility Documents (each to the extent it is a party thereto), as well as to execute, deliver, file, record, and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, to which the Takeback Exit Term Loan Facility Agent is a party and to promptly consummate the transactions contemplated thereby, and (iii) take any other actions required or contemplated to be taken by the Takeback Exit Term Loan Facility Agent and/or the Replacement First Lien Agent (as applicable) under the Plan, including, without limitation, with respect to the Contributed Term Loans and the Effective Date Pay Down.

14.      Issuance of New Common Stock.  On the Effective Date, Reorganized Monitronics shall issue or reserve for issuance all of the New Common Stock issuable in accordance with the terms of the Plan.  The issuance of the New Common Stock by Reorganized Monitronics for distribution pursuant to the Plan is authorized without the need for further corporate action and all of the shares of New Common Stock issued or issuable pursuant to the Plan shall be duly authorized, validly issued, fully paid, and nonassessable.

15.     <u>Notes Shares</u>   On the Effective Date, the Notes Shares shall be issued by Reorganized Monitronics to the Cash Opt Out Noteholders pursuant to and in accordance with the terms of the Plan.

16.     <u>Rights Offering Shares</u>.  On the Effective Date, the Rights Offering Shares shall be issued by Reorganized Monitronics to the Rights Offering Participants pursuant to and in accordance with the Rights Offering Procedures.

17.     <u>Backstop Commitment Shares; Equity Commitment Shares</u>.  On the Effective Date, (a) the Backstop Commitment Shares shall be issued by Reorganized Monitronics to the Backstop Commitment Parties, and (b) the Equity Commitment Shares shall be issued by Reorganized Monitronics to the Equity Commitment Parties, in each case, pursuant to and in accordance with the Plan and the Put Option Agreement.

18.     <u>Put Option Premium</u>.  On the Effective Date, New Common Stock in an amount equal to the Put Option Premium shall be issued by Reorganized Monitronics to the Commitment Parties pursuant to and in accordance with the Put Option Agreement.

19.     <u>Merger</u>.  The Merger is authorized without the need, other than approval by Ascent Shareholders, for further corporate action by the stockholders or board of directors of Monitronics or otherwise.  The Ascent Shares and/or Ascent Default Shares, as applicable, shall be issued by Reorganized Monitronics to the Ascent Shareholders or the Commitment Parties, as applicable, pursuant to and in accordance with the terms of the Plan, the Merger Agreement, the Restructuring Support Agreement and the Put Option Agreement, as applicable.

20.     <u>Retained Assets</u>.  To the extent that the succession to assets of the Debtors by the Reorganized Debtors pursuant to the Plan are deemed to constitute "transfers" of property, such transfers of property to the Reorganized Debtors (a) are or shall be legal, valid, and effective

transfers of property, (b) vest or shall vest the Reorganized Debtors with good title to such property, free and clear of all liens, charges, Claims, encumbrances, or interests of creditors, except as expressly provided in the Plan or this Confirmation Order (including, without limitation, as to the liens and security interests granted in connection with the New Exit Facilities Documents and the Takeback Exit Term Loan Facility Documents), (c) do not and shall not constitute avoidable transfers under the Bankruptcy Code or under applicable nonbankruptcy law, and (d) do not and shall not subject the Reorganized Debtors to any liability by reason of such transfer under the Bankruptcy Code or under applicable nonbankruptcy law, including, without limitation, any laws affecting successor or transferee liability.

21.    Automatic Stay.  Unless otherwise provided in the Plan, all injunctions or stays provided for in the Chapter 11 Cases under Sections 105 and 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date, and at that time shall be dissolved and of no further force or effect, subject to the injunction set forth in Article X of the Plan and/or Sections 524 and 1141 of the Bankruptcy Code. Upon the Effective Date, the injunction provided in Article X of the Plan shall apply. Notwithstanding anything to the contrary in this paragraph, nothing herein shall bar the filing of financing documents (including Uniform Commercial Code financing statements, security agreements, leases, mortgages, trust agreements and bills of sale) or the taking of such other actions as are necessary or appropriate to effectuate the transactions specifically contemplated by the Plan or by this Confirmation Order prior to the Effective Date.

22.    Change of Control Provisions.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including, without limitation, any "change of control" or "anti-assignment" provision) restricts or prevents, or purports to restrict or

prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease, exercise any other default-related rights with respect thereto, impose any penalty or other fees or payments, accelerate or increase obligations under such Assumed Contract, condition renewal or extension, or claim entitlement to any payment in connection therewith.  For the avoidance of doubt, any Executory Contract or Unexpired Lease assumed pursuant to the Plan or otherwise may not be terminated on account of such assumption or on account of the Plan, the transactions contemplated therein, or any change of control or ownership interest composition that may occur at any time before or on the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to Article VI of the Plan shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of this Court authorizing and providing for its assumption, or applicable law.

23.    <u>Assumption of the Indemnification Obligations, Designated Compensation Arrangements, D&O Liability Insurance Policies and Fiduciary Liability Insurance Policies</u>.  The Debtors, and upon the Effective Date, the Reorganized Debtors, shall assume all of the Indemnification Obligations in place on or before the Effective Date for Indemnified Parties for Claims related to or arising out of any actions, omissions or transactions occurring before the Effective Date pursuant to Section 365(a) of the Bankruptcy Code. On the Effective Date, and subject to any additions, deletions, and/or modifications as may be made by the Debtors with the consent of the Required Consenting Noteholders and the Requisite Commitment Parties, the applicable Debtor party to the Designated Compensation Arrangements shall assume such

Designated Compensation Arrangements pursuant to Section 365(a) of the Bankruptcy Code (or Ascent shall assign such Designated Compensation Arrangements to Reorganized Monitronics, as applicable). The Debtors, and upon the Effective Date, the Reorganized Debtors, shall assume all of the D&O Liability Insurance Policies (or Ascent shall assign such D&O Liability Insurance Policies to Reorganized Monitronics, as applicable) pursuant to Section 365(a) of the Bankruptcy Code. Unless previously effectuated by separate order entered by the Court, entry of this Confirmation Order shall constitute the Court's approval of the Debtors' foregoing assumption of each of the Indemnification Obligations, the Designated Compensation Arrangements, the D&O Liability Insurance Policies and the fiduciary liability insurance policies. Entry of this Confirmation Order shall further constitute authorization for the Debtors to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secure for the insureds the benefits of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations of the Debtors or Reorganized Debtors assumed by the foregoing assumption of the Indemnification Obligations, the Designated Compensation Arrangements, the D&O Liability Insurance Policies and the fiduciary liability insurance policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors hereunder. Notwithstanding anything to the contrary contained herein, confirmation of the Plan shall not impair or otherwise modify any rights of the Reorganized Debtors under the Indemnification Obligations, the Designated Compensation Arrangements, the D&O Liability Insurance Policies and the fiduciary liability insurance policies. After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any

D&O Liability Insurance Policies (including any "tail policy"), and all officers, directors, members and partners of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such officers, directors, members or partners remain in such positions after the Effective Date.  Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Debtors' obligations under the Put Option Agreement, including their indemnification obligations to the Commitment Parties, shall remain unaffected and shall remain in full force and effect following the Effective Date and any such obligations, including such indemnification obligations, shall not be discharged under the Plan.

24.    <u>Assumption of Executory Contracts and Unexpired Leases</u>.  Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan and the Plan Supplement, as of the Effective Date, each Debtor shall be deemed to have assumed each Executory Contract or Unexpired Lease to which it is a party, unless such contract or lease: (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of another motion to reject Filed on or before the Confirmation Date; or (4) is set forth in the Schedule of Rejected Executory Contracts and Unexpired Leases; <u>provided</u> that the Restructuring Support Agreement and the Information Sharing Agreement shall be deemed assumed as of the Confirmation Date.  Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting assignment, the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before or on the date that the Debtors

assume such Executory Contract or Unexpired Lease. For the avoidance of doubt, any Executory Contract or Unexpired Lease assumed pursuant to the Plan or otherwise may not be terminated on account of such assumption or on account of the Plan, the transactions contemplated therein, or any change of control or ownership interest composition that may occur at any time before or on the Effective Date.  The Reorganized Debtors may rely on the Plan and this Confirmation Order as a complete defense to any action by a party to an assumed Executory Contract or Unexpired Lease to terminate such Executory Contract or Unexpired Lease on account of such assumption or on account of the Plan, the transactions contemplated therein, or any change of control or ownership interest composition that may occur at any time before or on the Effective Date.  This Confirmation Order shall constitute an order of this Court approving such assumptions pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Notwithstanding the foregoing, before the Effective Date, the Debtors, with the reasonable consent of the Required Consenting Noteholders, the Required Consenting Term Lenders, and the Requisite Commitment Parties and, after the Effective Date, the Reorganized Debtors, shall have the right to amend the Schedule of Rejected Executory Contracts and Unexpired Leases.

25.     <u>Claims for Rejection Damages</u>.  All Claims arising from the rejection (if any) of Executory Contracts or Unexpired Leases must be Filed with the clerk of this Court and served upon counsel for the Reorganized Debtors within thirty (30) days after the date of entry of an order of this Court (including this Confirmation Order) approving the rejection of such Executory Contract or Unexpired Lease.  Any Claim arising from the rejection of Executory Contracts or Unexpired Leases that becomes an Allowed Claim is classified and shall be treated as a Class 5 General Unsecured Claim.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within the time required by Article VI.G of the Plan will be forever

barred from assertion against the Debtors, the Reorganized Debtors, the Estates or the property of the Debtors or the Reorganized Debtors.

26.  <u>Postpetition Contracts</u>.  Contracts and leases entered into after the Petition Date by any Debtor, including, without limitation, any Executory Contract or Unexpired Lease assumed by a Debtor pursuant to the Plan, may be performed by the applicable Debtor or Reorganized Debtor in the ordinary course of business without further approval of this Court.  Such contracts and leases (including any Executory Contract or Unexpired Lease assumed pursuant to the Plan) shall survive and remain unaffected by entry of this Confirmation Order or the occurrence of the Effective Date.

27.  <u>Professional Compensation</u>.  Each Professional asserting a Fee Claim for services rendered before the Effective Date must File an application for final Allowance of such Fee Claim no later than forty-five (45) days after the Effective Date.  Objections to any Fee Claim must be Filed and served on the Reorganized Debtors and the requesting Professional no later than twenty (20) days after such application for Allowance of such Fee Claim is Filed with the Court.  Each Holder of an Allowed Fee Claim shall be paid in full in Cash, including from funds held in the Professional Fee Claims Reserve, within five (5) Business Days after entry of a Final Order of the Court approving such Allowed Fee Claim.  Notwithstanding anything to the contrary contained in the Plan, the failure of the Professional Fee Claims Reserve to satisfy in full the Fee Claims shall not, in any way, operate or be construed as a cap or limitation on the amount of Fee Claims due and payable by the Reorganized Debtors, as the amounts in the Professional Fee Claims Reserve are solely estimates.

28.  <u>Ordinary Course Professionals</u>.  On and after the Confirmation Date, the Debtors or the Reorganized Debtors, as applicable, are authorized to pay any accrued amounts owed to

40

ordinary course professionals that are not Professionals retained pursuant to an order of the Court or for which compensation and reimbursement has been Allowed by the Court pursuant to section 503(b)(4) of the Bankruptcy Code.

29.    Settlement Payments.   On and after the Confirmation Date, the Debtors are authorized to enter into settlement agreements with respect to Claims or Causes of Action asserted against the Debtors or their Estates and to pay any amounts due and owing thereunder.

30.    Post-Emergence Incentive Plan. The Reorganized Monitronics Board shall adopt, as of the Effective Date, the Post-Emergence Incentive Plan.  The details regarding the Post-Emergence Incentive Plan and the awards (and terms and conditions thereof) under the Post-Emergence Incentive Plan to certain officers, board members, and other members of management shall be determined by the Reorganized Monitronics Board, but shall in all respects be consistent with the terms of the Plan and the Restructuring Support Agreement.

31.    Employee Benefits. On and after the Effective Date (and subject to any additions, deletions, and/or modifications as may be adopted by the Debtors or the Reorganized Debtors, with the consent of the Required Consenting Noteholders and the Requisite Commitment Parties), the Reorganized Debtors shall honor, in the ordinary course of business, the Designated Compensation Arrangements; provided, however, that the Debtors' or Reorganized Debtors' performance of any employment agreement will not entitle any person to any benefit or alleged entitlement under any contract, agreement, arrangement, policy, program or plan that has expired or been terminated or cancelled before the Effective Date, or restore, reinstate or revive any such benefit or alleged entitlement under any such contract, agreement, arrangement, policy, program or plan. Nothing in the Plan or this Confirmation Order shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action or other rights with respect to any such

contracts, agreements, arrangements, policies, programs and plans. For the avoidance of doubt, all equity or equity-based awards granted under any Compensation Arrangement shall be treated in the manner set forth in the Existing Compensation Arrangements Term Sheet attached to the Plan as Plan Schedule 3.

32.    <u>Information Sharing Agreement</u>.  On and after the Confirmation Date, the Debtors are authorized and directed to perform under the Information Sharing Agreement without further approval of this Court.

33.    <u>Plan Distributions</u>.  On and after the Effective Date, distributions on account of Allowed Claims and Allowed Equity Interests, if any, and the resolution and treatment of Disputed Claims or Equity Interests shall be effectuated pursuant to Article VII of the Plan.

34.    <u>Operation as of the Effective Date</u>.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Equity Interests or Causes of Action without supervision or approval by this Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

35.    <u>Discharge of Debtors</u>.  Pursuant to Section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Equity Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Equity Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of

such Claims and Equity Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Claim or Equity Interest based upon such Claim, debt, right or Equity Interest is Allowed pursuant to Section 502 of the Bankruptcy Code; or (2) the Holder of such a Claim or Equity Interest has accepted the Plan.  Except as otherwise provided in the Plan, any default by the Debtors or their Affiliates with respect to any Claim or Equity Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  This Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

36.     Filing and Recording.  This Confirmation Order (a) is and shall be effective as a determination that, except as otherwise provided in the Plan or this Confirmation Order, or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan (including, without limitation, the New Exit Facilities Documents and the Takeback Exit Term Loan Facility Documents), on the Effective Date, all Claims existing prior to such date have been unconditionally released, discharged, and terminated and (b) is and shall be binding upon and shall govern the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument.  Each and every federal, state, and local government agency

is hereby directed to accept any and all documents and instruments necessary, useful, or appropriate (including Uniform Commercial Code financing statements) to effectuate, implement, and consummate the transactions contemplated by the Plan and this Confirmation Order (including, without limitation, the New Exit Facilities Documents and the Takeback Exit Term Loan Facility Documents) without payment of any stamp or similar tax or governmental assessment imposed by state or local law.

37.     _Payment of Statutory Fees and Compliance with Reporting Requirements_. All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by this Court at a hearing pursuant to Section 1128 of the Bankruptcy Code to the extent necessary, shall be paid by each of the Debtors or the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Debtors or Reorganized Debtors), as applicable, for each quarter (including any fraction thereof) until the earliest to occur of the entry of (a)  a final decree closing such Debtor's Chapter 11 Case, (b) an order dismissing such Debtor's Chapter 11 Case, or (c) an order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

38.     _Releases by the Debtors_.  As provided for in Article X.B of the Plan, pursuant to Section 1123(b) of the Bankruptcy Code, the Debtor Releases in the Plan are approved and authorized.

39.     _Third-Party Releases_.  As provided for in Article X of the Plan, the releases of the Released Parties (including Third-Party Releases) set forth in Article X.C of the Plan are approved, authorized and shall be effective as of the Effective Date without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and this Confirmation Order hereby permanently enjoins the commencement or prosecution by any Person or Entity, whether directly, derivatively or

44

otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to the Third-Party Releases set forth in the Plan. The releases set forth in Article X.C were made for substantial consideration.

40. <u>Exculpation</u>. The exculpations set forth in Article X.D of the Plan are hereby approved and authorized; provided that such exculpations shall apply to each Exculpated Party solely in its capacity as a fiduciary of the Debtors or the Debtors' estates.

41. <u>Injunction</u>. **As contemplated in Article X.F of the Plan, except as otherwise expressly provided in the Plan or this Confirmation Order, or on account of obligations issued or created pursuant to the Plan, from and after the Effective Date, all persons and entities are permanently enjoined from (i) commencing or continuing, in any manner or in any place, any suit, action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind; (iv) asserting a setoff or right of subrogation or recoupment of any kind; or (v) commencing or continuing in any manner any action or other proceeding of any kind, in each case on account of or with respect to any Claim, demand, liability, obligation, debt, right, Cause of Action, Equity Interest, or remedy released or to be released, exculpated or to be exculpated, settled or to be settled or discharged or to be discharged pursuant to the Plan or this Confirmation Order against any person or Entity so released, discharged, or exculpated (or the property or estate of any person or Entity so released, discharged, or exculpated). All injunctions or stays provided for in the Chapter 11 Cases under Section 105 or Section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date**.

US-DOCS\109671198.8

42.   <u>Exemption from Securities Laws</u>.  The offering, issuance, and distribution of the Notes Shares shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration before the offering, issuance, distribution or sale of securities pursuant to Section 1145(a) of the Bankruptcy Code. The offering and issuance of the Rights and the Rights Offering Shares shall be exempt from the registration requirements of section 5 of the Securities Act pursuant, in part, to Section 1145(a) of the Bankruptcy Code and to the extent necessary, in part, to Section 4(a)(2), Regulation D and/or Regulation S, as set forth in the Rights Offering Solicitation Materials, and the Rights and Rights Offering Shares issued pursuant to Section 1145(a) of the Bankruptcy Code shall also be exempt from any other applicable law requiring registration before the offering or issuance thereof.  The Equity Commitment Shares shall be issued in reliance upon the exemption from registration under the Securities Act and any other applicable law requiring registration before the offering, issuance, distribution or sale of securities pursuant to Section 1145(a) of the Bankruptcy Code.  The Backstop Commitment Shares and the Put Option Premium Shares shall be issued in reliance upon the exemption from registration under the Securities Act set forth in Section 4(a)(2), Regulation D and/or Regulation S.  The Notes Shares, the Equity Commitment Shares and Rights Offering Shares issued pursuant to Section 1145 of the Bankruptcy Code shall be freely transferable by the recipients thereof, subject to any limitations that may be applicable to any Person receiving such securities that is an "affiliate" of Reorganized Monitronics as determined in accordance with applicable U.S. securities law and regulations or is otherwise an "underwriter" as defined in Section 1145(b) of the Bankruptcy Code. Any shares of New Common Stock issued pursuant to Section 4(a)(2), Regulation D and/or Regulation S shall be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to

registration (or an applicable exemption from such registration requirements) under the Securities Act and other applicable law. The offering and issuance of New Common Stock in the Ascent Share Distribution (if applicable) shall be registered under the Securities Act pursuant to the Form S-4 Registration Statement.

43.     <u>Stock Transfer Agent</u>.  Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of shares of New Common Stock through the facilities of The Depositary Trust Company ("**<u>DTC</u>**") or any stock transfer agent, the Reorganized Debtors need not provide any further evidence other than the Plan or this Confirmation Order with respect to the treatment of such securities under applicable securities laws.  DTC or any such stock transfer agent shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether such securities are exempt from registration and/or eligible for DTC or such stock transfer agent's book-entry delivery, settlement, and depository services.

44.     <u>Exemption from Taxation</u>.  Pursuant to Section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer or exchange of any debt, Equity Security or other Equity Interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment or recording of any lease or sublease; or (4) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instruments of transfer executed in connection with any transaction arising out of, contemplated by or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or

similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents are directed to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

45.     <u>Continued Corporate Existence</u>.  Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state law).  Notwithstanding the foregoing, Reorganized Monitronics shall be redomiciled as a Delaware corporation, pursuant to a statutory conversion or otherwise, on the Effective Date (or prior to the Plan Effective Date if mutually agreed by the Debtors and the Requisite Commitment Parties) prior to the issuance of the New Common Stock.

46.     <u>Effectiveness of All Actions</u>.  All actions authorized to be taken pursuant to the Plan shall be effective on, prior to or after the Effective Date pursuant to this Confirmation Order, without further application to, or order of the Court, or further action by the respective officers, directors, members or stockholders of the Debtors or Reorganized Debtors and with the effect that

such actions had been taken by unanimous action of such officers, directors, members or stockholders.

47.    <u>Approval of Consents and Authorization To Take Acts Necessary To Implement Plan</u>.  Pursuant to Section 1142(b) of the Bankruptcy Code, section 303 of the Delaware General Corporation Law, and any comparable provision of the business corporation laws of any other state, the Debtors, the Reorganized Debtors and the officers and members of the boards of directors, boards of managers or similar governing bodies thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Debtors or the Reorganized Debtors, whether or not such action is specifically contemplated by the Plan or this Confirmation Order, without the need for any approvals, authorizations or consents except for those expressly required pursuant to the Plan or the Amended Organizational Documents, and the obligations thereunder shall constitute legal, valid, binding and authorized obligations of each of the respective parties thereto, enforceable in accordance with their terms.

No further approval by the Court shall be required for any action, transaction, or agreement that the management of the Debtors determines is necessary or appropriate to implement and effectuate or consummate the Plan, whether or not such action, transaction, or agreement is specifically contemplated in the Plan or this Confirmation Order.  This Confirmation Order shall further constitute all approvals, consents, and directions required for the Reorganized Debtors to act consistent with the Plan and the laws, rules, and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and any

documents, instruments, or agreements, and any other acts and transactions referred to in or contemplated by the Plan.

Unless specifically directed by this Confirmation Order or the Plan, no further action of the Debtors or the Reorganized Debtors shall be necessary to perform any act to comply with, implement, and effectuate the Plan.  The approvals and authorizations specifically set forth in this Confirmation Order are nonexclusive and are not intended to limit the authority of the Debtors or the Reorganized Debtors to take any and all actions necessary or appropriate to implement, effectuate, and consummate any and all documents or transactions contemplated by the Plan or this Confirmation Order, including authorizing the issuance of all consideration to be issued under the Plan, and authorizing entry into all agreements necessary to effectuate the Plan.

48.     <u>Applicable Non-Bankruptcy Law</u>.  The provisions of this Confirmation Order, the Plan, and all related documents (including, without limitation, the New Exit Facilities Credit Agreement, the Takeback Exit Term Loan Facility Credit Agreement, the Put Option Agreement and the Merger Agreement), and any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law, rule, or regulation of any state, federal, or other governmental authority.

49.     <u>Governmental Approvals Not Required</u>.  This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state, federal, or other governmental authority with respect to the implementation or consummation of the Plan, any certifications, documents, instruments or agreements (including, without limitation, any mortgages or other collateral documents related to the New Exit Facilities Documents and the Takeback Exit Term Loan Facility Documents), and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan.

50.   <u>Confirmation Order Supersedes</u>.  It is hereby ordered that this Confirmation Order shall supersede any Court orders issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.

51.   <u>Notice of Entry of Confirmation Order</u>.  Pursuant to Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c), the Reorganized Debtors shall promptly after entry of this Confirmation Order file notice of entry of this Confirmation Order in substantially the form annexed hereto as **Exhibit B** (the "**Notice of Confirmation**"), and shall cause the Notice of Confirmation to be served on the parties on whom the Combined Notice was served within ten (10) Business Days after the date of entry of this Confirmation Order or as soon as reasonably practicable thereafter. Such notice is adequate under the particular circumstances and no other or further notice is necessary.  The form of Notice of Confirmation substantially in the form annexed hereto as **Exhibit B** is approved.

52.   <u>Notice of Effective Date</u>.  Pursuant to Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c), the Reorganized Debtors shall promptly after the occurrence of the Effective Date file notice of the Effective Date in substantially the form annexed hereto as **Exhibit C** (the "**Notice of Effective Date**"), and shall cause the Notice of Effective Date to be served on the parties on whom the Combined Notice was served within ten (10) Business Days after the Effective Date or as soon as reasonably practicable thereafter.  Such notice is adequate under the particular circumstances and no other or further notice is necessary.  The form of Notice of Effective Date substantially in the form annexed hereto as **Exhibit C** is approved.

53.   <u>Substantial Consummation</u>.  On the Effective Date, the Plan shall be deemed to be substantially consummated under Sections 1101(2) and 1127(b) of the Bankruptcy Code.

54.     <u>Failure To Consummate Plan</u>.  The Plan shall not become effective unless and until the conditions set forth in Article IX.B of the Plan have been satisfied or waived pursuant to Article IX.C of the Plan.  If the Effective Date does not occur, then: (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; (c) no distributions will be made; and (d) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims, Equity Interests, or Causes of Action, (ii) prejudice in any manner the rights of the Debtors or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

55.     <u>Modification of Plan</u>.  Without need for further order or authorization of the Court, the Debtors or the Reorganized Debtors, subject to the consents required by the Plan, are authorized and empowered to make any and all modifications to any and all documents included as part of the Plan Supplement, and any other documents that are necessary to effectuate the Plan, that are consistent with the Plan.  Subject to the limitations and rights contained in the Plan, after the entry of this Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may amend or modify the Plan in accordance with Section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  A Holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of such Claim or Interest of such Holder.

US-DOCS\109671198.8

56.     <u>References to Plan Provisions</u>.  The failure to include or reference any particular provision of the Plan or Plan Supplement in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan be confirmed in its entirety and such provisions shall have the same binding effect, enforceability, and legality as every other provision of the Plan.  Each term and provision of the Plan, as it may have been altered or interpreted by the Court, is valid and enforceable pursuant to its terms.

57.     <u>Waiver of Filings</u>.  Any requirement under section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with the Court or the U.S. Trustee (except for monthly operating reports or any other post-confirmation reporting obligation to the U.S. Trustee) is hereby waived.

58.     <u>Waiver of Section 341 Meeting</u>.  Any requirement under section 341(e) for the U.S. Trustee to convene a meeting of creditors or equity holders is waived as of the Confirmation Date.

59.     <u>Governmental Agencies</u>.   Nothing in the Plan or this Confirmation Order is intended to affect the police or regulatory activities of governmental agencies.

60.     <u>Replacement First Lien Agent</u>.  Article I.A.155 of the Plan shall be amended and restated (additions shown in underline and bold) as follows:

> "*Prepetition First Lien Agent Fees and Expenses*" means all reasonable and documented fees and out-of-pocket expenses of the Prepetition First Lien Agent, including the reasonable and documented fees and out-of-pocket expenses of **Arnold & Porter Kaye Scholer LLP,** Morgan, Lewis & Bockius LLP, Winstead PC, and Getzler Henrich & Associates LLC.

Article I.A.191 of the Plan shall be amended and restated (additions shown in underline and bold; deletions shown in strike-through and bold) as follows:

> "*Replacement First Lien Agent*" means ~~**a third party designated by the Prepetition Term Lenders, and reasonably acceptable to the Debtors, in either case, to act**~~ **Cortland Capital Market Services LLC,** as replacement and successor administrative agent under the Prepetition Credit Agreement.

61.     <u>Texas Comptroller of Public Accounts</u>.  Notwithstanding any term in the Plan or this Confirmation Order to the contrary: (i) the Texas Comptroller of Public Accounts' (the "**Comptroller**") setoff rights are preserved under section 553 of the Bankruptcy Code; any and all tax liabilities owed by Debtors to the Comptroller, including those resulting from audits, shall be determined, resolved, and paid when due under and in accordance with the laws of the State of Texas; (iii) all matters involving Debtors' liabilities to the Comptroller shall be resolved in accordance with the processes and procedures provided by Texas law, including prosecution in Texas state courts; (iv) Debtors shall not request relief from this bankruptcy court with regard to any matters involving Debtors' liabilities to the Comptroller; and (v) the bankruptcy shall have no effect on the Comptroller's rights as to non-Debtor third parties.

62.     <u>Northstar Alarm Services, LLC</u>.  Monitronics and Northstar Alarm Services, LLC ("**Northstar**") are parties to the following prepetition agreements: (i) that certain *Alarm Monitoring Purchase Agreement*, dated January 7, 2015 (the "**AMPA**"); and (ii) that certain *Agreement*, by and between Security Networks, LLC and Monitronics, on the one hand, and Northstar, on the other, dated January 7, 2015 (the "**Settlement Agreement**" and, together with the AMPA, the "**Northstar Agreements**").  As a result of certain disputes arising under the Northstar Agreements, Monitronics commenced civil litigation in New York County Supreme Court styled *Monitronics International, Inc. v. NorthStar Alarm Services, LLC*, Case No. 654792/2017 (the "**State Court Litigation**").  The State Court Litigation remained pending on the Petition Date and is currently stayed pursuant to Section 362 of the Bankruptcy Code.

Northstar has asserted certain informal objections to the Cure Notice, including with respect to the nature of the Northstar Agreements, the assumption of the Northstar Agreements, and the proposed cure amount set forth in the Cure Notice.

Both Monitronics and Northstar have agreed that the parties' disputes should be resolved through the State Court Litigation rather than in these Chapter 11 Cases. Accordingly, notwithstanding the Cure Notice, any provision of the Solicitation Order or the Plan to the contrary, or any other provision in this Confirmation Order, all Claims, Causes of Action, rights, or remedies of the Debtors and/or Northstar related to the Northstar Agreements, whether arising under contract, at law, in equity, or otherwise, and whether previously asserted in the State Court Litigation or not, are expressly preserved, and none of the Cure Notice, the Plan, this Confirmation Order, nor any other order of this Court shall be construed as limiting or expanding the relief, remedies, or recovery available to either party in the State Court Litigation.

For the avoidance of doubt, upon the occurrence of the Effective Date, the automatic stay pursuant to Section 362 of the Bankruptcy Code shall no longer apply with respect to the State Court Litigation.

63.     _Further Assurances_.  The Debtors or the Reorganized Debtors, as applicable, shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or this Confirmation Order.

64.     _Conflicts Between Confirmation Order and Plan_.  The provisions of the Plan and of this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; _provided_, _however_, that if there is determined to be any inconsistency between any Plan provision and any provision of this Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of this Confirmation Order shall govern and any such provision of this Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

US-DOCS\109671198.8

65.     <u>Nonseverability of Plan Provisions Upon Confirmation</u>.  Each provision of the Plan is:  (a) valid and enforceable in accordance with its terms; (b) integral to the Plan and may not be deleted or modified except as provided for in the Plan or this Confirmation Order; and (c) nonseverable and mutually dependent. The provisions of this Confirmation Order and the provisions of the Plan are hereby deemed mutually nonseverable and mutually dependent.

66.     <u>Final Order</u>.  This Confirmation Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.  Notwithstanding Bankruptcy Rules 7062 or 3020(e), this Confirmation Order shall be effective and enforceable immediately upon its entry.

67.     <u>Integration of Plan and Confirmation Order Provisions</u>.  The provisions of the Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth herein, are integrated with each other and are nonseverable and mutually dependent.

68.     <u>Effectiveness of Order</u>.  This Confirmation Order is and shall be deemed to be a separate order with respect to each Debtor for all purposes.

69.     <u>Retention of Jurisdiction</u>.  To the fullest extent permitted by applicable law, and notwithstanding the entry of this Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain exclusive jurisdiction over all matters arising in, arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to Sections 105(a) and 1142 of the Bankruptcy Code.

70.     <u>Reversal</u>.  If any or all of the provisions of this Confirmation Order are hereafter reversed, modified or vacated by subsequent order of this Court or any other court, such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Debtors' receipt of written notice of any such

order.  Notwithstanding any such reversal, modification or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Confirmation Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Confirmation Order and the Plan and any amendments or modifications thereto.

**Signed:  August 07, 2019**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

US-DOCS\109671198.8

**<u>EXHIBIT A</u>**

**Plan**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

```
------------------------------------------------------------- x
                                                              :   Chapter 11
In re:                                                        :
                                                              :   Case No. 19-        (      )
MONITRONICS INTERNATIONAL, INC., et al.,                      :
                                                              :   Joint Administration Requested
        Debtors.¹                                             :
                                                              :
------------------------------------------------------------- x
```

**JOINT PARTIAL PREPACKAGED PLAN OF REORGANIZATION OF MONITRONICS**
**INTERNATIONAL, INC. AND ITS DEBTOR AFFILIATES**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

| LATHAM & WATKINS LLP | HUNTON ANDREWS KURTH LLP |
|---|---|
| David A. Hammerman | Timothy A. ("Tad") Davidson II |
| Annemarie V. Reilly | Ashley L. Harper |
| Jeffrey T. Mispagel | 600 Travis Street, Suite 4200 |
| 885 Third Avenue | Houston, TX 77002 |
| New York, New York 10022 | Telephone: (713) 220-4200 |
| Telephone: (212) 906-1200 | Facsimile: (713) 220-4285 |
| Facsimile (212) 751-4864 | |

Dated: June 3, 2019

---

¹ The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Monitronics International, Inc. (9343), Security Networks LLC (8893), MIBU Servicer Inc. (5978), LiveWatch Security, LLC (3274), Platinum Security Solutions, Inc. (3850), Monitronics Canada, Inc. (9545), MI Servicer LP, LLC (N/A), Monitronics Security LP (6524), and Monitronics Funding LP (6754).  The location of the Debtors' corporate headquarters and the Debtors' service address is:  1990 Wittington Place, Farmers Branch, Texas 75234.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND
GOVERNING LAW ...................................................................................................................1

    A.     Defined Terms ...............................................................................................................1
    B.     Rules of Interpretation ................................................................................................20
    C.     Computation of Time ..................................................................................................20
    D.     Governing Law ...........................................................................................................20
    E.     Reference to Monetary Figures ..................................................................................20
    F.     Reference to the Debtors or the Reorganized Debtors ..............................................21

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY  CLAIMS .................21

    A.     Administrative Claims ................................................................................................21
    B.     DIP Facility Claims ....................................................................................................22
    C.     Priority Tax Claims ....................................................................................................22
    D.     Other Priority Claims .................................................................................................22
    E.     Statutory Fees .............................................................................................................23

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS ...................23

    A.     Introduction.................................................................................................................23
    B.     Summary of Classification .........................................................................................23
    C.     Treatment of Claims and Equity Interests..................................................................24
    D.     Special Provision Governing Unimpaired Claims ......................................................27
    E.     Discharge of Claims ...................................................................................................27

ARTICLE IV. ACCEPTANCE REQUIREMENTS ...........................................................................27

    A.     Acceptance or Rejection of this Plan ..........................................................................28
    B.     Confirmation of This Plan Pursuant to Sections 1129(a)(10) and 1129(b) of the
             Bankruptcy Code ........................................................................................................28
    C.     Controversy Concerning Impairment..........................................................................28

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ........................................................28

    A.     Transactions Effective as of the Effective Date .........................................................28
    B.     Merger and Non-Ascent Restructuring Toggle ..........................................................28
    C.     Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors ...........29
    D.     New Exit Facilities Documents ..................................................................................29
    E.     Takeback Exit Term Loan Facility Documents .........................................................29
    F.     Rights Offering ...........................................................................................................30
    G.     Backstop Commitments, Equity Commitments, and Put Option Premium...................30
    H.     Issuance of New Common Stock ................................................................................30
    I.     Registration Rights Agreement ..................................................................................30
    J.     Listing and Registration of New Common Stock .......................................................30
    K.     Cancellation of Securities and Agreements ...............................................................31
    L.     Securities Act Registration and Section 1145 and Private Placement Exemptions.........31
    M.    Corporate Action ........................................................................................................32
    N.     Corporate Existence ...................................................................................................32
    O.     Amended Organizational Documents .........................................................................32
    P.     Vesting of Assets in the Reorganized Debtors ...........................................................33
    Q.     Directors and Officers of the Debtors and the Reorganized Debtors .........................33
    R.     Post-Emergence Incentive Plan..................................................................................33

S.      Effectuating Documents; Further Transactions..................................................................33
T.      Exemption from Certain Taxes and Fees ..........................................................................33
U.      Employee Benefits ............................................................................................................34
V.      Preservation of Causes of Action .....................................................................................34
W.      Professional Fee Claims Reserve .....................................................................................34
X.      Information Sharing Agreement ........................................................................................35

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES............................35

A.      Assumption of Executory Contracts and Unexpired Leases .............................................35
B.      Assumption of Indemnification Obligations .....................................................................36
C.      Assumption of Designated Compensation Arrangements..................................................36
D.      Assumption of the D&O Liability Insurance Policies and Fiduciary Liability Insurance
        Policies..............................................................................................................................36
E.      Payments Related to Assumption of Executory Contracts and Unexpired Leases............36
F.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases...........36
G.      Rejection Damages Claims ...............................................................................................36
H.      Contracts and Leases Entered Into After the Petition Date ..............................................37
I.      Intercompany Contracts and Leases..................................................................................37
J.      Modifications, Amendments, Supplements, Restatements or Other Agreements.............37
K.      Reservation of Rights........................................................................................................37
L.      Nonoccurrence of Effective Date .....................................................................................37

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS.................................................................38

A.      Timing and Calculation of Amounts To Be Distributed; Entitlement to Distributions..................38
B.      Disbursing Agent ..............................................................................................................38
C.      Rights and Powers of Disbursing Agent ...........................................................................39
D.      Distributions on Account of Claims or Equity Interests Allowed After the Effective Date...........39
E.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.......................40
F.      Compliance with Tax Requirements/Allocations..............................................................41
G.      Surrender of Canceled Instruments or Securities .............................................................41
H.      Claims Paid or Payable by Third Parties...........................................................................41

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND
DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS .................................................................42

A.      Allowance of Claims and Equity Interests........................................................................42
B.      Disallowance of Certain Claims .......................................................................................42
C.      Prosecution of Objections to Claims and Equity Interests ...............................................42
D.      Procedures Regarding Disputed Claims or Disputed Equity Interests ..............................42
E.      No Distribution Pending Allowance .................................................................................43
F.      Distributions After Allowance..........................................................................................43
G.      No Interest.........................................................................................................................43
H.      Adjustments to Claims Without Objection ........................................................................43

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE
EFFECTIVE DATE ..............................................................................................................................44

A.      Conditions Precedent to Confirmation..............................................................................44
B.      Conditions Precedent to the Effective Date ......................................................................44
C.      Waiver of Conditions........................................................................................................46
D.      Effect of Nonoccurrence of Conditions ............................................................................46

ARTICLE X. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS..................................47

A. Compromise and Settlement of Claims, Equity Interests and Controversies .................................. 47
B. Releases by the Debtors ................................................................................................................... 47
C. Releases by Holders of Claims and Equity Interests ...................................................................... 48
D. Exculpation ...................................................................................................................................... 48
E. Discharge of Claims and Termination of Equity Interests .............................................................. 48
F. Injunction ......................................................................................................................................... 49
G. Setoffs .............................................................................................................................................. 49
H. Release of Liens ............................................................................................................................... 49
I. Recoupment ...................................................................................................................................... 50

ARTICLE XI. BINDING NATURE OF PLAN ............................................................................................. 50

ARTICLE XII. RETENTION OF JURISDICTION ...................................................................................... 50

ARTICLE XIII. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ....................... 52

A. Modifications and Amendments ...................................................................................................... 52
B. Effect of Confirmation on Modifications ........................................................................................ 52
C. Revocation or Withdrawal of the Plan ............................................................................................ 52
D. Substantial Consummation of the Plan ............................................................................................ 53

ARTICLE XIV. MISCELLANEOUS PROVISIONS .................................................................................... 53

A. Successors and Assigns .................................................................................................................... 53
B. Reservation of Rights ....................................................................................................................... 53
C. Further Assurances ........................................................................................................................... 53
D. Payment of Fees and Expenses ........................................................................................................ 53
E. Service of Documents ....................................................................................................................... 53
F. Dissolution of Committee ................................................................................................................ 54
G. Nonseverability of Plan Provisions ................................................................................................. 54
H. Return of Security Deposits ............................................................................................................. 54
I. Term of Injunctions or Stays ........................................................................................................... 55
J. Entire Agreement ............................................................................................................................. 55
K. Exhibits ............................................................................................................................................ 55
L. Votes Solicited in Good Faith .......................................................................................................... 55
M. Closing of Chapter 11 Cases ............................................................................................................ 55
N. Conflicts ........................................................................................................................................... 55
O. Filing of Additional Documents ...................................................................................................... 55
P. Tax Reporting and Compliance ........................................................................................................ 56

## <u>EXHIBITS</u>

| | |
|---|---|
| Exhibit 1 | Restructuring Support Agreement |
| Exhibit 2 | Put Option Agreement |
| Exhibit 3 | Amended Organizational Documents |
| Exhibit 4 | New Exit Facilities Credit Agreement |
| Exhibit 5 | Takeback Exit Term Loan Facility Credit Agreement |
| Exhibit 6 | Registration Rights Agreement |
| Exhibit 7 | Director Nomination Agreement |
| Exhibit 8 | Board Observer Agreement |
| Exhibit 9 | Information Sharing Agreement |
| Exhibit 10 | Merger Agreement |

## <u>SCHEDULES</u>

SCHEDULE 1   The Debtors

SCHEDULE 2   Non-Ascent Restructuring Toggle Events

SCHEDULE 3   Existing Compensation Arrangements Term Sheet

SCHEDULE 4   D&O Liability Insurance Policies

SCHEDULE 5   New Boards

SCHEDULE 6   Retained Causes of Action

SCHEDULE 7   Rejected Executory Contracts and Unexpired Leases

## INTRODUCTION

Monitronics International, Inc. and certain of its affiliates and subsidiaries in the above-captioned Chapter 11 Cases respectfully propose the following joint partial prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to such terms in Article I hereof.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

A.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*510(b) Equity Claim*" means any Claim subordinated pursuant to section 510(b) of the Bankruptcy Code.

2.    "*Accrued Professional Compensation*" means, at any given date, all accrued and/or contingent fees and reimbursable expenses (including, without limitation, success fees) for legal, financial advisory, accounting and other professional services rendered before the Effective Date by any Professional in the Chapter 11 Cases that are awardable and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code, or that are awardable and allowable under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been Filed for any such amount). To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

3.    "*Ad Hoc Lender Group*" means the Holders of Prepetition Term Loan Claims represented by Jones Day and Evercore L.L.C.

4.    "*Ad Hoc Noteholder Group*" means the Holders of Prepetition Notes Claims (and/or Affiliates thereof) represented by Stroock & Stroock & Lavan LLP and Houlihan Lokey Capital, Inc.

5.    "*Administrative Claim*" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses pursuant to sections 328, 330(a) or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and through the Effective Date; (c) all fees and charges assessed against the Estates under section 1930, chapter 123, of the Judicial Code; (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code; (e) the DIP Facility Claims, (f) the Cure Claims; (g) the Commitment Parties Fees; (h) the Plan Supporters' Advisors Fees; and (i) the Put Option Premium.

6.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

7.    "*Affiliate Equity Interests*" means, collectively, the Equity Interests issued by each Monitronics Subsidiary, in each case, in existence immediately prior to the Effective Date.

8.    "*Aggregate Rights Offering Amount*" means $177 million.

9.      "*Allowed*" means, with respect to any Claim or Equity Interest (or any portion thereof):  (a) any Claim or Equity Interest as to which no objection to allowance has been interposed (either in the Bankruptcy Court or in the ordinary course of business) on or before any applicable period of limitation under applicable law; (b) any Claim or Equity Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of the Bankruptcy Court or a court of competent jurisdiction other than the Bankruptcy Court, either before or after the Effective Date; or (c) any Claim or Equity Interest expressly deemed Allowed by the Plan or a Final Order of the Bankruptcy Court.

10.      "*Amended Organizational Documents*" means the new organizational and governance documents for Reorganized Monitronics that will become effective on the Effective Date, upon its redomiciliation as a Delaware corporation, including the certificate of incorporation and bylaws, and, if applicable, other organization or formation documents, in substantially the forms Filed with the Plan Supplement, which documents shall be materially consistent with the Governance Term Sheet and section 1123(a)(6) of the Bankruptcy Code and otherwise acceptable to the Requisite Commitment Parties in consultation with the Required Consenting Term Lenders and reasonably acceptable to the Required Consenting Noteholders, the Debtors and Ascent (solely to the extent the Non-Ascent Restructuring Toggle has not occurred).

11.      "*Ascent*" means Ascent Capital Group, Inc.

12.      "*Ascent Cash Amount*" means all Cash owned by Ascent at the time of the Merger.

13.      "*Ascent Default Amount*" means an amount equal to $23,000,000.

14.      "*Ascent Default Shares*" means, solely in the event a Non-Ascent Restructuring Toggle occurs, the number of shares of New Common Stock equal to the quotient of the Ascent Default Amount divided by the Exercise Price.

15.      "*Ascent Default Share Distribution*" means, solely in the event a Non-Ascent Restructuring Toggle occurs, the issuance of the Ascent Default Shares to the Commitment Parties in exchange for the contribution by the Commitment Parties to the Reorganized Debtors of the Ascent Default Amount in accordance with the Backstop and Equity Commitment Documents.

16.      "*Ascent Restructuring*" means a restructuring to be effectuated pursuant to this Plan solely in the event a Non-Ascent Restructuring Toggle does not occur, under which restructuring, among other things: (a) the Merger shall be consummated on the Effective Date, (b) as a result of the Merger, all assets of Ascent (including the Ascent Cash Amount) shall become assets of Reorganized Monitronics, and (c) Ascent's Shareholders shall receive the Ascent Share Distribution on the Effective Date.

17.      "*Ascent Shares*" means, as of the Effective Date, the number of shares of New Common Stock representing the percentage equal to the quotient of the Net Cash Amount of up to $23 million divided by the Discounted Plan Value.

18.      "*Ascent Share Distribution*" means, solely in the event a Non-Ascent Restructuring Toggle does not occur, the issuance of the Ascent Shares to the Ascent Shareholders in exchange for Ascent's contribution to the Reorganized Debtors, through the Merger, of the Net Cash Amount.

19.      "*Ascent Shareholders*" means the shareholders of Ascent as of the applicable date of determination.

20.      "*Avoidance Actions*" means any and all claims and Causes of Action which any of the Debtors, the Estates, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

21.     "*Backstop and Equity Commitment Approval Order*" means an order of the Bankruptcy Court, in form and substance acceptable to the Requisite Commitment Parties, and reasonably acceptable to the Required Consenting Noteholders and the Required Consenting Term Lenders, approving the Put Option Agreement and the other Backstop and Equity Commitment Documents, which order, for the avoidance of doubt, may be the same order as the Confirmation Order.

22.     "*Backstop and Equity Commitment Documents*" means the Put Option Agreement and any other documents or agreements governing the Backstop Commitments and/or the Equity Commitments to be made by the applicable Commitment Parties consistent with the Restructuring Support Agreement, which shall be reasonably acceptable to the Debtors, the Required Consenting Noteholders, the Requisite Commitment Parties, the Required Consenting Term Lenders, and Ascent (solely in the event a Non-Ascent Restructuring Toggle has not occurred) and consistent with the Restructuring Support Agreement.

23.     "*Backstop Commitment Parties*" has the meaning given to such term in the Put Option Agreement.

24.     "*Backstop Commitment Percentage*" has the meaning given to such term in the Put Option Agreement.

25.     "*Backstop Commitments*" means, with respect to any Backstop Commitment Party, the right, on the terms and conditions set forth in the Backstop and Equity Commitment Documents, of the Debtors to require such Backstop Commitment Party to (a) purchase the Unsubscribed Shares (which, for the avoidance of doubt, shall result in an aggregate purchase price for all Rights Offering Shares equal to the Aggregate Rights Offering Amount), (b) solely in the event that the Non-Ascent Restructuring Toggle occurs, purchase the Ascent Default Shares for an aggregate purchase price equal to the Ascent Default Amount, and (c) solely in the event that the Non-Ascent Restructuring Toggle does not occur and the Net Cash Amount is less than $23 million (but not less than $20 million), purchase the Net Cash Shortfall Shares for an aggregate purchase price equal to the Net Cash Shortfall Amount, in each case, in a proportion based on the Backstop Commitment Percentage of such Backstop Commitment Party.

26.     "*Backstop Commitment Shares*" means, collectively, the Unsubscribed Shares and, if applicable, the Ascent Default Shares or the Net Cash Shortfall Shares.

27.     "*Ballots*" means the ballots accompanying the Disclosure Statement upon which Holders of Claims in the Voting Classes shall, among other things, indicate their acceptance or rejection of the Plan and their election with respect to the Release Opt-Out in accordance with the Plan and the procedures governing the solicitation process, and which Ballots must be actually received by the Solicitation Agent on or before the applicable Voting Deadline as set forth in the Ballot.

28.     "*Bankruptcy Code*" means Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases.

29.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of any reference under section 157 of title 28 of the United States Code and/or the Order of the United States District Court for the Southern District of Texas pursuant to section 157(a) of the Judicial Code, the United States District Court for the Southern District of Texas.

30.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under 28 U.S.C. § 2075 and the general, local and chambers rules of the Bankruptcy Court, as each may be amended from time to time.

31.     "*Board Observer Agreement*" means an agreement by and among Reorganized Monitronics and each Commitment Party that, as of the Effective Date, receives or is entitled to receive at least 17.5% of the Total Effective Date Shares, pursuant to which each such Commitment Party shall have, for so long as it continues to hold at least 10% of the total outstanding shares of New Common Stock, the right to appoint a non-voting observer to the

New Monitronics Board, which agreement shall be in form and substance reasonably acceptable to Reorganized Monitronics and each such Commitment Party.

32.     "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

33.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

34.     "*Cash Opt Out Election Forms*" means the forms upon which the Prepetition Noteholders shall, among other things, indicate their election to opt out of the Cash Payout (unless otherwise instructed by its broker, dealer, commercial bank, trust company, or other agent nominee), in accordance with the Plan and the procedures governing the solicitation process.

35.     "*Cash Opt Out Noteholder*" means a Holder of one or more Prepetition Notes Claims that validly and timely elects, in accordance with the procedures set forth on the Cash Opt Out Election Form, to affirmatively opt out of the Cash Payout in accordance with the instructions set forth on the Cash Opt Out Election Form on or before the Postpetition Voting Deadline and, in lieu of receiving its Pro Rata portion of the Cash Payout, (a) receive its Pro Rata portion of the Notes Shares and (b) become eligible to exercise Rights in the Rights Offering.

36.     "*Cash Payout*" means Cash in an aggregate amount equal to 2.5% of the principal and accrued but unpaid interest due under the Prepetition Notes held by the Prepetition Noteholders that are not Cash Opt Out Noteholders.

37.     "*Causes of Action*" means all actions, causes of action (including Avoidance Actions), claims, liabilities, obligations, rights, suits, debts, dues, sums of money, damages, reckonings, rights to legal remedies, rights to equitable remedies, rights to payment and claims, controversies, covenants, promises, judgments, remedies, demands, setoffs, defenses, recoupments, cross claims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct, derivative, or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date and also includes, without limitation: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

38.     "*Certificate*" means any instrument evidencing a Claim or Equity Interest.

39.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

40.     "*Claim*" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

41.     "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.

42.     "*Committee*" means any statutory committee (and all subcommittees thereof) appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as such committee may be reconstituted from time to time.

43.     "*Commitment Parties*" means the Backstop Commitment Parties and the Equity Commitment Parties.

44.     "*Commitment Parties Fees*" means all unpaid reasonable and documented fees and out-of-pocket expenses of the Commitment Parties incurred in connection with the Backstop Commitment, the Equity Commitment, and the Put Option Agreement, including, but not limited to, the Commitment Party Professional Fees.

45.     "*Commitment Party Professionals*" means Stroock & Stroock & Lavan LLP, Houlihan Lokey Capital, Inc., and Mike R. Meyers LLC, as advisors to the Commitment Parties.

46.     "*Commitment Party Professional Fees*" means the reasonable and documented fees and expenses of the Commitment Party Professionals, to the extent due and payable under the Put Option Agreement and in accordance with any letter agreements entered into between the Debtors and the Commitment Party Professionals, including, without limitation, any "success", "transaction", "deferred", or similar fees.

47.     "*Compensation Arrangements*" means any plans, policies, agreements, programs, arrangements, or contracts for, among other things, compensation, employment, consulting, bonus or incentive compensation, compensatory equity awards, health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement or pension benefits, welfare benefits, vacation/paid time off benefits, workers' compensation insurance and accidental death and dismemberment insurance, for the directors, officers and employees of any of the Debtors or Ascent who served in such capacity at any time.

48.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article IX.A hereof having been: (a) satisfied; or (b) waived pursuant to Article IX.C hereof.

49.     "*Confirmation Date*" means the date upon which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

50.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation, as such hearing may be adjourned or continued from time to time in consultation with the Ad Hoc Noteholder Group, the Ad Hoc Lender Group, and Ascent (solely to the extent to Non-Ascent Restructuring Toggle has not occurred).

51.     "*Confirmation Order*" means the order or orders of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order or orders shall be reasonably acceptable to the Required Consenting Noteholders, the Required Consenting Term Lenders, the Debtors, and Ascent (or, solely to the extent the Non-Ascent Restructuring Toggle has occurred, reasonably acceptable to Ascent solely to the extent the Confirmation Order would adversely impact Ascent).

52.     "*Consenting Noteholder Fees and Expenses*" means all reasonable documented fees and out-of-pocket expenses of the Ad Hoc Noteholder Group, including the reasonable documented fees and out-of-pocket expenses of Stroock & Stroock & Lavan, LLP, Houlihan Lokey Capital, Inc., one local counsel, and the financial and operational advisors to the Ad Hoc Noteholder Group existing as of the Petition Date, including, without limitation, any "success", "transaction", "deferred", or similar fees, in accordance with their respective engagement letters and/or fee and expense reimbursement agreements with the Debtors.

53.     "*Consenting Noteholders*" means the Holders of Prepetition Notes Claims that are signatories to the Restructuring Support Agreement.

54.     "*Consenting Term Lender Fees and Expenses*" means all reasonable documented fees and out-of-pocket expenses of the Ad Hoc Lender Group, including the reasonable documented fees and out-of-pocket expenses of Jones Day, Evercore Group L.L.C., one local counsel, and the financial and operational advisors to the Ad Hoc Lender Group existing as of the Petition Date, including, without limitation, any "success", "transaction", "deferred", or similar fees, in accordance with their respective engagement letters and/or fee and expense reimbursement agreements with the Debtors.

55.     "*Consenting Term Lenders*" the Holders of Prepetition Term Loan Claims that are signatories to the Restructuring Support Agreement.

56.     "*Consummation*" means the occurrence of the Effective Date.

57.     "*Contributed Term Loans*" means an aggregate principal amount of $100 million of Prepetition Term Loans owned or controlled by the Equity Commitment Parties, which shall be exchanged, as part of the Equity Commitment, for the Equity Commitment Shares pursuant to the terms of the Put Option Agreement.

58.     "*Cure Claim*" means the Claim of any counterparty to any Executory Contract or Unexpired Lease, based upon a monetary default, if any, by any Debtor on such Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

59.     "*D&O Liability Insurance Policies*" means the insurance policies (including runoff endorsements extending coverage, including costs and expenses (including reasonable and necessary attorneys' fees and experts' fees) for current or former directors, managers and officers of the Debtors and for certain of the future directors, managers and officers of the Reorganized Debtors for a six-year period after the Effective Date for covered liabilities, including sums that any party becomes legally obligated to pay as a result of judgments, fines, losses, claims, damages, settlements, or liabilities arising from activities occurring prior to the Effective Date) for directors', managers' and officers' liability maintained by the Debtors and/or Ascent on or before the Effective Date.

60.     "*Debtor*" means each of the Persons listed on Schedule 1 hereto, in its individual capacity as a debtor and debtor in possession in the Chapter 11 Cases under sections 1107 and 1108 of the Bankruptcy Code.

61.     "*Debtor Released Claims*" has the meaning set forth in Article X.B of this Plan.

62.     "*Debtor Releases*" has the meaning set forth in Article X.B of the Plan.

63.     "*Definitive Documents*" has the meaning given to such term in the Restructuring Support Agreement.

64.     "*Designated Compensation Arrangements*" means (a) all existing Compensation Arrangements (other than (i) that certain Amended and Restated Employment Agreement by and between Ascent and William Niles dated February 1, 2019 (for the avoidance of doubt, to the extent any termination obligations are payable thereunder, such termination obligations shall be a liability of Ascent for purposes of determining the Net Cash Amount) and (ii) those that are terminated, cancelled, or settled as set forth in the Existing Compensation Arrangements Term Sheet attached as Plan Schedule 3) and (b) such additional Compensation Arrangements for the restructuring transitional period and for calendar year 2019 and beyond as may be adopted by the Debtors with the consent of the Required Consenting Noteholders and the Requisite Commitment Parties in their sole discretion.

65.     "*DIP/Exit Facility Commitment*" means the commitment letter attached as Exhibit C to the Restructuring Support Agreement.

66.     "*DIP Facility*" means that certain debtor-in-possession financing facility in an aggregate principal amount of $245 million provided by the DIP Facility Lenders on the terms of, and subject to the conditions set forth in, the DIP/Exit Facility Commitment, which DIP Facility shall be documented in the DIP Facility Credit Agreement and shall be consistent in all material respects with the Restructuring Term Sheet and the DIP/Exit Facility Commitment.

67.     "*DIP Facility Agent*" means Cortland Capital Market Services LLC or another third party designated by KKR Credit Advisors (US) LLC, in its capacity as "Structuring Advisor" and reasonably acceptable to Monitronics, in either case, in its capacity as administrative agent under the DIP Facility Credit Agreement.

68.     "*DIP Facility Claims*" means any and all Claims arising from, under, or in connection with the DIP Facility Credit Agreement or any other DIP Facility Loan Document.

69. "*DIP Facility Credit Agreement*" means that certain debtor-in-possession financing facility agreement to be entered into by and among the Debtors, the DIP Facility Agent, and the DIP Facility Lenders, as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, which shall be consistent in all material respects with the Restructuring Term Sheet and the DIP/Exit Facility Commitment and reasonably acceptable to the Required Consenting Noteholders, the Required Consenting Term Lenders, the Debtors, the DIP Facility Agent, the DIP Facility Lenders, and Ascent (solely to the extent the Non-Ascent Restructuring Toggle has not occurred).

70. "*DIP Facility Lenders*" means the lenders party to the DIP Facility Credit Agreement from time to time.

71. "*DIP Facility Liens*" means the Liens securing the obligations of the Debtors under the DIP Facility Credit Agreement.

72. "*DIP Facility Loan Documents*" means the DIP Facility Credit Agreement, the DIP Orders, and the other documents executed in connection with the DIP Facility, each of which shall be reasonably acceptable to the Required Consenting Noteholders, the Required Consenting Term Lenders, the Debtors, and Ascent (solely to the extent the Non-Ascent Restructuring Toggle has not occurred), in each case, as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and the Restructuring Support Agreement prior to the Effective Date.

73. "*DIP Orders*" means the Interim DIP Order and the Final DIP Order, as applicable.

74. "*Director Nomination Agreement*" means an agreement by and among Reorganized Monitronics and certain of the Commitment Parties pursuant to which such Commitment Parties shall have the right to nominate certain members of the New Monitronics Board, which Director Nomination Agreement shall be on the terms and conditions set forth in the Governance Term Sheet.

75. "*Disbursing Agent*" means the Reorganized Debtors or the Entity or Entities chosen by the Reorganized Debtors in their sole discretion to make or facilitate distributions pursuant to the Plan. For purposes of distributions under this Plan to the Holders of Allowed DIP Facility Claims, Allowed Prepetition RBL Claims, Allowed Prepetition Term Loan Claims, and Allowed Prepetition Notes Claims, the DIP Facility Agent, the Prepetition First Lien Agent, the Replacement First Lien Agent, and the Indenture Trustee or the Solicitation Agent, as applicable, will be and shall act as the Disbursing Agent; provided, however, that the Solicitation Agent will only coordinate distributions based on the directions of the Reorganized Debtors.

76. "*Disclosure Statement*" means the *Proposed Disclosure Statement for Joint Partial Prepackaged Plan of Reorganization of Monitronics International, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated June 3, 2019, as the same may be amended, supplemented or modified from time to time with the reasonable consent of the Required Consenting Noteholders, the Requisite Commitment Parties, the Required Consenting Term Lenders, the Required DIP Facility Lenders, and Ascent (solely to the extent the Non-Ascent Restructuring Toggle has not occurred), including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules and any other applicable law.

77. "*Discounted Plan Value*" means $395,111,570.

78. "*Disputed*" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

79. "*Distribution Date*" means the date or dates selected in consultation with the Ad Hoc Noteholder Group, the Ad Hoc Lender Group, and Ascent (solely to the extent the Non-Ascent Restructuring Toggle has not occurred) that is as soon as practicable after the Effective Date, but no later than ten (10) days after the Effective Date, upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Equity Interests entitled to receive distributions under the Plan.

80.      "*DTC*" means The Depository Trust Company.

81.      "*Effective Date*" means the date that is the first (1st) Business Day on which the Confirmation Order becomes a Final Order; provided, however, that all of the conditions specified in Article IX.B hereof have been satisfied or waived pursuant to Article IX.C hereof.

82.      "*Effective Date Pay Down*" means the payment of $150 million in Cash by the Reorganized Debtors, from (a) the proceeds of the Rights Offering and (b)(1) the Net Cash Amount and, if applicable, the Net Cash Shortfall Amount, or (2) the Ascent Default Amount, as applicable, to the Replacement First Lien Agent, for the ratable benefit of the Prepetition Term Lenders under the Prepetition Credit Agreement, for application to the Prepetition Term Loan Claims (provided that no Equity Commitment Party shall receive any portion of the Effective Date Pay Down on account of Contributed Term Loans).

83.      "*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

84.      "*Equity Interest*" means: (a) any Equity Security in any Debtor, including, without limitation, all issued, unissued, authorized or outstanding shares of stock and other ownership interests, together with (i) any options, warrants, or contractual rights to purchase or acquire any such Equity Securities at any time with respect to any Debtor, and all rights arising with respect thereto and (ii) the rights of any Entity to purchase or demand the issuance of any of the foregoing in any of the Debtors, and shall include: (1) conversion, exchange, voting, participation, and dividend rights; (2) liquidation preferences; (3) options, warrants, and call and put rights; and (4) share-appreciation rights; and (b) any 510(b) Equity Claim, in each case, as in existence immediately prior to the Effective Date.

85.      "*Equity Commitments*" means, with respect to any Equity Commitment Party, the right, on the terms and conditions set forth in the Backstop and Equity Commitment Documents, of the Debtors to cause such Equity Commitment Party to purchase the Equity Commitment Shares by exchanging the Contributed Term Loans in an aggregate amount equal to the product of $100 million and its Equity Commitment Percentage under the Put Option Agreement.

86.      "*Equity Commitment Parties*" has the meaning given to such term in the Put Option Agreement.

87.      "*Equity Commitment Percentage*" has the meaning given to such term in the Put Option Agreement; provided that, for the avoidance of doubt, the total of all Equity Commitment Percentages shall equal 100%.

88.      "*Equity Commitment Shares*" means shares of New Common Stock representing 25.31% of the total shares of the New Common Stock to be issued and outstanding as of the Effective Date, subject to dilution by the Post-Emergence Incentive Plan.

89.      "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

90.      "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

91.      "*Exculpated Claim*" means any Claim related to any act or omission in connection with, relating to or arising out of the Debtors' in- or out-of-court restructuring efforts, the Debtors' Chapter 11 Cases, the Merger, the formulation, preparation, dissemination, negotiation or filing of the Restructuring Support Agreement, the Disclosure Statement or the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan (including the DIP Facility, the Exit Facilities, the Rights Offering, and the Backstop and Equity Commitment Documents), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of New Common Stock or the distribution of property under the Plan or any other agreement; provided, however, that Exculpated Claims shall not include: (i) any act or omission that is determined in a Final Order to

have constituted willful misconduct, gross negligence, criminal conduct or fraud, and/or (ii) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court.

92.      "*Exculpated Party*" means each of: (a) the Debtors, (b) the Reorganized Debtors, (c) the Committee (if any), and (d) with respect to each of the foregoing Entities in clauses (a) through (c), such Entities' current or former subsidiaries, Affiliates (other than Ascent), managed accounts or funds, officers, directors, managers, managing members, principals, partners, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other Professionals, in their capacity as such.

93.      "*Exculpation*" means the exculpation provision set forth in Article X.D hereof.

94.      "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

95.      "*Exercise Price*" means $17.56 per share of New Common Stock, which is the price at which the Rights may be exercised, and reflects the Discounted Plan Value.

96.      "*Existing Compensation Arrangements Term Sheet*" means the term sheet attached as Plan Schedule 3.

97.      "*Exit Facilities*" means the New Exit Facilities and the Takeback Exit Term Loan Facility.

98.      "*Federal Judgment Rate*" means the federal judgment rate, as such rate was in effect as of the Petition Date.

99.      "*Fee Claim*" means a Claim for Accrued Professional Compensation.

100.      "*File*," "*Filed*" or "*Filing*" means file, filed or filing in the Chapter 11 Cases with the Bankruptcy Court or other court of competent jurisdiction.

101.      "*Final DIP Order*" means the Final Order(s) of the Bankruptcy Court approving the DIP Facility on a final basis and authorizing the use of cash collateral, which shall be reasonably acceptable to the Debtors, the Required Consenting Noteholders, the Required Consenting Term Lenders, the DIP Facility Agent, the Required DIP Facility Lenders, Ascent (solely to the extent the Non-Ascent Restructuring Toggle has not occurred), and the Prepetition First Lien Agent (with respect to those provisions that impact the legal or economic rights of the Prepetition First Lien Agent and/or the Prepetition Revolving Lenders).

102.      "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice, provided that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024, or any analogous rule, may be filed relating to such order or judgment shall not cause such order or judgment not to be a Final Order.

103.      "*Form S-4 Registration Statement*" means the Form S-4 registration statement filed with the SEC on May 24, 2019 by Monitronics to register the Ascent Share Distribution under the Securities Act, as such registration statement may be amended or supplemented from time to time.

104.      "*General Unsecured Claim*" means any Unsecured Claim against any of the Debtors that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, a Fee Claim, an Intercompany Claim, a Prepetition Notes Claim, or a 510(b) Equity Claim.

105.      "*Governance Term Sheet*" means the Reorganized Monitronics Governance Term Sheet attached as Exhibit 1 to the Restructuring Term Sheet.

106.      "*Governmental Unit*" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

107.      "*Holder*" means any Person or Entity holding a Claim or an Equity Interest.

108.      "*Impaired*" means any Claim or Equity Interest in an Impaired Class.

109.      "*Impaired Class*" means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

110.      "*Indemnification Obligation*" means each of the Debtors' indemnification provisions currently in place, whether in the Debtors' bylaws, certificates of incorporation or other formation documents in the case of a limited liability company, board resolutions, management or indemnification agreements, employment or service contracts, or otherwise for the benefit of the current, former or future directors of the Debtors or the Reorganized Debtors, director nominees, managers, managing members, officers, members (including any *ex officio members*), equity holders, employees, accountants, investment bankers, attorneys, other professionals of the Debtors, and such current and former directors', officers', and managers' respective Affiliates, each of the foregoing solely in their capacity as such.

111.      "*Indemnified Parties*" means, each of the Debtors' respective current or former directors, director nominees, managers, managing members, officers, members (including any *ex officio members*), equity holders, employees, accountants, investment bankers, attorneys, other professionals of the Debtors, and such current and former directors', officers', and managers' respective Affiliates, each of the foregoing solely in their capacity as such.

112.      "*Indenture Trustee*" means U.S. Bank National Association, as indenture trustee under the Prepetition Notes Indenture or any such successor indenture trustee(s).

113.      "*Indenture Trustee Fees and Expenses*" means all reasonable documented fees and out-of-pocket expenses of the Indenture Trustee, including the fees and out-of-pocket expenses of Foley & Lardner LLP and any local counsel.

114.      "*Information Sharing Agreement*" means a cooperation agreement to be entered into by the Debtors and the Consenting Noteholders on or prior to the Petition Date, which agreement shall be acceptable to the Debtors and the Required Consenting Noteholders and shall provide that the Debtors will cooperate in good faith to assist in the transition of the business during the period after the effectiveness of the Information Sharing Agreement and prior to the Effective Date.

115.      "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

116.      "*Interim DIP Order*" means each interim order or orders of the Bankruptcy Court authorizing the DIP Facility on an interim basis and authorizing the use of cash collateral, which shall be reasonably acceptable to the Debtors, the Required Consenting Noteholders, the Required Consenting Term Lenders, the DIP Facility Agent, the Required DIP Facility Lenders, Ascent (solely to the extent the Non-Ascent Restructuring Toggle has not occurred), and the Prepetition First Lien Agent (with respect to those provisions that impact the legal or economic rights of the Prepetition First Lien Agent and/or the Prepetition Revolving Lenders).

117.      "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

118.     "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

119.     "*Merger*" means the merger of Ascent with and into Monitronics, with Reorganized Monitronics as the surviving entity, on the terms and subject to the conditions of the Merger Agreement.

120.     "*Merger Agreement*" means that certain Agreement and Plan of Merger, dated as of May 24, 2019, by and between Ascent and Monitronics, as attached as Exhibit 10 to this Plan.

121.     "*Merger Approvals*" means all requisite approvals to consummate the Merger (including, for the avoidance of doubt, all third-party and regulatory approvals required to consummate the Merger, including approvals from the SEC and stockholder approvals).

122.     "*Merger Approval Outside Date*" means the date that is sixty-five (65) days after the Petition Date, unless otherwise extended in accordance with the terms of the Restructuring Support Agreement.

123.     "*Monitronics*" means Monitronics International, Inc.

124.     "*Monitronics Equity Interests*" mean the Equity Interests issued by Monitronics and outstanding immediately prior to the Effective Date.

125.     "*Monitronics Subsidiary*" means any direct or indirect subsidiary of Monitronics.

126.     "*Net Cash Amount*" means the Ascent Cash Amount, net of all liabilities of Ascent (including, but not limited to, funded indebtedness, professionals' fees, settlements, severance payments, unclaimed property liabilities, agreements or understandings with respect to the use of Cash, contingent liabilities, and operating expenses expected to be paid in connection with the Merger or that will be assumed by Monitronics or Reorganized Monitronics, as applicable, in connection with the Merger), as of the Effective Date, the calculation of which shall be determined in good faith by Ascent, the Debtors, the Required Consenting Noteholders, and the Required Consenting Term Lenders on the date that is ten (10) days prior to the Effective Date.

127.     "*Net Cash Shortfall Amount*" means $23,000,000 less the Net Cash Amount.

128.     "*Net Cash Shortfall Share Distribution*" means, solely in the event a Non-Ascent Restructuring Toggle has not occurred and the Net Cash Amount is less than $23 million, but not less than $20 million, the issuance of the Net Cash Shortfall Shares to the Commitment Parties in exchange for the contribution by the Commitment Parties to the Debtors of the Net Cash Shortfall Amount in accordance with the Backstop and Equity Commitment Documents.

129.     "*Net Cash Shortfall Shares*" means the number of shares of New Common Stock equal to the quotient of the Net Cash Shortfall Amount divided by the Exercise Price.

130.     "*New Affiliate Boards*" means the boards of directors or managers of the Reorganized Debtors other than Reorganized Monitronics.

131.     "*New Boards*" means the Reorganized Monitronics Board and the New Affiliate Boards.

132.     "*New Common Stock*" means the shares of common stock of Reorganized Monitronics authorized to be issued pursuant to this Plan.

133.     "*New Exit Facilities*" means the (a) revolving credit facility to be entered into with the New Exit Facilities Agent and the applicable New Exit Facilities Lenders with a revolving commitment of $145 million, and (b) term loan facility to be entered into with the New Exit Facilities Agent and the applicable New Exit Facilities Lenders in the amount of $150 million, each of which shall contain terms and conditions consistent in all material respects with those set forth in the Restructuring Term Sheet and the DIP/Exit Facility Commitment.

134.    "*New Exit Facilities Agent*" means the administrative agent for the New Exit Facilities under the New Exit Facilities Credit Agreement.

135.    "*New Exit Facilities Credit Agreement*" means the credit agreement, in substantially the form Filed with the Plan Supplement, which credit agreement shall contain terms and conditions consistent in all material respects with those set forth in the Restructuring Term Sheet and the DIP/Exit Facility Commitment and, to the extent any terms and conditions are not set forth on or contemplated therein, such other terms and conditions as are acceptable to the Debtors, the New Exit Facilities Lenders, the Required Consenting Term Lenders, and the Required Consenting Noteholders (such acceptance not to be unreasonably withheld).

136.    "*New Exit Facilities Documents*" means the New Exit Facilities Credit Agreement and such other definitive documentation acceptable to the Debtors, the New Exit Facilities Lenders, the Required Consenting Term Lenders and the Required Consenting Noteholders (such acceptance not to be unreasonably withheld).

137.    "*New Exit Facilities Lenders*" means the revolving credit facility lenders and the term loan lenders party to the New Exit Facilities Credit Agreement.

138.    "*New Exit Facilities Loans*" means the revolving loans and the term loans provided by the New Exit Facilities Lenders under the New Exit Facilities Credit Agreement.

139.    "*Non-Ascent Restructuring*" means a restructuring to be effectuated pursuant to this Plan solely in the event a Non-Ascent Restructuring Toggle occurs, under which restructuring: (a) the Plan shall be consummated without the consummation of the Merger, (b) Ascent shall not participate in the restructuring, (c) Ascent shall make the Toggle Contribution to the Reorganized Debtors, (d) the Backstop Commitment Parties shall pay the Ascent Default Amount and receive the Ascent Default Shares on the terms and conditions set forth in the Restructuring Support Agreement and the Put Option Agreement, (e) Ascent Shareholders shall not receive the Ascent Share Distribution, and (f) 100% of the New Common Stock to be issued and outstanding as of the Effective Date, subject to dilution by the Post-Emergence Incentive Plan, shall be distributed to creditors of Monitronics pursuant to the Plan, the Rights Offering, the Equity Commitments, the Backstop Commitments, and the Put Option Agreement (and not to Ascent or Ascent Shareholders in their capacity as such).

140.    "*Non-Ascent Restructuring Toggle*" means the occurrence of any of the events set forth on Plan Schedule 2.

141.    "*Non-Voting Classes*" means, collectively, Class 1 Other Secured Claims, Class 2 Prepetition RBL Claims, Class 5 General Unsecured Claims, Class 6 Intercompany Claims, Class 7 Affiliate Equity Interests in any Monitronics Subsidiary, and Class 8 Monitronics Equity Interests.

142.    "*Notes Shares*" means shares of New Common Stock representing 18.0% of the total shares of New Common Stock to be issued and outstanding as of the Effective Date, subject to dilution by the Post-Emergence Incentive Plan.

143.    "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; (b) a DIP Facility Claim, or (c) a Priority Tax Claim.

144.    "*Other Secured Claim*" means any Secured Claim that is not a Prepetition RBL Claim, a Prepetition Term Loan Claim, or a DIP Facility Claim.

145.    "*Person*" means a person as defined in section 101(41) of the Bankruptcy Code.

146.    "*Petition Date*" means the date on which the Debtors File their petitions for relief commencing the Chapter 11 Cases.

147.     "*Plan*" means this Joint Partial Prepackaged Plan of Reorganization of Monitronics International, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, dated June 3, 2019, as the same may be amended, supplemented or modified from time to time in accordance with the terms hereof, including, without limitation, any exhibits hereto, which are incorporated herein by reference.

148.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan to be Filed on notice to parties-in-interest, including, but not limited to, the following: (a) the Amended Organizational Documents; (b) the New Exit Facility Credit Agreement; (c) the Takeback Exit Term Loan Facility Credit Agreement; (d) the identity of the members of the New Boards; (e) the Schedule of Rejected Executory Contracts and Unexpired Leases; (f) the Schedule of D&O Insurance Policies; (g) the Schedule of Retained Causes of Action; (h) the Registration Rights Agreement; (i) the Director Nomination Agreement; (j) the Board Observer Agreement; and (k) the Information Sharing Agreement.   The Debtors shall File forms of the materials comprising the Plan Supplement no later than the Plan Supplement Filing Date.

149.     "*Plan Supplement Filing Date*" means the date that is five (5) days prior to the deadline to object to the Confirmation of the Plan.

150.     "*Plan Supporters' Advisors Fees*" means the Consenting Noteholders Fees and Expenses, the Indenture Trustee Fees and Expenses, the Prepetition First Lien Agent Fees and Expenses, and the Consenting Term Lender Fees and Expenses.

151.     "*Post-Emergence Incentive Plan*" means a management equity incentive program that is deemed to have been adopted by Reorganized Monitronics as of the Effective Date under which at least 7.5% and up to 10% of the New Common Stock on a fully diluted basis (after giving effect to the awards to be issued under the Post-Emergence Incentive Plan) shall be reserved for awards to be granted to certain officers, board members, and other members of management of Reorganized Monitronics.

152.     "*Postpetition Voting Deadline*" means 5:00 p.m. (prevailing Eastern Time) on the date that is the first business day that is twenty-nine (29) days after the commencement date of the Rights Offering, or such other date as set forth in an order of the Bankruptcy Court.

153.     "*Prepetition Credit Agreement*" means that certain Credit Agreement dated as of March 23, 2012, by and among Monitronics, Bank of America, N.A., as administrative agent, and the lenders from time to time party thereto, as amended by Amendment No. 1 to Credit Agreement and Consent dated as of November 7, 2012, Amendment No. 2 to Credit Agreement dated as of March 25, 2013, Amendment No. 3 to the Credit Agreement and Amendment No. 1 to Guaranty Agreement dated as of August 16, 2013, Amendment No. 4 to Credit Agreement dated as of February 17, 2015, Amendment No. 5 to Credit Agreement dated as of April 9, 2015, Amendment No. 6 to Credit Agreement dated as of September 30, 2016, and Amendment No. 7 to Credit Agreement dated as of December 29, 2016, and as modified by that certain Waiver No. 1 to Credit Agreement, dated as of March 28, 2019 and that certain Waiver No. 2 to Credit Agreement, dated as of April 30, 2019.

154.     "*Prepetition First Lien Agent*" means Bank of America, N.A., in its capacity as administrative agent under the Prepetition Credit Agreement and related financing documents or any such successor administrative agent (including, for the avoidance of doubt, the Replacement First Lien Agent).

155.     "*Prepetition First Lien Agent Fees and Expenses*" means all reasonable and documented fees and out-of-pocket expenses of the Prepetition First Lien Agent, including the reasonable and documented fees and out-of-pocket expenses of Morgan, Lewis & Bockius LLP, Winstead PC, and Getzler Henrich & Associates LLC.

156.     "*Prepetition Loan Documents*" means the "Loan Documents" as defined in the Prepetition Credit Agreement, in each case as amended, supplemented, or modified from time to time prior to the Petition Date.

157.     "*Prepetition Noteholders*" means those Holders of Prepetition Notes Claims.

158.     "*Prepetition Notes*" means the 9.125% Senior Notes due 2020 issued by Monitronics under the Prepetition Notes Indenture.

159.     "*Prepetition Notes Claim*" means any and all Claims arising from, under, or in connection with the Prepetition Notes, the Prepetition Notes Indenture, or any other related document or agreement.

160.     "*Prepetition Notes Indenture*" means the Indenture dated as of March 23, 2012 (as amended, restated, modified, supplemented, or replaced from time to time in accordance with the terms thereof), by and among Monitronics, the guarantors named thereunder, and the Indenture Trustee.

161.     "*Prepetition RBL Claim*" means any and all Claims arising from, under or in connection with the Revolving Credit Loans under and as defined in the Prepetition Credit Agreement or any other Prepetition Loan Document.

162.     "*Prepetition Revolving Lenders*" means those Holders of Prepetition RBL Claims.

163.     "*Prepetition Term Lenders*" means those Holders of Prepetition Term Loan Claims.

164.     "*Prepetition Term Loans*" means the Term B-2 Loans under (and as defined in) the Prepetition Credit Agreement.

165.     "*Prepetition Term Loan Claim*" means any and all Claims arising from, under, or in connection with the Term B-2 Loans under (and as defined in) the Prepetition Credit Agreement or any other Prepetition Loan Document.

166.     "*Prepetition Voting Deadline*" means 5:00 p.m. (prevailing Eastern Time) on June 24, 2019.

167.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

168.     "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Equity Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Equity Interests in that Class, or the proportion that Allowed Claims or Allowed Equity Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Equity Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed Equity Interest under the Plan.

169.     "*Professional*" means an Entity:  (a) retained pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

170.     "*Professional Fee Claims Reserve*" means a Cash reserve established and maintained by the Debtors or the Reorganized Debtors, as applicable, to pay in full in Cash the Allowed Fee Claims incurred on or prior to the Effective Date.

171.     "*Put Option Agreement*" means that certain Put Option Agreement, among the Debtors, Ascent, and the Commitment Parties, dated as of May 28, 2019.

172.     "*Put Option Premium*" means the put option premium issued by Monitronics, in accordance with the Put Option Agreement, in exchange for the Debtors' right to (a) sell and cause the Backstop Commitment Parties to purchase the Backstop Commitment Shares in exchange for the Backstop Commitment Parties' funding their Backstop Commitments and (b) sell and cause the Equity Commitment Parties to purchase the Equity Commitment Shares in exchange for the Equity Commitment Parties' funding their Equity Commitments, in each case pursuant to

14

the terms and conditions of the Put Option Agreement, which Put Option Premium shall be payable on the Effective Date in the form of the Put Option Premium Shares.

173.    "*Put Option Premium Shares*" means shares of New Common Stock at the Exercise Price, representing 6.07% of the total shares of New Common Stock to be issued and outstanding as of the Effective Date, subject to dilution by the Post-Emergence Incentive Plan.

174.    "*Registration Rights Agreement*" means the Registration Rights Agreement to be entered into between Reorganized Monitronics and each of the Registration Rights Agreement Parties as of the Effective Date, substantially in the form Filed with the Plan Supplement and in accordance with the Backstop and Equity Commitment Documents, which Registration Rights Agreement shall be acceptable to the Commitment Parties that are Registration Rights Agreement Parties, pursuant to which Reorganized Monitronics shall be required to (a) file a shelf registration statement to register all shares held by the Registration Rights Agreement Parties at emergence and (b) maintain the effectiveness of the shelf registration statement until all the shares registered thereunder are sold, with customary rights to require underwritten take-downs.

175.    "*Registration Rights Agreement Parties*" means (a) each of the Commitment Parties, and (b) each other Holder of Prepetition Notes Claims that receives, in the aggregate, 10% or more of the total shares of New Common Stock to be issued and outstanding as of the Effective Date, subject to dilution by the Post-Emergence Incentive Plan.

176.    "*Regulation D*" means Regulation D promulgated under the Securities Act.

177.    "*Regulation S*" means Regulation S promulgated under the Securities Act.

178.    "*Reinstated*" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim or Equity Interest entitles the Holder of such Claim or Equity Interest so as to leave such Claim or Equity Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default:  (i) curing any such default that occurred before, on or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Equity Interest (other than the Debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim or Equity Interest entitles the Holder.

179.    "*Related Persons*" means, with respect to a Person, each of that Person's current and former Affiliates, and each of such Person's and Affiliate's current and former directors, officers, managers, managing members, principals, partners, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, other professionals, managed accounts, and managed funds, each in their capacity as such.

180.    "*Release Opt-Out*" means the items set forth in the Ballots or the Release Opt-Out Forms, as applicable, pursuant to which Holders of Claims and Equity Interests may opt out of the release set forth in Article X hereof.

181.    "*Release Opt-Out Deadline*" means the date that is the applicable Voting Deadline.

182.    "*Release Opt-Out Form*" means the form upon which certain Holders of Claims or Equity Interests not entitled to vote shall indicate their election with respect to the Release Opt-Out, in each case in

accordance with the Plan and the procedures governing the solicitation process, and which Release Opt-Out Form must be actually received by the Solicitation Agent on or before the Release Opt-Out Deadline.

183.    *"Released Claims"* means the Debtor Released Claims and the Third-Party Released Claims.

184.    "*Released Party*" means each of: (a) the Debtors and the Reorganized Debtors, (b) the Prepetition First Lien Agent, (c) the Releasing Prepetition Revolving Lenders, (d) the Releasing Prepetition Term Lenders, (e) the Indenture Trustee, (f) the Releasing Prepetition Noteholders, (g) the Commitment Parties, (h) the DIP Facility Agent, (i) the DIP Facility Lenders, (j) Ascent, (k) the Solicitation Agent, (l) all Holders of Claims or Equity Interests in Non-Voting Classes that do not affirmatively opt out of the release set forth in Article X hereof on the Release Opt-Out Form, and (m) with respect to each of the foregoing Entities in clauses (a) through (l), such Entities' Related Persons, in each case solely in their capacity as such; provided, however, that, in the event the Non-Ascent Restructuring Toggle occurs, Ascent and its Related Parties shall constitute Released Parties solely in the event that Ascent makes the Toggle Contribution.

185.    "*Releasing Parties*" means all Entities who have held, hold or may hold Released Claims that have been released pursuant to Article X.B or Article X.C, discharged pursuant to Article X.E or are subject to Exculpation.

186.    *"Releasing Prepetition Noteholder"* means each (a) Consenting Noteholder and (b) any other Prepetition Noteholder that (i) votes to accept the Plan or (ii) abstains from voting on the Plan or votes to reject the Plan and does not affirmatively opt out of the release set forth in Article X.C of the Plan on its respective Ballot.

187.    *"Releasing Prepetition Revolving Lenders"* means each Prepetition Revolving Lender that does not affirmatively opt out of the release set forth in Article X.C of the Plan on a Release Opt-Out Form.

188.    *"Releasing Prepetition Term Lenders"* means each (a) Consenting Term Lender and (b) any other Prepetition Term Lender that (i) votes to accept the Plan or (ii) abstains from voting on the Plan or votes to reject the Plan and does not affirmatively opt out of the release set forth in Article X.C of the Plan on its respective Ballot.

189.    "*Reorganized Debtors*" means from and after the Effective Date, any and all Debtors reorganized under and pursuant to the Plan, or any successor thereto, by merger, consolidation, transfer of all or substantially all assets or otherwise, including Reorganized Monitronics.

190.    "*Reorganized Monitronics Board*" means the initial board of directors of Reorganized Monitronics.

191.    "*Replacement First Lien Agent*" means a third party designated by the Prepetition Term Lenders, and reasonably acceptable to the Debtors, in either case, to act as replacement and successor administrative agent under the Prepetition Credit Agreement.

192.    "*Required Consenting Term Lenders*" means, as of any date of determination, those Consenting Term Lenders holding more than 50% of the aggregate principal amount of Prepetition Term Loans that are held by all Consenting Term Lenders; *provided*, *however*, that as long as the Ad Hoc Lender Group holds at least 50% of the aggregate principal amount of the Prepetition Term Loans, "*Required Consenting Term Lenders*" shall mean, as of any date of determination, those Consenting Term Lenders holding more than 50% of the aggregate principal amount of the Prepetition Term Loans that are held by Consenting Term Lenders that are members of the Ad Hoc Lender Group.

193.    "*Required Consenting Noteholders*" means, as of any date of determination, those Consenting Noteholders holding more than 66⅔% of the aggregate principal amount of the Prepetition Notes that are held by all Consenting Noteholders; *provided*, *however*, that as long as the Ad Hoc Noteholder Group holds at least 50% of the aggregate principal amount of the Prepetition Notes, "*Required Consenting Noteholders*" shall mean, as of any date of determination, those Consenting Noteholders holding more than 66⅔% of the aggregate principal amount of the Prepetition Notes that are held by Consenting Noteholders that are members of the Ad Hoc Noteholder Group.

194.     "*Required DIP Facility Lenders*" means the "Required Lenders" as defined in the DIP/Exit Facility Commitment.

195.     "*Requisite Commitment Parties*" has the meaning ascribed to it in the Put Option Agreement.

196.     "*Restructuring*" means the Ascent Restructuring or the Non-Ascent Restructuring, as the context requires.

197.     "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of May 20, 2019, by and between the Debtors, the Consenting Noteholders, the Consenting Term Lenders, and Ascent, as amended, modified, or supplemented from time to time in accordance with its terms, attached as Exhibit 1 to this Plan.

198.     "*Restructuring Term Sheet*" means the term sheet attached as Exhibit A to the Restructuring Support Agreement.

199.     "*Rights*" means subscription rights to subscribe for and purchase New Common Stock to be issued in the Rights Offering, which shall be issued in respect of all Prepetition Notes outstanding as of the date of the commencement of the Rights Offering.

200.     "*Rights Offering*" means that certain offering of Rights, issued with respect to all outstanding Prepetition Notes and exercisable solely by Cash Opt Out Noteholders, to purchase the Rights Offering Shares for an aggregate purchase price equal to the Aggregate Rights Offering Amount, which shall be backstopped by the Backstop Commitment Parties pursuant to the terms and conditions of the Put Option Agreement, as approved by the Rights Offering Approval Order.

201.     "*Rights Offering Approval Order*" means a Final Order of the Bankruptcy Court approving the Rights Offering Procedures and the Rights Offering Solicitation Materials and any motion filed in support thereof, which Rights Offering Approval Order may, for the avoidance of doubt, be the same order as the order approving the Disclosure Statement and which shall be reasonably acceptable to the Debtors, the Required Consenting Noteholders, the Required Consenting Term Lenders, and Ascent (solely in the event a Non-Ascent Restructuring Toggle has not occurred).

202.     "*Rights Offering Participants*" means the Cash Opt Out Noteholders who timely and validly elect to participate in the Rights Offering by electing to exercise their Rights for their corresponding share of the Rights Offering Shares at the Exercise Price.

203.     "*Rights Offering Procedures*" means the procedures governing the Rights Offering, as approved by the Rights Offering Approval Order.

204.     "*Rights Offering Questionnaire*" means a questionnaire to be included in the Rights Offering Solicitation Materials through which each Rights Offering Participant shall certify that it is either (a) an "accredited investor" (as defined in Regulation D of the Securities Act), a non U.S. person (as defined in Regulation S of the Securities Act) and not participating on behalf or on account of a U.S. person, or a "qualified institutional buyer" (as defined in Rule 144A of the Securities Act) or (b) none of the foregoing.

205.     "*Rights Offering Shares*" means shares of New Common Stock representing 44.80% of the total shares of New Common Stock to be issued and outstanding as of the Effective Date, subject to dilution by the Post-Emergence Incentive Plan.

206.     "*Rights Offering Solicitation Materials*" means the offering document for the Rights Offering (which may be the Disclosure Statement), the Rights Offering Procedures, the Subscription Form, the Rights Offering Questionnaire, and any other documents to be utilized by the Cash Opt Out Noteholders in connection with the Rights Offering.

17

207.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule of Executory Contracts and Unexpired Leases to be rejected, if any, which schedule shall be prepared by the Debtors and be reasonably acceptable to the Required Consenting Noteholders, the Requisite Commitment Parties, the Required Consenting Term Lenders, and Ascent (solely to the extent the Non-Ascent Restructuring Toggle has not occurred), and Filed in the Plan Supplement.

208.    "*SEC*" means the U.S. Securities and Exchange Commission.

209.    "*Section 4(a)(2)*" means Section 4(a)(2) of the Securities Act.

210.    "*Secured*" means, when referring to a Claim:  (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code; or (b) otherwise Allowed pursuant to this Plan as a Secured Claim.

211.    "*Secured Claim*" means a Claim that is Secured.

212.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended.

213.    "*Solicitation Agent*" means Prime Clerk LLC.

214.    "*Subscription Form*" means that certain form to be distributed to the Holders of Prepetition Notes Claims pursuant to which they may exercise their Rights, as approved by the Bankruptcy Court under the Rights Offering Approval Order.

215.    "*Takeback Exit Term Loan Facility Agent*" means the administrative agent for the Takeback Exit Term Loan Facility under the Takeback Exit Term Loan Facility Credit Agreement.

216.    "*Takeback Exit Term Loan Facility Credit Agreement*" means the credit agreement, in substantially the form Filed in the Plan Supplement, which credit agreement shall contain terms and conditions consistent in all material respects with those set forth in the Restructuring Term Sheet and the Takeback Exit Term Loan Facility Term Sheet and, to the extent any terms and conditions are not set forth on or contemplated therein, such other terms and conditions as are acceptable to the Debtors, the Required Consenting Term Lenders, and the Required Consenting Noteholders (such acceptance not to be unreasonably withheld).

217.    "*Takeback Exit Term Loan Facility Documents*" means the Takeback Exit Term Loan Facility Credit Agreement and such other definitive documentation acceptable to the Debtors, the Required Consenting Term Lenders, and the Required Consenting Noteholders (such acceptance not to be unreasonably withheld).

218.    "*Takeback Exit Term Loan Facility Lenders*" means the term loan lenders party to the Takeback Exit Term Loan Facility Credit Agreement.

219.    "*Takeback Exit Term Loans*" means the term loans provided by the Takeback Exit Term Loan Facility Lenders under the Takeback Exit Term Loan Facility Credit Agreement.

220.    "*Takeback Exit Term Loan Facility*" means the term loan facility to be entered into by Reorganized Monitronics, the Takeback Exit Term Loan Facility Agent, and the Takeback Exit Term Loan Facility Lenders in the amount of $822.5 million.

221.    "*Takeback Exit Term Loan Facility Term Sheet*" means the term sheet attached as Exhibit D to the Restructuring Support Agreement.

222.    "*Third-Party Released Claims*" has the meaning set forth in Article X.C of this Plan.

223.     "*Third-Party Releases*" has the meaning set forth in Article X.C of the Plan.

224.     "*Toggle Contribution*" means, in the event the Non-Ascent Restructuring Toggle occurs, Ascent's contribution of Cash in an amount equal to $3.5 million to Monitronics on or before the Effective Date, subject to receipt of the release set forth in Article X of this Plan.

225.     "*Total Effective Date Shares*" means the total shares of New Common Stock to be issued as of the Plan Effective Date.

226.     "*Transition Services Agreement*" means an agreement to be entered into by the Debtors and Ascent on the Effective Date, solely in the event the Non-Ascent Restructuring Toggle occurs, in form and substance acceptable to the Required Consenting Noteholders, the Commitment Parties, the Debtors, and Ascent, which agreement shall have a term of no longer than twelve (12) months and shall provide, among other things, that (a) Ascent and the Reorganized Debtors will each: (i) cooperate fully and in good faith in the transition of any shared services between Ascent and the Debtors and/or the Reorganized Debtors, and (ii) use commercially reasonable efforts to ensure that all permits, licenses, software, agreements, contracts, information, and other items necessary to operate their respective businesses are transitioned and operations are not disrupted and (b) Ascent will reimburse the Reorganized Debtors for all services provided to Ascent during the period from the Effective Date through termination of the Transition Services Agreement (including, without limitation, IT, accounting, and finance services) at rates to be negotiated at arms' length between Ascent and the Debtors and which shall be acceptable to the Required Consenting Noteholders and the Commitment Parties.

227.     "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

228.     "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

229.     "*Unimpaired Class*" means an Unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

230.     "*Unsecured Claim*" means a Claim that is not Secured by a Lien on property in which one of the Debtors' Estates has an interest.

231.     "*Unsubscribed Shares*" means any Rights Offering Shares that are not timely and properly subscribed for and purchased by Rights Offering Participants, in their capacity as such, pursuant to the Rights Offering Procedures.

232.     "*U.S. Trustee*" means the United States Trustee for the Southern District of Texas.

233.     "*Voting Classes*" means, collectively, Class 3 Prepetition Term Loan Claims and Class 4 Prepetition Notes Claims.

234.     "*Voting Deadline*" means either the Prepetition Voting Deadline or the Postpetition Voting Deadline, as applicable.

235.     "*Voting Record Date*" means the date for determining (a) which Holders of Claims in the Voting Classes are entitled, as applicable, to receive the Disclosure Statement and the Ballots, and to vote to accept or reject this Plan, and (b) which Holders of Claims and/or Equity Interests in the Non-Voting Classes are entitled, as applicable, to receive the Disclosure Statement and the Release Opt Out Form, in each case, which date shall be May 31, 2019.

*B.       Rules of Interpretation*

For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) whenever from the context it is appropriate, the words "and" or "or" shall mean "and/or"; (c) unless otherwise specified, any reference in this Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (d) unless otherwise specified, any reference in this Plan to an existing document, schedule or exhibit, whether or not Filed, shall mean such document, schedule or exhibit, as it may have been or may be amended, modified or supplemented; (e) any reference to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (f) unless otherwise specified, all references in this Plan to Articles are references to Articles of this Plan or to this Plan; (g) the words "herein," "hereof" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (h) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release or other agreement or document entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (j) unless otherwise set forth in this Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (k) any term used in capitalized form in this Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (l) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (m) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time, as applicable to the Chapter 11 Cases, unless otherwise stated; and (n) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order or approval of the Bankruptcy Court or any other Entity.

*C.       Computation of Time*

In computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply.  If a payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act shall instead occur on the next succeeding Business Day, but shall be deemed to have occurred as of the required date.

*D.       Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of this Plan, any agreements, documents, instruments or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

*E.       Reference to Monetary Figures*

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, Priority Tax Claims, and Other Priority Claims have not been classified and thus are excluded from the Classes of Claims and Equity Interests set forth in Article III.

A.      *Administrative Claims*

1.      General Administrative Claims

Except with respect to Administrative Claims that are Fee Claims, Plan Supporters' Advisors Fees, Commitment Parties Fees, or the Put Option Premium, and except to the extent that a Holder of an Allowed Administrative Claim, the Required Consenting Noteholders, the Required Consenting Term Lenders, and the applicable Debtors agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim due and payable on or before the Effective Date shall receive, on the latest to occur of (a) the Effective Date, (b) the date on which such Administrative Claim becomes Allowed, and (c) the date on which such Allowed Administrative Claim becomes due and payable in the ordinary course of business, at the option of the Debtors (subject to the reasonable consent of the Required Consenting Noteholders and the Required Consenting Term Lenders), one of the following treatments: (1) be paid in full in Cash or (2) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; *provided, however,* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to, such Allowed Administrative Claims.

2.      Fee Claims

Each Professional asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated in the Confirmation Order an application for final Allowance of such Fee Claim no later than forty-five (45) days after the Effective Date. Objections to any Fee Claim must be Filed and served on the Reorganized Debtors and the requesting Professional no later than twenty (20) days after such application for Allowance of such Fee Claim is Filed with the Bankruptcy Court. Each Holder of an Allowed Fee Claim shall be paid in full in Cash, including from funds held in the Professional Fee Claims Reserve, within five (5) Business Days after entry of a Final Order of the Bankruptcy Court approving such Allowed Fee Claim. Notwithstanding anything to the contrary contained in this Plan, the failure of the Professional Fee Claims Reserve to satisfy in full the Fee Claims shall not, in any way, operate or be construed as a cap or limitation on the amount of Fee Claims due and payable by the Reorganized Debtors, as the amounts in the Professional Fee Claims Reserve are solely estimates. To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Fee Claims.

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, and other fees and expenses of the Professionals or other Entities related to implementation and Consummation of the Plan incurred by the Debtors or the Reorganized Debtors after the Effective Date. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention for services rendered after such date shall terminate, and the Debtors or the Reorganized Debtors,

as applicable, may employ any Professional or other Entity in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

        3.        Plan Supporters' Advisors Fees and Commitment Parties Fees

Notwithstanding anything to the contrary herein, Plan Supporters' Advisors Fees and Commitment Parties Fees will be paid pursuant to Article XIV.D of this Plan and without (i) the need for the filing of any claim or request for allowance or (ii) any further order of the Bankruptcy Court (except as expressly provided for in Article XIV.D of this Plan).

        4.        Put Option Premium

The Put Option Premium will be paid pursuant to Article V.G of this Plan and without (i) the need for the filing of any claim or request for allowance or (ii) any further order of the Bankruptcy Court (except as expressly provided for in Article V.G of this Plan).

*B.*     *DIP Facility Claims*

On the Effective Date, in full satisfaction, settlement, discharge and release of, and in exchange for, the Allowed DIP Facility Claims, (x) $50 million in Cash shall be used to reduce the outstanding amount under the DIP Facility and (y) subject to the terms and conditions of the DIP/Exit Facilities Commitment, the DIP Facility shall be converted into the New Exit Facilities; provided, however, that, if the condition precedent to the Effective Date that the New Exit Facilities shall have closed has not occurred, the Allowed DIP Facility Claims shall be paid in accordance with the DIP Facility Loan Documents.

*C.*     *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment or has been paid by the Debtors prior to the Effective Date, on or as soon as reasonably practicable after the latest to occur of (a) the Effective Date, (b) the date on which such Priority Tax Claim becomes Allowed, (c) the date on which such Allowed Priority Tax Claim becomes due and payable in the ordinary course of business, and (d) such other date as may be mutually agreed to by and among such Holder, the Required Consenting Noteholders, the Required Consenting Term Lenders, and the Debtors, in full and final satisfaction, settlement, release and discharge of, and in exchange for, each Allowed Priority Tax Claim, at the Debtors' option (subject to the reasonable consent of the Required Consenting Noteholders and the Required Consenting Term Lenders), each Holder of such Allowed Priority Tax Claim shall receive on account of such Allowed Priority Tax Claim:  (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such Holder, the Required Consenting Noteholders, the Required Consenting Term Lenders, and the Debtors or otherwise determined by an order of the Bankruptcy Court.  To the extent any Priority Tax Claim is not due and owing on the Effective Date, after such Claim becomes Allowed, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and such Holder, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

*D.*     *Other Priority Claims*

Except to the extent that a Holder of an Allowed Other Priority Claim, the Required Consenting Noteholders, the Required Consenting Term Lenders, and the applicable Debtors agree to less favorable treatment for such Holder, each Holder of an Allowed Other Priority Claim due and payable on or before the Effective Date shall receive, on the latest to occur of (a) the Effective Date, (b) the date on which such Other Priority Claim becomes Allowed, and (c) the date on which such Allowed Other Priority Claim becomes due and payable in the ordinary course of business, at the option of the Debtors (subject to the reasonable consent of the Required Consenting Noteholders and the Required Consenting Term Lenders), one of the following treatments: (1) be paid in

full in Cash or (2) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

E.     *Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code to the extent necessary, shall be paid by each of the Debtors or the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Debtors or Reorganized Debtors), as applicable, for each quarter (including any fraction thereof) until the earliest to occur of the entry of (a) a final decree closing such Debtor's Chapter 11 Case, (b) an order dismissing such Debtor's Chapter 11 Case, or (c) an order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

# ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

A.     *Introduction*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Equity Interests in the Debtors.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

This Plan, though proposed jointly, constitutes a separate plan proposed by each Debtor.  Therefore, the classifications set forth in Article III.B herein apply separately with respect to each Plan proposed by each Debtor. If there are no Claims or Equity Interests in a particular Class for a particular Debtor, then such Class of Claims or Equity Interests shall not exist for all purposes of the Plan for that Debtor.

B.     *Summary of Classification*

The classification of Claims and Equity Interests against the Debtors pursuant to the Plan is as follows:

| SUMMARY OF STATUS AND VOTING RIGHTS | | | |
|---|---|---|---|
| Class | Claim/Equity Interest | Status | Voting Rights |
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Prepetition RBL Claims | Unimpaired | Not entitled to Vote (Presumed to Accept) |
| 3 | Prepetition Term Loan Claims | Impaired | Entitled to Vote |
| 4 | Prepetition Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 6 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Affiliate Equity Interests in any Monitronics Subsidiary | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Monitronics Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

C.      *Treatment of Claims and Equity Interests*

1.      Class 1 – Other Secured Claims

(a)     *Classification*: Each Class 1 Claim is an Other Secured Claim against the applicable Debtor.  With respect to each Debtor, this Class will be further divided into subclasses designated by letters of the alphabet (Class 1A, Class 1B, and so on), so that each Holder of any Other Secured Claim against such Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

(b)     *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed Other Secured Claims will not be altered by this Plan.  Except to the extent a Holder of an Allowed Other Secured Claim has been paid by the Debtors prior to the Effective Date or the Holder of an Allowed Other Secured Claim, the Required Consenting Noteholders, the Required Consenting Term Lenders, and the Debtors agree to less favorable treatment of such Claim, each Holder of an Allowed Other Secured Claim (including any Claim for postpetition interest accrued until the Effective Date at the non-default rate provided in the applicable contract or, if there is no contract, then at the Federal Judgment Rate, to the extent permissible under Bankruptcy Code section 506(a)) shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Other Secured Claim, in the discretion of the Debtors (subject to the reasonable consent of the Required Consenting Noteholders and the Required Consenting Term Lenders), one of the following alternative treatments:

(i)     payment of the Allowed Other Secured Claim in full in Cash on the latest to occur of (A) the Distribution Date, (B) as soon as reasonably practicable after the date on which such Other Secured Claim becomes Allowed, and (C) as soon as reasonably practicable after the date on which such Allowed Other Secured Claim becomes due and payable in the ordinary course of business;

(ii)    delivery to the Holder of the Allowed Other Secured Claim of the collateral securing such Allowed Other Secured Claim;

(iii)   the Holder shall retain its Lien on such property and such Allowed Other Secured Claim shall be Reinstated pursuant to section 1124(2) of the Bankruptcy Code; or

(iv)    such other treatment as may be agreed to by the applicable Debtor, the Required Consenting Noteholders, the Required Consenting Term Lenders, and the Holder.

(c)     *Voting*: Class 1 is Unimpaired.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of such Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.      Class 2 – Prepetition RBL Claims

(a)     *Classification*:  Class 2 consists of all Prepetition RBL Claims.

(b)     *Allowance*:  The Prepetition RBL Claims are deemed Allowed in the aggregate principal amount of not less than $182,400,000.00, plus any accrued and unpaid interest payable on such amounts through the date that each Holder of an Allowed Prepetition RBL Claim receives the treatment provided under this Plan.

24

(c)    *Treatment*:  Upon the closing of the DIP Facility pursuant to the terms of the DIP Facility Loan Documents, each Holder of an Allowed Prepetition RBL Claim shall have received, in full and final satisfaction, settlement, release and discharge of, and in exchange for such Allowed Prepetition RBL Claim, payment in full in Cash.

(d)    *Voting*: Class 2 is Unimpaired.  Holders of Allowed Prepetition RBL Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of such Allowed Prepetition RBL Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 – Prepetition Term Loan Claims

(a)    *Classification*:  Class 3 consists of all Prepetition Term Loan Claims.

(b)    *Allowance*:  The Prepetition Term Loan Claims are deemed Allowed in the aggregate principal amount of $1,072,500,000.00, plus any accrued and unpaid interest due under the Prepetition Credit Agreement payable on such Allowed amounts through the Effective Date (which interest shall be calculated as if there were no default under the Prepetition Credit Agreement and at the non-default rate).

(c)    *Treatment*:  On the Effective Date, each Holder of an Allowed Prepetition Term Loan Claim shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for such Allowed Prepetition Term Loan Claim, (i) its Pro Rata share of (A) the Effective Date Pay Down and (B) the Takeback Exit Term Loans and commitments under the Takeback Exit Term Loan Facility Credit Agreement and (ii) payment in full in Cash of all accrued and unpaid interest on such Allowed Prepetition Term Loan Claim due under the Prepetition Credit Agreement (which interest shall be calculated as if there were no default under the Prepetition Credit Agreement and at the non-default rate).

On the Effective Date, the Contributed Term Loans will be exchanged for Equity Commitment Shares as part of the Equity Commitments pursuant to the terms and conditions of the Restructuring Support Agreement and the Put Option Agreement.

For the avoidance of doubt, notwithstanding the foregoing, no Equity Commitment Party will receive any portion of the Effective Date Pay Down or the Takeback Exit Term Loan on account of Contributed Term Loans; provided, however, that the principal amount of the Contributed Term Loans shall continue to accrue interest through the Effective Date, and all accrued and unpaid interest on the Contributed Term Loans shall be paid in Cash to the Equity Commitment Parties on the Effective Date.

(d)    *Voting*:  Class 3 is Impaired.  Holders of Allowed Prepetition Term Loan Claims are entitled to vote to accept or reject this Plan.

4.    Class 4 – Prepetition Notes Claims

(a)    *Classification*:  Class 4 consists of all Prepetition Notes Claims.

(b)    *Allowance*: The Prepetition Notes Claims are deemed Allowed in the aggregate principal amount of $585,000,000.00, plus any accrued and unpaid interest payable on such amounts through the Petition Date (which amount shall not be less than $40,489,770.80), plus fees, costs, expenses and other amounts asserted under the Prepetition Notes Indenture.

(c)      *Treatment*:  On the Effective Date, each Holder of an Allowed Prepetition Notes Claim, in full and final satisfaction, settlement, release and discharge of, and in exchange for such Allowed Prepetition Notes Claim and the full cancellation of the Prepetition Notes, shall

(i)      receive its Pro Rata share of the Cash Payout, or

(ii)     solely to the extent that such Holder timely and validly elects to be a Cash Opt Out Noteholder, (A) receive its Pro Rata share of the Notes Shares and (B) be eligible to exercise Rights to acquire Rights Offering Shares at the Exercise Price in accordance with the Rights Offering Procedures.

In order to opt out of the Cash Payout with respect to all or any portion of its Allowed Prepetition Notes Claim, a Holder of an Allowed Prepetition Notes Claim will be required to tender the underlying Prepetition Notes into a contra-CUSIP pursuant to DTC's ATOP procedures by the deadline specified in the Cash Opt Out Election Form, and Prepetition Notes that are tendered into the contra-CUSIP may no longer be transferable.

(d)      *Voting*:  Class 4 is Impaired.  Holders of Allowed Prepetition Notes Claims are entitled to vote to accept or reject this Plan.

5.      Class 5 – General Unsecured Claims

(a)      *Classification*: Class 5 consists of all General Unsecured Claims.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of, and in exchange for each Allowed General Unsecured Claim, on or as soon as practicable after the Effective Date or when such obligation becomes due in the ordinary course of business in accordance with applicable law or the terms of any agreement that governs such Allowed General Unsecured Claim, whichever is later, each Holder of an Allowed General Unsecured Claim shall be paid in full in Cash, or otherwise receive such treatment as to render such Holder Unimpaired; provided, however, that no Holder of an Allowed General Unsecured Claim shall receive any distribution for any Claim that has previously been satisfied pursuant to a Final Order of the Bankruptcy Court.

(c)      *Voting*:  Class 5 is Unimpaired.  Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of such Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan.

6.      Class 6 – Intercompany Claims

(a)      *Classification*: Class 6 consists of all Intercompany Claims.

(b)      *Treatment*:  On the Effective Date, all Class 6 Intercompany Claims shall either be (i) Reinstated or (ii) cancelled and extinguished, in which case Holders of Intercompany Claims shall receive no recovery on account of such Claims.

(c)      *Voting*:  Class 6 is Impaired and the Holders of Class 6 Intercompany Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims in Class 6 are not entitled to vote to accept or reject this Plan.

7.      Class 7 –Affiliate Equity Interests in any Monitronics Subsidiary

      (a)      *Classification*: Class 7 consists of the Affiliate Equity Interests in any Monitronics Subsidiary.

      (b)      *Treatment*: All Class 7 Affiliate Equity Interests in any Monitronics Subsidiary shall remain effective and outstanding on the Effective Date and shall be owned and held by the same applicable Entities that held and/or owned such Affiliate Equity Interests immediately prior to the Effective Date.

      (c)      *Voting*: Class 7 is Unimpaired and the Holders of the Affiliate Equity Interests in any Monitronics Subsidiary are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of the Affiliate Equity Interests in any Monitronics Subsidiary in Class 7 are not entitled to vote to accept or reject this Plan.

8.      Class 8 –Monitronics Equity Interests

      (a)      *Classification*: Class 8 consists of the Monitronics Equity Interests.

      (b)      *Treatment*: On the Effective Date, all Class 8 Monitronics Equity Interests shall be cancelled and extinguished and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

      (c)      *Voting*: Class 8 is Impaired and the Holder of Monitronics Equity Interests is conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Monitronics Equity Interests in Class 8 are not entitled to vote to accept or reject this Plan.

D.      *Special Provision Governing Unimpaired Claims*

Except as otherwise provided herein, nothing under this Plan shall affect the Debtors' or the Reorganized Debtors' rights and defenses in respect of any Claim or Equity Interest that is Unimpaired under this Plan, including, without limitation, all rights in respect of (1) legal and equitable defenses to, (2) setoff or recoupment against or (3) counter-claims with respect to any such Unimpaired Claims and Equity Interests.

E.      *Discharge of Claims*

Pursuant to section 1141(c) of the Bankruptcy Code, all Claims and Equity Interests that are not expressly provided for and preserved herein (or in any contract, instrument, release or other agreement or document created pursuant to the Plan) shall be discharged and extinguished upon Confirmation, and the Debtors and all property dealt with herein shall be free and clear of all such Claims and Equity Interests, including, without limitation, liens, security interests and any and all other encumbrances.

**ARTICLE IV.**

**ACCEPTANCE REQUIREMENTS**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the applicable Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of Allowed Claims in such Class actually voting have voted to accept the applicable Plan.

A.      *Acceptance or Rejection of this Plan*

      1.      Voting Classes

Classes 3 and 4 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

      2.      Presumed Acceptance of this Plan

Classes 1, 2, 5, and 7 are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

      3.      Deemed Rejection of this Plan

Classes 6 and 8 are Impaired under the Plan. The Holders of Claims and Equity Interests in such Classes are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.

B.      *Confirmation of This Plan Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by an Impaired Class.  The Debtors request Confirmation of this Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept this Plan pursuant to section 1126(c) of the Bankruptcy Code.  The Debtors reserve the right to modify this Plan in accordance with Article XIII hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

C.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Equity Interests (or any Class of Claims or Equity Interests) are Impaired under this Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or prior to the Confirmation Date.

**ARTICLE V.**

**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.      *Transactions Effective as of the Effective Date*

The transactions contemplated by the Plan shall be approved and effective as of the Effective Date without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtors, their board of directors, or their stockholders, or any other person or entity.  On the Effective Date, to the extent practicable, (i) all transactions contemplated by the Plan shall be sequenced to preserve and/or maximize the use of the tax attributes attributable to the Reorganized Debtors and (ii) the Merger (in the event that a Non-Ascent Restructuring Toggle does not occur) shall not be the last transaction step to occur.

B.      *Merger and Non-Ascent Restructuring Toggle*

The occurrence of any of the events set forth on Plan Schedule 2 shall constitute a Non-Ascent Restructuring Toggle. In the event that a Non-Ascent Restructuring Toggle does not occur, the Merger shall occur on the Effective Date, Reorganized Monitronics, as the surviving entity, shall be redomiciled as a Delaware corporation, and the Ascent Restructuring shall be effectuated pursuant to the Plan.  In the event a Non-Ascent Restructuring Toggle occurs, the Non-Ascent Restructuring shall be effectuated pursuant to the Plan.

C.      *Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors*

All consideration necessary for the Debtors and/or Reorganized Debtors, as applicable, to make payments or distributions pursuant hereto shall be obtained from Cash from the Debtors and/or Reorganized Debtors, as applicable, including Cash from business operations and the proceeds of the Exit Facilities, the Net Cash Amount, the Net Cash Shortfall Amount, the Ascent Default Amount, the Rights Offering, the Backstop Commitments, and/or the Equity Commitments, as applicable.  Further, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.   Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

D.      *New Exit Facilities Documents*

On the Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall be authorized to execute and deliver, and to consummate the transactions contemplated by, the New Exit Facilities Documents, in form and substance acceptable to the Required Consenting Term Lenders and the Required Consenting Noteholders (such acceptance not to be unreasonably withheld), without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the New Exit Facilities Documents). On the Effective Date, the New Exit Facilities Documents shall constitute legal, valid, binding and authorized indebtedness and obligations of the Reorganized Debtors, enforceable in accordance with their respective terms and such indebtedness and obligations shall not be, and shall not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under this Plan, the Confirmation Order or on account of the Confirmation or Consummation of this Plan.

E.      *Takeback Exit Term Loan Facility Documents*

On the Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall be authorized to execute and deliver, and to consummate the transactions contemplated by, the Takeback Exit Term Loan Facility Documents, in form and substance acceptable to the Required Consenting Term Lenders and the Required Consenting Noteholders (such acceptance not to be unreasonably withheld), without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the Takeback Exit Term Loan Facility Documents).  On the Effective Date, the Takeback Exit Term Loan Facility Documents shall constitute legal, valid, binding and authorized indebtedness and obligations of the Reorganized Debtors, enforceable in accordance with their respective terms and such indebtedness and obligations shall not be, and shall not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under this Plan, the Confirmation Order or on account of the Confirmation or Consummation of this Plan.

On and as of the Effective Date, all Holders of Prepetition Term Loans (other than Contributed Term Loans) as of the Effective Date shall be deemed to be parties to, and bound by, the Takeback Exit Term Loan Facility Credit Agreement, without the need for execution thereof by any such applicable Holder of Prepetition Term Loans.  By voting to accept this Plan, each Prepetition Term Lender thereby instructs and directs the Replacement First Lien Agent, and each such vote to accept this Plan shall, for all purposes, constitute an instruction from such Prepetition Term Lender directing the Replacement First Lien Agent and the Takeback Exit Term Loan Facility Agent (as applicable), to (i) act as Disbursing Agent to the extent required by this Plan, (ii) execute and deliver the Takeback Exit Term Loan Facility Documents (each to the extent it is a party thereto), as well as to execute, deliver, file, record, and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, to which the Takeback Exit Term Loan Facility Agent is a party and to promptly consummate the transactions contemplated thereby, and (iii) take any other actions required or contemplated to be taken by the Takeback Exit Term Loan Facility Agent and/or the Replacement First Lien Agent (as applicable) under this Plan.

*F.      Rights Offering*

Following entry of the Rights Offering Approval Order, the Rights Offering shall be conducted pursuant to the Rights Offering Procedures substantially contemporaneously with the post-petition solicitation of votes to accept or reject the Plan from certain Holders of Prepetition Notes Claims. Rights will be issued in respect of all Prepetition Notes outstanding at the time the Rights Offering is commenced, but solely Cash Opt Out Noteholders will be eligible to exercise Rights to purchase Rights Offering Shares at the Exercise Price in accordance with the Rights Offering Procedures.

*G.      Backstop Commitments, Equity Commitments, and Put Option Premium*

Each Backstop Commitment Party has agreed to make the Backstop Commitments on the terms of, and subject to the conditions set forth in, the Put Option Agreement.  For the avoidance of doubt, the aggregate amount of the Backstop Commitments totals $200 million.

Each Equity Commitment Party has agreed to make the Equity Commitments on the terms of, and subject to the conditions set forth in, the Put Option Agreement.  For the avoidance of doubt, the aggregate amount of the Equity Commitments totals $100 million.

On the Effective Date, New Common Stock in an amount equal to the Put Option Premium shall be issued by Reorganized Monitronics to the Commitment Parties pursuant to and in accordance with the Put Option Agreement.

*H.      Issuance of New Common Stock*

The issuance of the New Common Stock by Reorganized Monitronics is authorized without the need for any further corporate action and without any further action by Holders of Claims or Equity Interests. The New Common Stock shall be issued in accordance with the terms of the Plan pursuant to the Rights Offering, the Equity Commitments, the Backstop Commitments, the Put Option Agreement, and the Plan.  For the avoidance of doubt, solely in the event the Non-Ascent Restructuring Toggle does not occur and the Merger is consummated, the New Common Stock shall be distributed to the Ascent Shareholders pursuant to the Ascent Share Distribution.

All of the New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable.  Each distribution and issuance referred to in Article VII hereof shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

*I.      Registration Rights Agreement*

On the Effective Date, Reorganized Monitronics and the Registration Rights Agreement Parties shall enter into the Registration Rights Agreement, which shall become valid, binding and enforceable in accordance with its terms, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the Registration Rights Agreement).

*J.      Listing and Registration of New Common Stock*

On the Effective Date, Reorganized Monitronics shall issue the New Common Stock pursuant to the Plan, the Rights Offering Solicitation Materials, and the Backstop and Equity Commitment Documents.  Reorganized Monitronics shall not be obligated to register any shares of New Common Stock under the Securities Act, except as provided below with respect to the Ascent Share Distribution (if applicable) and as expressly provided in the Registration Rights Agreement.  Reorganized Monitronics shall not list the New Common Stock for trading on the New York Stock Exchange, NASDAQ, or any other stock exchange; provided that the Reorganized Debtors will endeavor to cause the New Common Stock to be admitted for trading and quoted on any markets operated by OTC

Markets Group Inc. If the Non-Ascent Restructuring Toggle shall not have occurred and the Merger is consummated, Reorganized Monitronics will register the New Common Stock under Section 12(g) of the Exchange Act as promptly as practicable after the Effective Date. If the Non-Ascent Restructuring Toggle occurs, Reorganized Monitronics will, if requested by the Requisite Commitment Parties, register the New Common Stock under Section 12(g) of the Exchange Act as promptly as practicable after the Effective Date.

K.      *Cancellation of Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the Prepetition Credit Agreement, the Prepetition Notes and any other Certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such Certificates, notes or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, Certificates, notes or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any agreement that governs the rights of the Holder of a Claim or Equity Interest shall continue in effect solely for purposes of (a) the Replacement First Lien Agent and the Indenture Trustee to make distributions to Holders as provided in the Plan and (b) permitting the Indenture Trustee to maintain or assert any rights or charging liens it may have on distributions to Prepetition Noteholders pursuant to the terms of the Prepetition Notes Indenture. For the avoidance of doubt, nothing in this paragraph shall apply to or affect or impair the New Exit Facilities Documents or the Takeback Exit Term Loan Facility Documents, which shall be in full force and effect as of and after the Effective Date.

L.      *Securities Act Registration and Section 1145 and Private Placement Exemptions*

The offering, issuance, and distribution of the Notes Shares shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration before the offering, issuance, distribution or sale of securities pursuant to section 1145(a) of the Bankruptcy Code.

The offering and issuance of the Rights and the Rights Offering Shares shall be exempt from the registration requirements of section 5 of the Securities Act pursuant, in part, to section 1145(a) of the Bankruptcy Code and, in part, to Section 4(a)(2), Regulation D and/or Regulation S, as set forth in the Rights Offering Solicitation Materials, and the Rights and Rights Offering Shares issued pursuant to section 1145(a) of the Bankruptcy Code shall also be exempt from any other applicable law requiring registration before the offering or issuance thereof.

The Equity Commitment Shares, the Backstop Commitment Shares and the Put Option Premium Shares will be issued in reliance upon the exemption from registration under the Securities Act set forth in Section 4(a)(2), Regulation D and/or Regulation S.

The Notes Shares and Rights Offering Shares issued pursuant to section 1145 of the Bankruptcy Code shall be freely transferable by the recipients thereof, subject to any limitations that may be applicable to any Person receiving such securities that is an "affiliate" of Reorganized Monitronics as determined in accordance with applicable U.S. securities law and regulations or is otherwise an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

The shares of New Common Stock issued pursuant to Section 4(a)(2), Regulation D and/or Regulation S will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration (or an applicable exemption from such registration requirements) under the Securities Act and other applicable law.

The offering and issuance of New Common Stock in the Ascent Share Distribution (if applicable) shall be registered under the Securities Act pursuant to the Form S-4 Registration Statement.

M.      *Corporate Action*

Upon the Effective Date, all actions contemplated under the Plan and the Put Option Agreement shall be deemed authorized and approved in all respects, including, without limitation:  (i) selection of the directors and officers for the Reorganized Debtors; (ii) the issuance and distribution of the New Common Stock contemplated under the Plan; (iii) implementation of the Restructuring, including the Rights Offering pursuant to the Rights Offering Procedures; (iv) entry into the New Exit Facilities Documents and the Takeback Exit Term Loan Facility Documents; (v) adoption of the Amended Organizational Documents; (vi) issuance of the Rights and the Rights Offering Shares pursuant to the Rights Offering Procedures; (vii) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (viii) the transactions contemplated by the Put Option Agreement; (ix) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); and (x) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate and give effect to the Restructuring and the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the Restructuring and transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the Amended Organizational Documents, the New Exit Facilities Documents, the Takeback Exit Term Loan Facility Documents, the Rights Offering, the transactions contemplated by the Put Option Agreement, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this paragraph shall be effective notwithstanding any requirements under non-bankruptcy law.

N.      *Corporate Existence*

Except as otherwise provided herein, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state law).  Notwithstanding the foregoing, Reorganized Monitronics shall be redomiciled as a Delaware corporation, pursuant to a statutory conversion or otherwise, on the Effective Date (or prior to the Plan Effective Date if mutually agreed by the Debtors and the Requisite Commitment Parties) prior to the issuance of the New Common Stock.

O.      *Amended Organizational Documents*

To the extent required under the Plan or applicable non-bankruptcy law, on the Effective Date, the Reorganized Debtors shall adopt their respective Amended Organizational Documents as permitted by the laws of their respective states of incorporation or organization and, in connection therewith, shall make all such required filings with the applicable Secretaries of State and/or other applicable authorities in their respective states of incorporation in accordance with the corporate or other applicable laws of their respective states of incorporation or organization.  On the Effective Date, the Amended Organizational Documents shall be effective.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Amended Organizational Documents of each Reorganized Debtor will prohibit the issuance of non-voting equity securities.

P.      *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action (except those released by the Debtors pursuant to this Plan or otherwise) and any property acquired by any of the Debtors pursuant to the Plan (other than the Professional Fee Claims Reserve) shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances (except for Liens granted to secure the obligations under the New Exit Facilities Documents and the Takeback Exit Term Loan Facility Documents).  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Equity Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

Q.      *Directors and Officers of the Debtors and the Reorganized Debtors*

Upon the Effective Date, subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, the New Boards shall take office and replace the then-existing boards of directors, boards of managers or similar governing bodies of the Reorganized Debtors.  All members of such existing boards shall cease to hold office or have any authority from and after the Effective Date to the extent not expressly included in the roster of the New Boards.

The Reorganized Monitronics Board shall, on the Effective Date, be comprised of seven (7) directors.  The New Affiliate Boards shall be comprised of directors designated in accordance with the Governance Term Sheet. The individuals appointed to the New Boards shall be identified in the Plan Supplement.

R.      *Post-Emergence Incentive Plan*

As of the Effective Date, the Reorganized Monitronics Board shall be deemed to have adopted the Post-Emergence Incentive Plan.  The details regarding the Post-Emergence Incentive Plan and the awards (and terms and conditions thereof) under the Post-Emergence Incentive Plan to certain officers, board members, and other members of management under the Post-Emergence Incentive Plan will be determined by the Reorganized Monitronics Board.

S.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors and the officers and members of the New Boards are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan, the corporate actions and transactions contemplated under the Plan, and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations or consents except for those expressly required pursuant to the Plan or the Amended Organizational Documents.

T.      *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer or exchange of any debt, Equity Security or other Equity Interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment or recording of any lease or sublease; or (4) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instruments of transfer executed in connection with any transaction arising out of, contemplated by or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment, and the Confirmation Order shall direct the

appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

U.    *Employee Benefits*

On and after the Effective Date (and subject to any additions, deletions, and/or modifications as may be adopted by the Debtors or the Reorganized Debtors, with the consent of the Required Consenting Noteholders and the Requisite Commitment Parties), the Reorganized Debtors shall honor, in the ordinary course of business, the Designated Compensation Arrangements; provided, however, that the Debtors' or Reorganized Debtors' performance of any employment agreement will not entitle any person to any benefit or alleged entitlement under any contract, agreement, arrangement, policy, program or plan that has expired or been terminated or cancelled before the Effective Date, or restore, reinstate or revive any such benefit or alleged entitlement under any such contract, agreement, arrangement, policy, program or plan. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action or other rights with respect to any such contracts, agreements, arrangements, policies, programs and plans. For the avoidance of doubt, all equity or equity-based awards granted under any Compensation Arrangement shall be treated in the manner set forth in the Existing Compensation Arrangements Term Sheet attached as Plan Schedule 3.

V.    *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Debtor Releases provided in Article X hereof), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically identified in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them.  Except with respect to Causes of Action as to which the Debtors or the Reorganized Debtors have released any Entity on or before the Effective Date (including pursuant to the Debtor Releases or otherwise), the Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of Confirmation or Consummation of the Plan.

W.    *Professional Fee Claims Reserve*

On or before the Effective Date, the Debtors shall establish and fund the Professional Fee Claims Reserve with Cash in an amount determined by the Debtors, with the consent of the Required Consenting Term Lenders and the Required Consenting Noteholders (in each case, not to be unreasonably withheld), or as determined by order of the Bankruptcy Court, as necessary in order to be able to pay in full in Cash the obligations and liabilities for which such reserve was established, which amount shall be based on (x) the aggregate amount of unpaid Fee Claims billed by the Professionals prior to the Effective Date plus (y) an estimate of the aggregate Fee Claims for periods through the Effective Date that have not been billed, as provided to the Debtors by each Professional.  Each Professional shall estimate in good faith their Fee Claims for periods that have not been billed as of the Effective Date and shall deliver such good faith estimate to the Debtors, counsel to the Ad Hoc Noteholder Group, and counsel to the Ad Hoc Lender Group no later than five (5) Business Days prior to the Effective Date; provided, however, that such estimate shall not be deemed to limit the amount of fees and expenses that are the subject of such Professional's final request for payment of Fee Claims.  If a Professional does not provide an estimate, the Debtors shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional through the Effective Date.

The Reorganized Debtors shall not commingle any funds contained in the Professional Fee Claims Reserve and shall use such funds to pay only the Fee Claims, as and when Allowed by a Final Order of the Bankruptcy Court.  Except as provided in this Article V.W, after the Effective Date, the Reorganized Debtors shall not deposit any other funds or property into the Professional Fee Claims Reserve without further order of the Bankruptcy Court. No Liens or Claims shall encumber the Professional Fee Claims Reserve in any way (whether on account of the Exit Facilities or otherwise).  The Professional Fee Claims Reserve shall be maintained in trust for the Professionals and shall not be considered property of the Debtors' Estates or the Reorganized Debtors; provided that the Reorganized Debtors shall have a reversionary interest in the Cash, if any, in the Professional Fee Claims Reserve after all Allowed Fee Claims are paid, satisfied, and discharged in full in Cash in accordance with this Plan, with such amount being returned to the Reorganized Debtors within three (3) Business Days after determination thereof.  The Debtors or the Reorganized Debtors, as applicable, shall maintain records of all deposits to and payments made from the Professional Fee Claims Reserve.  To the extent that funds held in the Professional Fee Claims Reserve do not or are unable to satisfy the full amount of any Allowed Fee Claim, the Debtors or the Reorganized Debtors, as applicable, shall, within five (5) Business Days after entry of the Final Order approving such Allowed Fee Claim, pay such Allowed Fee Claim from either Cash on hand or by drawing under the Exit Facilities to the extent of any availability thereunder, without any further action or order of the Bankruptcy Court.

X.      *Information Sharing Agreement*

The Confirmation Order shall provide that the Debtors are authorized and directed to perform under the Information Sharing Agreement from and after Confirmation.

## ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption of Executory Contracts and Unexpired Leases*

Except as otherwise provided herein, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan and the Plan Supplement, as of the Effective Date, each Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party, unless such contract or lease: (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of another motion to reject Filed on or before the Confirmation Date; or (4) is set forth in the Schedule of Rejected Executory Contracts and Unexpired Leases; provided that the Restructuring Support Agreement and the Information Sharing Agreement shall be deemed assumed as of the Confirmation Date.  Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting assignment, the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before or on the date that the Debtors assume such Executory Contract or Unexpired Lease. For the avoidance of doubt, any Executory Contract or Unexpired Lease assumed pursuant to the Plan or otherwise may not be terminated on account of such assumption or on account of this Plan, the transactions contemplated herein, or any change of control or ownership interest composition that may occur at any time before or on the Effective Date.  The Reorganized Debtors may rely on this Plan and the Confirmation Order as a complete defense to any action by a party to an assumed Executory Contract or Unexpired Lease to terminate such Executory Contract or Unexpired Lease on account of such assumption or on account of this Plan, the transactions contemplated herein, or any change of control or ownership interest composition that may occur at any time before or on the Effective Date.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Notwithstanding the foregoing, before the Effective Date, the Debtors, with the reasonable consent of the Required Consenting Noteholders, the Required Consenting Term Lenders, and the Requisite Commitment Parties and, after the Effective Date, the Reorganized Debtors, shall have the right to amend the Schedule of Rejected Executory Contracts and Unexpired Leases.  In addition, notwithstanding the foregoing, the Reorganized Debtors shall have the right to terminate, amend or modify any intercompany contracts, leases or other agreements without approval of the Bankruptcy Court.

B.      *Assumption of Indemnification Obligations*

The Debtors, and upon the Effective Date, the Reorganized Debtors, shall assume all of the Indemnification Obligations in place on and before the Effective Date for Indemnified Parties for Claims related to or arising out of any actions, omissions or transactions occurring before the Effective Date.

C.      *Assumption of Designated Compensation Arrangements*

On the Effective Date, and subject to any additions, deletions, and/or modifications as may be made by the Debtors with the consent of the Required Consenting Noteholders and the Requisite Commitment Parties, the applicable Debtor party to the Designated Compensation Arrangements shall assume such Designated Compensation Arrangements pursuant to section 365(a) of the Bankruptcy Code (or Ascent shall assign such Designated Compensation Arrangements to Reorganized Monitronics, as applicable).   Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the applicable Debtors' assumption of the Designated Compensation Arrangements.

D.      *Assumption of the D&O Liability Insurance Policies and Fiduciary Liability Insurance Policies*

The Debtors, and upon the Effective Date, the Reorganized Debtors, shall assume all of the D&O Liability Insurance Policies (or Ascent shall assign such D&O Liability Insurance Policies to Reorganized Monitronics, as applicable) pursuant to section 365(a) of the Bankruptcy Code.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies  and authorization for the Debtors to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secured for the insureds the benefits of the D&O Liability Insurance Policies.

E.      *Payments Related to Assumption of Executory Contracts and Unexpired Leases*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to this Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree (with the reasonable consent of the Required Consenting Noteholders and the Requisite Commitment Parties).  In the event of a dispute regarding: (a) the amount of any Cure Claim; (b) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), if applicable, under the Executory Contract or the Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the Cure Claims shall be paid following the entry of a Final Order resolving the dispute and approving the assumption of such Executory Contracts or Unexpired Leases; provided, however, that the Debtors, with the reasonable consent of the Required Consenting Noteholders, and the Requisite Commitment Parties, or the Reorganized Debtors, as applicable, may settle any dispute regarding the amount of any Cure Claim without any further notice to or action, order or approval of the Bankruptcy Court.

F.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

G.      *Rejection Damages Claims*

All Claims arising from the rejection (if any) of Executory Contracts or Unexpired Leases must be Filed with the clerk of the Bankruptcy Court and served upon counsel for the Reorganized Debtors within thirty (30) days

after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving the rejection of such Executory Contract or Unexpired Lease.  Any Claim arising from the rejection of Executory Contracts or Unexpired Leases that becomes an Allowed Claim is classified and shall be treated as a Class 5 General Unsecured Claim.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within the time required by this section will be forever barred from assertion against the Debtors, the Reorganized Debtors, the Estates or the property of the Debtors or the Reorganized Debtors.

H.      *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor may be performed by the applicable Debtor or Reorganized Debtor in the ordinary course of business without approval of the Bankruptcy Court.

I.      *Intercompany Contracts and Leases*

Any intercompany Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business without approval of the Bankruptcy Court.

J.      *Modifications, Amendments, Supplements, Restatements or Other Agreements*

Unless otherwise provided in this Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, whether executed before or during the Chapter 11 Cases, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, extension rights, purchase rights and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under this Plan.

Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or the Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

K.      *Reservation of Rights*

Except with respect to the Restructuring Support Agreement and the Information Sharing Agreement, neither the exclusion nor inclusion of any contract or lease in the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, with the reasonable consent of the Required Consenting Noteholders and the Requisite Commitment Parties, or the Reorganized Debtors, as applicable, shall have sixty (60) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

L.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts or Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

# ARTICLE VII.

# PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts To Be Distributed; Entitlement to Distributions*

    1.    Timing and Calculation of Amounts To Be Distributed

Unless otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim or Equity Interest is not an Allowed Claim or Allowed Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Allowed Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Equity Interest against the Debtors shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class.  If and to the extent that there are Disputed Claims or Disputed Equity Interests, distributions on account of any such Disputed Claims or Disputed Equity Interests shall be made pursuant to the provisions set forth in this Article VII.  Except as otherwise provided herein, Holders of Claims shall not be entitled to postpetition interest (except in the case of the Prepetition Term Lenders, which shall be entitled to postpetition interest on account of the Prepetition Term Loan Claims in accordance with the Prepetition Credit Agreement, calculated as if there were no default under the Prepetition Credit Agreement and at the non-default rate), dividends or accruals on the distributions provided for herein or in the DIP Orders, regardless of whether such distributions are delivered on or at any time after the Effective Date.

    2.    Entitlement to Distributions

On the Effective Date, the Disbursing Agent shall be authorized to recognize and deal only with those Holders of Claims listed on the Debtors' books and records.  Accordingly, the Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Effective Date, and will be entitled for all purposes herein to recognize and distribute securities, property, notices and other documents only to those Holders of Allowed Claims who are Holders of such Claims (or participants therein) as of the close of business on the Effective Date; provided, however, that distributions to holders of publicly held securities will be made on or as soon as practicable after the Effective Date in accordance with the surrender provisions of the Plan.

B.    *Disbursing Agent*

Except as otherwise provided herein, all distributions under the Plan shall be made by the Reorganized Debtors as Disbursing Agent or such other Entity designated by the Reorganized Debtors as a Disbursing Agent on the Effective Date.  Distributions on account of the Allowed DIP Facility Claims, Allowed Prepetition RBL Claims, the Allowed Prepetition Term Loan Claims, and the Allowed Prepetition Notes Claims shall be made to (or in coordination with) the DIP Facility Agent, the Prepetition First Lien Agent, the Replacement First Lien Agent, and the Indenture Trustee, as applicable, and such agent or trustee will be, and shall act as, the Disbursing Agent with respect to its respective Class of Claims in accordance with the terms and conditions of this Plan and the applicable loan or indenture documents.  All distributions to Holders of Allowed DIP Facility Claims, Allowed Prepetition RBL Claims, Allowed Prepetition Term Loan Claims, and Allowed Prepetition Notes Claims shall be deemed completed when made by the Reorganized Debtors to (or at the direction of) the DIP Facility Agent, the Prepetition First Lien Agent, the Replacement First Lien Agent, and the Indenture Trustee, as applicable.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  In the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors. The DIP Facility Agent shall be deemed to be the Holder of all DIP Facility Claims for purposes of distributions to be made hereunder, and all distributions on account of Allowed DIP Facility Claims shall be made to the DIP Facility Agent. The DIP Facility Agent shall hold such distributions for the benefit of the Holders of Allowed DIP Facility Claims and shall deliver such distributions to the applicable Holders in accordance with the terms of the DIP Facility Loan Documents.  The Prepetition First Lien Agent shall be deemed to be the Holder of all Prepetition RBL Claims for purposes of distributions to be made hereunder or pursuant to any order of the Bankruptcy Court, and all distributions on account of Allowed Prepetition RBL Claims shall be made to the Prepetition First Lien Agent.  The Prepetition First Lien

Agent shall hold such distributions for the benefit of the Holders of Allowed Prepetition RBL Claims and shall deliver such distributions to the applicable Holders in accordance with the terms of the Prepetition Loan Documents. The Replacement First Lien Agent shall be deemed to be the Holder of all Prepetition Term Loan Claims for purposes of distributions to be made hereunder, and all distributions on account of Allowed Prepetition Term Loan Claims shall be made to the Replacement First Lien Agent.  The Replacement First Lien Agent shall hold such distributions for the benefit of the Holders of Allowed Prepetition Term Loan Claims and shall deliver such distributions to the applicable Holders. The Indenture Trustee  shall be deemed to be the Holder of all Prepetition Notes Claims for purposes of distributions to be made hereunder, and all distributions on account of Allowed Prepetition Notes Claims shall be made to (or in coordination with) the Indenture Trustee (provided, however, that non-Cash consideration shall not be distributed in the name of the Indenture Trustee).  As soon as practicable and in accordance with the requirements set forth in this Article VII, the Indenture Trustee or the Reorganized Debtors (in coordination with the Solicitation Agent), as applicable, shall cause such distributions to or on behalf of such Holders to be made in accordance with the terms of the Prepetition Notes Indenture.  If the Indenture Trustee is unable to make, or consents to the Reorganized Debtors making, such distributions, the Reorganized Debtors (in coordination with the Solicitation Agent), with the Indenture Trustee's cooperation, shall make such distributions to the extent practicable to do so.  The distributions of Rights under this Plan to Holders of Allowed Prepetition Notes Claims shall be made by the Reorganized Debtors (in coordination with the applicable stock transfer agent and the Solicitation Agent) as provided in the Rights Offering Procedures.  The Debtors or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of an Allowed Prepetition Notes Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC as soon as reasonably practicable after the Effective Date.

C.      Rights and Powers of Disbursing Agent

        1.      Powers of the Disbursing Agent

        The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof; provided, however, that, other than the preservation of rights set forth in Article V.K with respect to the Replacement First Lien Agent and the Indenture Trustee, such Disbursing Agent shall waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under this Plan to be distributed by such Disbursing Agent.

        2.      Expenses Incurred on or After the Effective Date

        Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable and documented compensation and expense reimbursement claims (including reasonable and documented attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.      Distributions on Account of Claims or Equity Interests Allowed After the Effective Date

        1.      Payments and Distributions on Disputed Claims or Equity Interests

        Distributions made after the Effective Date to Holders of Disputed Claims or Disputed Equity Interests that are not Allowed Claims or Allowed Equity Interests as of the Effective Date but which later become Allowed Claims or Allowed Equity Interests shall be deemed to have been made on the Effective Date.

        2.      Special Rules for Distributions to Holders of Disputed Claims and Disputed Equity Interests

        Notwithstanding any provision otherwise in this Plan and except as otherwise agreed to by the Debtors, with the reasonable consent of the Required Consenting Noteholders, and the Requisite Commitment Parties, or the Reorganized Debtors, as applicable, (a) no partial payments and no partial distributions shall be made with respect to

a Disputed Claim or a Disputed Equity Interest until all such disputes in connection with such Disputed Claim or Disputed Equity Interest have been resolved by settlement or Final Order and such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Allowed Equity Interest; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim or an Allowed Equity Interest and a Disputed Equity Interest shall not receive any distribution on the Allowed Claim or Allowed Equity Interest unless and until all objections to the Disputed Claim or the Disputed Equity Interest have been resolved by settlement or Final Order and the Disputed Claims or the Disputed Equity Interests have been Allowed or disallowed (with only Allowed portions of such Disputed Claims or Disputed Equity Interests remaining).

E.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.    Delivery of Distributions in General

Except as otherwise provided herein, the Reorganized Debtors shall make distributions to Holders of Allowed Claims and Allowed Equity Interests at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution.

2.    Partial Distributions

The Reorganized Debtors shall not be required to make partial distributions on account of Allowed Claims.

3.    No Fractional Shares

No fractional shares of New Common Stock shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts, except as provided in the Merger Agreement with respect to the Ascent Share Distribution, if applicable.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of shares of New Common Stock that is not a whole number, such New Common Stock shall be rounded as follows: (a) fractions of greater than one-half shall be rounded to the next higher whole number and (b) fractions of one-half or less shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

4.    Undeliverable Distributions and Unclaimed Property

(a)    Failure To Claim Undeliverable Distributions

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim or Equity Interest of any Holder to such property or interest in property shall be discharged and forever barred.

(b)    Failure To Present Checks

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the issuance of such check.  Requests for reissuance of any check shall be made directly to the Disbursing Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.  Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within one hundred and eighty (180) days after the issuance of such check shall have its Claim for such un-negotiated check discharged and shall be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property.  In

such cases, any Cash held for payment on account of such Claims shall be property of the Reorganized Debtors, free of any Claims of such Holder with respect thereto.  Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

F.      *Compliance with Tax Requirements/Allocations*

        In connection with this Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and encumbrances.  For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount (as determined for U.S. federal income tax purposes) of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

        Notwithstanding any other provision of this Plan to the contrary, pursuant to the terms of the Put Option Agreement, the Put Option Premium shall be paid free and clear of any withholding and each Holder of an Allowed Claim otherwise shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

G.      *Surrender of Canceled Instruments or Securities*

        As a condition precedent to receiving any distribution on account of its Allowed Prepetition Notes Claim, each Prepetition Noteholder will be required to surrender its Prepetition Notes to the Disbursing Agent.  With respect to all other Holders of an Allowed Claim or Allowed Equity Interest, each Holder of a Claim or an Equity Interest shall be deemed to have surrendered the Certificates or other documentation underlying each such Claim or Equity Interest, and all such surrendered Certificates and other documentations shall be deemed to be canceled pursuant to Article V.K hereto, except to the extent otherwise provided herein.

H.      *Claims Paid or Payable by Third Parties*

        1.      Claims Paid by Third Parties

        The Debtors or the Reorganized Debtors, as applicable, shall reduce a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two (2) weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the Distribution Date.

        2.      Claims Payable by Third Parties

        No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

3. Applicability of Insurance Policies

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in this Plan shall constitute or be deemed a release, settlement, satisfaction, compromise or waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VIII.**

**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS**

A. *Allowance of Claims and Equity Interests*

Except as expressly provided herein or any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), no Claim or Equity Interest shall be deemed Allowed unless and until such Claim or Equity Interest is deemed Allowed under the Bankruptcy Code or under the Plan, or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim under section 502 of the Bankruptcy Code. Except as expressly provided in any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), the Reorganized Debtors after Confirmation will have and retain any and all rights and defenses the Debtors had with respect to any Claim or Equity Interest as of the Petition Date.

B. *Disallowance of Certain Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code unless expressly Allowed pursuant to the Plan, and Holders of such Claims may not receive any distributions on account of such Claims and Interests until such time as such Causes of Action against that Entity have been settled or a Final Order of the Bankruptcy Court with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors.

C. *Prosecution of Objections to Claims and Equity Interests*

The Debtors or the Reorganized Debtors, as applicable, shall have the exclusive authority to File, settle, compromise, withdraw or litigate to judgment any objections to Claims or Equity Interests as permitted under this Plan. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim or Disputed Equity Interest without approval of the Bankruptcy Court. The Debtors also reserve the right to resolve any Disputed Claim or Disputed Equity Interest outside the jurisdiction of the Bankruptcy Court under applicable governing law.

D. *Procedures Regarding Disputed Claims or Disputed Equity Interests*

1. No Filing of Proofs of Claim or Equity Interests

Except as otherwise provided in this Plan, including, without limitation Article VI.G, Holders of Claims or Equity Interests shall not be required to File a proof of claim or proof of interest, and no parties should File a proof of claim or proof of interest. The Debtors do not intend to object to the allowance of Claims Filed or Equity Interests Filed; provided, however, that the Debtors and the Reorganized Debtors, as applicable, reserve the right to object to any Claim or Equity Interest that is entitled, or deemed to be entitled, to a distribution under this Plan or is rendered Unimpaired under this Plan. Instead, the Debtors intend to make distributions, as required by this Plan, in accordance with the books and records of the Debtors. Unless disputed by a Holder of a Claim or an Equity Interest, the amount set forth in the books and records of the Debtors shall constitute the amount of the Allowed Claim or

Allowed Equity Interest of such Holder. If any such Holder of a Claim or an Equity Interest disagrees with the Debtors' books and records with respect to the Allowed amount of such Holder's Claim or Equity Interest, such Holder must so advise the Debtors in writing within thirty (30) days of receipt of any distribution on account of such Holder's Claim or Equity Interest, in which event the Claim or Equity Interest will become a Disputed Claim or a Disputed Equity Interest. The Debtors intend to attempt to resolve any such disputes consensually or through judicial means outside the jurisdiction of the Bankruptcy Court. Nevertheless, the Debtors may, in their discretion, File with the Bankruptcy Court (or any other court of competent jurisdiction) an objection to the allowance of any Claim or Equity Interest or any other appropriate motion or adversary proceeding with respect thereto. All such objections will be litigated to Final Order; provided, however, that the Debtors may compromise, settle, withdraw or resolve by any other method approved by the Bankruptcy Court any objections to Claims or Equity Interests.

2.  Claims Estimation

Any Debtor or Reorganized Debtor, as applicable, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether such Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanism.

E.  *No Distribution Pending Allowance*

If an objection to a Claim is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

F.  *Distributions After Allowance*

To the extent that a Disputed Claim or a Disputed Equity Interest ultimately becomes an Allowed Claim or Allowed Equity Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Equity Interest in accordance with the provisions of this Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Equity Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Equity Interest the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any postpetition interest to be paid on account of such Claim or Equity Interest

G.  *No Interest*

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

H.  *Adjustments to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted on the Claims register by the Reorganized Debtors without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

# ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE

A.      *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation hereof that the following provisions, terms and conditions are satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.      The Plan and the Definitive Documents that are required to be entered into or Filed prior to Confirmation, including any amendments, modifications or supplements to such Definitive Documents, are in form and substance materially consistent with the Restructuring Support Agreement and otherwise reasonably acceptable to the Required Consenting Noteholders, the Required Consenting Term Lenders, the Debtors, and Ascent (or, solely to the extent the Non-Ascent Restructuring Toggle has occurred, reasonably acceptable to Ascent solely to the extent such documents, amendments, modifications or supplements would adversely impact Ascent).

2.      The proposed Confirmation Order shall be in form and substance materially consistent with the Restructuring Support Agreement and otherwise reasonably acceptable in all respects to the Required Consenting Noteholders, the Required Consenting Term Lenders, the Required DIP Facility Lenders, the Debtors, and Ascent (or, solely to the extent the Non-Ascent Restructuring Toggle has occurred, reasonably acceptable to Ascent solely to the extent the Confirmation Order would adversely impact Ascent).

3.      The proposed Confirmation Order shall provide that, among other things, the Debtors or the Reorganized Debtors, as appropriate, are authorized and directed to take all actions necessary or appropriate to consummate this Plan, including, without limitation, entering into, implementing and consummating the other contracts, instruments, releases, leases, indentures, financing arrangements, and other agreements or documents created in connection with or described in this Plan.

4.      The Debtors shall not have submitted any amendment, modification or filing seeking to amend or modify this Plan, the Disclosure Statement or any documents, motions or orders related to the foregoing, in any manner not consistent with the Restructuring Support Agreement or otherwise not reasonably acceptable to the Required Consenting Noteholders, the Requisite Commitment Parties, the Required Consenting Term Lenders, the Required DIP Facility Lenders, and Ascent (or, solely to the extent the Non-Ascent Restructuring Toggle has occurred, not reasonably acceptable to Ascent solely to the extent such amendments or modifications would adversely impact Ascent).

5.      There shall be no default or Event of Default (as defined in the DIP Facility Credit Agreement) under any of the DIP Facility Loan Documents.

6.      The Bankruptcy Court shall have entered the Rights Offering Approval Order.

7.      The Restructuring Support Agreement shall continue to be in full force and effect and shall not have been terminated as to any party thereto (other than Ascent) in accordance with its terms.

8.      The Information Sharing Agreement shall have been executed and delivered by all Entities that are parties thereto and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof.

B.      *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date that the following provisions, terms and conditions are satisfied (or waived pursuant to the provisions of Article IX.C hereof), and the Effective Date shall occur on the date upon which the last of such conditions are so satisfied and/or waived.

1.      Confirmation shall have occurred and the Confirmation Order shall be a Final Order, in form and substance reasonably acceptable to the Required Consenting Noteholders, the Requisite Commitment Parties, the Required Consenting Term Lenders, the Required DIP Facility Lenders, the Debtors, and Ascent (or, solely to the extent the Non-Ascent Restructuring Toggle has occurred, reasonably acceptable to Ascent solely to the extent the Confirmation Order would adversely impact Ascent).

2.      The Restructuring Support Agreement shall continue to be in full force and effect and shall not have been terminated as to any party thereto (other than Ascent) in accordance with its terms.

3.      (x) The Plan and the Definitive Documents entered into or Filed prior to Confirmation shall not have been modified or amended in any manner not consistent with the Restructuring Support Agreement or otherwise not reasonably acceptable to the Required Consenting Noteholders, the Requisite Commitment Parties, the Required Consenting Term Lenders, the Required DIP Facility Lenders, and Ascent (or, solely to the extent the Non-Ascent Restructuring Toggle has occurred, not reasonably acceptable to Ascent solely to the extent such amendments or modifications would adversely impact Ascent); and (y) the Definitive Documents required to be entered into or Filed on or prior to the Effective Date, including any amendments, modifications or supplements to such Definitive Documents, shall be in form and substance materially consistent with the Restructuring Support Agreement and otherwise reasonably acceptable to the Required Consenting Noteholders, the Required Consenting Term Lenders, and the Debtors, and Ascent (or, solely to the extent the Non-Ascent Restructuring Toggle has occurred, reasonably acceptable to Ascent solely to the extent such amendments, modifications or supplements would adversely impact Ascent).

4.      The Debtors shall have received, or concurrently with the occurrence of the Effective Date shall have received, at least $177 million in Cash as contemplated in connection with the Put Option Agreement and the Rights Offering.

5.      The Debtors shall have received, or concurrently with the occurrence of the Effective Date shall have received, at least $100 million in value in the form of the Contributed Term Loans as contemplated in connection with the Equity Commitment and the Put Option Agreement.

6.      The Debtors shall have received, or concurrently with the occurrence of the Effective Date shall have received, at least $23 million in Cash either from (a) Ascent in the form of the Net Cash Amount and, if applicable, the Backstop Commitment Parties in the form of the Net Cash Shortfall Amount, or (b) the Backstop Commitment Parties in the form of the Ascent Default Amount.

7.      The New Exit Facilities Credit Agreement shall have been executed and delivered by all of the Entities that are parties thereto and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof.

8.      The Takeback Exit Term Loan Facility Credit Agreement shall have been executed and delivered by all of the Entities that are parties thereto and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof.

9.      (x) All DIP Facility Claims shall have been paid in full in Cash, or will have been paid in full in Cash simultaneously with occurrence of the Effective Date, in accordance with the terms of the DIP Facility Credit Agreement, or (y) the DIP Facility shall have been, or will have been simultaneously with the effectiveness of this Plan, converted into the New Exit Facilities in accordance with the DIP/Exit Facility Commitment.

10.     Solely in the event the Non-Ascent Restructuring Toggle occurs, the Transition Services Agreement shall have been executed and delivered by all Entities that are parties thereto and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof.

11.     The Put Option Premium shall have been paid in full (or will be paid in full concurrently with the occurrence of the Effective Date) in the form of the Put Option Premium Shares.

12.     Prior to or as of the Effective Date, any and all accrued but unpaid reasonable and documented Plan Supporters' Advisors Fees and Commitment Parties Fees for which the Debtors have received invoices or estimates prior to the Effective Date shall have been paid in full in Cash.

13.     The New Boards shall have been selected.

14.     Solely in the event the Non-Ascent Restructuring Toggle does not occur, (i) the Form S-4 Registration Statement shall have become effective under the Securities Act, and no stop order suspending the effectiveness of the Form S-4 Registration Statement shall have been issued and no proceedings for that purpose shall have been initiated or threatened by the SEC and (ii) any documents, forms, proxies, or agreements required for Monitronics to register the Ascent Share Distribution under the Securities Act shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

15.     Any disclosure documents or Securities Act filings related to the issuance of the New Common Stock shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

16.     All actions, documents, certificates, deeds, filings, notifications, pleadings, orders, letters, instruments, and agreements necessary to implement this Plan, including the documents set forth in the Plan Supplement, shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

17.     All approvals and consents of Governmental Units that are legally required for the consummation of this Plan and the occurrence of the Effective Date shall have been obtained, shall not be subject to unfulfilled conditions, and shall be in full force and effect.

18.     In the event a Non-Ascent Restructuring Toggle has not occurred, the Merger shall have been consummated (or shall be consummated concurrently with the occurrence of the Effective Date).

19.     The Professional Fee Claims Reserve shall have been established and funded in Cash in accordance with Article V.W.

*C.*     *Waiver of Conditions*

Each of the conditions to Confirmation and to Consummation set forth in this Article IX may be waived with the consent of the Debtors, the Required Consenting Noteholders, the Requisite Commitment Parties, the Required Consenting Term Lenders, the Required DIP Facility Lenders, and Ascent (or, solely in the event a Non-Ascent Restructuring Toggle has occurred, consent by Ascent shall be limited to Article IX.A.1, A.2, A.3 (solely to the extent Ascent would be adversely impacted), and A.4 and Article IX.B.1, B.2, and B.3) without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate this Plan; provided, however, only the consent of the Required DIP Facility Lenders shall be required to waive the condition precedent to the Effective Date set forth in Article IX.B.9.

*D.*     *Effect of Nonoccurrence of Conditions*

If the Consummation of this Plan does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

**ARTICLE X.**

**SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS**

A.    *Compromise and Settlement of Claims, Equity Interests and Controversies*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Allowed Equity Interest, or any distribution to be made on account of such Allowed Claim or Allowed Equity Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interest of the Debtors, their Estates and Holders of Claims and Equity Interests and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

B.    **Releases by the Debtors**

**To the extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, and Bankruptcy Rule 9019, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including, without limitation, the service of the Released Parties to facilitate the expeditious reorganization of the Debtors, the implementation of the restructuring contemplated by the Plan, and the waiver of certain Claims of certain of the Released Parties against the Debtors, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether direct or indirect, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, the Reorganized Debtors, the Estates, their Affiliates, or the Committee (if any) would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity (collectively, the "Debtor Released Claims"), based on or relating to or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, the Prepetition Credit Agreement, the Prepetition Notes Indenture, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, or any transaction contemplated thereby, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the DIP Facility Loan Documents, the Exit Facilities, the New Exit Facilities Documents, the Takeback Exit Term Loan Facility Documents, the Put Option Agreement, the Backstop Commitments, the Equity Commitments, the Rights Offering, the Rights Offering Procedures, the Backstop and Equity Commitment Approval Order, the Amended Organizational Documents, or any other restructuring documents, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or distribution of property under the Plan, or any other act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date, related or relating to the foregoing; provided, however, that the foregoing "Debtor Releases" shall not operate to waive or release any Debtor Released Claim of any Debtor or the Committee (if any): (1) against a Released Party arising from any obligations owed to the Debtors pursuant to an Executory Contract or Unexpired Lease that is not otherwise rejected by the Debtors pursuant to section 365 of the Bankruptcy Code before, after, or as of the Effective Date; (2)  expressly set forth in and preserved by the Plan or related documents; or (3) arising from claims for fraud, gross negligence, willful misconduct or criminal conduct. Notwithstanding anything to the contrary in the foregoing, the "Debtor Releases" set forth above do not release any post-Effective Date obligations of any party under the Plan or any document, instrument or**

agreement executed in connection with the Plan with respect to the Debtors, the Reorganized Debtors or the Estates.

C.    *Releases by Holders of Claims and Equity Interests*

To the extent permitted by applicable law and approved by the Bankruptcy Court, as of the Effective Date, (i) each Holder of a Claim or Equity Interest entitled to vote on the Plan who does not elect the Release Opt-Out on its Ballot by the applicable Voting Deadline and (ii) each Holder of a Claim or Equity Interest in a Non-Voting Class who does not elect the Release Opt-Out on its Release Opt-Out Form by the Release Opt-Out Deadline shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, the Reorganized Debtors and the Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether direct or indirect, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity (collectively, the "<u>Third-Party Released Claims</u>"), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, the Prepetition Credit Agreement, the Prepetition Notes Indenture, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, or any transaction contemplated thereby, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the DIP Facility Loan Documents, the Exit Facilities, the New Exit Facilities Documents, the Takeback Exit Term Loan Facility Documents, the Put Option Agreement, the Backstop Commitments, the Equity Commitments, the Rights Offering, the Rights Offering Procedures, the Backstop and Equity Commitment Approval Order, the Amended Organizational Documents, or any other restructuring documents, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or distribution of property under the Plan, or any other act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date, related or relating to the foregoing; *provided*, *however*, that the foregoing "<u>Third-Party Releases</u>" shall not operate to waive or release any Third-Party Released Claims of any Releasing Party: (1) against a Released Party arising from any obligations owed to the Releasing Party that are wholly unrelated to the Debtors or the Reorganized Debtors; (2) expressly set forth in and preserved by the Plan or related documents; or (3) arising from claims for fraud, gross negligence, willful misconduct or criminal conduct.  Notwithstanding anything to the contrary in the foregoing, the "<u>Third-Party Releases</u>" set forth above do not release any post-Effective Date obligations of any party under the Plan or any document, instrument or agreement executed in connection with the Plan.

D.    *Exculpation*

Except as otherwise specifically provided in the Plan, from and after the Effective Date, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim, obligation, Cause of Action or liability for any Exculpated Claim, except for fraud, gross negligence, willful misconduct or criminal conduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

E.    *Discharge of Claims and Termination of Equity Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Equity Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Equity Interests in, the Debtors or any of their assets or properties, regardless of whether

48

any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Claim or Equity Interest based upon such Claim, debt, right or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (2) the Holder of such a Claim or Equity Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Equity Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

F.    *Injunction*

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR CONFIRMATION ORDER, OR ON ACCOUNT OF OBLIGATIONS ISSUED OR CREATED PURSUANT TO THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OR RECOUPMENT OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED). ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

G.    *Setoffs*

Except as otherwise expressly provided for in the Plan, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law or as may be agreed to by the Holder of a Claim or an Equity Interest, may setoff against any Allowed Claim or Allowed Equity Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Allowed Equity Interest (before any distribution is made on account of such Allowed Claim or Allowed Equity Interest), any claims, rights and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim or Allowed Equity Interest, to the extent such claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Equity Interest pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such claims, rights and Causes of Action that such Reorganized Debtor may possess against such Holder.  In no event shall any Holder of Claims or Equity Interests be entitled to setoff any Claim or Equity Interest against any claim, right or Cause of Action of the Debtor or the Reorganized Debtor, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date.

H.    *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan (including, for the avoidance of doubt, the New Exit Facilities Documents

and the Takeback Exit Term Loan Facility Documents), on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.

I.      *Recoupment*

In no event shall any Holder of Claims or Equity Interests be entitled to recoup any Claim or Equity Interest against any claim, right or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date.

## ARTICLE XI.

## BINDING NATURE OF PLAN

THIS PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES, OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

## ARTICLE XII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors, the Reorganized Debtors, and this Plan to the fullest extent permitted by law, including, without limitation, jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority, Secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount or allowance of Claims or Equity Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to: (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article VI, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of the Plan;

5.       adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.       adjudicate, decide or resolve any and all matters related to Causes of Action;

7.       adjudicate, decide or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

8.       enter and implement such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.       enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

10.      resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.      resolve any cases, controversies, suits, disputes or Released Claims with respect to the releases, injunctions and other provisions contained in Article X and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

13.      resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Equity Interest for amounts not timely repaid pursuant to Article VII;

14.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

15.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.      enter an order or final decree concluding or closing the Chapter 11 Cases;

17.      adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.      consider any modifications of the Plan to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.      determine requests for the payment of Claims and Equity Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.      hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

21.      hear and determine matters concerning any tax matters relating to the restructuring, including state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.      hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23.      enforce all orders previously entered by the Bankruptcy Court; and

24.      hear any other matter not inconsistent with the Bankruptcy Code.

Notwithstanding the foregoing, (i) after the Effective Date, any dispute arising under or in connection with the New Exit Facilities or the Takeback Exit Term Loan Facility shall be dealt with in accordance with the provisions of the applicable document and (ii) if the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article of the Plan, the provisions of this Article XII shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XIII.

## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

A.      *Modifications and Amendments*

Subject to the limitations and rights contained in this Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, and with the reasonable consent of the Required Consenting Noteholders, the Requisite Commitment Parties, the Required Consenting Term Lenders, the Required DIP Facility Lenders, and Ascent to amend or modify this Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors, or the Reorganized Debtors, as applicable, with the reasonable consent of the Required Consenting Noteholders, the Requisite Commitment Parties, the Required Consenting Term Lenders, the Required DIP Facility Lenders, and Ascent, may, upon order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan; provided, however, that solely in the event the Non-Ascent Restructuring Toggle has occurred, Ascent's reasonable consent shall be required solely to the extent such modifications or amendments would adversely impact Ascent.

B.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan*

The Debtors reserve the right, subject to the terms and conditions of the Restructuring Support Agreement, to revoke or withdraw this Plan prior to the Effective Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw this Plan or if Confirmation or Consummation does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

D.      *Substantial Consummation of the Plan*

Substantial consummation of the Plan under Bankruptcy Code section 1101(2) shall be deemed to occur on the Effective Date.

## ARTICLE XIV.

### MISCELLANEOUS PROVISIONS

A.      *Successors and Assigns*

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiary or guardian, if any, of each Entity.

B.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Plan Supplement or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Equity Interests before the Effective Date.

C.      *Further Assurances*

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

D.      *Payment of Fees and Expenses*

Prior to or as of the Effective Date, the Debtors shall promptly pay in Cash in full any and all accrued but unpaid reasonable Plan Supporters' Advisors Fees and Commitment Parties Fees for which the Debtors have received invoices or estimates prior to the Effective Date (in each case whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases) without application by any such parties to the Bankruptcy Court, and without notice and a hearing, pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise; provided, however, if the Debtors or Reorganized Debtors and any such party cannot agree with respect to the reasonableness of the fees and expenses (incurred prior to the Effective Date) to be paid to such party, the reasonableness of any such fees and expenses shall be determined by the Bankruptcy Court (with any undisputed amounts to be paid by the Debtors or the Reorganized Debtors on or after the Effective Date (as applicable) and any disputed amounts to be escrowed by the Reorganized Debtors).  Following the Effective Date, the Reorganized Debtors shall pay the Plan Supporters' Advisors Fees and the Commitment Parties Fees in the ordinary course of business for all reasonable and documented fees earned and expenses incurred after the Effective Date in connection with the implementation and consummation of this Plan, without further Bankruptcy Court order.

E.      *Service of Documents*

Any pleading, notice or other document required by this Plan to be served on or delivered to the Debtors shall be sent by overnight mail to:

Monitronics International, Inc.
1990 Wittington Place
Farmers Branch, TX 75234
Attn:  Fred Graffam

Telephone:  (972) 243-7443
Email:  wniles@ascentcapitalgroupinc.com
           fgraffam@mymoni.com

**with copies to**:

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Attn:  David A. Hammerman
           Annemarie V. Reilly
           Jeffrey T. Mispagel
Telephone:  (212) 906-1200
Fax:  (212) 751-4864
Email:  david.hammerman@lw.com
           annemarie.reilly@lw.com
           jeffrey.mispagel@lw.com

F.      *Dissolution of Committee*

On the Effective Date, the Committee(s), if any, shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except for purposes of filing applications for Professional compensation in accordance with Article II.A.2 of this Plan.

G.      *Nonseverability of Plan Provisions*

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; underlined provided that any such alteration or interpretation must be in form and substance acceptable to the Debtors, the Required Consenting Noteholders and the Required Consenting Term Lenders; underlined provided, further, that the Debtors may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

H.      *Return of Security Deposits*

Unless the Debtors have agreed otherwise in a written agreement or stipulation approved by the Bankruptcy Court, all security deposits provided by the Debtors to any Person or Entity at any time after the Petition Date shall be returned to the Reorganized Debtors within twenty (20) days after the Effective Date, without deduction or offset of any kind.

*I.*     *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

*J.*     *Entire Agreement*

Except as otherwise indicated herein, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan; provided that the Restructuring Support Agreement shall remain in full force and effect in accordance with its terms.

*K.*     *Exhibits*

All exhibits hereto are incorporated into and are a part of the Plan as if set forth in full in the Plan.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

*L.*     *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the securities offered and sold under the Plan.

*M.*     *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

*N.*     *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, the Plan shall govern and control.  In the event of a conflict between any provision of the Plan and the Confirmation Order, the Confirmation Order shall govern and control.

*O.*     *Filing of Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

P.      *Tax Reporting and Compliance*

The Reorganized Debtors shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

Dated:  June 3, 2019

Respectfully submitted,

**MONITRONICS INTERNATIONAL, INC.,**
a Texas corporation

By:  ___William E. Niles_____

**SECURITY NETWORKS LLC**
a Florida limited liability company, by
Monitronics International, Inc., its sole member

By:  ___William E. Niles_____

**MIBU SERVICER INC.,**
a Delaware corporation

By:  ___William E. Niles_____

**LIVEWATCH SECURITY, LLC,**
a Delaware limited liability company, by Monitronics
International, Inc., its sole member

By:  ___William E. Niles_____

**PLATINUM SECURITY SOLUTIONS, INC.,**
a Delaware corporation

By:  ___William E. Niles_____

**MONITRONICS CANADA, INC.,**
a Delaware corporation


By:     William E. Niles _____


**MI SERVICER LP, LLC,**
a Delaware limited liability company, by Monitronics
International, Inc., its sole member


By:     William E. Niles _____


**MONITRONICS SECURITY LP,**
a Delaware limited partnership, by Monitronics International,
Inc., its general partner


By:     William E. Niles _____


**MONITRONICS FUNDING LP,**
a Delaware limited partnership, by Monitronics International,
Inc., its general partner


By:     William E. Niles _____

**<u>Schedule 1</u>**

**Debtors**

Monitronics International, Inc.
Security Networks LLC
MIBU Servicer Inc.
LiveWatch Security, LLC
Platinum Security Solutions, Inc.
Monitronics Canada, Inc.
MI Servicer LP, LLC
Monitronics Security LP
Monitronics Funding LP

### Schedule 2[1]

**Non-Ascent Restructuring Toggle**

The occurrence of any of the following events, in each case in the determination of the Debtors, the Required Consenting Noteholders, and the Required Consenting Term Lenders, shall constitute a "**Non-Ascent Restructuring Toggle**".

a.      Ascent fails for any reason to obtain all requisite Merger Approvals on or prior to the Merger Approval Outside Date;

b.      the Net Cash Amount is, or is reasonably expected to be in the determination of the Debtors, the Required Consenting Noteholders, and the Required Consenting Term Lenders, less than $20 million as of the Effective Date, the calculation of which shall be determined in good faith by Ascent, the Debtors, the Required Consenting Noteholders, and the Required Consenting Term Lenders on the date that is ten (10) days prior to the Effective Date;

c.      the Merger does not occur on or before the Effective Date for any reason;

d.      the material breach by Ascent of any of its undertakings, representations, warranties, or covenants set forth in the Restructuring Support Agreement;

e.      Ascent (i)(1) communicates its intention not to support the Restructuring, or (2) files, communicates, executes a definitive written agreement with respect to, or otherwise supports an Alternative Restructuring Proposal and (ii) such action has, or may be reasonably expected to have, an adverse effect on the Debtors' ability to consummate the Restructuring;

f.      Ascent (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except as contemplated by the Restructuring Support Agreement; (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the foregoing clause (i); (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to Ascent or for a substantial part of Ascent's assets; (iv) makes a general assignment or arrangement for the benefit of creditors; or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

g.      Ascent files any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with the Restructuring Support Agreement, the relief requested by such motion has, or may be reasonably expected to have, a material adverse effect on the Debtors' ability to consummate the Restructuring, and such motion has not been withdrawn within two (2) Business Days of the receipt by Ascent, of written notice from the other parties to the Restructuring Support Agreement that such motion or pleading is inconsistent with the Restructuring Support Agreement;

h.      the Restructuring Support Agreement has been validly terminated with respect to Ascent, by Ascent, pursuant to section 15.04 of the Restructuring Support Agreement, so long as no other party to the Restructuring Support Agreement would have an independent right to terminate the Restructuring Support Agreement and actually exercises such right; or

---

[1] Capitalized terms used in this Schedule 2 but not defined herein or in the Plan shall have the meaning ascribed to them in the Restructuring Support Agreement.

i.    the meeting of Ascent Shareholders contemplated by section 7.01(h) of the Restructuring Support Agreement (including any adjournments thereof) shall have been held and completed, and the Ascent Shareholders shall not have approved and adopted the definitive merger agreement for the Merger, pursuant to a vote that satisfies the applicable stockholder approval requirements under the Delaware General Corporation Law and Ascent's certificate of incorporation as in effect on the date of such meeting.

**Schedule 3**

**Existing Compensation Arrangements Term Sheet**

| | |
|---|---|
| Designated Compensation Arrangements: | Regardless of whether a Non-Ascent Restructuring Toggle has occurred, the applicable Debtors and/or Reorganized Debtors shall assume, pursuant to section 365(a) of the Bankruptcy Code (or Ascent shall assign to Reorganized Monitronics, as applicable), the Designated Compensation Arrangements. |
| | Any Compensation Arrangements that are not Designated Compensation Arrangements will not be assumed and will be rejected or otherwise terminated. |
| Change in Control Provisions: | The consummation of the Merger shall constitute a Change in Control of Ascent for purposes of the existing Compensation Arrangements as it relates to double trigger provisions in any Compensation Arrangement that is an employment agreement with Ascent, or an equity or equity-based compensation plan of Monitronics. |
| Director/Officer/Employee Awards in the Event a Non-Ascent Restructuring Toggle Does Not Occur and an Ascent Restructuring is Consummated: | 1. With respect to awards granted by Ascent:[1] |

    a.  all equity-based compensatory awards held by directors of Ascent will vest in full immediately prior to the Merger;

    b.  the following performance restricted stock unit awards will terminate without consideration:  (1) 172,101 units held by Jeff Gardner; (2) 108,969 units held by William Fitzgerald; and (3) 50,000 units held by William Niles;

    c.  the vesting of any other awards will be accelerated in full and settled by Ascent in shares of Ascent common stock immediately prior to the Merger, which awards include the following: (i) 59,443 RSUs held by Jeff Gardner; (ii) 28,743 RSUs held by William Niles; (iii) 8,504 restricted shares held by Fred Graffam and (iv) 8,026 RSUs or restricted shares held by certain non-executive employees; and

    d.  all stock options will be cancelled for no consideration.

Ascent will obtain customary acknowledgements and releases from affected participants with respect to settlement, cancellation, termination, and/or vesting of such awards described above.

2. With respect to awards granted by Monitronics:

    a.  Monitronics phantom unit awards outstanding at the time of the Merger will remain outstanding but will be adjusted by Reorganized Monitronics to cover shares of New

---

[1] Awards herein described may consist of more than one award, the total units under which are the sums set forth here.

Common Stock based on the Merger Exchange Ratio[2] rather than shares of Ascent common stock;

b. the value paid for a vested phantom unit will be based on the value of New Common Stock (rather than Ascent common stock); and

c. Reorganized Monitronics will take all actions necessary to provide that the phantom units will not accelerate and become vested solely due to the Merger.

Director/Officer/Employee Awards in the Event a Non-Ascent Restructuring Toggle Occurs and a Non-Ascent Restructuring is Consummated:

1. With respect to awards granted by Ascent, Sections 1(a)-(d) above shall apply, except equity awards held by William Niles and any directors of Ascent will remain outstanding and eligible to vest pursuant to their terms.

2. With respect to awards granted by Monitronics, Monitronics phantom unit awards will remain outstanding and Reorganized Monitronics will make any changes it determines are necessary and permitted by the phantom unit plan to equitably adjust the number of phantom units and/or class of securities/value covered by the phantom units, and such other terms reasonably necessary, to reflect the Non-Ascent Restructuring (as applicable).

---

[2]   The "**Merger Exchange Ratio**" shall have the meaning ascribed to the term "Exchange Ratio" in the Merger Agreement.

**<u>Schedule 4</u>**

**D&O Liability Insurance Policies**

*To be Filed with Plan Supplement*

**<u>Schedule 5</u>**

**New Boards**

*To be Filed with Plan Supplement*

**<u>Schedule 6</u>**

**Retained Causes of Action**

*To be Filed with Plan Supplement*

**<u>Schedule 7</u>**

**Rejected Executory Contracts and Unexpired Leases**

*To be Filed with Plan Supplement*

**Exhibit 1**

**Restructuring Support Agreement**

EXECUTION VERSION

**THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING FOR THE COMPANY PARTIES THAT WOULD BE EFFECTUATED THROUGH PARTIAL PRE-PACKAGED CHAPTER 11 CASES IN THE BANKRUPTCY COURT.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WOULD COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.   NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON THE PARTIES HERETO.**

**THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS ARE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN.  THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.**

---

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (together with all exhibits, annexes, and schedules hereto, as each may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***"), dated as of May 20, 2019, is entered into by and among:  (i) Monitronics International, Inc. ("***Monitronics***") and its direct and indirect domestic subsidiaries that are signatories to this Agreement (such subsidiaries and Monitronics, collectively, the "***Company Parties***"), (ii) the undersigned Noteholders (as defined below) (the "***Consenting Noteholders***"), (iii) the undersigned First Lien Term Lenders (as defined below) (the "***Consenting Term Lenders***"), (iv) Ascent Capital Group, Inc. ("***Ascent***"), and (v) each transferee who becomes a Permitted Transferee (as defined below) in accordance with Section 10 (each of the foregoing described in sub-clauses (i) – (v), a "***Party***" and, collectively, the "***Parties***").   Each of the Consenting Noteholders, the Consenting Term Lenders, and their Permitted Transferees (if any) is a "***Consenting Creditor***," which are collectively referred to herein as the "***Consenting Creditors***".

Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Restructuring Term Sheet (as defined below).

## RECITALS

**WHEREAS**, the Company Parties, the Consenting Creditors and Ascent have in good faith and at arm's length negotiated, or been apprised of such negotiations, and agreed to the terms of a restructuring transaction for the Company Parties in accordance with, subject to the terms and conditions in, and consistent in all material respects with this Agreement (including the Restructuring Term Sheet attached hereto as **Exhibit A**, together with all exhibits, annexes, and schedules thereto, the "***Restructuring Term Sheet***"), the Rights Offering and Equity Commitment Term Sheet attached hereto as **Exhibit B**, the DIP/Exit Facility Commitment attached hereto as **Exhibit C**, and the Takeback Exit Term Loan Facility Term Sheet attached hereto as **Exhibit D**, each of which are incorporated herein by reference (including, as applicable, the Non-Ascent Restructuring (as defined below), collectively, the "***Restructuring***");

**WHEREAS**, the Company Parties intend to commence voluntary reorganization cases (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the Bankruptcy Code (defined below) in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Bankruptcy Court***") to consummate the Restructuring pursuant to a partial prepackaged chapter 11 plan of reorganization consistent in all material respects with this Agreement (together with all exhibits, annexes, and schedules thereto, as each may be amended, restated, amended and restated, supplemented, or otherwise modified in accordance with the terms of this Agreement, the "***Plan***");

**WHEREAS**, the Company Parties, the First Lien Agent, and certain of the First Lien Revolving Lenders entered into that certain Waiver No. 1 to Credit Agreement, dated as of March 28, 2019 and that certain Waiver No. 2 to Credit Agreement, dated as of April 30, 2019, pursuant to which the First Lien Revolving Lenders party thereto agreed to waive certain conditions precedent to borrowing pursuant to the terms thereof;

**WHEREAS**, the Company Parties, the First Lien Agent, and certain of the Consenting Term Lenders entered into that certain Forbearance Agreement, dated as of April 1, 2019, that certain Amendment No. 1 to Forbearance Agreement, dated as of April 12, 2019, that certain Amendment No. 2 to Forbearance Agreement, dated as of April 24, 2019, that certain Amendment No. 3 to Forbearance Agreement, dated as of April 30, 2019, that certain Amendment No. 4 to Forbearance Agreement, dated as of May 3, 2019, that certain Amendment No. 5 to Forbearance Agreement, dated as of May 8, 2019, that certain Amendment No. 6 to Forbearance Agreement, dated as of May 10, 2019, and that certain Amendment No. 7 to Forbearance Agreement, dated as of May 15, 2019 (together with the foregoing amendments, the "***Lender Forbearance Agreement***"), pursuant to which (i) the Consenting Term Lenders party thereto agreed to temporarily forbear on enforcement of the Specified Defaults (as defined in the Lender Forbearance Agreement), (ii) commencing on April 24, 2019, the principal amount of all outstanding Obligations (as defined in the Credit Agreement) due under the Credit Agreement began accruing interest at a fluctuating interest rate per annum at all times equal to the Default Rate (as defined in the Credit Agreement) to the

fullest extent permitted by applicable law through the date hereof (the amount of such interest accruing through the date hereof, the "**Default Interest Amount**"), and (iii) as of the date that is one day after the Agreement Effective Date, interest on the principal amount of all outstanding Obligations under the Credit Agreement shall accrue at the non-default rate;

**WHEREAS**, the Company Parties and certain of the Consenting Noteholders entered into that certain Forbearance Agreement, dated as of May 1, 2019 (as amended on May 7, 2019, May 10, 2019, and May 15, 2019, the "**Noteholder Forbearance Agreement**"), pursuant to which the Consenting Noteholders party thereto agreed to temporarily forbear on enforcement of the Specified Default (as defined in the Noteholder Forbearance Agreement);

**WHEREAS**, the Company Parties have agreed to conduct an equity Rights Offering (as defined below), substantially on the terms set forth herein, in the Restructuring Term Sheet, and the Rights Offering and Equity Commitment Term Sheet (as defined below) and in accordance with the Rights Offering Procedures (as defined below), which Rights Offering will be solicited by Monitronics and which will be in the amount of $177 million;

**WHEREAS**, the Equity Commitment Parties (as defined below) have agreed to purchase New Common Stock (as defined below) on the terms and conditions set forth in the Restructuring Term Sheet, the Rights Offering and Equity Commitment Term Sheet, and the Put Option Agreement (as defined below) for an aggregate purchase price of $100 million by exchanging the Contributed Term Loans (as defined in the Rights Offering and Equity Commitment Term Sheet);

**WHEREAS**, each Cash Opt Out Noteholder (as defined below) will be offered as part of the Rights Offering the opportunity to purchase New Common Stock on the terms and conditions set forth in the Rights Offering and Equity Commitment Term Sheet and in accordance with the Rights Offering Procedures;

**WHEREAS**, the Consenting Noteholders that are set forth on a schedule to the Put Option Agreement, which schedule will be in effect upon execution of the Put Option Agreement and has been disclosed to the Parties to this Agreement but is subject to change as provided in the Put Option Agreement (collectively in such capacity, the "**Backstop Commitment Parties**"), have agreed to backstop the Rights Offering on the terms set forth herein, in the Restructuring Term Sheet, in the Rights Offering and Equity Commitment Term Sheet, and in the Put Option Agreement;

**WHEREAS**, in connection with the Restructuring, solely to the extent that the Non-Ascent Restructuring Toggle (as defined below) has not occurred, the Parties agree that Ascent shall merge with Monitronics, with Reorganized Monitronics (as defined below) as the surviving entity (the "**Merger**"), and as a result of the Merger, all assets of Ascent at the time of the Merger (including all cash at Ascent (the "**Ascent Cash Amount**")) shall become assets of Reorganized Monitronics and the holders of Ascent's common stock shall receive New Common Stock in the amount of the Ascent Share Distribution (as defined below) on the terms and conditions set forth in the Restructuring Term Sheet;

**WHEREAS**, the Takeback Exit Term Loan Facility Lenders (as defined below) have agreed, among other things, to provide the Takeback Exit Term Loan Facility (as defined below) in an aggregate dollar amount of $822,500,000, on the terms and conditions set forth in the Takeback Exit Term Loan Facility Term Sheet;

**WHEREAS**, pursuant to the DIP/Exit Facility Commitment (as defined below), the DIP Lenders (as defined below) have committed, among other things, to provide the DIP Facility (as defined below) in an aggregate dollar amount of $245 million, all on the terms and subject to the conditions set forth in the DIP/Exit Facility Commitment; and

**WHEREAS**, in the event that the Non-Ascent Restructuring Toggle (as defined below) has occurred: (a) the Parties shall pursue the Restructuring without the inclusion of the Merger; (b) the Company Parties shall consummate the Restructuring without Ascent's participation; (c) the Backstop Commitment Parties shall pay the Ascent Default Amount (as defined below) and receive the Ascent Default Shares (as defined below) on the terms and conditions set forth in the Rights Offering and Equity Commitment Term Sheet and the Put Option Agreement; (d) the holders of Ascent's common stock shall not receive the Ascent Share Distribution; (e) Ascent shall make the Toggle Contribution (as defined below), subject to the receipt by Ascent of the release contemplated in the Restructuring Term Sheet; (f) 100% of the New Common Stock to be issued and outstanding as of the Plan Effective Date, subject to dilution by the Post-Emergence Incentive Plan, shall be distributed to creditors of Monitronics pursuant to the Plan, the Rights Offering, the Equity Commitments, and the Put Option Agreement (and not to Ascent or shareholders of Ascent) (the foregoing clauses (a) through (f), collectively, the "***Non-Ascent Restructuring***"); and (g) the Parties (other than Ascent) shall negotiate and work together in good faith to make appropriate modifications to the Definitive Documents to effectuate the Non-Ascent Restructuring.

**NOW, THEREFORE**, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

**Section 1.**      *Definitions and Interpretation*.

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**<u>Ad Hoc Lender Group</u>**" means that group of certain First Lien Term Lenders (or nominees, investment managers, advisors or subadvisors for the beneficial owners of the Term Loans held by such First Lien Term Lenders) under the Credit Agreement represented by Jones Day and Evercore L.L.C.

"**<u>Ad Hoc Noteholder Group</u>**" means that group of certain beneficial owners (or nominees, investment managers, advisors or subadvisors for the beneficial owners) of the Notes issued under the Notes Indenture represented by Stroock & Stroock & Lavan LLP and Houlihan Lokey Capital, Inc.

"**Affiliate**" means, with respect to any Person, any other Person controlled by, controlling or under common control with such Person; provided that, for purposes of this Agreement, no Company Party shall be deemed to be an Affiliate of any Consenting Creditor.  As used in this Agreement, "control" (including, with its correlative meanings, "controlling," "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities, by contract or otherwise).

"**Agreement**" shall have the meaning ascribed to it in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 17.02.

"**Agreement Effective Date**" means the date on which all of the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means the period from the Agreement Effective Date to the Termination Date.

"**Alternative Restructuring Proposal**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, tender offer, recapitalization, plan of reorganization, share exchange, business combination, joint venture or similar transaction involving any one or more Company Parties, or any Affiliates of the Company Parties, or the debt, equity, or other interests in any one or more Company Parties or any Affiliates of the Company Parties (including a Superior Proposal), in each case other than the Restructuring, but, for the avoidance of doubt, excluding the Non-Ascent Restructuring.

"**Ascent**" has the meaning ascribed to it in the recitals to this Agreement.

"**Ascent Cash Amount**" has the meaning ascribed to it in the recitals to this Agreement.

"**Ascent Default Amount**" has the meaning ascribed to it in the Rights Offering and Equity Commitment Term Sheet.

"**Ascent Default Shares**" has the meaning ascribed to it in the Rights Offering and Equity Commitment Term Sheet.

"**Ascent Equity Interests**" means any equity interests (including common stock, preferred stock, limited liability company interests, other equity ownership interests, profit interests, options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into, any of the foregoing) in Ascent (in each case whether or not arising under or in connection with any employment agreement).

"**Ascent Share Distribution**" has the meaning ascribed to it in the Restructuring Term Sheet.

5

"**Backstop Approval Order**" has the meaning ascribed to it in the Rights Offering and Equity Commitment Term Sheet.

"**Backstop Commitment**" has the meaning ascribed to it in the Rights Offering and Equity Commitment Term Sheet.

"**Backstop Commitment Documents**" has the meaning ascribed to it in Section 3.01.

"**Backstop Commitment Parties**" (each, individually, a "**Backstop Commitment Party**") has the meaning ascribed to it in the recitals to this Agreement.

"**Backstop Commitment Shares**" has the meaning ascribed to it in the Rights Offering and Equity Commitment Term Sheet.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" has the meaning ascribed to it in the recitals to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of the state of New York.

"**Cash Payout**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**Cash Opt Out Noteholder**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**Chapter 11 Cases**" has the meaning ascribed to it in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Commitment Parties**" means, collectively, the Backstop Commitment Parties and the Equity Commitment Parties.

"**Company Claims**" means any Claim against a Company Party.

"**Company Parties**" has the meaning ascribed to it in the preamble to this Agreement.

"**Compensation Arrangements**" means any compensation and benefits plans, policies, agreements, programs, and arrangements of any member of the Consolidated Group.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with the proposed Restructuring.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code, which Confirmation Order shall be in accordance

with this Agreement and which, for the avoidance of doubt, may be the same order as the Disclosure Statement Order.

"**Consenting Term Lenders**" has the meaning ascribed to it in the preamble to this Agreement.

"**Consenting Noteholders**" has the meaning ascribed to it in the preamble to this Agreement.

"**Consenting Creditors**" has the meaning ascribed to it in the preamble to this Agreement.

"**Consolidated Group**" means Monitronics and its Affiliates and subsidiaries including, for the avoidance of doubt, Ascent.

"**Credit Agreement**" means that certain Credit Agreement dated as of March 23, 2012, by and among Monitronics, as borrower, Bank of America, N.A., as administrative agent, and the lenders from time to time party thereto, as amended by Amendment No. 1 to Credit Agreement and Consent dated as of November 7, 2012, Amendment No. 2 to Credit Agreement dated as of March 25, 2013, Amendment No. 3 to the Credit Agreement and Amendment No. 1 to Guaranty Agreement dated as of August 16, 2013, Amendment No. 4 to Credit Agreement dated as of February 17, 2015, Amendment No. 5 to Credit Agreement dated as of April 9, 2015, Amendment No. 6 to Credit Agreement dated as of September 30, 2016, and Amendment No. 7 to Credit Agreement dated as of December 29, 2016, and as modified by that certain Waiver No. 1 to Credit Agreement, dated as of March 28, 2019 and that certain Waiver No. 2 to Credit Agreement, dated as of April 30, 2019.

"**Creditor Professional Agreements**" means the Jones Day Letter, the Evercore Letter, the Stroock Letter and the Houlihan Letter.

"**Debtors**" means the Company Parties in their capacity as debtors in the Chapter 11 Cases.

"**Default Interest Amount**" has the meaning ascribed to it in the Recitals.

"**Definitive Documents**" has the meaning ascribed to it in Section 3.01, which Definitive Documents shall be in accordance with this Agreement.

"**DIP Documents**" has the meaning ascribed to it in Section 3.01.

"**DIP/Exit Facility Commitment**" means the commitment letter attached as **Exhibit C** hereto.

"**DIP/Exit Facility Documents**" means the DIP Documents and the New Exit Facilities Documents.

"**DIP Facility**" has the meaning ascribed to it in the Restructuring Term Sheet.

7

"**DIP Lenders**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**DIP Orders**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**Disclosure Statement**" means the disclosure statement with respect to the Plan.

"**Disclosure Statement Order**" means any conditional, interim and/or final order of the Bankruptcy Court approving the Disclosure Statement under section 1125 of the Bankruptcy Code and any solicitation motion filed in support thereof, which Disclosure Statement and Disclosure Statement Order shall be in accordance with this Agreement. For the avoidance of doubt, the Disclosure Statement Order may be the same order as the Confirmation Order.

"**Equity Commitments**" has the meaning ascribed to it in the Rights Offering and Equity Commitment Term Sheet.

"**Equity Commitment Parties**" (each, an "**Equity Commitment Party**") means the Consenting Noteholders that are set forth on a schedule to the Put Option Agreement, which schedule will be in effect upon execution of the Put Option Agreement and has been disclosed to the Parties to this Agreement but is subject to change as provided in the Put Option Agreement.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Existing Equity Interests**" means, collectively, any equity interests (including common stock, preferred stock, limited liability company interests, other equity ownership interests, profit interests, options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into, any of the foregoing) in any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Evercore Letter**" means that certain engagement letter, dated as of January 29, 2019, between Evercore Group L.L.C., Jones Day, and Monitronics.

"**Final DIP Order**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**First Day Pleadings**" means the "first day" pleadings that the Company Parties determine, in consultation with counsel for the Ad Hoc Noteholder Group, counsel for the Ad Hoc Lender Group, and counsel for Ascent, are necessary or desirable to file with the Bankruptcy Court.

"**First Lien Agent**" means Bank of America, N.A., as administrative agent under the Credit Agreement.

"**First Lien Revolving Lenders**" means those Revolving Credit Lenders (as defined in the Credit Agreement) party to the Credit Agreement.

"**First Lien Term Lenders**" means those Term Lenders (as defined in the Credit Agreement) party to the Credit Agreement.

"**Governance Documents**" means the new organizational and governance documents for Reorganized Monitronics, including charters, bylaws, articles of incorporation, operating agreements, or other organization or formation documents, as applicable, which shall be materially consistent with the Governance Term Sheet attached as Exhibit 1 to the Restructuring Term Sheet and section 1123(a)(6) of the Bankruptcy Code and otherwise acceptable to the Commitment Parties in consultation with the Required Consenting Term Lenders and subject to the consent rights set forth in Section 3.02 of this Agreement.

"**Governmental Entity**" means any applicable federal, state, local or foreign government or any agency, bureau, board, commission, court or arbitral body, department, political subdivision, regulatory or administrative authority, tribunal or other instrumentality thereof, or any self-regulatory organization.

"**Houlihan Letter**" means that certain letter agreement, dated as of December 26, 2018, by and among Houlihan Lokey Capital, Inc., Stroock & Stroock & Lavan LLP, the Company Parties, and Ascent.

"**Indenture Trustee**" means U.S. Bank National Association, as trustee under the Notes Indenture.

"**Information Sharing Agreement**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**Insolvency Proceeding**" means any corporate action, legal proceedings or other procedure or step taken in any jurisdiction in relation to:

(a)     the suspension of payments, a moratorium of any indebtedness, winding-up, bankruptcy, liquidation, dissolution, administration, receivership, administrative receivership, judicial composition, assignment for the benefit of creditors, or reorganization (by way of voluntary arrangement, scheme or otherwise) of any member of the Consolidated Group, including under the Bankruptcy Code;

(b)     a composition, conciliation, compromise or arrangement with the creditors generally of any member of the Consolidated Group or an assignment by any member of the Consolidated Group of its assets for the benefit of its creditors generally or any member of the Consolidated Group becoming subject to a distribution of its assets;

(c)     the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager or other similar officer in respect of any member of the Consolidated Group or any of its assets;

(d)     enforcement of any security over any assets of any member of the Consolidated Group; or

(e)     any procedure or step in any jurisdiction analogous to those set out in the preceding sub-paragraphs (a) through (d).

9

"**Interim DIP Order**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit E**.

"**Jones Day Letter**" means that certain Fee and Expense Reimbursement Agreement, dated January 24, 2019, between Monitronics and Jones Day.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Merger**" has the meaning ascribed to it in the recitals to this Agreement.

"**Merger Approval Outside Date**" means the date that is no later than sixty-five (65) days after the Petition Date.

"**Merger Approvals**" has the meaning ascribed to it in Section 6.02(a).

"**Monitronics**" has the meaning ascribed to it in the preamble to this Agreement.

"**Net Cash Amount**" has the meaning ascribed to it in Section 6.02(b).

"**New Board**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**New Common Stock**" means the new shares of common stock of Reorganized Monitronics authorized to be issued pursuant to the Plan.

"**New Exit Facilities**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**New Exit Facilities Documents**" has the meaning ascribed to it in Section 3.01.

"**New Exit Facility Lenders**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**Non-Ascent Restructuring**" has the meaning ascribed to it in the recitals of this Agreement.

"**Non-Ascent Restructuring Toggle**" has the meaning ascribed to it in Section 6.02.

"**Noteholders**" means the beneficial owners (or nominees, investment managers, advisors or subadvisors for the beneficial owners) of the Notes.

"**Notes**" means the 9.125% Senior Notes due 2020 issued by Monitronics under the Notes Indenture.

10

"**Notes Indenture**" means that certain Indenture dated as of March 23, 2012 (as amended, restated, modified, supplemented, or replaced from time to time in accordance with the terms thereof), by and among Monitronics, the guarantors named thereunder, and the Indenture Trustee.

"**Outside Date**" means the date that is no later than eighty-two (82) days after the Petition Date, which date may not be extended without the written consent of the Company Parties, the Required Consenting Noteholders, the Required Consenting Term Lenders, and prior to the occurrence of the Non-Ascent Restructuring Toggle, Ascent.

"**Parties**" has the meaning ascribed to it in the preamble to this Agreement.

"**Permitted Transfer**" means a Transfer of any Company Claims that meets the requirements of Section 10.

"**Permitted Transferee**" means each transferee of any Company Claims who meets the requirements of Section 10.

"**Person**" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a Governmental Entity, or any legal entity or association.

"**Petition Date**" means the date on which the Company Parties commence the Chapter 11 Cases in accordance with this Agreement.

"**Petition Date Milestone**" has the meaning ascribed to it in Schedule 1 to this Agreement.

"**Plan**" has the meaning ascribed to it in the recitals of this Agreement.

"**Plan Effective Date**" means the date on which all conditions to consummation of the Plan have been satisfied in full or waived, in accordance with the terms of the Plan, and the Plan becomes effective.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Company Parties with the Bankruptcy Court in accordance with this Agreement and shall include (i) certain Governance Documents, (ii) the Takeback Exit Term Loan Facility Documents, (iii) the DIP/Exit Facility Documents, (iv) a schedule of rejected contracts, (v) a list of retained causes of action, and (vi) the identity of the members of the New Board.

"**Post-Emergence Incentive Plan**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**Prepetition Solicitation Commencement Date**" has the meaning ascribed to it in Schedule 1 to this Agreement.

11

"**Prepetition Solicitation Deadline**" has the meaning ascribed to it in Schedule 1 to this Agreement.

"**Put Option Agreement**" means an agreement to be executed by the Company Parties and the  Commitment Parties no later than five (5) Business Days after the Agreement Effective Date, setting forth, among other things, the terms and conditions of the Backstop Commitments, the Equity Commitments, and the payment of the Put Option Premium and the Commitment Party Professional Fees (each as defined in the Rights Offering and Equity Commitment Term Sheet), which Put Option Agreement shall be materially consistent with the terms set forth herein, in the Restructuring Term Sheet, and in the Rights Offering and Equity Commitment Term Sheet, and otherwise acceptable to each of the Commitment Parties and reasonably acceptable to the Required Consenting Term Lenders, and subject to the consent rights set forth in Section 3.02 of this Agreement.

"**Qualified Market-Maker**" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers Company Claims, or enter with customers into long and/or short positions in Company Claims, in its capacity as a dealer or market maker in such Company Claims; and (ii) is in fact regularly in the business of making a market in claims, interests and/or securities of issuers or borrowers.

"**Qualified Market-Maker Joinder Date**" has the meaning ascribed to it in Section 10.03 of this Agreement.

"**Reorganized Debtors**" means, from and after the Plan Effective Date, any and all Debtors, as reorganized under and pursuant to the Plan, including any successor thereto (to the extent applicable), by merger, consolidation, transfer of all or substantially all its assets or otherwise, including Reorganized Monitronics.

"**Reorganized Monitronics**" means, from and after the Plan Effective Date, Monitronics, as reorganized under and pursuant to the Plan, including any successor thereto (to the extent applicable), by merger, consolidation, transfer of all or substantially all of its assets or otherwise.

"**Required Consenting Term Lenders**" means, as of any date of determination, those Consenting Term Lenders holding more than 50% of the aggregate principal amount of the Term Loans that are held by all Consenting Term Lenders; *provided*, *however*, that as long as the Ad Hoc Lender Group holds at least 50% of the aggregate principal amount of the Term Loans, "**Required Consenting Term Lenders**" shall mean, as of any date of determination, those Consenting Term Lenders holding more than 50% of the aggregate principal amount of the Term Loans that are held by Consenting Term Lenders that are members of the Ad Hoc Lender Group.

"**Required Consenting Noteholders**" means, as of any date of determination, those Consenting Noteholders holding more than 66⅔% of the aggregate principal amount of the Notes that are held by all Consenting Noteholders; *provided*, *however*, that as long as the Ad Hoc Noteholder Group holds at least 50% of the aggregate principal amount of the Notes, "**Required Consenting Noteholders**" shall mean, as of any date of determination, those Consenting Noteholders holding more than 66⅔% of the aggregate principal amount of the Notes that are held by Consenting Noteholders that are members of the Ad Hoc Noteholder Group.

"**Restructuring**" has the meaning ascribed to it in the recitals to this Agreement.

"**Restructuring Term Sheet**" has the meaning ascribed to it in the recitals to this Agreement.

"**Revolving Credit Loans**" means the Total Revolving Credit Outstandings (as defined in the Credit Agreement).

"**Rights**" has the meaning ascribed to it in the Rights Offering and Equity Commitment Term Sheet.

"**Rights Offering**" has the meaning ascribed to it in the Rights Offering and Equity Commitment Term Sheet.

"**Rights Offering and Equity Commitment Term Sheet**" means the term sheet attached as **Exhibit B** hereto.

"**Rights Offering Approval Order**" means the order of the Bankruptcy Court approving the Rights Offering Procedures, the Rights Offering Solicitation Materials and any motion filed in support thereof, which Rights Offering Approval Order shall be in accordance with this Agreement and which, for the avoidance of doubt, may be the same order as the Disclosure Statement Order.

"**Rights Offering Exercise Deadline**" has the meaning ascribed to it in the Rights Offering and Equity Commitment Term Sheet.

"**Rights Offering Participants**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**Rights Offering Procedures**" means the procedures governing the Rights Offering, which Rights Offering Procedures shall be materially consistent with the terms set forth in the Rights Offering and Equity Commitment Term Sheet and otherwise acceptable to each of the Backstop Commitment Parties and subject to the consent rights set forth in Section 3.02.

"**Rights Offering Solicitation Materials**" has the meaning ascribed to it in the Rights Offering and Equity Commitment Term Sheet.

"**RSA Milestones**" has the meaning set forth in Section 8.01(a) of this Agreement.

"**Rules**" means Rule 501(a) of the Securities Act.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means all solicitation materials in respect of the Plan, together with the Disclosure Statement, which Solicitation Materials shall be in accordance with this Agreement.

"**Stroock Letter**" means that certain letter agreement, dated as of December 26, 2018, between Stroock & Stroock & Lavan LLP and the Company Parties.

"**Superior Proposal**" means a bona fide Alternative Restructuring Proposal that the board of directors of Monitronics determines in good faith would, if consummated, result in a superior transaction for the Company Parties, their estates, and stakeholders, than the transactions contemplated by this Agreement, after consultation with financial advisors and outside legal counsel and taking into account (x) the likelihood and timing of consummation and (y) all material legal, financial (including the financing terms of any such proposal), conditionality, and other aspects of such proposal, in each case as compared to the transactions contemplated by this Agreement.

"**Takeback Exit Term Loan Facility**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**Takeback Exit Term Loan Facility Lenders**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**Takeback Exit Term Loan Facility Documents**" has the meaning ascribed to it in Section 3.01.

"**Takeback Exit Term Loan Facility Term Sheet**" means the term sheet attached as **Exhibit D** hereto.

"**Term Loans**" means the Term Loans (as defined in the Credit Agreement).

"**Termination Date**" means the date on which termination of this Agreement is effective in accordance with Sections 15.01, 15.02, 15.03, 15.05, or 15.06.

"**Toggle Contribution**" has the meaning set forth in Section 7.01(k) of this Agreement.

"**Transfer**" means to sell, resell, reallocate, use, pledge, loan, assign, transfer, hypothecate (other than hypothecations or re-hypothecations in favor of a registered broker-dealer with whom the Notes are held in a prime brokerage account), participate, donate, tender or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit F**.

"**TSA**" has the meaning ascribed to it in the Restructuring Term Sheet.

"**Unsubscribed Shares**" has the meaning ascribed to it in the Rights Offering and Equity Commitment Term Sheet.

14

**Section 2.**     *Agreement Effectiveness*

2.01.   This Agreement shall become effective and binding upon each of the Parties according to its terms as of 12:00 a.m., prevailing Eastern Time, on the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:  (i) each of the Parties (including (a) Consenting Noteholders holding, in the aggregate, in excess of 66⅔% of the principal amount outstanding of all Notes and (b) Consenting Term Lenders holding, in the aggregate, in excess of 66⅔% of the principal amount outstanding of all Term Loans under the Credit Agreement) shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties in accordance with the confidentiality provisions of Sections 17.07 and 17.21 of this Agreement (which signature pages may be delivered by counsel and in electronic form); and (ii) the Company Parties shall have given written notice to counsel to each of the Consenting Creditors and Ascent that they believe that each of the foregoing conditions set forth in this Section 2 has been satisfied and that this Agreement is effective, and counsel to each of the Consenting Creditors and Ascent shall have given written agreement to counsel to the Company Parties confirming the same, which notice and agreement shall be given promptly and may be given by email (such date, the "**Agreement Effective Date**").   With respect to any Consenting Creditor that becomes a party to this Agreement pursuant to Section 10.02 hereof, this Agreement shall become effective as to such Consenting Creditor at the time it executes and delivers a Joinder or Transfer Agreement in accordance with the terms hereof.

**Section 3.**     *Definitive Documents.*

3.01.   Definitive Documents.   The documents related to or otherwise utilized to implement or effectuate the Restructuring (collectively, the "**Definitive Documents**") shall include:

(a)     the documentation in respect of the DIP Facility and the Company Parties' use of cash collateral, all pleadings in support of approval thereof and all orders relating thereto (including any exhibits, schedules, amendments, modifications, or supplements thereto), including the DIP Orders (collectively, the "**DIP Documents**");

(b)     any disclosure documents or Securities Act filings related to the issuance of the New Common Stock;

(c)     the Plan (including the Plan Supplement documents and all other exhibits, annexes, and schedules thereto), all pleadings in support of confirmation of the Plan and all orders relating thereto, including the Confirmation Order;

(d)     the First Day Pleadings and all orders relating thereto;

(e)     the Solicitation Materials, all pleadings in support of approval of the Solicitation Materials and all orders relating thereto, including the Disclosure Statement Order;

(f)     any documents, forms, proxies or agreements required for (i) Ascent to solicit approval from its shareholders of the Merger as contemplated under this Agreement, or (ii) Monitronics to register the Ascent Share Distribution under the Securities Act;

15

(g)     any documents or agreements governing the Takeback Exit Term Loan Facility, including the credit agreement and collateral documents governing the Takeback Exit Term Loan Facility (the "**Takeback Exit Term Loan Facility Documents**");

(h)     any documents or agreements governing the New Exit Facilities, including the credit agreement and collateral documents governing the New Exit Facilities (the "**New Exit Facilities Documents**");

(i)     the Put Option Agreement, the Rights Offering Procedures, the Rights Offering Solicitation Materials, and any other documents or agreements governing the Rights Offering, the Equity Commitments and the Backstop Commitments to be made by the Commitment Parties (the "**Backstop Commitment Documents**");

(j)     all pleadings relating to the Company Parties' entry into, and performance under, the Rights Offering, the Put Option Agreement and any other Backstop Commitment Documents and all orders relating thereto, including the Backstop Approval Order and the Rights Offering Approval Order;

(k)     any other exhibits, schedules, amendments, modifications, supplements, or other documents and/or agreements relating to the Plan, the Plan Supplement, the Solicitation Materials, the Disclosure Statement Order, or the Confirmation Order;

(l)     the Governance Documents;

(m)     the Information Sharing Agreement;

(n)     the TSA (solely in the event the Non-Ascent Restructuring Toggle occurs);

(o)     such other definitive documentation relating to a recapitalization or restructuring of the Company Parties as is necessary or desirable to consummate the Restructuring as determined by the Company Parties, the Required Consenting Noteholders, the Required Consenting Term Lenders, and Ascent (provided that Ascent shall have no consent rights after the occurrence of the Non-Ascent Restructuring Toggle); and

(p)     any deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments, or other documents related to the Restructuring (including any exhibits, amendments, modifications, or supplements made from time to time thereto) as reasonably determined by the Company Parties, the Required Consenting Noteholders, the Required Consenting Term Lenders, and Ascent.

3.02.     Consent Rights Regarding Definitive Documents.  Each of the Definitive Documents that remains subject to negotiation and completion shall, upon completion, contain terms, conditions, representations, warranties and covenants consistent in all material respects with the terms of this Agreement and shall, except where otherwise specified in this Agreement, in all respects be reasonably acceptable to the Company Parties, the Required Consenting Noteholders, the Required Consenting Term Lenders (except with respect to the TSA and Information Sharing Agreement), and Ascent.  Any amendment, modification or waiver of, or supplement to, any of the Definitive Documents shall be reasonably acceptable to the Company Parties, the Required Consenting Noteholders, the Required Consenting Term Lenders (except

16

with respect to the TSA and Information Sharing Agreement), and Ascent.  For the avoidance of doubt, after the occurrence of the Non-Ascent Restructuring Toggle, Ascent shall have no consent rights over the Definitive Documents other than the TSA.

**Section 4.**      ***Commitments of the Consenting Creditors***

4.01.   <u>General Commitments and Waivers</u>.

(a)      During the Agreement Effective Period, each Consenting Creditor agrees (severally and not jointly) in respect of any and all of its Company Claims pursuant to this Agreement to use good faith and commercially reasonable efforts (including, (i) with respect to each Consenting Noteholder, directing the Indenture Trustee, as necessary, and (ii) with respect to each Consenting Term Lender, directing the First Lien Agent, as necessary) to:

(i)      support the Restructuring and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring;

(ii)      negotiate in good faith to execute and implement the Definitive Documents to which it is required to be a party or to which its approval is required by this Agreement; and

(iii)      after the occurrence of the Non-Ascent Restructuring Toggle, negotiate in good faith to amend the Definitive Documents and enter into any other required agreements, in each case in accordance with Section 3.02, as necessary to consummate the Non-Ascent Restructuring.

(b)      During the Agreement Effective Period, each Consenting Creditor agrees (severally and not jointly) in respect of any and all of its Company Claims pursuant to this Agreement that it shall not directly or indirectly:

(i)      exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of the Company Claims against the Company Parties other than in accordance with this Agreement; *provided* that nothing in this Agreement shall prevent any Consenting Creditor from filing a proof of claim in the Chapter 11 Cases on behalf of its respective Company Claims;

(ii)      object to, delay, impede, or take any other action to interfere with the pursuit, implementation, or consummation of the Restructuring or take any other action that is inconsistent with, or that would delay or obstruct the proposal or consummation of, the Restructuring, except as expressly permitted pursuant to this Agreement;

(iii)      withdraw or revoke its tender, consent and/or vote with respect to the Restructuring, except as expressly permitted pursuant to this Agreement;

17

(iv)     propose, file, support, vote for, or consent to any Alternative Restructuring Proposal or engage in, continue, or otherwise participate in any negotiations regarding any Alternative Restructuring Proposal or engage in, continue, or otherwise participate in discussions regarding the negotiation or formulation of, or otherwise pursue, any financing or other equity proposal or offer;

(v)     propose, file, support, vote for, or consent to any dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets, or restructuring for any of the Company Parties other than as contemplated and agreed to as part of the Restructuring;

(vi)     file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that is not materially consistent with the Restructuring, this Agreement or the Plan or take any other action that, in whole or in part, is not materially consistent with the Restructuring, this Agreement or the Plan;

(vii)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to this Agreement, the Restructuring, or the Chapter 11 Cases contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document, to effectuate the Restructuring in accordance therewith, or as otherwise permitted under this Agreement;

(viii)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; *provided, however*, that nothing in this Agreement shall limit the right of any Party to exercise any right or remedy provided hereunder, under the Confirmation Order or any other Definitive Document;

(ix)     take any action (or encourage or instruct any other party including the First Lien Agent or Indenture Trustee to take any action) in respect of any potential, actual, or alleged occurrence of any "Default" or "Event of Default" under the Credit Agreement or Notes Indenture that is triggered or that would be triggered as a result of the execution of this Agreement or the undertaking of Ascent or the Company Parties to implement the Restructuring, except as expressly permitted pursuant to this Agreement; or

(x)     Transfer, other than in accordance with Section 10 hereof, any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Exchange Act) in any Company Claims to any affiliated or unaffiliated Person, including any Person in which it may hold a direct or indirect beneficial interest.

4.02.   Commitments with Respect to Chapter 11 Cases.

(a)     During the Agreement Effective Period, each Consenting Creditor that is entitled to vote to accept or reject the Plan pursuant to its terms agrees (severally and not jointly) that it shall, subject to receipt by such Consenting Creditor, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)       vote each of its Company Claims to accept the Plan by timely delivering its duly executed and completed ballot accepting the Plan no later than the Prepetition Solicitation Deadline, subject to such Consenting Creditor's actual receipt of the Solicitation Materials (including the ballot);

(ii)      to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, not elect to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) consistent with its election not to opt out (except such Consenting Creditor shall not be prohibited from "opting out" of granting such a release to any Party that has materially breached this Agreement); and

(iii)     not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a)(i) and (ii) above; *provided, however,* that nothing in this Agreement shall prevent any Party from withholding, amending, or revoking (or causing the same) its timely consent or vote with respect to the Plan if this Agreement has been terminated in accordance with its terms with respect to such Party.

(b)      During the Agreement Effective Period, each Consenting Noteholder and each Backstop Commitment Party that is entitled to elect to opt out of the Cash Payout pursuant to the terms of the Plan agrees (severally and not jointly) that it shall elect to opt out of the Cash Payout by timely delivering its duly executed and completed election form consistent with its election to opt out of the Cash Payout.

Notwithstanding any other provision of this Agreement, including this Section 4, nothing in this Agreement shall require any Party to incur any expenses, liabilities or other obligations, or to commence litigation or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to any Party or its Affiliates other than as specifically stated in this Agreement and the exhibits hereto.

For the avoidance of doubt, each Consenting Creditor has entered into this Agreement solely in its capacity as a holder of Company Claims, and the commitments and obligations of Consenting Creditors under this Agreement do not apply to any Consenting Creditor in its capacity as a beneficial owner (or the nominee, investment manager, advisor or subadvisor for a beneficial owner) of Ascent Equity Interests.

4.03.    Forbearance.  Commencing on the Agreement Effective Date, each Consenting Creditor agrees to forbear, until the date that is one day after the Petition Date, from the exercise of its rights (including any right of set-off) or remedies it may have under the Credit Agreement and Notes Indenture, as applicable, in each case, solely with respect to the Company Parties' current or anticipated defaults as set forth on Schedule 2 to this Agreement (the "*Specified Defaults*") and on no other basis.  Each Consenting Creditor further agrees that if any applicable indenture trustee, administrative agent or collateral agent takes any action inconsistent with any such Consenting Creditor's obligations under this Agreement, such Consenting Creditor shall direct and use commercially reasonable efforts to cause such indenture trustee, administrative agent or collateral agent to cease and refrain from taking such actions.  For the avoidance of doubt, the Credit Agreement and the Notes Indenture shall remain in full force and effect, and

are hereby ratified and confirmed, except, in each case, as expressly modified in this Section 4.03. The forbearance set forth in this Section 4.03 shall not constitute a waiver with respect to any default or event of default under the Credit Agreement or Notes Indenture (other than the Specified Defaults during the term of the Agreement Effective Period) and shall not bar any Consenting Creditor from filing a proof of claim or taking action to establish the amount of such claim. Upon the termination of this Agreement, the agreement of the Consenting Creditors to forbear from exercising rights and remedies in accordance with this Section 4.03 shall immediately terminate without requirement of any demand, presentment or protest of any kind, all of which the Company Parties hereby waive.

**Section 5.** *Additional Provisions Regarding the Consenting Creditors' Commitments*. Notwithstanding anything to the contrary in this Agreement, and notwithstanding any delivery of a consent or vote to accept the Plan by any Consenting Creditor, or any acceptance of the Plan by any class of creditors, nothing in this Agreement shall:

(a) be construed to prohibit any Consenting Creditor from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement, the Definitive Documents or the Restructuring;

(b) be construed to prohibit any Consenting Creditor from appearing as a party-in-interest in any matter to be adjudicated in a Chapter 11 Case, so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement or the Restructuring, and are not for the purpose of delaying, interfering, impeding, or taking any other action to delay, interfere with or impede, directly or indirectly, the Restructuring;

(c) affect the ability of any Consenting Creditor to consult with any other Consenting Creditor, the Company Parties, Ascent or any other party in interest;

(d) impair or waive the rights of any Consenting Creditor to assert or raise any objection not prohibited under or inconsistent with this Agreement;

(e) prevent any Consenting Creditor from enforcing this Agreement and/or any of the Definitive Documents;

(f) prevent any Consenting Creditor from exercising any of its rights and remedies under any of the Definitive Documents;

(g) obligate a Consenting Creditor to deliver a vote to support the Plan or prohibit a Consenting Creditor from withdrawing such vote, in each case from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date); *provided* that upon the withdrawal of any such vote after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date), such vote shall be deemed void *ab initio* and such Consenting Creditor shall have the opportunity to change its vote;

(h)     limit the rights of any Consenting Creditor to engage in any discussions, enter into any agreements, or take any other action after the Termination Date;

(i)     prevent a Consenting Creditor from taking any action that is required in order to comply with applicable Law; *provided, however,* that if any Consenting Creditor proposes to take any action that is otherwise inconsistent with this Agreement or the Restructuring in order to comply with applicable Law, such Consenting Creditor shall provide, to the extent possible without violating applicable Law, at least five (5) Business Days' advance notice to the Company Parties, Ascent and the other Consenting Creditors;

(j)     prevent any Consenting Creditor by reason of this Agreement or the Restructuring from making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like, so long as such action is not inconsistent with the terms of this Agreement;

(k)     constitute a waiver or amendment of any term or provision of the Notes Indenture or the Credit Agreement, or any other agreement, instrument or document that gives rise to a Company Claim held by a Consenting Creditor, the First Lien Agent, or Indenture Trustee;

(l)     be construed to require any Consenting Creditor, the First Lien Agent, or Indenture Trustee, to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities or other obligations to such Consenting Creditor or Indenture Trustee, other than those set forth in this Agreement;

(m)     prohibit any Consenting Creditor from taking any action that is not inconsistent with this Agreement or the Restructuring; or

(n)     obligate any Consenting Creditor to take any action or refrain from taking any action in its capacity as a beneficial owner (or the nominee, investment manager, advisor or subadvisor for a beneficial owner) of Ascent Equity Interests, or otherwise impair or waive the rights of any Consenting Creditor in its capacity as a beneficial owner (or the nominee, investment manager, advisor or subadvisor for a beneficial owner) of Ascent Equity Interests.

**Section 6.     *Additional Commitments of the Parties.***

6.01.     <u>DIP Commitments</u>. During the Agreement Effective Period, in addition to the commitments set forth in Sections 4, 5, 7 and 8 of this Agreement, in the event that the Company Parties and DIP Lenders enter into the DIP Facility contemplated by the DIP/Exit Facility Commitment, each Party agrees (severally and not jointly) that it (i) consents to the liens, security interests, claims, and documents created in connection with the DIP Facility, subject to the consent rights set forth in Section 3.02 of this Agreement and the provision of acceptable adequate protection to the First Lien Term Lenders on terms consistent with the Restructuring Term Sheet, and (ii) shall not directly or indirectly object to, delay, impede, or take any other action to interfere with the consummation of the DIP Facility or the entry of the DIP Orders.  In addition, in the event that the Company Parties and DIP Lenders enter into the DIP Facility

21

contemplated by the DIP/Exit Facility Commitment, each Consenting Term Lender further agrees (severally and not jointly) that obligations under the DIP Facility shall constitute "Priority Payment Lien Obligations" under the Intercreditor Agreement (as defined in the Credit Agreement).

6.02.   <u>Commitment to Consummate Non-Ascent Restructuring</u>.  During the Agreement Effective Period, in addition to the commitments set forth in Sections 4, 5, 7 and 8 of this Agreement, each Party agrees (severally and not jointly) that it will (i) negotiate and work together in good faith with the other Parties to make appropriate modifications to the Definitive Documents in accordance with Section 3.02, to the extent necessary, to effectuate the Non-Ascent Restructuring and (ii) support the Non-Ascent Restructuring in all respects, in each case after the occurrence of any of the following events (any such event, the "***Non-Ascent Restructuring Toggle***"), in each case in the determination of the Company Parties, the Required Consenting Noteholders and the Required Consenting Term Lenders:

(a)     Ascent fails, for any reason to obtain all requisite approvals to consummate the Merger (including, for the avoidance of doubt, all third-party and regulatory approvals required to consummate the Merger, including approvals from the SEC and stockholder approvals) (collectively, the "***Merger Approvals***") on or prior to the Merger Approval Outside Date;

(b)     the Ascent Cash Amount net of all liabilities of Ascent (including, but not limited to, funded indebtedness, professionals' fees, settlements, severance payments, unclaimed property liabilities, agreements or understandings with respect to the use of cash, contingent liabilities, and operating expenses expected to be paid in connection with the Merger or that will be assumed by Monitronics or Reorganized Monitronics, as applicable, in connection with the Merger) (such net amount, the "***Net Cash Amount***") is, or is reasonably expected to be in the determination of the Company Parties, the Required Consenting Noteholders and the Required Consenting Term Lenders, a net cash amount of less than $20 million as of the Plan Effective Date; *provided*, that the calculation of the Net Cash Amount as of the Plan Effective Date shall be determined in good faith by Ascent, the Company Parties, the Required Consenting Noteholders, and the Required Consenting Term Lenders on the date that is ten (10) days prior to the Plan Effective Date;

(c)     the Merger does not occur on the Plan Effective Date for any reason;

(d)     the material breach by Ascent of any of its undertakings, representations, warranties, or covenants set forth in this Agreement;

(e)     Ascent (i)(1) communicates its intention not to support the Restructuring or (2) files, communicates, executes a definitive written agreement with respect to, or otherwise supports an Alternative Restructuring Proposal and (ii) such action has, or may be reasonably expected to have, an adverse effect on the Company Parties' ability to consummate the Restructuring;

(f)     Ascent (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state or foreign bankruptcy, insolvency, administrative

receivership, or similar law now or hereafter in effect, except as contemplated by this Agreement; (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the foregoing clause (i); (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to Ascent or for a substantial part of Ascent's assets; (iv) makes a general assignment or arrangement for the benefit of creditors; or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(g)     Ascent files any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with this Agreement, the relief requested by such motion has, or may be reasonably expected to have, a material adverse effect on the Company Parties' ability to consummate the Restructuring, and such motion has not been withdrawn within two (2) Business Days of the receipt by Ascent, of written notice from the other Parties that such motion or pleading is inconsistent with this Agreement;

(h)     this Agreement has been validly terminated with respect to Ascent, by Ascent, pursuant to Section 15.04, so long as no other Party would have an independent right to terminate this Agreement and actually exercises such right; or

(i)     the meeting of Ascent stockholders contemplated by Section 7.01(h) of this Agreement (including any adjournments thereof) shall have been held and completed, and Ascent's stockholders shall not have approved and adopted the definitive merger agreement for the Merger, pursuant to a vote that satisfies the applicable stockholder approval requirements under the Delaware General Corporation Law and Ascent's certificate of incorporation as in effect on the date of such meeting.

**Section 7.     *Commitments of Ascent.***

7.01.   <u>Affirmative Commitments</u>.   During the Agreement Effective Period, Ascent agrees to use good faith and commercially reasonable efforts in respect of any and all of its Existing Equity Interests and Company Claims, to the extent applicable, to:

(a)     support and take all steps reasonably necessary and desirable, including those steps reasonably requested by the Ad Hoc Noteholder Group, or the Ad Hoc Lender Group, to consummate the Restructuring (including, for the avoidance of doubt, the Non-Ascent Restructuring) in accordance with this Agreement;

(b)     vote and exercise any powers or rights available to it (including in any meeting or process requiring voting or approval in which it is legally entitled to participate) in favor of any matter requiring approval to the extent necessary to implement the Restructuring (including, for the avoidance of doubt, the Non-Ascent Restructuring);

(c)     use good faith and commercially reasonable efforts to obtain all required governmental, regulatory (including self-regulatory), and/or third-party approvals for the Restructuring (including, for the avoidance of doubt, the Non-Ascent Restructuring);

(d)      negotiate in good faith to execute and implement the Definitive Documents to which it is required to be a party or to which its approval is required by this Agreement;

(e)      promptly inform the advisors to the Company Parties, the advisors to the Ad Hoc Noteholder Group, and the advisors to the Ad Hoc Lender Group, as to the status of obtaining any necessary or desirable authorizations (including any consents) from any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

(f)      maintain its good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(g)      operate its business in the ordinary course, taking into account the Restructuring (including, for the avoidance of doubt, the Non-Ascent Restructuring);

(h)      (i) cause meetings of (x) Ascent's board of directors, and (y) Ascent stockholders to be duly called and held, in accordance with applicable Law, NASDAQ requirements and the applicable provisions of Ascent's certificate of incorporation and bylaws, for the purpose of voting on approval of the Merger as promptly as reasonably practicable after the Agreement Effective Date, (ii) prepare and file, or cause Monitronics to prepare and file, with the SEC a Form S-4 or a preliminary proxy statement, as may be the case, relating to the Merger (which shall include the recommendation of Ascent's board of directors that stockholders approve the Merger and all other proxy materials (except, for the avoidance of doubt, approval of the Plan), for such stockholders meeting) as promptly as reasonably practicable after the Agreement Effective Date, (iii) prepare and file, or cause Monitronics to prepare and file, with the SEC any amendments to such Form S-4 or preliminary proxy statement, as may be the case, or other filings as may be necessary to respond to SEC staff comments on such Form S-4 or preliminary proxy statement as promptly as reasonably practicable, (iv) use diligent efforts to have the Form S-4 declared effective by the SEC or the proxy statement cleared by the SEC, as may be the case, (v) cause the prospectus or definitive proxy statement and related proxy materials, as may be the case, to be distributed to stockholders as promptly as reasonably practicable after such effectiveness or clearance by the SEC, (vi) use commercially reasonable efforts to obtain the required affirmative vote of Ascent stockholders to approve the Merger, (vii) otherwise comply with all requirements of Law applicable to such stockholders meeting and solicitation of votes, and (viii) keep the advisors to the Company Parties, the Ad Hoc Noteholder Group, and the Ad Hoc Lender Group fully informed with respect to the shareholder approval process and the results thereof;

(i)      promptly inform the advisors to the Company Parties, the advisors to the Ad Hoc Noteholder Group, and the advisors to the Ad Hoc Lender Group if at any time Ascent has, or reasonably expects to have as of the Plan Effective Date, a Net Cash Amount of less than $20 million;

(j)      cause the Ascent Cash Amount to be contributed to Monitronics under the Plan;

(k)      after the occurrence of the Non-Ascent Restructuring Toggle, contribute cash in an amount equal to $3.5 million to Monitronics on or before the Plan Effective Date (such

24

amount, the "***Toggle Contribution***"), subject to receipt of the release contemplated under the Restructuring Term Sheet; and

(l)  promptly repay, repurchase, cause to be defeased, or satisfy and discharge, to the extent permissible under that certain Indenture, dated as of July 17, 2013, between Ascent and U.S. Bank National Association as trustee thereunder, and any other applicable governing documents, any of Ascent's outstanding 4.00% Convertible Senior Notes due 2020, so long as not otherwise on terms inconsistent with this Agreement.

For the avoidance of doubt, (i) the agreements and covenants set forth in Sections 7.01(a), (b), (c), (d), (e), and (k) shall survive the occurrence of the Non-Ascent Restructuring Toggle and (ii) the agreements and covenants set forth in Sections 7.01(f), (g), (h), (i), (j), and (l) shall not survive the occurrence of the Non-Ascent Restructuring Toggle.

7.02.  <u>Negative Commitments</u>.  During the Agreement Effective Period, Ascent agrees in respect of any and all of its Existing Equity Interests and Company Claims, to the extent applicable, that it shall not directly or indirectly:

(a)  object to, delay, impede, or take any other action to interfere with the pursuit, acceptance, implementation, or consummation of the Restructuring (including, for the avoidance of doubt, the Non-Ascent Restructuring), or take any other action that is inconsistent with, or that would delay or obstruct the proposal or consummation of, the Restructuring (including, for the avoidance of doubt, the Non-Ascent Restructuring);

(b)  take any action that is inconsistent with, or is intended to frustrate, impede, delay or obstruct the approval, implementation, and consummation of the Restructuring (including, for the avoidance of doubt, the Non-Ascent Restructuring);

(c)  file any motion, pleading, Definitive Documents or other documents with the SEC, the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with this Agreement and the Definitive Documents;

(d)  Transfer any material asset or right of Ascent (including any Existing Equity Interests held by Ascent) or any material asset or right used in the business of Ascent to any Person outside the ordinary course of business without the consent of the Required Consenting Noteholders, the Required Consenting Term Lenders and the Company Parties, other than as contemplated by the Restructuring;

(e)  take any worthless stock deduction with respect to any Existing Equity Interests held by Ascent;

(f)  take any action that would impair the value of the net operating loss carryforwards and other similar tax attributes of Ascent or Monitronics;

(g)      engage in any material merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness, or other similar transaction outside of the ordinary course of business other than as contemplated by the Restructuring;

(h)      seek, solicit, support, encourage, propose, assist, consent to, vote for, enter into, participate in, pursue or consummate any Alternative Transaction, or engage in, continue, or otherwise participate in any negotiations regarding any Alternative Restructuring Proposal or engage in, continue, or otherwise participate in discussions regarding the negotiation or formulation of, or otherwise pursue, any alternate financing or other equity proposal or offer;

(i)      exercise any right or remedy with respect to any of the Existing Equity Interests or Company Claims, to the extent applicable, other than in accordance with this Agreement;.

(j)      withdraw or revoke any tender, consent and/or vote with respect to the Restructuring (including, for the avoidance of doubt, the Non-Ascent Restructuring) to the extent applicable, except as otherwise expressly permitted pursuant to this Agreement;

(k)      propose, file, support, vote for, or consent to any dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets, or restructuring for any of the Company Parties other than as contemplated and agreed to as part of the Restructuring (including, for the avoidance of doubt, the Non-Ascent Restructuring);

(l)      file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) or take any other action that, in whole or in part, is not materially consistent with the Restructuring (including, for the avoidance of doubt, the Non-Ascent Restructuring), this Agreement or the Plan;

(m)      initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to this Agreement, the Restructuring (including, for the avoidance of doubt, the Non-Ascent Restructuring), or the Chapter 11 Cases contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document, to effectuate the Restructuring in accordance therewith, or as otherwise permitted under this Agreement;

(n)      object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; or

(o)      enter into or adopt any new Compensation Arrangements (or amend, modify, or terminate any existing Compensation Arrangements) without the consent of the Required Consenting Noteholders (other than as contemplated by the Restructuring Term Sheet).

For the avoidance of doubt, (i) the agreements and covenants set forth in Sections 7.02(a), (b), (c), (d) (solely with respect to the Transfer of any Existing Equity Interests held by Ascent), (e), (f) (solely with respect to net operating loss carryforwards and other similar tax attributes of Monitronics), (h), (i), (j), (k), (l), (m), and (n) shall survive the occurrence of the Non-Ascent

Restructuring Toggle, and (ii) the agreements and covenants set forth in Sections 7.02(d) (other than with respect to a Transfer of any Existing Equity Interests held by Ascent), (f) (other than with respect to net operating loss carryforwards and other similar tax attributes of Monitronics), (g), and (o) shall not survive the occurrence of the Non-Ascent Restructuring Toggle.

**Section 8.**     *Commitments of the Company Parties.*

8.01.   <u>Affirmative Commitments</u>.     Except as set forth in Section 9, during the Agreement Effective Period, the Company Parties agree to:

(a)     support and take all steps reasonably necessary and desirable, including those steps reasonably requested by the Ad Hoc Noteholder Group or the Ad Hoc Lender Group to consummate the Restructuring in accordance with this Agreement (including the exercise by Monitronics of its put option to cause the Backstop Commitment Parties to purchase the Backstop Commitment Shares in accordance with the Backstop Commitments pursuant and subject to the terms and conditions set forth in this Agreement and the Put Option Agreement), including the applicable milestones set forth on <u>Schedule 1</u> to this Agreement (collectively, the "**RSA Milestones**");

(b)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring contemplated herein, support and take all steps reasonably necessary and desirable to address and resolve any such impediment; *provided, however,* that any actions taken in connection with such support or such steps shall be reasonably acceptable to the Ad Hoc Noteholder Group and the Ad Hoc Lender Group;

(c)     use good faith and commercially reasonable efforts to obtain all required governmental, regulatory (including self-regulatory), and/or third-party approvals for the Restructuring;

(d)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring as contemplated by this Agreement;

(e)     after the occurrence of the Non-Ascent Restructuring Toggle, negotiate in good faith and use commercially reasonable efforts to execute and deliver amendments to the Definitive Documents and any other required agreements to effectuate and consummate the Non-Ascent Restructuring;

(f)     pay, in cash, the Default Interest Amount within five (5) days of the Agreement Effective Date, in accordance with the Credit Agreement;

(g)     seek additional support for the Restructuring from their other material stakeholders to the extent reasonably prudent and as may be reasonably requested by the Ad Hoc Noteholder Group, the Ad Hoc Lender Group, or Ascent and, to the extent the Company Parties receive any Joinders or Transfer Agreements, notify counsel to the Ad Hoc Noteholder Group, counsel to the Ad Hoc Lender Group, and counsel to Ascent of such Joinders and Transfer Agreements (irrespective of whether such Joinders or Transfer Agreements were previously

delivered to counsel to the Ad Hoc Noteholder Group, counsel to the Ad Hoc Lender Group, or counsel to Ascent by such joining party or transferee);

(h)     actively oppose and object to, in consultation with counsel for the Ad Hoc Noteholder Group, counsel for the Ad Hoc Lender Group, and counsel for Ascent, the efforts of any Person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring (including, if applicable, by timely filing objections or written responses in the Chapter 11 Cases);

(i)     obtain the requisite consents set forth in this Agreement from, and consult and negotiate in good faith with, the Consenting Creditors, Ascent, and their respective advisors regarding the implementation and execution of the Restructuring;

(j)     inform the advisors to the Ad Hoc Noteholder Group, the advisors to the Ad Hoc Lender Group, and the advisors to Ascent as to:  (i) the material business and financial (including liquidity) performance of Monitronics and all its subsidiaries, (ii) the status and progress of the Restructuring, including progress in relation to the negotiations of the Definitive Documents, and (iii) the status of obtaining any necessary or desirable authorizations (including any consents) from each Consenting Creditor, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

(k)     notify counsel for the Ad Hoc Lender Group of any breach or default by any Commitment Party under this Agreement, the Put Option Agreement, or any other agreement relating to the Restructuring, including any default or breach with respect to any Commitment Party's obligation to fund and/or pay into escrow any part of their respective Backstop Commitment or Equity Commitment, which notice shall be given promptly, and in no event more than twenty-four (24) hours following such breach or default;

(l)     promptly notify counsel for the Ad Hoc Noteholder Group, counsel for the Ad Hoc Lender Group, and counsel for Ascent as soon as reasonably practicable (but in no event later than forty-eight (48) hours thereafter) after becoming aware of:  (i) any notice of any commencement of any material involuntary Insolvency Proceedings, legal suit for payment of debt or securement of security from or by any Person in respect of any member of the Consolidated Group, (ii) a breach of this Agreement (including a breach by any Company Party), and (iii) any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made;

(m)     maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(n)     operate their business in the ordinary course and use their commercially reasonable efforts to preserve intact their current material business organizations, and preserve their material relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with the Company Parties, taking into account the Restructuring;

(o)      provide counsel for the Ad Hoc Noteholder Group, counsel for the Ad Hoc Lender Group, and counsel for Ascent a reasonable opportunity (which shall be no less than three (3) Business Days, except in the case of the Plan, Disclosure Statement, Disclosure Statement Order, Confirmation Order, DIP Orders, Rights Offering Approval Order, or Backstop Approval Order, which shall be no less than five (5) Business Days) to review draft copies of all Solicitation Materials, First Day Pleadings, second day motions and proposed orders relating thereto, and all other motions, pleadings and documents that the Company Parties intend to file with the Bankruptcy Court, and, without limiting any consent rights set forth in this Agreement, consult in good faith with respective counsel to such Parties regarding the form and substance of any such proposed filing; *provided, however,* that each such pleading or document shall be consistent in all respects with the terms and conditions set forth in this Agreement;

(p)      timely file a formal objection (in consultation with the Ad Hoc Noteholder Group and the Ad Hoc Lender Group) to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases; (iv) seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization; (v) sustaining a challenge to the validity, enforceability, perfection or priority of, or seeking avoidance or subordination of, any portion of the Credit Agreement Claims or Notes Claims (as applicable), or asserting any other cause of action against or with respect or relating to such Claims or any pre-petition liens securing such Claims (as applicable);

(q)      provide, and direct its employees, officers, advisors, and other representatives to provide, to the Consenting Noteholders, the Consenting Term Lenders, Ascent, and their respective advisors (i) reasonable access to the Company Parties' books and records during normal business hours on reasonable advance notice to the Company Parties' representatives and without disruption to the operation of the Company Parties' business, (ii) reasonable access to the management and advisors of the Company Parties on reasonable advance notice to such Persons and without disruption to the operation of the Company's business and (iii) such other information or access as reasonably requested by the Ad Hoc Noteholder Group, the Ad Hoc Lender Group, Ascent, or their respective legal and financial advisors or as set forth in the Information Sharing Agreement;

(r)      commence solicitation of votes to accept or reject the Plan by no later than the Prepetition Solicitation Commencement Date and commence the Chapter 11 Cases no later than the Petition Date Milestone;

(s)      file, on the Petition Date, a motion seeking approval of the DIP Facility and the use of cash collateral;

(t)      file, on the Petition Date, one or more motions seeking (A) conditional approval of the Disclosure Statement and the other Solicitation Materials on an interim basis, (B) approval of the Rights Offering Procedures, (C) approval of the Backstop Commitment Documents, and

(D) approval of the Disclosure Statement and the other Solicitation Materials on a final basis and confirmation of the Plan;

(u)      file, on the Petition Date, the First Day Pleadings and to seek interim (to the extent necessary) and final orders from the Bankruptcy Court approving such relief;

(v)      subject to the terms of the DIP Orders, the Backstop Approval Order, and authorization by the Bankruptcy Court, timely pay the reasonable and documented fees and expenses of the advisors to the Ad Hoc Noteholder Group, and the Ad Hoc Lender Group, arising prior to and after the Petition Date; *provided* that, for the avoidance of doubt, all of such fees and expenses shall be paid consistent with the Creditor Professional Agreements; and

(w)      provide prompt notice of any proposed amendment, modification, or waiver to any Definitive Document to all Parties (except to Ascent upon occurrence of the Non-Ascent Restructuring Toggle).

8.02.   <u>Negative Commitments</u>.  Except as set forth in Section 9, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring;

(b)      take any action that is inconsistent with, or is intended to frustrate, impede, delay or obstruct the approval, implementation, and consummation of the Restructuring;

(c)      modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement and the Definitive Documents, including, without limitation, the Backstop Commitment Documents, the Takeback Exit Term Loan Facility Documents, and the DIP/Exit Facility Documents;

(d)      file any motion, pleading, or other Definitive Document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with this Agreement and the Definitive Documents;

(e)      seek, solicit, or support any Alternative Restructuring Proposal, other than as expressly permitted under Section 9.01 hereof;

(f)      Transfer any material asset or right of the Company Parties or any asset or right used in the business of the Company Parties to any Person outside the ordinary course of business without the consent of the Required Consenting Noteholders, the Required Consenting Term Lenders, and Ascent;

(g)      engage in any material merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness, or other similar transaction outside of the ordinary course of business other than the Restructuring;

(h)      seek, solicit, support, encourage, propose, assist, consent to, vote for, enter into, participate in, pursue or consummate any Alternative Transaction or any substantive discussions regarding an Alternative Transaction (other than as to respond to any such Person to advise such Person that it does not intend to engage in such discussions), subject to the provisions set forth in Section 9 of this Agreement; or

(i)      enter into or adopt any new Compensation Arrangements (or amend, modify, or terminate any existing Compensation Arrangements) without the consent of the Required Consenting Noteholders.

**Section 9.**      *Additional Provisions Regarding Company Parties' Commitments*

9.01.   <u>Fiduciary Duties</u>.   Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement, the Restructuring Term Sheet or any other Definitive Document shall require any of the Company Parties, their directors, managers, and officers, or the independent directors, after consulting with counsel, to take or refrain from taking any action that any such Person or Persons determines in good faith would be inconsistent with its fiduciary duties under applicable Law, including, without limitation, negotiation and consummation of a Superior Proposal. Notwithstanding the foregoing, the Company Parties acknowledge that their entry into this Agreement is consistent with their fiduciary duties.

9.02.   <u>Notice Regarding Alternative Restructuring Proposals</u>.   If any of the Company Parties receives an Alternative Restructuring Proposal or any request for information that could reasonably be expected to be used for the purpose of formulating any inquiry, offer, unsolicited proposal, or expression of interest, within forty-eight (48) hours of the receipt of such Alternative Restructuring Proposal or such request for information, the Company Parties shall notify the Consenting Creditors and Ascent in writing (electronic mail to the advisors for the Consenting Creditors and Ascent being sufficient) of the receipt thereof, with such notice to include: (i) a written description of the material terms and conditions thereof, including in such description (to the extent permissible) the identity of the Person from which such expression of interest, inquiry, proposal, offer, or request for information was received (the "**Other Interested Party**") and (ii) to the extent permissible, a copy of each written communication (x) transmitted on behalf of the Other Interested Party or any of its representatives to the Company Parties or any of its representatives or (y) transmitted on behalf of the Company Parties or any of its representatives to the Other Interested Party or any of its representatives.   Notwithstanding the receipt of any Alternative Restructuring Proposal or request for information, each of the Company Parties acknowledges and agrees that it is, and will continue to be, bound by its obligations set forth in this Agreement, subject to its duties under applicable law and/or its governing documents as well as its rights under Section 9.01 of this Agreement.

**Section 10.**      *Transfer of Interests and Securities*.

10.01.   <u>No Transfer of Existing Equity Interests</u>.   During the Agreement Effective Period, Ascent shall not Transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Exchange Act) in any Existing Equity Interests to any affiliated or

unaffiliated Person, including any Person in which it may hold a direct or indirect beneficial interest.

10.02. <u>Transfer of Claims</u>.   During the Agreement Effective Period, no Consenting Creditor shall Transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Exchange Act) in any Company Claims to any affiliated or unaffiliated Person, including any Person in which it may hold a direct or indirect beneficial interest, unless:

(a)      either: (i) (1) with respect to any transfer by a Consenting Noteholder, the transferee executes and delivers a Transfer Agreement to counsel to the Company Parties, counsel to Ascent, counsel to the Ad Hoc Noteholder Group, counsel to the Ad Hoc Lender Group, and the Indenture Trustee, and (2) with respect to any transfer by a Consenting Term Lender, the transferee executes and delivers a Transfer Agreement to counsel to the Company Parties, counsel to Ascent, counsel to the Ad Hoc Lender Group, and counsel to the Ad Hoc Noteholder Group, in each case at or before the time of the proposed Transfer, or (ii) the transferee is a Consenting Creditor and the transferee provides notice of such Transfer (including the amount and type of Company Claim Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer; and

(b)      any such proposed Transfer (as defined herein) of the Notes by a Consenting Noteholder shall be permitted only so long as such Transfer complies in all respects with the procedures and terms set forth in the Notes Indenture; and

(c)      any such proposed Transfer (as defined herein) of Company Claims held by a Consenting Term Lender on account of its Term Loans shall be permitted only so long as such Transfer complies in all respects with the procedures and terms set forth in the Credit Agreement.

Notwithstanding anything to the contrary in this Section 10.02, a Consenting Noteholder may permit its prime broker to hold the Notes as part of a custodian agreement whereby such Consenting Noteholder retains all of its voting rights with respect to such Notes during the Agreement Effective Period until the occurrence of the Termination Date.  With respect to the Transfer of any Company Claims by a Consenting Creditor, upon consummation of a Transfer in accordance herewith, such transferee is deemed to make all of the representations, warranties, and covenants of a Consenting Creditor, as applicable, set forth in this Agreement and (if not already a Consenting Creditor) is deemed to be, and shall be, a Consenting Creditor for all purposes of this Agreement.

10.03. <u>Qualified Market-Maker</u>. Notwithstanding anything herein to the contrary, (i) any Consenting Creditor may Transfer any of its Company Claims to an entity that is acting in its capacity as a Qualified Market-Maker without the requirement that the Qualified Market-Maker be or become a Consenting Creditor; *provided, however*, that the Qualified Market-Maker subsequently Transfers all right, title and interest in such Company Claims to a transferee that is or becomes a Consenting Creditor as provided above, and the Transfer documentation between the transferor Consenting Creditor and such Qualified Market-Maker shall contain a requirement that provides as such; and (ii) to the extent any Consenting Creditor is acting in its capacity as a

Qualified Market-Maker, it may Transfer any Company Claims that it acquires from a holder of such Company Claims that is not a Consenting Creditor without the requirement that the transferee be or become a Consenting Creditor. Notwithstanding the foregoing, if, at the time of the proposed Transfer of any Company Claims to a Qualified Market-Maker, such Company Claims (x) may be voted on the Plan, the proposed transferor Consenting Creditor must first vote such Company Claims in accordance with the requirements of Section 4.02(a) hereof, or (y) have not yet been and may not yet be voted on the Plan and such Qualified Market-Maker does not Transfer such Company Claims to a subsequent transferee prior to the fifth (5th) Business Day prior to the expiration of the voting deadline (such date, the "*Qualified Market-Maker Joinder Date*"), such Qualified Market-Maker shall be required to (and the Transfer documentation to the Qualified Market-Maker shall have provided that it shall), on the first (1st) Business Day immediately following the Qualified Market-Maker Joinder Date, become a Consenting Creditor with respect to such Company Claims in accordance with the terms hereof (provided, that the Qualified Market-Maker shall automatically, and without further notice or action, no longer be a Consenting Creditor with respect to such Company Claims at such time that the transferee of such Company Claims becomes a Consenting Creditor with respect to such Company Claims).

10.04. <u>Release of Transferor</u>. Upon compliance with the requirements of Section 10.02, the transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims. Any Transfer in violation of Section 10.02 shall be void *ab initio*.

10.05. <u>Acquisition of Additional Claims</u>. Subject to this Section 10, this Agreement shall in no way be construed to preclude the Consenting Creditors from acquiring additional Company Claims; *provided, however*, that (i) such additional Company Claims shall automatically and immediately upon acquisition by a Consenting Creditor be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to Ascent, counsel to the Company Parties, counsel to Ad Hoc Noteholder Group, or counsel to the Ad Hoc Lender Group) and (ii) such Consenting Creditors must provide notice of such acquisition (including the amount and type of Company Claims acquired) to counsel to Ascent, counsel to the Company Parties, counsel to the Ad Hoc Noteholder Group, and counsel to the Ad Hoc Lender Group within three (3) Business Days of such acquisition.

10.06. <u>No Obligations of Company Parties</u>. This Section 10 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Creditor to Transfer any of its Company Claims. Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations (including any obligation by any Company Party to issue "cleansing materials" or otherwise make a public disclosure of information) otherwise arising under such Confidentiality Agreements.

10.07. <u>Additional Provisions Regarding Transfers</u>. Notwithstanding anything to the contrary in this Section 10, the restrictions on Transfers set forth in this Section 10 shall not

apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 11.    *Representations and Warranties of Consenting Creditors.*** Each Consenting Creditor severally, and not jointly, represents and warrants that, as of the date such Consenting Creditor executes and delivers this Agreement:

(a)     it is the beneficial or record owner of the face amount of the Company Claims, or is the nominee, investment manager, advisor or subadvisor for the beneficial holders of the Company Claims reflected in, and it is not the beneficial or record owner of any Company Claims other than those reflected in, such Consenting Creditor's signature page to this Agreement, a Joinder or a Transfer Agreement, as applicable (as may be updated pursuant to Section 10);

(b)     it has the full power and authority to act on behalf of, vote, and consent to matters concerning, such Company Claims (as may be updated pursuant to Section 10);

(c)     such Company Claims (as may be updated pursuant to Section 10) are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Creditor's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)     it has the full power to vote, approve changes to, and Transfer all of its Company Claims (as may be updated pursuant to Section 10) referable to it as contemplated by this Agreement subject to applicable Law; and

(e)     solely with respect to holders of Company Claims (as may be updated pursuant to Section 10), (i) it is either (a) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (b) not a U.S. person (as defined in Regulation S of the Securities Act), or (c) an accredited investor (as defined in the Rules).

**Section 12.    *Representations and Warranties of Ascent.*** Ascent represents and warrants that, as of the date it executes and delivers this Agreement:

(a)     it is the beneficial or record owner of the Existing Equity Interests reflected in, and it is not the beneficial or record owner of any Existing Equity Interests other than those reflected in, its signature page to this Agreement;

(b)     it has the full power and authority to act on behalf of, vote, and consent to matters concerning, such Existing Equity Interests;

(c)     such Existing Equity Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in

34

any way Ascent's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)    it has the full power to vote, approve changes to, and Transfer all of its Existing Equity Interests pursuant to this Agreement and subject to applicable Law;

(e)    there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of Ascent after reasonable inquiry, threatened or contemplated, at Law, in equity, in arbitration or before any Governmental Entity or regulatory division, by or against Ascent or any of its subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement, any other Definitive Document, or the consummation of the Restructuring, or (b) either individually or in the aggregate, would reasonably be expected to: (i) have a material adverse effect upon, or result in a material adverse change in, the operations, business, properties, liabilities (actual or contingent), or financial condition of the Company Parties or Reorganized Monitronics and its subsidiaries taken as a whole; (ii) cause a material impairment of the rights and remedies of the administrative agent or any lender under the DIP Facility, the New Exit Facilities, or the Takeback Exit Term Loan Facility, or of the ability of any Company Party or Reorganized Monitronics to perform its obligations under the DIP Facility, the New Exit Facilities, or the Takeback Exit Term Loan Facility; or (iii) have a material adverse effect upon the legality, validity, binding effect or enforceability of this Agreement or any Definitive Document; and

(f)    to its knowledge, neither itself nor Monitronics nor any subsidiary of Monitronics has undergone an "ownership change," as defined in section 382(g) of the Internal Revenue Code of 1986 (as amended), since January 1, 2016.

**Section 13.    *Representations and Warranties of Company Parties*.**  Each Company Party (severally and not jointly) represents and warrants that as of the date such Company Party executes and delivers this Agreement:

(a)    to the best of its knowledge having made all reasonable inquiries, no order has been made, petition presented, or resolution passed for the winding up of or appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of it or any other Company Party or other member of the Consolidated Group, and no analogous procedure has been commenced in any jurisdiction;

(b)    except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with any other Person with respect to Company Claims or Existing Equity Interests that have not been disclosed to all Parties to this Agreement;

(c)    it is not party to any asset sale or investment agreements with any other Person with respect to Company Claims or Existing Equity Interests that have not been disclosed to all Parties to this Agreement;

(d)     the issuance of the Rights and the issuance of the Rights Offering Shares upon the exercise thereof shall qualify for exemption, and shall be exempt, from registration under the Securities Act;

(e)     to the knowledge of any Company Party, neither it nor any of its subsidiaries has undergone an "ownership change," as defined in section 382(g) of the Internal Revenue Code of 1986 (as amended), since January 1, 2016;

(f)     all existing Compensation Arrangements of the members of the Consolidated Group have been disclosed to counsel to the Ad Hoc Noteholder Group;

(g)     there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of any Company Party after reasonable inquiry, threatened or contemplated, at Law, in equity, in arbitration or before any Governmental Entity or regulatory division, by or against Ascent or any of its subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement, any other Definitive Document, or the consummation of the Restructuring, or (b) either individually or in the aggregate, would reasonably be expected to: (i) have a material adverse effect upon, or result in a material adverse change in, the operations, business, properties, liabilities (actual or contingent), or financial condition of the Company Parties or Reorganized Monitronics and its subsidiaries taken as a whole; (ii) cause a material impairment of the rights and remedies of the administrative agent or any lender under the DIP Facility, the New Exit Facilities, or the Takeback Exit Term Loan Facility, or of the ability of any Company Party or Reorganized Monitronics to perform its obligations under the DIP Facility, the New Exit Facilities, or the Takeback Exit Term Loan Facility; or (iii) have a material adverse effect upon the legality, validity, binding effect or enforceability of this Agreement or any Definitive Document; and

(h)     the DIP/Exit Facility Commitment, including the Fee Letter (as defined in the DIP/Exit Facility Commitment), has been entered into and is in full force and effect, and no amendment or modification of the DIP/Exit Facility Commitment or Fee Letter is contemplated, and none of the commitments in the DIP/Exit Facility Commitment or Fee Letter have been withdrawn or rescinded in any respect.  With the exception of the Fee Letter, to the knowledge of the Company Parties after reasonable inquiry, there are no side letters or other agreements, contracts, arrangements or understandings to which the Company Parties are party related to the DIP Facility or New Exit Facilities or the funding or investing, as applicable, of the full amount of the DIP Facility or New Exit Facilities, other than as expressly set forth in the Fee Letter in the form delivered to the Consenting Creditors prior to the date hereof.  To the knowledge of the Company Parties after reasonable inquiry, no event has occurred which, with or without notice, lapse of time or both would or would reasonably be expected to constitute a default or breach on the part of any Company Party or other party to the DIP/Exit Facility Documents.  To the knowledge of the Company Parties after reasonable inquiry, there are no conditions precedent or other contingencies (A) related to the funding of the DIP Facility or New Exit Facilities or any provisions that could reduce the aggregate proceeds contemplated by the DIP/Exit Facility Commitment or (B) that could otherwise adversely affect the conditionality, enforceability or availability of the DIP/Exit Facility Commitment with respect to all or any portion of the DIP Facility or the New Exit Facilities, in each case other than as expressly set forth in the DIP/Exit

Facility Commitment.  The Company Parties shall use its reasonable best efforts to maintain the DIP/Exit Facility Commitment in effect and satisfy its obligations thereunder.

**Section 14.** *Mutual Representations, Warranties, and Covenants; Further Assurances*. Each Party (severally and not jointly) represents, warrants, and covenants to each other Party, as of the date such Party executed and delivered this Agreement that:

(a)    it is validly existing and in good standing (or the equivalent thereof) under the Laws of the jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)    except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by a governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange, third party or any other Person in order for it to effectuate the Restructuring contemplated by, and perform its respective obligations under, this Agreement other than any such consent or approval which has been obtained, provided, or otherwise satisfied prior to the Agreement Effective Date and which consent or approval has not been subsequently revoked;

(c)    the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association, certificates of incorporation, bylaws, or other constitutional documents; and

(d)    except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring contemplated by, and perform its respective obligations under, this Agreement, on behalf of itself and its Affiliates, as applicable.

**Section 15.** *Termination Events*.

15.01. Noteholder Termination Events.  This Agreement may be terminated by the Required Consenting Noteholders, and such termination shall be effective immediately upon the delivery to the Company Parties, counsel to the Ad Hoc Lender Group, and Ascent of a written notice in accordance with Section 17.10, at any time after the occurrence, and during the continuation, of any of the following events, in each case, other than as contemplated by the Restructuring:

(a)    the (i) material breach in any respect by any Company Party or any Consenting Term Lender of any of the respective undertakings, representations, warranties, or covenants of the Company Parties or the Consenting Term Lenders, as applicable, set forth in this Agreement (it being understood and agreed that any actions and obligations required to be taken by any such Party that are included in the exhibits attached to this Agreement but not in this Agreement are to be considered "covenants" of such Party, and therefore covenants of this Agreement, notwithstanding the failure of any specific provision in any of the exhibits to be re-copied into

this Agreement) or (ii) failure of any Company Party or any Consenting Term Lender to act in a manner materially consistent with this Agreement (other than an immaterial failure), which breach or failure remains uncured (to the extent curable) before the earlier of (x) five (5) Business Days after the applicable Required Consenting Noteholders transmit a written notice to the Company Parties and the Consenting Term Lenders in accordance with Section 17.10 and (y) one calendar day before the Plan Effective Date contemplated herein; *provided that* the Required Consenting Noteholders may not terminate this Agreement pursuant to this Section 15.01(a) upon the breach or failure of any Consenting Term Lender, if at the time or during the continuation of such breach or failure, the remaining Consenting Term Lenders hold or control in excess of 66⅔% of the dollar amount, and in excess of 50% in number of the holders of, the Term Loans under the Credit Agreement;

(b)    the failure of any Definitive Document to comply with the requirements of Section 3.02 of this Agreement, which non-compliance remains uncured for a period of five (5) Business Days after the applicable Required Consenting Noteholders transmit a written notice to the Company Parties of such breach;

(c)    the making public (or filing, if under the Chapter 11 Cases) of any of the Definitive Documents (including any amendment or modification thereof) that contains terms and conditions that are not consistent with this Agreement or otherwise reasonably acceptable to the Required Consenting Noteholders in accordance with this Agreement, and such public disclosure (or filing, if under the Chapter 11 Cases) is not withdrawn or such inconsistency is not amended or modified in a manner consistent with this Agreement or otherwise reasonably acceptable to the Required Consenting Noteholders in accordance with this Agreement within five (5) Business Days after the receipt by the Company Parties of notice of such breach;

(d)    any Company Party or any Consenting Term Lender (i)(1) communicates its intention not to support the Restructuring or (2) files, communicates, executes a definitive written agreement with respect to, or otherwise supports an Alternative Restructuring Proposal and (ii) such action has, or may be reasonably expected to have, an adverse effect on the Company Parties' ability to consummate the Restructuring; *provided that* the Required Consenting Noteholders may not terminate this Agreement pursuant to this Section 15.01(d) upon such filing, communication or execution by any Consenting Term Lender if, at the time of such filing, communication or execution, the remaining Consenting Term Lenders hold or control in excess of 66⅔% of the dollar amount , and in excess of 50% in number of the holders of, the Term Loans under the Credit Agreement;

(e)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring, including the Plan and (ii) either (1) such ruling, judgment, or order has been issued at the request of or with the acquiescence of any Company Party or (2) remains in effect as of the earlier of (A) fifteen (15) Business Days after such terminating Required Consenting Noteholders transmit a written notice in accordance with Section 17.10 detailing any such issuance and (B) one (1) calendar day immediately prior to the Plan Effective Date contemplated herein; *provided* that this termination right may not be

exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(f)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the applicable Required Consenting Noteholders), (i) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases; (iii) appointing a trustee under section 1104 of the Bankruptcy Code in one or more of the Chapter 11 Cases; (iv) dismissing one or more of the Chapter 11 Cases, (v) terminating exclusivity under Bankruptcy Code section 1121, or (vi) rejecting this Agreement;

(g)     if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except as contemplated by this Agreement; (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the preceding subsection (i); (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to any Company Party or for a substantial part of such Company Party's assets; (iv) makes a general assignment or arrangement for the benefit of creditors; or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(h)     an order is entered by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any Person to proceed against any asset of any Company Party that would materially and adversely affect the Company Party's operational or financial performance;

(i)     any Company Party or any Consenting Term Lender files any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with this Agreement, the relief requested by such motion has, or may be reasonably expected to have, a material adverse effect on the Company Parties' ability to consummate the Restructuring, and such motion has not been withdrawn within two (2) Business Days of the receipt by the Company Parties or the Consenting Term Lenders, as applicable, of written notice from the Required Consenting Noteholders that such motion or pleading is inconsistent with this Agreement; *provided that* the Required Consenting Noteholders may not terminate this Agreement pursuant to this Section 15.01(i) upon such filing by any Consenting Term Lender if, at the time of such filing, the remaining Consenting Term Lenders hold or control in excess of 66⅔% of the dollar amount, and in excess of 50% in number of holders of, the Term Loans under the Credit Agreement;

(j)     the Bankruptcy Court enters an order in the Chapter 11 Cases, or any Company Party moves or consents to, terminating any Company Party's exclusive right to file a plan or plans of reorganization under section 1121 of the Bankruptcy Code;

(k)     the termination of or the exercise of any remedies under the DIP Facility or any agreement regarding any Company Party's use of cash collateral;

(l)     the termination or material breach of the Put Option Agreement; *provided* that this termination right may not be exercised by any Noteholder if such Noteholder failed to perform or comply in any material respect with the terms and conditions of this Agreement or the Put Option Agreement, and such failure to perform or comply caused, or resulted in, the occurrence of the termination or material breach of the Put Option Agreement;

(m)     the Bankruptcy Court grants relief that is inconsistent in any respect with, or enters an order rejecting, this Agreement and such inconsistent relief is not dismissed, vacated, or modified to be consistent with this Agreement before the earlier of (x) five (5) Business Days after the applicable Required Consenting Noteholders transmit a written notice to the Company Parties that such relief is inconsistent with the agreement and (y) one calendar day before the Plan Effective Date contemplated herein;

(n)     Ascent takes any action that has, or is reasonably expected to have, a material adverse effect on the Company Parties' ability to consummate the Non-Ascent Restructuring; or

(o)     the Company Parties shall not have complied with any of the RSA Milestones (unless such RSA Milestone is waived or amended in accordance with Section 16 of this Agreement).

Notwithstanding anything to the contrary in this Section 15.01, the Required Consenting Noteholders may not terminate this Agreement: (a) due solely to the occurrence of the Non-Ascent Restructuring Toggle, (b) due solely to a ruling by the Bankruptcy Court requiring a modification to the Solicitation Materials solely with respect to the Cash Payout, in which event the Parties will work together in good faith to address the Bankruptcy Court's concerns in a manner consistent with all other material terms of the Restructuring, or (c) pursuant to Section 15.01(b) or (c) solely if the Definitive Document that gives rise to such termination right is the Information Sharing Agreement and/or the TSA.

15.02.  <u>First Lien Term Lender Termination Events</u>.  This Agreement may be terminated by the Required Consenting Term Lenders, and such termination shall be effective immediately upon the delivery to the Company Parties, the Consenting Noteholders, and Ascent of a written notice in accordance with Section 17.10, at any time after the occurrence, and during the continuation, of any of the following events, in each case, other than as contemplated by the Restructuring:

(a)     the (i) material breach in any respect by any Company Party or any Consenting Noteholder of any of the respective undertakings, representations, warranties, or covenants of the Company Parties or the Consenting Noteholders, as applicable, set forth in this Agreement (it being understood and agreed that any actions and obligations required to be taken by any such Party that are included in the exhibits attached to this Agreement but not in this Agreement are to be considered "covenants" of such Party, and therefore covenants of this Agreement, notwithstanding the failure of any specific provision in any of the exhibits to be re-copied into

this Agreement) or (ii) failure of any Company Party or any Consenting Noteholder to act in a manner materially consistent with this Agreement (other than an immaterial failure), which breach or failure remains uncured (to the extent curable) before the earlier of (x) five (5) Business Days after the applicable Required Consenting Term Lenders transmit a written notice to the Company Parties and the Consenting Noteholders in accordance with Section 17.10 and (y) one calendar day before the Plan Effective Date contemplated herein; *provided that* the Required Consenting Term Lenders may not terminate this Agreement pursuant to this Section 15.02(a) upon the breach or failure of any Consenting Noteholder if, at the time or during the continuation of such breach or failure, the remaining Consenting Noteholders hold or control in excess of 66⅔% of the dollar amount of the Notes under the Notes Indenture;

(b)     the failure of any Definitive Document to comply with the requirements of Section 3.02 of this Agreement, which non-compliance remains uncured for a period of five (5) Business Days after the applicable Required Consenting Term Lenders transmit a written notice to the Company Parties of such breach;

(c)     the making public (or filing, if under the Chapter 11 Cases) of any of the Definitive Documents (including any amendment or modification thereof) that contains terms and conditions that are not consistent with this Agreement or otherwise reasonably acceptable to the Required Consenting Term Lenders in accordance with this Agreement, and such public disclosure (or filing, if under the Chapter 11 Cases) is not withdrawn or such inconsistency is not amended or modified in a manner consistent with this Agreement or otherwise reasonably acceptable to the Required Consenting Term Lenders in accordance with this Agreement within five (5) Business Days after the receipt by the Company Parties of notice of such breach;

(d)     any Company Party or any Consenting Noteholder (i)(1) communicates its intention not to support the Restructuring or (2) files, communicates, executes a definitive written agreement with respect to, or otherwise supports an Alternative Restructuring Proposal and (ii) such action has, or may be reasonably expected to have, an adverse effect on the Company Parties' ability to consummate the Restructuring; *provided that* the Required Consenting Term Lenders may not terminate this Agreement pursuant to this Section 15.02(d) upon such filing, communication or execution by any Consenting Noteholder if, at the time of such filing, communication or execution, the remaining Consenting Noteholders hold or control in excess of 66⅔% of the dollar amount of the Notes under the Notes Indenture;

(e)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring, including the Plan and (ii) either (1) such ruling, judgment, or order has been issued at the request of or with the acquiescence of any Company Party or (2) remains in effect as of the earlier of (A) fifteen (15) Business Days after such terminating Required Consenting Term Lenders transmit a written notice in accordance with Section 17.10 detailing any such issuance and (B) one (1) calendar day immediately prior to the Plan Effective Date contemplated herein; *provided* that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(f)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the applicable Required Consenting Term Lenders), (i) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases; (iii) appointing a trustee under section 1104 of the Bankruptcy Code in one or more of the Chapter 11 Cases; (iv) dismissing one or more of the Chapter 11 Cases, (v) terminating exclusivity under Bankruptcy Code section 1121, or (vi) rejecting this Agreement;

(g)      if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except as contemplated by this Agreement; (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the preceding subsection (i); (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to any Company Party or for a substantial part of such Company Party's assets; (iv) makes a general assignment or arrangement for the benefit of creditors; or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(h)      an order is entered by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any Person to proceed against any asset of any Company Party that would materially and adversely affect the Company Party's operational or financial performance;

(i)      any Company Party or any Consenting Noteholder files any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with this Agreement, the relief requested by such motion has, or may be reasonably expected to have, a material adverse effect on the Company Parties' ability to consummate the Restructuring, and such motion has not been withdrawn within two (2) Business Days of the receipt by the Company Parties or the Consenting Noteholders, as applicable, of written notice from such Required Consenting Term Lenders that such motion or pleading is inconsistent with this Agreement; *provided that* the Required Consenting Term Lenders may not terminate this Agreement pursuant to this Section 15.02(i) upon such filing by any Consenting Noteholder if, at the time of such filing, the remaining Consenting Noteholders hold or control in excess of 66⅔% of the dollar amount of the Notes under the Notes Indenture;

(j)      the Bankruptcy Court enters an order in the Chapter 11 Cases, or any Company Party moves or consents to, terminating any Company Party's exclusive right to file a plan or plans of reorganization under section 1121 of the Bankruptcy Code;

(k)      the termination of or the exercise of any remedies under the DIP Facility or any agreement regarding any Company Party's use of cash collateral;

(l)     the termination or material breach of the Put Option Agreement, including, for the avoidance of doubt, the failure of (i) any Equity Commitment Party to make its respective Equity Commitment or (ii) any Backstop Commitment Party to make its respective Backstop Commitment, in each case, in accordance with the terms and conditions of the Put Option Agreement;

(m)     the Bankruptcy Court grants relief that is inconsistent in any respect with, or enters an order rejecting, this Agreement and such inconsistent relief is not dismissed, vacated, or modified to be consistent with this Agreement before the earlier of (x) five (5) Business Days after the applicable Required Consenting Term Lenders transmit a written notice to the Company Parties that such relief is inconsistent with the agreement and (y) one calendar day before the Plan Effective Date contemplated herein;

(n)     the failure of Monitronics to exercise its put option to cause the Backstop Commitment Parties to purchase the Backstop Commitment Shares in accordance with the Backstop Commitments pursuant and subject to the terms and conditions set forth in this Agreement and the Put Option Agreement;

(o)     Ascent takes any action that has, or is reasonably expected to have, a material adverse effect on the Company Parties' ability to consummate the Non-Ascent Restructuring; or

(p)     the Company Parties shall not have complied with any RSA Milestone (unless such RSA Milestone is waived or amended in accordance with Section 16 of this Agreement).

Notwithstanding anything to the contrary in this Section 15.02, the Required Consenting Term Lenders may not terminate this Agreement: (a) due solely to the occurrence of the Non-Ascent Restructuring Toggle, (b) due solely to a ruling by the Bankruptcy Court requiring a modification to the Solicitation Materials solely with respect to the Cash Payout, in which event the Parties will work together in good faith to address the Bankruptcy Court's concerns in a manner consistent with all other material terms of the Restructuring, or (c) pursuant to Section 15.02(b) or (c) solely if the Definitive Document that gives rise to such termination right is the Information Sharing Agreement and/or the TSA.

15.03.  Company Party Termination Events.  This Agreement may be terminated by the Company Parties, and such termination shall be effective immediately upon the delivery to the Consenting Noteholders, the Consenting Term Lenders, and Ascent of a written notice in accordance with Section 17.10, at any time after the occurrence, and during the continuation, of any of the following events, in each case, other than as contemplated by the Restructuring:

(a)     the material breach by any Consenting Noteholder or any Consenting Term Lender of any of the respective undertakings, representations, warranties, or covenants set forth in this Agreement of the Consenting Noteholders or the Consenting Term Lenders, as applicable, that remains uncured for a period of five (5) Business Days after the Company Parties transmit a written notice of such breach to the Consenting Noteholders, the Consenting Term Lenders, and Ascent in accordance with Section 17.10; *provided, that* the Company Parties may not terminate this Agreement pursuant to this Section 15.03(a) upon the breach or failure of (i) any Consenting

Noteholder if, at the time or during the continuation of such breach or failure, the remaining Consenting Noteholders hold or control in excess of 66⅔% of the dollar amount of the Notes under the Notes Indenture, or (ii) any Consenting Term Lender, if at the time or during the continuation of such breach or failure, the remaining Consenting Term Lenders hold or control in excess of 66⅔% of the dollar amount, and in excess of 50% in number of holders of, the Term Loans under the Credit Agreement;

(b)        the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring and (ii) remains in effect for fifteen (15) Business Days after such terminating Company Party transmits a written notice in accordance with Section 17.10 detailing any such issuance; *provided* that this termination right shall not be exercised if any Company Party sought or requested, directly or indirectly, such ruling or order in contravention of any obligation or restriction set out in, or is in a manner inconsistent with, this Agreement; or

(c)        upon the date and time that is three (3) Business Days after the delivery of notice by the Company Parties that they are exercising their rights in accordance with Section 9.01 hereof.

Notwithstanding anything to the contrary in this Section 15.03, the Company Parties may not terminate this Agreement: (a) due solely to the occurrence of the Non-Ascent Restructuring Toggle, or (b) due solely to a ruling by the Bankruptcy Court requiring a modification to the Solicitation Materials, in which event the Parties will work together in good faith to address the Bankruptcy Court's concerns in a manner consistent with all other material terms of the Restructuring.

15.04.  <u>Ascent Termination Events</u>. This Agreement may be terminated, solely as to Ascent, by Ascent, and such termination shall be effective immediately upon the delivery to the Company Parties, the Consenting Noteholders, and the Consenting Term Lenders of a written notice in accordance with Section 17.10, at any time after the occurrence, and during the continuation, of any of the following events, in each case, other than as contemplated by the Restructuring; *provided that* Ascent shall have no termination right under this Section 15.04 after the occurrence of the Non-Ascent Restructuring Toggle:

(a)        the (i) material breach in any respect by any Company Party, any Consenting Noteholder, or any Consenting Term Lender of any of the undertakings, representations, warranties, or covenants of the Company Parties, the Consenting Noteholders, or the Consenting Term Lenders, as applicable, set forth in this Agreement (it being understood and agreed that any actions and obligations required to be taken by any such Party that are included in the exhibits attached to this Agreement but not in this Agreement are to be considered "covenants" of such Party, and therefore covenants of this Agreement, notwithstanding the failure of any specific provision in any of the exhibits to be re-copied into this Agreement) or (ii) failure of any Company Party, any Consenting Noteholder, or any Consenting Term Lender to act in a manner materially consistent with this Agreement and/or the Term Sheet (other than an immaterial failure), which breach or failure remains uncured (to the extent curable) before the earlier of (x)

44

five (5) Business Days after Ascent transmits a written notice to the Company Parties, the Consenting Noteholders, and the Consenting Term Lenders, in accordance with Section 17.10 and (y) one calendar day before the Plan Effective Date contemplated herein; *provided that* Ascent may not terminate this Agreement pursuant to this Section 15.04(a) upon the breach or failure of (i) any Consenting Noteholder if, at the time or during the continuation of such breach or failure, the remaining Consenting Noteholders hold or control in excess of 66⅔% of the dollar amount of the Notes under the Notes Indenture, or (ii) any Consenting Term Lender, if at the time or during the continuation of such breach or failure, the remaining Consenting Term Lenders hold or control in excess of 66⅔% of the dollar amount, and in excess of 50% in number of holders of, the Term Loans under the Credit Agreement;

(b)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring, including the Plan and (ii) either (1) such ruling, judgment or order has been issued at the request of or with the acquiescence of any Company Party or (2) remains in effect as of the earlier of (i) fifteen (15) Business Days after Ascent transmits a written notice in accordance with Section 17.10 detailing any such issuance and (ii) one (1) calendar day immediately prior to any proposed Plan Effective Date; *provided* that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of Ascent), (i) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases; (iii) appointing a trustee under section 1104 of the Bankruptcy Code in one or more of the Chapter 11 Cases; (iv) dismissing one or more of the Chapter 11 Cases, or (v) terminating exclusivity under Bankruptcy Code section 1121;

(d)      any Company Party, any Consenting Noteholder, or any Consenting Term Lender files any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with this Agreement, the relief requested by such motion has, or may be reasonably expected to have, a material adverse effect on the Company Parties' ability to consummate the Restructuring, and such motion has not been withdrawn within two (2) Business Days of the receipt by the Company Parties, the Consenting Noteholders, or the Consenting Term Lenders, as applicable, of written notice from Ascent that such motion or pleading is inconsistent with this Agreement; *provided that* Ascent may not terminate this Agreement pursuant to this Section 15.04(d) upon such filing, communication or execution by (i) any Consenting Noteholder if, at the time of such filing, communication or execution, the remaining Consenting Noteholders hold or control in excess of 66⅔% of the dollar amount of the Notes under the Notes Indenture, or (ii) any Consenting Term Lender, if at the time of such filing, communication or execution, the remaining Consenting Term Lenders hold or control in excess of 66⅔% of the dollar amount, and in excess of 50% in number of holders of, the Term Loans under the Credit Agreement; or

(e)     any Company Party, any Consenting Noteholder, or any Consenting Term Lender (i)(A) communicates its intention not to support the Restructuring or (B) files, communicates, executes a definitive written agreement with respect to or otherwise supports an Alternative Restructuring Proposal and (ii) such action has, or may be reasonably expected to have, an adverse effect on the Company Parties' ability to consummate the Restructuring; *provided that* Ascent may not terminate this Agreement pursuant to this Section 15.04(e) upon such filing by (i) any Consenting Noteholder if, at the time of such filing, the remaining Consenting Noteholders hold or control in excess of 66⅔% of the dollar amount of the Notes under the Notes Indenture, or (ii) any Consenting Term Lender, if at the time of such filing, the remaining Consenting Term Lenders hold or control in excess of 66⅔% of the dollar amount, and in excess of 50% in number of holders of, the Term Loans under the Credit Agreement.

Notwithstanding anything to the contrary herein, Ascent may not terminate this Agreement (a) pursuant to this Section 15.04 to the extent the Ascent Termination Event arises from an action or failure on the part of the Company Parties that is within Ascent's control, or (b) due solely to a ruling by the Bankruptcy Court requiring a modification to the Solicitation Materials, in which event the Parties will work together in good faith to address the Bankruptcy Court's concerns in a manner consistent with all other material terms of the Restructuring.

15.05.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Noteholders; (b) the Required Consenting Term Lenders; (c) Ascent; and (d) Monitronics; *provided*, *however*, that after the occurrence of the Non-Ascent Restructuring Toggle, this Agreement and the obligations of all Parties hereunder may be terminated by mutual written agreement of the Required Consenting Noteholders, the Required Consenting Term Lenders and Monitronics.

15.06.  Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately after the earlier of (i) the Plan Effective Date and (ii) the Outside Date.

15.07.  Limitation on Termination Rights.  A Party may not terminate this Agreement pursuant to Sections 15.01 - 15.04 if such Party failed to perform or comply in any material respect with the terms and conditions of this Agreement, and such failure to perform or comply caused, or resulted in, the occurrence of one or more termination events specified herein.

15.08.  Effect of Termination.  Except as set forth in Section 17.17, upon the occurrence of a Termination Date, as applicable, this Agreement shall be of no further force and effect, and each Party shall be released from its respective commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any Claims or causes of action; *provided, however*, that in no event shall any such termination relieve a Party from liability for its breach or nonperformance of its obligations under this Agreement prior to the Termination Date.  Upon the occurrence of a Termination Date prior to the Plan Effective Date, any consent, agreement,

undertaking, tender, waiver, forbearance, ballot, or vote delivered by a Party subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement or otherwise. Notwithstanding anything to the contrary in this Agreement, the foregoing shall not be construed to prohibit any Party from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Party, or the ability of any Party, to protect and preserve its rights (including rights under this Agreement or any Definitive Document), remedies, and interests, including its claims against any other Party. For the avoidance of doubt, the automatic stay arising under section 362 of the Bankruptcy Code shall be deemed waived or modified solely for purposes of providing notice or exercising rights hereunder.

**Section 16.**    *Amendments and Waivers.*

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 16 and subject to Section 3.02.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, only in a writing signed by the Company Parties, the Required Consenting Noteholders, the Required Consenting Term Lenders, and Ascent; *provided that* (i) any waiver, modification, amendment or supplement to this Section 16(b) shall require the prior written consent of each Party; (ii) any waiver, modification, amendment or supplement to the definition of Required Consenting First Lien Lenders and/or Required Consenting Noteholders, respectively, shall require the prior written consent of each applicable Consenting Creditor that is a member of the Ad Hoc Lender Group and/or the Ad Hoc Noteholder Group, respectively; and (iii) any waiver, modification, amendment or supplement that disproportionately and adversely affects the economic recoveries or treatment of any Consenting Noteholder or Consenting Term Lender, relative to the other Consenting Noteholders or Consenting Term Lenders, respectively, may not be made without the prior written consent of each such affected Consenting Noteholder or Consenting Term Lender; *provided further that* after the occurrence of the Non-Ascent Restructuring Toggle, the Company Parties, the Required Consenting Noteholders, and the Required Consenting Term Lenders may modify, amend or supplement this Agreement, or waive a condition or requirement of this Agreement, in writing pursuant to this Section 16(b) without the consent of Ascent. Notwithstanding anything to the contrary in this Section 16, this Agreement may not be modified, amended or supplemented in any way that modifies the obligations of or adversely affects the rights of Ascent, in each case, without the written consent of Ascent.

(c)    Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 16 shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

## Section 17.     *Miscellaneous*.

17.01.  <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.   Any such offer or solicitation shall be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

17.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

17.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to cooperate with each other in good faith in connection with, and shall exercise good faith and commercially reasonable efforts with respect to the pursuit, approval, negotiation, execution, delivery, implementation, and consummation of the Restructuring, as well as the negotiation, drafting, execution, and delivery of the Definitive Documents. Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary and appropriate to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement; *provided however* that this Section 17.03 shall not limit the right of any Party to exercise any right or remedy provided for in this Agreement.

17.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

17.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT (AND ANY CLAIMS OR CAUSE OF ACTION ARISING UNDER, OUT OF OR IN CONNECTION WITH THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR STATUTE) SHALL BE GOVERNED BY AND CONSTRUED IN

ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.   Each of the Parties irrevocably and unconditionally agrees that, subject to the immediately following sentence of this Section 17.05, any legal action, suit, or proceeding against it with respect to any matter arising under, out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought any state or federal court of competent jurisdiction in New York County, State of New York, and by execution and delivery of this Agreement, each of the Parties: (a) irrevocably submits itself to the nonexclusive jurisdiction of such court, (b) waives any objection to laying venue in any such action, suit, or proceeding and (c) waives any objection that such court is an inconvenient forum or does not have jurisdiction over such Party.   Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State and County of New York, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that, if the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement.   Each Party agrees that it shall bring any action or proceeding in respect of any claim arising under, out of or in connection with this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under, out of or in connection with this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party.

17.06.   <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING UNDER, OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER IN CONTRACT, TORT, OR STATUTE).

17.07.   <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.  Signature pages executed by each of the Parties shall be delivered to counsel to each of the other Parties in unredacted form (which signature pages may be delivered by counsel); *provided* that such signature pages may only be delivered to the individual Consenting Creditors in a redacted form that removes such Consenting Creditors' holdings; *provided further* that such signature pages shall be subject to Section 17.21.

17.08.   <u>Rules of Construction</u>.

(a)      This Agreement is the product of negotiations among the Company Parties, the Consenting Creditors and Ascent, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any

49

portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties, the Consenting Creditors and Ascent were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

(b)      The title of and the section and paragraph headings in this Agreement are for convenience of reference only and shall not govern or affect the interpretation of any of the terms or provisions of this Agreement.  Where specific language is used to clarify by example a general statement contained herein, such specific language shall not be deemed to modify, limit, or restrict in any manner the construction of the general statement to which it relates.  The language used in this Agreement has been chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."   The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument, or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements, or modifications set forth in this Agreement), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) unless otherwise specified, all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified, or supplemented from time to time, (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights, and (g) the term "reasonably acceptable" shall be construed to include a proviso that the accepting party will not unreasonably withhold or delay its consent.

17.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person.

17.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

Monitronics International, Inc.
1990 Wittington Place

Farmers Branch, TX 75234
Attn:   William E. Niles (wniles@ascentcapitalgroupinc.com)
            Fred Graffam (fGraffam@mymoni.com)

with copies to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Attn:   Roger G. Schwartz (roger.schwartz@lw.com)
            David A. Hammerman (david.hammerman@lw.com)

(b)      if to a Consenting Creditor, to each Consenting Creditor at the addresses or e-mail addresses set forth below the Consenting Creditor's signature page to this Agreement (or to the signature page to a Joinder or Transfer Agreement in the case of any Consenting Creditor that becomes a Party after the initial Agreement Effective Date):

with a copy to (which shall not constitute notice):

For the Consenting Noteholders:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
Attn:   Kristopher M. Hansen (khansen@stroock.com)
            Sayan Bhattacharyya (sbhattacharyya@stroock.com)

For the Consenting Term Lenders:
Jones Day
250 Vesey Street
New York, NY 10281
Attn:   Scott J. Greenberg (sgreenberg@jonesday.com)
            Michael C. Schneidereit (mschneidereit@jonesday.com)

(c)      if to Ascent, to:

Baker Botts L.L.P.
30 Rockefeller Plaza
New York, NY 10112
Attn:   Renee L. Wilm (renee.wilm@bakerbotts.com)
            Emanuel. Grillo (emanuel.grillo@bakerbotts.com)

Any notice given by delivery, mail, or courier shall be effective when received.

17.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Creditor and Ascent hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial, and other conditions, and prospects of the Company Parties.

17.12.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code solely for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

17.13.  <u>Waiver</u>.   If the Restructuring is not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve all of their rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

17.14.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

17.15.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

17.16.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

17.17.  <u>Survival</u>.   Notwithstanding (a) any Transfer of any Company Claims in accordance with Section 10 or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 15.08, Section 17 and any confidentiality provisions shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof; provided, further, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

17.18.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not

preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

17.19.  Capacities of Consenting Creditors.  Each Consenting Creditor has entered into this Agreement on account of all Company Claims that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims.  Notwithstanding any other provision of this Agreement, each Consenting Creditor has entered into this Agreement solely in its capacity as a holder of Company Claims, and the commitments and obligations of Consenting Creditors under this Agreement do not apply to any Consenting Creditor in its capacity as the beneficial owner (or the nominee, investment manager, advisor or subadvisor for the beneficial owner) of Ascent Equity Interests.

17.20.  Email Consents.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, including a written approval by the Company Parties, the Required Consenting Noteholders, the Required Consenting Term Lenders, or Ascent, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

17.21.  Confidentiality and Publicity.

(a)    No Party shall (1) use the name or any other identifying information of any Noteholder or First Lien Term Lender in any communication regarding the matters contemplated hereby (including a press release, pleading, or other publicly available document) (other than a communication with the legal, accounting, financial, and other advisors to the Company Parties who are under obligations of confidentiality to the Company Parties with respect to such communication, and whose compliance with such obligations the Company Parties shall be responsible for) without such Noteholder's or First Lien Term Lender's prior written consent; *provided that*, this subsection (a)(1) shall not prevent any Party from complying with applicable Law, including any disclosure requirements in the Chapter 11 Cases, or enforcing or preserving its rights under this Agreement against any other Party, or (2) disclose to any Person (including for the avoidance of doubt, any other Noteholder or First Lien Term Lender), other than legal, accounting, financial, and other advisors to the Company Parties, the name or the principal amount or percentage of the Company Claims held by any Noteholder or First Lien Term Lender or any of its respective subsidiaries (including, for the avoidance of doubt, any Company Claims acquired pursuant to any Transfer); *provided, however*, that the Company Parties shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of the Company Claims held collectively by the Consenting Noteholders and/or collectively by the Consenting Term Lenders.

(b)    Notwithstanding the foregoing, the Consenting Creditors hereby consent to the disclosure of the execution, terms, and contents of this Agreement by the Company Parties in the

Definitive Documents or as otherwise required by law or regulation; *provided, however,* that (i) if any of the Company Parties or Ascent determines that they are required to attach a copy of this Agreement, any Joinder or Transfer Agreement to any Definitive Documents or any other filing or similar document relating to the transactions contemplated hereby, they will redact any reference to or identifying information concerning a specific Consenting Creditor and such Consenting Creditor's name and holdings (including before filing any pleading with the Bankruptcy Court) and (ii) if disclosure of identifying information of any Consenting Noteholder or Consenting Term Lender is required by applicable Law, advance notice of the intent to disclose, if permitted by applicable Law, shall be given by the disclosing Party to each Consenting Noteholder or Consenting Term Lender, as applicable (who shall have the right to seek a protective order prior to disclosure).  Nothing contained herein shall be deemed to waive, amend or modify the terms of any Confidentiality Agreement.

(c)    Ascent and Monitronics shall consult with the advisors to the Ad Hoc Noteholder Group and the Ad Hoc Lender Group before issuing any press release or making any public filing announcing entry into this Agreement or any of the Definitive Documents and shall submit drafts to the advisors to the Ad Hoc Noteholder Group and the Ad Hoc Lender Group of any such press releases or other public filings as soon as reasonably practicable prior to making any such disclosure, and shall afford such advisors a reasonable opportunity to comment on such documents and disclosures, and such documents and disclosures shall be in form and substance reasonably acceptable to such advisors; provided that Ascent and Monitronics shall be permitted, upon twenty-four (24) hours' notice to the Ad Hoc Noteholder Group and the Ad Hoc Lender Group, to make any filings with the SEC as either of their respective counsel shall determine to be necessary to cause Ascent or Monitronics to comply with this Agreement.

17.22.  <u>Relationship Among Parties</u>.  Notwithstanding anything to the contrary herein, the duties and obligations of the Consenting Creditors under this Agreement shall be several, not joint.  None of the Consenting Creditors shall, solely as a result of entering into this Agreement, have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any Consenting Creditors, Ascent, any of Ascent's respective creditors or other stakeholders, any Company Party, or any of the Company Party's respective creditors or other stakeholders, and there are no commitments among or between the Consenting Creditors, in each case except as expressly set forth in this Agreement.  No prior history, pattern, or practice of sharing confidence among or between any of the Consenting Creditors, Ascent and/or the Company Parties shall in any way affect or negate this understanding and agreement.  It is understood and agreed that any Consenting Creditor may trade in the Company Claims without the consent of any other Party, subject to applicable securities laws and the terms of this Agreement.  No Party hereto shall have any responsibility with respect to the Transfer of any Company Claims by any other Party by virtue of this Agreement.  The Parties have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any securities of any of the Company Parties and do not constitute a "group" within the meaning of Section 13(d)(3) of the Exchange Act or Rule 13d-5 promulgated thereunder.  For the avoidance of doubt, no Consenting Creditor shall, nor shall any action taken by a Consenting Creditor pursuant to this Agreement, be deemed to be acting in concert or as any group with any other Consenting Creditor with respect to the

obligations under this Agreement nor shall this Agreement create a presumption that the Consenting Creditors are in any way acting as a group.

      17.23.  <u>Damages</u>.  Notwithstanding anything to the contrary in this Agreement, none of the Parties shall claim or seek to recover from any other Party on the basis of anything in this Agreement any punitive, special, indirect, or consequential damages or damages for lost profits.

      IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

[<em>Signatures Follow</em>]

**Schedule 1**

**RSA Milestones**

1. The Company Parties shall commence solicitation of votes to accept or reject the Plan within twelve (12) days following the Agreement Effective Date (the "***Prepetition Solicitation Commencement Date***").

2. The Put Option Agreement shall be entered into and an executed copy shall be delivered to all Parties by the date that is no later than five (5) Business Days after the Agreement Effective Date.

3. The prepetition solicitation of votes to accept or reject the Plan shall be completed by the date that is no later than twenty (20) days after the Prepetition Solicitation Commencement Date (the "***Prepetition Solicitation Deadline***").

4. A final agreement with respect to the material terms of the DIP Facility shall be agreed upon by the Parties and the DIP Lenders by the date that is no later than one (1) day prior to the Petition Date.

5. The Company Parties shall commence the Chapter 11 Cases by filing voluntary petitions under chapter 11 of the Bankruptcy Code with the Bankruptcy Court by the date that is no later than five (5) Business Days after the Prepetition Solicitation Deadline (the "***Petition Date Milestone***").

6. The Company Parties shall file on the Petition Date:

    a. the First Day Pleadings;

    b. the Plan and the Disclosure Statement, and one or more motions seeking (A) conditional approval of the Disclosure Statement and the other Solicitation Materials on an interim basis, (B) approval of the Rights Offering Procedures, (C) approval of the Backstop Commitment Documents, and (D) approval of the Disclosure Statement and the other Solicitation Materials on a final basis and confirmation of the Plan; and

    c. a motion seeking approval of the DIP Facility and the use of cash collateral.

7. The Bankruptcy Court shall have entered one or more orders conditionally approving the Disclosure Statement and the other Solicitation Materials on an interim basis and approving the Rights Offering Procedures by the date that is no later than three (3) days after the Petition Date.

8. The Bankruptcy Court shall have entered the Final DIP Order (as defined in the Restructuring Term Sheet) by the date that is no later than forty-five (45) days after the Petition Date.

9. The Bankruptcy Court shall have entered the Backstop Approval Order by the date that is no later than forty-five (45) days after the Petition Date.

10. The Bankruptcy Court shall have entered an order approving the Disclosure Statement and the other Solicitation Materials on a final basis by the date that is no later than sixty (60) days after the Petition Date.

11. The Bankruptcy Court shall have entered an order confirming the Plan by the date that is no later than sixty (60) days after the Petition Date.

12. The Plan shall become effective by the date that is no later than seventy-five (75) days after the Petition Date.

**Schedule 2**

**Specified Defaults[1]**

1.  Any Default or Event of Default arising due to the failure of the Borrower to satisfy the requirement of <u>Section 6.01(a)</u> of the Credit Agreement that the report and opinion of Ernst & Young, KPMG or another independent certified public accountant of nationally recognized standing reasonably acceptable to the Required Lenders delivered with respect to the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of the fiscal year ended December 31, 2018, and the related consolidated statement of income or operations, and consolidated statement of changes in shareholders' equity, and cash flows for such fiscal year, not include an explanatory paragraph expressing substantial doubt about the ability of the Borrower or any Loan Party to continue as a going concern or any qualification or exception as to the scope of such audit.

2.  Any Default or Event of Default under <u>Section 7.11(c)</u> of the Credit Agreement with respect to the Consolidated Senior Secured Eligible RMR Leverage Ratio as of the fiscal quarter ending March 31, 2019.

3.  Any Default or Event of Default under <u>Section 8.01(e)</u> of the Credit Agreement, resulting from the Borrower's failure to make the interest payment due on April 1, 2019 under the Senior Unsecured Notes.

4.  Any Event of Default (as defined in the Notes Indenture) under Section 6.1(2) of the Notes Indenture resulting from the Borrower's failure to make the interest payment due on the Notes on April 1, 2019 pursuant to the Notes and the Notes Indenture.

---

[1] Capitalized terms used in this Schedule 2 but not defined herein or in the Agreement have the meanings ascribed to them in the Credit Agreement.

## EXHIBIT A

**Restructuring Term Sheet**

**EXECUTION VERSION**

# MONITRONICS INTERNATIONAL, INC.
## RESTRUCTURING TERM SHEET

This term sheet (collectively with all exhibits, annexes and schedules hereto, as each may be amended, restated, amended and restated, supplemented or otherwise modified in accordance with the terms of the Restructuring Support Agreement, this "**Restructuring Term Sheet**"), which is Exhibit A to the Restructuring Support Agreement, dated as of May 20, 2019 (collectively with all exhibits, annexes, and schedules thereto, as each may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Restructuring Support Agreement**"),[1] summarizes certain terms and conditions (and does not purport to summarize all of the terms and conditions) of the proposed restructuring transactions for Monitronics International, Inc., a Texas corporation ("**Monitronics**"), and each of its direct and indirect domestic subsidiaries that are signatories to the Restructuring Support Agreement (collectively, with Monitronics, each a "**Company Party**," and collectively, the "**Company Parties**"), in accordance with, subject to the terms and conditions in, and consistent in all material respects with the Restructuring Support Agreement (the "**Restructuring**").

**THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER TO SELL OR BUY, OR THE SOLICITATION OF AN OFFER TO SELL OR BUY ANY SECURITIES OR A SOLICITATION OR ACCEPTANCE OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE (AS DEFINED BELOW), IT BEING UNDERSTOOD THAT ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW.**

Without limiting the generality of the foregoing, this Restructuring Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of the Definitive Documents (as defined in the Restructuring Support Agreement).

This Restructuring Term Sheet is provided as part of a settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any applicable statutes, doctrines or rules protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions.

| Material Restructuring Terms | |
|---|---|
| **Chapter 11 Cases** | This Restructuring Term Sheet contemplates the restructuring of Monitronics and each of the Company Parties.    The |

---

[1]   Capitalized terms used but not otherwise defined in this Restructuring Term Sheet have the meanings ascribed to such terms in the Restructuring Support Agreement.

| | |
|---|---|
| | Restructuring will be consummated through voluntary cases (the "**Chapter 11 Cases**") commenced by each of the Company Parties under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**") and pursuant to a partial prepackaged chapter 11 plan of reorganization consistent in all material respects with the Restructuring Support Agreement and this Restructuring Term Sheet (collectively with all exhibits, annexes and schedules thereto, as each may be amended, restated, amended and restated, supplemented or otherwise modified in accordance with its terms and the terms of the Restructuring Support Agreement, the "**Plan**") to be confirmed by the Bankruptcy Court. |
| **Restructuring Support Agreement** | To effectuate the Restructuring, the following parties will enter into the Restructuring Support Agreement: |
| | (i) the Company Parties; |
| | (ii) certain of the beneficial owners (or nominees, investment managers, advisors or subadvisors for the beneficial owners) (each, a "**Noteholder**") of the 9.125% Senior Notes due 2020 (the "**Notes**") issued pursuant to that certain Indenture dated as of March 23, 2012 (as amended, restated, modified, supplemented, or replaced from time to time in accordance with the terms thereof, the "**Notes Indenture**"), by and among Monitronics, the guarantors named thereunder, and U.S. Bank National Association, as trustee, (those Noteholders that are signatories to the Restructuring Support Agreement are referred to as the "**Consenting Noteholders**"); |
| | (iii) certain of the Term Lenders (as defined in the Credit Agreement) (the "**First Lien Term Lenders**") party to the Credit Agreement (those First Lien Term Lenders that are signatories to the Restructuring Support Agreement are referred to as the "**Consenting Term Lenders**"); and |
| | (iv) Ascent Capital Group, Inc. ("**Ascent**"). |
| **Summary of Restructuring** | In connection with the Restructuring: |
| | (i) solely to the extent that the Non-Ascent Restructuring Toggle has not occurred, the Merger shall be consummated on the terms set forth in the Restructuring Support Agreement, this Restructuring Term Sheet, and in the Rights Offering and Equity Commitment Term Sheet; |
| | (ii) within five (5) days of the Petition Date, the Debtors shall |

2

commence the Rights Offering (as defined in the Rights Offering and Equity Commitment Term Sheet) in accordance with the terms and conditions set forth in the Restructuring Support Agreement, this Restructuring Term Sheet, the Rights Offering and Equity Commitment Term Sheet, and the Put Option Agreement;

(iii) the Backstop Commitment Parties (as defined in the Restructuring Support Agreement) will backstop (a) the Rights Offering up to the full Aggregate Rights Offering Amount (as defined in the Rights Offering and Equity Commitment Term Sheet), and (b) the Net Cash Shortfall Amount or Ascent Default Amount (each as defined in the Rights Offering and Equity Commitment Term Sheet), as applicable, on the terms and conditions set forth in the Restructuring Support Agreement, this Restructuring Term Sheet, the Rights Offering and Equity Commitment Term Sheet, and the Put Option Agreement;

(iv) the Equity Commitment Parties (as defined in the Restructuring Support Agreement) will purchase the Equity Commitment Shares (as defined in the Rights Offering and Equity Commitment Term Sheet) for an aggregate purchase price of $100 million, payable by exchanging an aggregate principal amount of $100 million of Contributed Term Loans (as defined in the Rights Offering and Equity Commitment Term Sheet) on the terms and conditions set forth in the Restructuring Support Agreement, this Restructuring Term Sheet, the Rights Offering and Equity Commitment Term Sheet, and the Put Option Agreement;

(v) the Company Parties and the "Lenders" (as defined in the Takeback Exit Term Loan Facility Term Sheet (as defined in the Restructuring Support Agreement)) (the "**Takeback Exit Term Loan Facility Lenders**") will enter into the Takeback Exit Term Loan Facility (as defined below) on the terms and conditions set forth in the Restructuring Support Agreement, this Restructuring Term Sheet, the Takeback Exit Term Loan Facility Term Sheet (as defined in the Restructuring Support Agreement), and the Takeback Exit Term Loan Facility Documents (as defined in the Restructuring Support Agreement);

(vi) the Company Parties and the "Lenders" (as defined in the DIP/Exit Facility Commitment) (the "**New Exit Facility Lenders**") will enter into the New Exit Facilities (as defined below) on the terms and conditions set forth in the Restructuring Support Agreement, this Restructuring Term

3

Sheet, the DIP/Exit Facility Commitment, and the New Exit Facilities Documents (as defined in the Restructuring Support Agreement);

(vii) the Company Parties and the DIP Lenders (as defined below) will enter into the DIP Facility (as defined below) on the terms and conditions set forth in the Restructuring Support Agreement, this Restructuring Term Sheet, the DIP/Exit Facility Commitment, and the DIP Documents (as defined in the Restructuring Support Agreement); and

(viii) the Company Parties shall commence solicitation of votes on the Plan in accordance with applicable law within twelve (12) days of the Agreement Effective Date.

On the Plan Effective Date, pursuant to the Plan:

(i) the Notes will be cancelled and each of the Noteholders shall receive on account of its Claims arising under the Notes (each, a "**Note Claim**" and collectively, the "**Note Claims**"):

(a) cash in an amount equal to the Cash Payout (as defined below) or (b) solely to the extent that such Noteholder timely and validly elects the Cash Opt Out Election (as defined below), (1) its *pro rata* share of the Notes Shares (as defined below), plus (2) Rights (as defined in the Rights Offering and Equity Commitment Term Sheet) to acquire New Common Stock (as defined in the Restructuring Support Agreement) to be issued in the Rights Offering.

(ii) solely in the event and to the extent that (a) the Non-Ascent Restructuring Toggle has not occurred and (b) the Merger is in fact consummated pursuant to the terms hereof and the Restructuring Support Agreement, then the shareholders of Ascent shall receive the Ascent Share Distribution (as defined below);

(iii) each of the First Lien Revolving Lenders shall have received repayment in full of all Claims on account of the outstanding Revolving Credit Loans (as defined in the Credit Agreement) from the proceeds of the DIP Facility;

(iv) each of the DIP Lenders shall receive payment in accordance with the terms and conditions of the DIP/Exit Facility Commitment; and

(v) each of the First Lien Term Lenders shall receive, on account of its Claims arising under the Credit Agreement, its *pro rata* share of: (a) the Effective Date Pay Down (as defined below), which, together with the equitization of the

4

| | |
|---|---|
| | Contributed Term Loans (as defined in the Rights Offering and Equity Commitment Term Sheet), will result in an aggregate reduction of the Term Loans by $250 million in principal amount; (b) the Takeback Exit Term Loans (as defined below) on the terms and conditions set forth in the Takeback Exit Term Loan Facility Term Sheet; and (c) accrued but unpaid interest due under the Credit Agreement.

The New Common Stock of Reorganized Monitronics will not be listed on the NYSE, NASDAQ or any other stock exchange; provided that the New Common Stock may (subject to satisfaction of the applicable requirements for being admitted to such market) be admitted for trading and quoted on any markets operated by OTC Markets Group Inc.

Other Definitive Documents governing the Restructuring will be consistent in all respects with the material terms set forth in the Restructuring Support Agreement (including all exhibits thereto and Section 3.02 thereof). |
| **Use of Cash Collateral** | Prior to the Petition Date, the Company Parties shall negotiate a cash collateral agreement with the First Lien Agent (which may be part of the Interim DIP Order (as defined below)) that shall be reasonably acceptable to the Required Consenting Term Lenders and the Required Consenting Noteholders, and that shall include terms and conditions related to customary adequate protection to be provided to the First Lien Term Lenders consistent with the terms and conditions of the Credit Agreement and related Loan Documents (as defined in the Credit Agreement) including, without limitation, replacement liens, fees (including the professional fees for the Ad Hoc Lender Group), interest (which interest, if owed to the First Lien Term Lenders, shall be calculated as if there were no default under the Credit Agreement and at the non-default rate, subject to the Consenting Term Lenders' rights to seek interest on modified terms upon termination of the Agreement Effective Period),[2] reporting and milestones. |
| **DIP Facility** | The "Lenders" (as defined in the DIP/Exit Facility Commitment) (the "**DIP Lenders**") will provide senior secured postpetition financing facilities in an aggregate principal |

---

[2]   For the avoidance of doubt, upon termination of the Agreement Effective Period (other than due to the Plan going effective), the rights of the First Lien Term Lenders to seek additional and/or different adequate protection (including, without limitation, interest at the default rate) and the rights of all other Parties to object to any such requests are expressly reserved.

amount of $245 million (the "**DIP Facility**" and the loans thereunder, the "**DIP Loans**") secured by first priority priming security interests and liens on all properties and assets, whether tangible, intangible, real, or personal, of each Company Party, regardless of whether such properties and assets are subject to valid, perfected, and non-avoidable liens in favor of the First Lien Agent, the First Lien Revolving Lenders, and the First Lien Term Lenders; *provided*, *however*, that such security interests and liens will be junior, and not priming, as to (i) a customary carve-out with respect to estate professional and other fees and (ii) customary "permitted liens" arising under applicable law with priority over the First Lien Agent's prepetition liens and security interests; *provided, further* that the DIP Facility shall be on terms and conditions that are consistent in all material respects with the DIP/Exit Facility Commitment and the DIP Documents and otherwise reasonably acceptable to the Required Consenting Term Lenders and the Required Consenting Noteholders.

On the Petition Date, the Company Parties shall seek, and the Consenting Creditors and Ascent shall support, entry of interim (the "**Interim DIP Order**") and final orders (the "**Final DIP Order**," and, together with the Interim DIP Order, the "**DIP Orders**") authorizing the Company Parties to enter into the DIP Facility under the Bankruptcy Code, each of which shall be reasonably acceptable to the Company Parties, the DIP Lenders, the Required Consenting Term Lenders, and the Required Consenting Noteholders, and which shall include terms and conditions related to customary adequate protection to be provided to the First Lien Term Lenders, including replacement liens, fees, interest (which interest, if owed to the First Lien Term Lenders, shall be calculated as if there were no default under the Credit Agreement and at the non-default rate, subject to the Consenting Term Lenders' rights to seek interest on modified terms upon termination of the Agreement Effective Period),[3] reporting and milestones.

Proceeds of the DIP Facility shall be used to:

(i)     provide for the ongoing working capital and capital expenditure needs of the Company Parties during the

---

[3]     For the avoidance of doubt, upon termination of the Agreement Effective Period (other than due to the Plan going effective), the rights of the First Lien Term Lenders to seek interest on modified terms (including, without limitation, interest at the default rate) and the rights of all other Parties to object to any such requests are expressly reserved.

6

| | |
|---|---|
| | pendency of the Chapter 11 Cases; |
| | (ii) fund the costs of the administration of the Chapter 11 Cases; and |
| | (iii) repay in full all Claims on account of the Revolving Credit Loans. |
| | On the Plan Effective Date, each DIP Lender shall receive payment in accordance with the terms and conditions of the DIP/Exit Facility Commitment. |
| **First Lien Revolving Lender Claims** | On the Plan Effective Date, each First Lien Revolving Lender shall have received payment in full in cash from the proceeds of the DIP Facility. |
| **First Lien Term Lender Claims** | On the Plan Effective Date, each First Lien Term Lender shall receive, on account of its Claims arising under the Credit Agreement, its *pro rata* share of: |
| | (i) $150 million in cash from (a) the proceeds of the Rights Offering and (b)(1) the Net Cash Amount (as defined in the Restructuring Support Agreement) and, if applicable, the Net Cash Shortfall Amount, or (2) the Ascent Default Amount, as applicable, for application to the outstanding Term Loans (except that no Equity Commitment Party shall receive any such cash on account of Contributed Term Loans) (such payments collectively, the "**Effective Date Pay Down**"); and |
| | (ii) the Takeback Exit Term Loans contemplated under the Takeback Exit Term Loan Facility, consistent with the terms and conditions set forth in the Takeback Exit Term Loan Facility Term Sheet (except that no Equity Commitment Party shall receive any such Takeback Exit Term Loan on account of Contributed Term Loans). |
| | On the Plan Effective Date, an aggregate principal amount of $100 million of the Term Loans held by the Equity Commitment Parties will be exchanged for New Common Stock as part of the Equity Commitments pursuant to the terms of the Put Option Agreement. |
| | The principal amount of all Term Loans (including Contributed Term Loans) shall continue to accrue interest through the Plan Effective Date, and all accrued but unpaid interest shall be paid in cash in full on the Plan Effective Date. |

7

| | |
|---|---|
| **Noteholder Claims** | On the Plan Effective Date, in exchange for the full cancellation of the Notes, each Noteholder will receive on account of its Notes Claim: |
| | (i)  cash in an amount equal to 2.5% of the principal and accrued but unpaid interest due under the Notes held by such Noteholder (the "**Cash Payout**"); or |
| | (ii)  solely to the extent that such Noteholder elects, on a timely and validly submitted election form, to receive Notes Shares (as defined below) in lieu of the Cash Payout by affirmatively opting out of the Cash Payout (such election, the "**Cash Opt Out Election**," and any such holder, a "**Cash Opt Out Noteholder**"), (1) its *pro rata* share of 18.0% of the total shares of New Common Stock to be issued and outstanding as of the Plan Effective Date, subject to dilution by the Post-Emergence Incentive Plan (as defined below) (such shares, the "**Notes Shares**"), plus (2) Rights to acquire New Common Stock to be issued in the Rights Offering. |
| | Notwithstanding anything herein to the contrary (including the preceding clause (ii)), each Consenting Noteholder (a) shall receive its pro rata share of the Notes Shares, (b) shall not receive cash on account of its Notes Claims, and (c) shall affirmatively exercise the Cash Opt Out Election and be a Cash Opt Out Noteholder. |
| **Exit Financing** | On the Plan Effective Date, the Company Parties and/or the reorganized Company Parties, as applicable, shall have entered into the following credit facilities: (i) revolving credit and term facilities with the Agent (as defined in the DIP/Exit Facility Commitment) and the New Exit Facility Lenders on the terms and conditions set forth in the DIP/Exit Facility Commitment and the New Exit Facilities Documents (the "**New Exit Facilities**") and (ii) a term loan facility with the Administrative Agent (as defined in the Takeback Exit Term Loan Facility Term Sheet) and the Takeback Exit Term Loan Facility Lenders in an aggregate dollar amount of $822.5 million (the "**Takeback Exit Term Loan Facility**" and the loans thereunder, the "**Takeback Exit Term Loans**"), the terms and conditions of which shall be set forth in the Takeback Exit Term Loan Facility Term Sheet and the Takeback Exit Term Loan Facility Documents, in each case of (i) and (ii), acceptable to the Company Parties, the Required Consenting Term Lenders, and the Required Consenting Noteholders (such |

8

| | |
|---|---|
| | acceptance not to be unreasonably withheld). |
| | For the avoidance of doubt, Reorganized Monitronics shall be the borrower and obligor under the New Exit Facilities and the Takeback Exit Term Loan Facility, and all guarantors under the Credit Agreement shall be guarantors of the New Exit Facilities and the Takeback Exit Term Loan Facility. |
| **Merger** | Ascent shall file, or shall cause Monitronics to file, with the SEC a Form S-4 or a preliminary proxy statement, as may be the case, for the purpose of obtaining stockholder consent for the proposed Merger within five (5) Business Days following the Agreement Effective Date. |
| | Solely to the extent that the Non-Ascent Restructuring Toggle has not occurred, on the Plan Effective Date: |
| | (i)  (a) Through the Merger, Ascent's Series B common stock will be effectively converted into Series A common stock of Ascent; (b) the Merger shall be consummated; (c) as a result of the Merger, all assets of Ascent (including the Ascent Cash Amount (as defined in the Restructuring Support Agreement)) shall become assets of Reorganized Monitronics; and (d) holders of Ascent's common stock (including equity compensation award holders whose awards are accelerated and settled in such common stock) shall receive approximately 5.82% of the total shares of New Common Stock to be issued and outstanding as of the Plan Effective Date, subject to dilution by the Post-Emergence Incentive Plan (the "**Ascent Share Distribution**"),[4] with such shares to be allocated pro rata among such holders of outstanding shares of common stock of Ascent pursuant to the Form S-4 or proxy materials, as may be the case, related to the Merger; |
| | (ii)  additional shares of New Common Stock, representing 76.4%[5] of the total shares of New Common Stock to be issued and outstanding as of the Plan Effective Date, |

---

[4]   This assumes that the Net Cash Amount at the time of the Merger is $23 million.  The Ascent Share Distribution will be adjusted to reflect the actual Net Cash Amount at the time of the Merger.  The Ascent Share Distribution at the time of the Merger will be calculated as follows: the quotient of the Net Cash Amount *divided by* $395,111,570.

[5]   This amount will be adjusted based on the Ascent Share Distribution at the time of the Merger.  This amount will be calculated as follows:  100% *less* 18% *less* the Ascent Share Distribution.

US-DOCS\105904881.25

subject to dilution by the Post-Emergence Incentive Plan, shall be distributed pursuant to the Plan, the Rights Offering, the Equity Commitments, and the Put Option Agreement.

In the event that the Non-Ascent Restructuring Toggle has occurred, then:

(i) the Parties shall pursue the Restructuring without the inclusion of the Merger;

(ii) the Company Parties shall consummate the Restructuring without Ascent's participation and the Merger shall not be consummated;

(iii) the Backstop Commitment Parties shall satisfy their Backstop Commitments (as defined in the Rights Offering and Equity Commitment Term Sheet) to purchase the Backstop Commitment Shares (as defined in the Rights Offering and Equity Commitment Term Sheet) on the terms and conditions set forth in the Rights Offering and Equity Commitment Term Sheet and the Put Option Agreement;

(iv) Ascent shall make the Toggle Contribution (as defined in the Restructuring Support Agreement), subject to the receipt of the release contemplated hereunder;

(v) the holders of Ascent's common stock will not receive the Ascent Share Distribution;

(vi) 100% of the New Common Stock to be issued and outstanding as of the Plan Effective Date, subject to dilution by the Post-Emergence Incentive Plan, shall be distributed to creditors of Monitronics pursuant to the Plan, the Rights Offering, the Equity Commitments and the Put Option Agreement; and

(vii) the Company Parties and the Consenting Creditors will negotiate in good faith to make appropriate modifications to the Definitive Documents to effectuate the Restructuring contemplated herein without the inclusion of the Merger.

10

| Treatment of Other Claims and Interests | |
|---|---|
| **Administrative, Priority and Tax Claims** | On or as soon as practicable after the latest to occur of the Plan Effective Date, the date such claim becomes allowed, and the date such claim becomes due in the ordinary course of business, each holder of an allowed administrative, priority or priority tax claim will, with the reasonable consent of the Company Parties, the Required Consenting Noteholders, and the Required Consenting Term Lenders, either be satisfied in full, in cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **Other Secured Claims** | Except to the extent that a holder of an allowed Other Secured Claim agrees to less favorable treatment, in exchange for the full and final satisfaction, settlement, release, and discharge of (including any liens related thereto) each allowed Other Secured Claim (other than claims under the Credit Agreement), each holder of an allowed Other Secured Claim shall, at the option of the Company Parties, with the reasonable consent of the Company Parties, the Required Consenting Term Lenders, and the Required Consenting Noteholders, shall receive (i) treatment of such allowed Other Secured Claim in a manner that renders such claim unimpaired in accordance with section 1124(2) of the Bankruptcy Code, including reinstatement, (ii) payment full in cash in the ordinary course of business or (iii) the collateral securing such allowed Other Secured Claim. |
| **General Unsecured Claims** | Except to the extent that a holder agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each allowed general unsecured claim, each holder of an allowed general unsecured claim shall receive payment in full in cash on account of their allowed Claims or such other treatment as would render such Claim unimpaired.<br><br>Holders of such unsecured claims will not be required to file any proof of claim in the Chapter 11 Cases. |
| **Intercompany Claims** | Intercompany claims among the Company Parties shall either be (a) reinstated as of the Plan Effective Date or (b) cancelled, in which case, no distribution shall be made on account of such Claim. |
| **Intercompany Interests** | Equity interests in any Company Party held by another Company Party will remain effective and outstanding on the |

11

| | Plan Effective Date. |
|---|---|
| **Equity Securities** | Subject to the "Existing Compensation Arrangements" section of this Restructuring Term Sheet, all equity securities issued by Monitronics before the Plan Effective Date will be cancelled and extinguished as of the Plan Effective Date. |
| **Voting Rights** | The First Lien Term Lenders and the Noteholders will be the only holders of claims or interests entitled to vote to accept or reject the Plan.  All other holders of claims or interests will be deemed to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code. |
| **Other Plan Terms** | |
| **Executory Contracts & Unexpired Leases** | Unless otherwise set forth herein, the Plan will provide for the Company Parties to assume all executory contracts and unexpired leases to which they are party, with any applicable undisputed cure costs to be paid on or as soon as reasonably practicable after the Plan Effective Date.  The Plan will further provide for a mechanism to resolve disputed cure claims. |
| **Post-Emergence Incentive Plan** | The Plan will provide that, as of the Plan Effective Date, Reorganized Monitronics will be deemed to have adopted a management equity incentive program (the "**Post-Emergence Incentive Plan**"), under which at least 7.5% and up to 10% of the New Common Stock on a fully diluted basis (after giving effect to the awards to be issued under the Post-Emergence Incentive Plan) shall be reserved for awards to be granted to certain officers, board members, and other members of management of Reorganized Monitronics under the Post-Emergence Incentive Plan.  Additional details regarding the Post-Emergence Incentive Plan will be determined by the New Board (as defined below). |
| **Board of Directors** | The new Board of Directors of Reorganized Monitronics after the Plan Effective Date (the "**New Board**") shall be made up of 7 directors, as set forth in the Governance Term Sheet attached as **Exhibit 1** hereto (the "**Governance Term Sheet**"). |

12

| Corporate Governance | Corporate governance for Reorganized Monitronics, including charters, bylaws, articles of incorporation, operating agreements or similar documents, or other organization or formation documents, as applicable, shall be materially consistent with the Governance Term Sheet attached hereto as **Exhibit 1** and section 1123(a)(6) of the Bankruptcy Code and otherwise acceptable to the Company Parties, the Required Consenting Noteholders, and the Commitment Parties and in consultation with the Required Consenting Term Lenders. |
|---|---|
| Releases and Exculpation | Ascent, the Company Parties, the Consenting Noteholders, the Consenting Term Lenders, the Commitment Parties, the DIP Agent, the DIP Lenders, and the Related Persons[6] of each of the foregoing will provide all other parties customary mutual and reciprocal releases and exculpation, in each case, to the fullest extent permitted by law, and such releases and exculpation will also be documented and granted in the Plan and the Bankruptcy Court's order confirming the Plan (the "**Confirmation Order**"); provided, however, that, after the occurrence of the Non-Ascent Restructuring Toggle, the foregoing releases and exculpation will only be provided to Ascent and its Related Persons (other than the Company Parties and their respective Related Persons) if the Toggle Contribution has been made by Ascent. The Plan and the Confirmation Order will also provide for such releases and exculpation to be provided to such parties by all consenting holders of claims against and interests in the Company Parties and parallel injunctive provisions, to the fullest extent approved by the Bankruptcy Court and permitted by law. |
| Indemnification | Prior to the Petition Date, Ascent and/or the applicable Company Parties will purchase runoff endorsements to their respective existing directors' and officers' liability insurance policies (collectively, "**D&O Liability Insurance Policies**"), extending coverage, including costs and expenses (including reasonable and necessary attorneys' fees and experts' fees) for current or former directors, managers, and officers of the Company Parties for a six-year period after the Plan Effective Date for covered liabilities, including sums which any such |

---

[6] "**Related Persons**" means, with respect to a Person, each of that Person's current and former Affiliates, and each of such Person's and Affiliates' current and former directors, officers, managers, managing members, principals, partners, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, other professionals, managed accounts, and managed funds, each in their capacity as such.

13

| | |
|---|---|
| | party becomes legally obligated to pay as a result of judgments, fines, losses, claims, damages, settlements or liabilities arising from activities occurring prior to the Plan Effective Date (collectively, "**Runoff Endorsements**").  Ascent and/or the applicable Company Parties will purchase new D&O Liability Insurance Policies for directors, managers, and officers of Reorganized Monitronics from and after the Plan Effective Date on terms and conditions acceptable to Ascent, the Company Parties, the Required Consenting Noteholders, and the Commitment Parties.<br><br>Under the Plan, the applicable Company Parties shall assume pursuant to section 365(a) of the Bankruptcy Code, (a) the existing D&O Liability Insurance Policies with Runoff Endorsements and (b) all of the existing indemnification provisions for current or former directors, managers and officers of the Company Parties (whether in by-laws, certificate of formation or incorporation, board resolutions, employment contracts, or otherwise), such indemnification provisions, the "**Indemnification Obligations**".  All claims arising from the existing D&O Liability Insurance Policies with Runoff Endorsements and such Indemnification Obligations shall be unaltered by the Restructuring. |
| **Existing Compensation Arrangements** | Under the Plan (including in the event of a Non-Ascent Restructuring Toggle in which the Merger is not consummated), the applicable Company Parties shall assume, pursuant to section 365(a) of the Bankruptcy Code (or Ascent shall assign to Reorganized Monitronics, as applicable), (a) all existing Compensation Arrangements (as defined in the Restructuring Support Agreement) other than (i) that certain Amended and Restated Employment Agreement by and between Ascent and William Niles dated February 1, 2019 (which shall remain an obligation of Ascent) or (ii) as terminated, cancelled, or settled as provided below; provided, however, that Monitronics will take all actions necessary to provide that the Monitronics phantom units will not accelerate and become vested solely due to the consummation of the Merger or the occurrence of a Non-Ascent Restructuring Toggle, and (b) such additional Compensation Arrangements for the restructuring transitional period and for calendar year 2019 and beyond as may be adopted by the Company Parties with the consent of the Required Consenting Noteholders and the Commitment Parties in their sole discretion (clauses (a) and (b) together, the "**Designated Compensation Arrangements**"), which may be set forth in the Plan |

14

Supplement.

Any such Compensation Arrangements that are not Designated Compensation Arrangements will not be assumed and will be rejected or otherwise terminated.

The consummation of the Merger shall constitute a Change in Control of Ascent for purposes of the existing Compensation Arrangements as it relates to double trigger provisions in any Compensation Arrangement that is an employment agreement with Ascent, or an equity or equity-based compensation plan of Monitronics.

For the avoidance of doubt, notwithstanding anything to the contrary set forth in this Restructuring Term Sheet or the Restructuring Support Agreement:

(i)    In the event a Non-Ascent Restructuring Toggle does not occur and the Merger is consummated:

a.    With respect to awards granted by Ascent:

1.    all equity-based compensatory awards held by directors of Ascent will vest in full immediately prior to the Merger;

2.    the following performance restricted stock unit awards will terminate without consideration: (1) 172,101 units held by Jeff Gardner;[7] (2) 108,969 units held by William Fitzgerald; and (3) 50,000 units held by William Niles;[8]

3.    the vesting of any other awards will be accelerated in full and settled by Ascent in shares of Ascent common stock immediately prior to the Merger, which awards include the following: (i) 59,443 RSUs held by Jeff Gardner; (ii) 28,743 RSUs held by William Niles; (iii) 8,504 restricted shares held by Fred Graffam and (iv) 8,026 RSUs or restricted

---

[7]    Such units are held under two separate awards: the 2017 grant covering 36,231 RSUs and the 2018 grant covering 135,870 RSUs.

[8]    Such units are held between two separate awards, each covering 25,000 RSUs and granted in 2018.

15

shares held by certain non-executive employees; and

4. all stock options will be cancelled for no consideration.

Ascent will obtain customary acknowledgements and releases from affected participants with respect to settlement, cancellation, termination, and/or vesting of such awards described above.

b. With respect to awards granted by Monitronics:

1. Monitronics phantom unit awards outstanding at the time of the Merger will remain outstanding but will be adjusted by Reorganized Monitronics to cover shares of New Common Stock based on the Merger Exchange Ratio [9] rather than shares of Ascent common stock;

2. the value paid for a vested phantom unit will be based on the value of New Common Stock (rather than Ascent common stock); and

3. Reorganized Monitronics will take all actions necessary to provide that the phantom units will not accelerate and become vested solely due to the Merger.

(ii) In the event that a Non-Ascent Restructuring Toggle occurs and the Merger is not consummated:

a. With respect to awards granted by Ascent:

1. Sections (i)(a)(1)-(4) above shall apply, except equity awards held by William Niles and any directors of Ascent will remain outstanding and eligible to vest pursuant to their terms.

b. With respect to awards granted by Monitronics:

---

[9]     The "**Merger Exchange Ratio**" shall be calculated as follows: the quotient of (a)(i) the Net Cash Amount *divided by* 395,111,570, *multiplied by* (ii) 22,500,000, *divided by* (b) the total issued and outstanding shares of Ascent common stock immediately prior to the consummation of the Merger.  Each of the Parties agrees that the number of outstanding shares of New Common Stock as of the Plan Effective Date shall be 22,500,000.

16

| | |
|---|---|
| | 1. Monitronics phantom unit awards will remain outstanding and Reorganized Monitronics will make any changes necessary and permitted by the phantom unit plan to equitably adjust the number of phantom units and/or class of securities/value covered by the phantom units, and such other terms reasonably necessary, to reflect the Non-Ascent Restructuring (as applicable). |
| **Transition Services Agreement** | Prior to the Plan Effective Date, the Company Parties and Ascent shall agree upon a form of Transition Services Agreement (a "**TSA**"), to be entered into on the Plan Effective Date solely in the event a Non-Ascent Restructuring Toggle occurs, in form and substance acceptable to the Required Consenting Noteholders, the Commitment Parties, the Company Parties, and Ascent and with a copy to be provided to counsel to the Ad Hoc Lender Group.  The term of the TSA shall not exceed twelve (12) months.<br><br>The TSA shall provide that (a) Ascent and the Reorganized Debtors will each: (i) cooperate fully and in good faith in the transition of any shared services between Ascent and the Company Parties and/or the Reorganized Debtors, and (ii) use commercially reasonable efforts to ensure that all permits, licenses, software, agreements, contracts, information, and other items necessary to operate their respective businesses are transitioned and operations are not disrupted and (b) Ascent will reimburse the Reorganized Debtors for all services provided to Ascent during the period from the Plan Effective Date through termination of the TSA (including, without limitation, IT, accounting, and finance services) at rates to be negotiated at arms' length between Ascent and the Company Parties and which shall be acceptable to the Required Consenting Noteholders and the Commitment Parties. |
| **Information Sharing Agreement** | The Company Parties and the Consenting Noteholders will enter into a cooperation agreement (the "**Information Sharing Agreement**"), on terms and conditions acceptable to the Company Parties and the Required Consenting Noteholders and with a copy to be provided to counsel to the Ad Hoc Lender Group, on or prior to the Petition Date, which Information Sharing Agreement shall provide that the Company Parties will cooperate in good faith to assist in the transition of the business during the period after the effectiveness of the Information Sharing Agreement and prior to the Plan Effective Date. |

| Tax Matters | The tax structure of the Restructuring shall be structured to preserve or otherwise maximize favorable tax attributes (including tax basis) of the Company Parties to the extent practicable as determined by the Company Parties, the Required Consenting Noteholders, and the Required Consenting Term Lenders. |
|---|---|
| **Exemption from SEC Registration** | The Plan and Confirmation Order shall provide that the issuance of any securities thereunder, including the New Common Stock, will be exempt from securities laws pursuant to section 1145 of the Bankruptcy Code or another available exemption from registration (or in the case of the Ascent Share Distribution registered under the securities laws), and such New Common Stock shall be, following the Plan Effective Date, freely transferable by the respective holders thereof to the furthest extent permissible pursuant to section 1145 and applicable securities law and regulations (or in the case of the Ascent Share Distribution pursuant to the Form S-4). |
| **Conditions to the Plan Effective Date** | It shall be a condition to the Plan Effective Date that the following conditions precedent are satisfied or waived by the Company Parties, the Consenting Creditors, and solely to the extent that the Non-Ascent Restructuring Toggle has not occurred, Ascent, and the Plan Effective Date shall occur on the date upon which the last of such conditions are so satisfied and/or waived: |

(i)   the Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Consenting Creditors, and the Confirmation Order shall not be stayed, modified, or vacated;

(ii)   the New Exit Facilities under the New Exit Facilities Documents shall have closed, contemporaneously with the Plan Effective Date;

(iii)   the Takeback Exit Facility under the Takeback Exit Facility Documents shall have closed, contemporaneously with the Plan Effective Date;

(iv)   the Company Parties shall have received at least $177 million in value as contemplated in connection with the Rights Offering and the Put Option Agreement;

(v)   the Company Parties shall have received at least $100 million in value as contemplated in connection with the Equity Commitment and the Put Option Agreement;

(vi)   the Company Parties shall have received at least

18

|   | $23 million in cash either from (a) Ascent in the form of the Net Cash Amount and, if applicable, the Backstop Commitment Parties in the form of the Net Cash Shortfall Amount, or (b) the Backstop Commitment Parties in the form of the Ascent Default Amount; |
|---|---|
| (vii) | the Company Parties shall have paid or reimbursed all reasonable and documented fees and out-of-pocket expenses of the Ad Hoc Noteholder Group in full in cash in connection with the Restructuring, including the reasonable and documented fees and expenses of their counsel, local counsel, and existing financial and operational advisors; |
| (viii) | the Company Parties shall have paid or reimbursed all reasonable and documented fees and out-of-pocket expenses of the First Lien Term Lenders in connection with the Restructuring, including the reasonable and documented fees and expenses of their counsel and existing financial advisors; |
| (ix) | each document or agreement constituting the Definitive Documents shall be in form and substance consistent with this Restructuring Term Sheet and the Restructuring Support Agreement; |
| (x) | all governmental approvals and consents that are legally required for the consummation of the Restructuring shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect; and |
| (xi) | such other conditions to the Plan Effective Date as are customary. |

19

## **EXHIBIT 1**

**Governance Term Sheet**

### REORGANIZED MONITRONICS
### GOVERNANCE TERM SHEET[1]

This term sheet (this "Governance Term Sheet") summarizes certain material terms in respect of the corporate governance of Reorganized Monitronics (as used herein, the "Company") to be reflected in the New Governance Documents (as defined  below) as of the Plan Effective Date, and is not an exhaustive list of all terms that will apply in respect of the corporate governance of the Company.  Without limiting the generality of the foregoing, this Governance Term Sheet and the terms and undertakings set forth herein are subject in all respects to the negotiation, execution and delivery (as applicable) of definitive documentation.

Corporate Structure:   The Company shall be a Delaware corporation, and the surviving corporation in a reincorporation merger between Monitronics and a newly formed Delaware corporation (which reincorporation merger will constitute part of the Restructuring and be consummated on the Plan Effective Date).

Governance Documents:   On the Plan Effective Date, pursuant to the Plan, (a) the certificate of incorporation of the Company will be amended and restated in substantially the form to be filed as part of the Plan Supplement (the "New Charter"), (b) the bylaws of the Company will be amended and restated in substantially the form to be filed as part of the Plan Supplement (the  "New Bylaws"), and (c) the Company and the other parties thereto will enter into a registration rights agreement, as more fully described below, in substantially the form to be filed as part of the Plan Supplement (the "Registration Rights Agreement").  The New Charter, the New Bylaws, and the Registration Rights Agreement (collectively,  the "New Governance Documents") will collectively reflect, without limitation, the terms set forth in this Governance Term Sheet.

New Common Stock:   The New Charter shall provide for a single class of common stock (i.e., the New Common Stock), which shall be voting stock entitled to one vote per share, The shares of New Common Stock issued in the Restructuring shall be issued through the facilities of The Depository Trust Company (DTC). The New Common Stock shall not be listed on the New York Stock Exchange ("NYSE"), NASDAQ or any other stock exchange, provided that the New Common Stock may (subject to satisfaction of the applicable requirements for being admitted to such market) be admitted for trading and quoted on any markets operated by OTC Markets Group Inc..  It is contemplated that the New Common Stock will be registered under Section 12(g) of the Securities Exchange Act of 1934, as amended.  The New Charter shall prohibit the issuance of non-voting equity securities, to the extent required pursuant to Section 1123(a)(6).

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Restructuring Term Sheet to which this Governance Term Sheet is attached as Exhibit 1 (the "Restructuring Term Sheet"), or the Restructuring Support Agreement (the "RSA") to which the Restructuring Term Sheet is attached as Exhibit A, as applicable.

Board of Directors: | The New Charter shall fix the size of the Board at seven (7) directors (each, a "Director"), and shall provide for the Board to be divided into three classes of Directors, designated as Class I, Class II and Class III, respectively, with two Directors in each of Class I and Class II, and three Directors in Class III.  Each Director shall serve for a term ending on the date of the third annual meeting following the annual meeting of stockholders at which such Director was elected; provided, that each Director initially appointed to Class I shall serve for an initial term expiring at the Company's first annual meeting following the Plan Effective Date (which shall occur no earlier than the date that is 12 months after the Plan Effective Date); each Director initially appointed to Class II shall serve for an initial term expiring at the Company's second annual meeting following the Plan Effective Date; and each Director initially appointed to Class III shall serve for an initial term expiring at the Company's third annual meeting following the Plan Effective Date; provided further, that the term of each Director shall continue until the election and qualification of his or her successor or, if applicable, such Director's earlier death, resignation or removal.

On the Plan Effective Date, pursuant to the Plan, the Board will be reconstituted to consist of the following Directors (the "Initial Board"), and the name and Class of each such Director shall be disclosed in the Plan Supplement:

(a) three (3) Directors designated by holders of New Common Stock that are funds or accounts that are managed or advised by, or that are affiliates of, EQT Partners UK Advisors LLP (collectively, the "EQT Stockholders"), which Directors shall be Class III Directors; provided, however, that such designation right is subject to the EQT Stockholders' being entitled to receive, as of the Plan Effective Date, at least 27.5% of the total shares of New Common Stock to be issued as of the Plan Effective Date (the "Total Effective Date Shares"), and shall become a right to designate two (2) Class III Directors if the EQT Stockholders are entitled to receive at least 17.5% (but less than 27.5%) of the Total Effective Date Shares;

(b) two (2) Directors designated by holders of New Common Stock that are funds or accounts that are managed or advised by, or that are affiliates of, Brigade Capital Management, LP (collectively, the "Brigade Stockholders"), and one such Director shall be designated as a Class II Director and the other shall be designated as a Class I Director; provided, however, that such designation right is subject to the Brigade Stockholders' being entitled to receive, as of the Plan Effective Date, at least 17.5% of the Total Effective Date Shares;

(c) the individual serving, as of the Plan Effective Date, as the Chief Executive Officer of the Company (the "CEO"), which Director shall be designated as a Class I Director; and

(d) the remaining Director shall be designated by the Ad Hoc Noteholder Group and shall be designated as a Class II Director (the "Ad Hoc Group Director").

| | |
|---|---|
| Chairman of the Board: | The initial Chairman of the Board (the "Chairman"), as of the Plan Effective Date, shall be selected by the EQT Stockholders and the Brigade Stockholders and shall be a Class III Director; provided, however, that if the EQT Stockholders and the Brigade Stockholders cannot reach agreement on the selection of the initial Chairman, the initial Chairman shall be selected by the holders of a majority of the outstanding shares of New Common Stock. Thereafter, the Chairman shall be elected annually by a majority vote of the Board and, for so long EQT has a Nomination Right with respect to 3 Directors, shall be elected from among the Class III Directors. The Chairman must be a Director. |
| Board Committees: | The Board may, by majority vote, establish one or more committees of the Board to exercise the powers of the Board, subject to the limitations set forth in the Delaware General Corporation Law (the "DGCL"). For so long as the EQT Stockholders have a Nomination Right (as defined below) with respect to at least two Director seats, they shall be entitled to proportionate representation (through their Director nominees) on each committee of the Board. For so long as the Brigade Stockholders have a Nomination Right with respect to at least two Director seats, they shall be entitled to proportionate representation (through their Director nominees) on each committee of the Board. The New Charter shall designate the initial committees of the Board, and the members of such committees shall be selected by the Initial Board. |
| Subsidiary Boards: | The composition of the board of directors, board of managers or other governing body of any wholly-owned subsidiary of the Company (including any committee thereof) (each, a "Subsidiary Governing Body") shall be the same as that of the Board (or any committee of the Board), except any wholly-owned subsidiary of the Company which is either (i) a limited liability company that is managed by its members, (ii) a limited partnership that is managed by its general partner, (iii) not organized under the laws of the United States of America, any State thereof or the District of Columbia or (iv) required by law or contract to have a different composition. The EQT Stockholders (for so long as they have a Nomination Right) and the Brigade Stockholders (for so long as they have a Nomination Right) shall be entitled to proportional representation on any Subsidiary Governing Body. |
| Director Elections and Vacancies: | At each annual meeting of the stockholders, Directors of the Class to be elected at such annual meeting shall be elected by a plurality vote of the holders of New Common Stock. If at any time a Director (other than the CEO) resigns, is removed, dies or becomes incapacitated, or if there is a |

vacancy on the Board for any other reason, a replacement director shall be promptly elected by a majority of the Directors then in office, to serve until the end of the then-current term for such Director seat; provided, however, that if such vacancy relates to a Director seat that is subject to a Nomination Right, then the following shall be the exclusive means of filling any such vacancy (a) the EQT Stockholders or the Brigade Stockholders, as applicable, shall have the exclusive right to designate such replacement and the Board shall not otherwise elect a replacement except with the prior written consent of such stockholders, (b) the Company's stockholders shall have the right to fill such vacancy, by the written consent of the holders of a majority of the outstanding shares of New Common Stock, but only if such consenting majority includes the EQT Stockholders or the Brigade Stockholders, as applicable and (c) the EQT Stockholders or the Brigade Stockholders, as applicable, shall have the right to require that the Company convene a special stockholders meeting as promptly as practicable to elect a replacement Director to fill such vacancy, and the Company's nominee for election to such Director seat at such meeting shall be designated by the EQT Stockholders or the Brigade Stockholders, as applicable. The Company's stockholders shall have also the right to fill any such vacancy (other than a vacancy that relates to a Director seat that is subject to a Nomination Right), by a plurality vote of the holders of New Common Stock at an annual or special meeting of the stockholders or by written consent of the holders of a majority of the outstanding shares of New Common Stock.

Director Nominations:

If the EQT Stockholders, as of the Plan Effective Date, receive or are entitled to receive at least 27.5% of the Total Effective Date Shares, then on the Plan Effective Date the Company shall enter into a Nomination Agreement (as defined below) with the EQT Stockholders (the "EQT Nomination Agreement"), in form and substance reasonably acceptable to the Company Parties and the EQT Stockholders, giving the EQT Stockholders a Nomination Right (i) with respect to 3 Class III Director seats for so long as they hold at least 27.5% of the total outstanding shares of New Common Stock, (ii) with respect to 2 Class III Director seats for so long as they hold at least 17.5% (but less than 27.5%) of the total outstanding shares of New Common Stock and (iii) with respect to 1 Class III Director seat for so long as they hold at least 10% (but less than 17.5%) of the total outstanding shares of New Common Stock; provided, however, that if the EQT Stockholders, as of the Plan Effective Date, receive or are entitled to receive at least 17.5% (but less than 27.5%) of the Total Effective Date Shares, then the EQT Nomination Agreement shall initially give the EQT Stockholders a Nomination Right with respect to only 2 Class III Directors.

If the Brigade Stockholders, as of the Plan Effective Date, receive or are entitled to receive at least 17.5% of the Total Effective Date Shares, then on the Plan Effective Date the Company shall enter into a Nomination Agreement with the Brigade Stockholders (the "Brigade Nomination Agreement"), in form and substance reasonably acceptable to the Company Parties and the Brigade Stockholders, giving the Brigade Stockholders a Nomination Right (i) with respect to 2 Class II Director

4

seats for so long as they hold at least 17.5% (but less than 27.5%) of the total outstanding shares of New Common Stock and (ii) with respect to 1 Class II Director seat for so long as they hold at least 10% (but less than 17.5%) of the total outstanding shares of New Common Stock.

As used herein, "Nomination Agreement" means an agreement between the Company on the one hand, and the EQT Stockholders or the Brigade Stockholders, as applicable, on the other hand, giving such stockholders the right (a "Nomination Right"), with respect to one or more specified Director seats, to require that the Company nominate, as the Company's nominee for such Director seat at each stockholder meeting where such Director seat is up for election, an individual designated by such stockholders and (b) include such nominee in the Company's proxy materials and ballot with respect to such stockholder meeting. In connection with exercising its Nomination Rights, the EQT Stockholders or Brigade Stockholders, as applicable, will be required to provide such information regarding its nominee(s) as the Company may reasonably request for inclusion in its proxy materials, but shall not otherwise be required to comply with the procedures set forth in the New Bylaws with respect to Director nominations by stockholders generally. Notwithstanding anything contained in this Governance Term Sheet, the Nomination Agreements, the New Charter and/or the New Bylaws shall include such provisions as may be reasonably requested by the EQT Stockholders and/or the Brigade Stockholders to help ensure that, if for any reason a vacancy occurs with respect to a Director seat that is subject to a Nomination Right, then the EQT Stockholders or the Brigade Stockholders, as applicable, will have the right to designate the individual who is elected or appointed to the Board to fill such vacancy.

Board Observer:                 Each Commitment Party that, as of the Plan Effective Date, receives or is entitled to receive at least 17.5% of the Total Effective Date Shares shall have, for so long as it continues to hold at least 10% of the total outstanding shares of New Common Stock, the right to appoint a non-voting observer to the Board, pursuant to an agreement (in form and substance reasonably acceptable to such parties) to be entered into between the Company and each such Commitment Party.

Removal of Directors:           Any Director may be removed from the Board (and as a member of any committee of the Board or any Subsidiary Governing Body, as applicable) at any time, with or without cause, by stockholders holding, in the aggregate, a majority of the outstanding shares of New Common Stock, either by written consent or by the affirmative vote of such stockholders at a duly convened stockholder meeting ("Majority Stockholder Approval"); provided, however, that until the Company's second annual meeting following the Plan Effective Date (a) the Ad Hoc Group Director shall not be subject to such removal without cause, (b) none of the Class III Directors shall (except with the prior written consent of the EQT Stockholders) be subject to such removal without cause, and (c) none of the Directors designated or nominated by the Brigade Stockholders shall (except with the prior written consent of the Brigade Stockholders) be  subject to such removal without cause. Any

Director may, in his or her sole discretion, resign from the Board at any time by giving written notice of such resignation to the Chairman or to each of the other Directors.  In addition, if the individual serving as the CEO is also a Director, he or she shall automatically be deemed to have resigned as a Director (and as a member of any Board committees or subsidiary boards or committees, as applicable) upon his or her ceasing to be the CEO for any reason.

Board Voting; Quorum:

A quorum for meetings of the Board will require the attendance of a majority of the Directors then in office.  The vote of a majority of the Directors then in office shall be the act of the Board, unless an express provision of the DGCL or otherwise applicable law requires a different vote, in which case such express provision shall govern and control.  In addition, the Board may take action by the unanimous written consent of all Directors then in office.

Board Meetings:

The Board shall hold regularly scheduled meetings at least once per calendar quarter.  In addition, the Chairman, the CEO or any two (2) Directors may call a special Board meeting at any time. Any meeting of the Board (or of any Board Committee or Subsidiary Governing Body) may be held in person or by conference call or through the use of any other means of remote communication permitted by the DGCL by which all Directors participating in the meeting can hear each other at the same time ("Remote Communication"); provided, that for any such meeting held in person, reasonable provision shall also be made to allow any Directors who wish to do so to participate in such meeting by conference call or other means of Remote Communication, and any Director participating through such means of communication shall be deemed to be present in person at such meeting.

Board Compensation:

Directors not employed by the Company or any of its subsidiaries shall be entitled to receive market-rate compensation (which may include future equity awards) from the Company, as determined by the Board from time to time, subject to Majority Stockholder Approval; provided, however, that the payment of compensation up to the amounts set forth in the New Bylaws (as determined by the Ad Hoc Noteholder Group prior to the Plan Effective Date) shall be deemed to have been approved by Majority Stockholder Approval.  All Directors will be reimbursed by the Company for reasonable and documented expenses related to their service as a Director, and will be entitled to customary indemnification/advancement and exculpation provisions and directors' and officers' liability insurance coverage.

Related Party Transactions:

The Company shall not (and shall not cause or permit any of its subsidiaries to) enter into or consummate a Related Party Transaction (as defined below) unless the Related Party Transaction shall have been approved by a majority of the disinterested Directors then in office and, with respect to any Related Party Transaction involving total payments or value (as determined by the disinterested Directors) of more than $1,000,000 (a) such disinterested Directors shall have obtained, prior to such approval, a fairness opinion with respect to such Related Party

6

Transaction from a nationally recognized investment banking or valuation firm or (b) the Related Party Transaction shall have been expressly approved by a majority of the disinterested stockholders.  As used herein:

- "Company Party" means an of the Company or any of its subsidiaries.

- "Related Party Transaction" means any transaction or series of related transactions, or any agreement or arrangement, between a Company Party, on the one hand, and a Related Party (as defined below), on the other hand.

- "Related Party" means: (i) a Director, a member of a Subsidiary Governing Body, or an executive officer of a Company Party (or a member of the immediate family of any such person); (ii) any company or other entity (other than a Company Entity) of which a person described in clause (i) is a partner, director or executive officer; (iii) any person that beneficially owns, or otherwise controls (or shares control of), at least 10% of the outstanding shares of New Common Stock or the voting power with respect thereto, or that is an affiliate of any such person; or (iv) any director or executive officer of a person described in clause (iii) (or a member of the immediate family of any such director or executive officer).

Preemptive Rights:    If at any time after the Plan Effective Date the Company or any of its subsidiaries proposes to issue shares of New Common Stock or other equity securities (including preferred equity), or any options, warrants, rights or other securities that are convertible into, or exchangeable or exercisable for, any shares of New Common Stock or other such equity securities (any of the foregoing, "New Equity Securities"), each stockholder that at the time of such offering is a Significant Stockholder (as defined below) shall have the right to participate in such offering on a *pro rata* basis, based on such stockholder's *pro rata* share of the outstanding shares of New Common Stock, subject to customary exceptions including for New Equity Securities issued pursuant to the Plan, or as purchase price consideration in acquisitions approved by the Board, or pursuant to the Post-Emergence Incentive Plan or any other equity incentive plan approved by the Board. "Significant Stockholder" means each holder of New Common Stock that (together with its Affiliates) holds at least 10% of the outstanding shares of New Common Stock at the time of the offering in question, and is an "accredited investor" (as defined in Section 501 of Regulation D of the Securities Act of 1933, as amended (the "Securities Act")) or a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act).

Stockholder Meetings:    Special meetings of the stockholders may be called by the Board, by the Chairman or CEO or by the Secretary of the Company at the written request of one or more stockholders holding, in the aggregate, at least 20% of the total outstanding shares of New Common Stock.

The New Bylaws shall include notice and other procedural requirements for any meetings of the stockholders (*e.g.*, place, date, hour, record date for determining stockholders entitled to vote, means of remote communication, etc.), including procedures for nominating Directors or submitting or voting on stockholder proposals, that are typical and customary for public companies.

Stockholder Voting:

The stockholders may take action at a duly convened meeting of the stockholders at which a quorum is present.  In addition, any action that may be taken by stockholders at a meeting may also be taken by written consent of the stockholders without a meeting.  Any such action by written consent shall require the consent of stockholders that own or hold the same percentage of shares of New Common Stock that would be required to take the same action at a stockholder meeting at which all then-issued and outstanding shares of New Common Stock entitled to vote thereon were present and voted.

Information Rights:

The New Governance Documents shall provide that (a) for so long as Reorganized Monitronics is not registered under Section 12(g) of the Exchange Act or otherwise required to file periodic reports with the SEC, its stockholders shall have customary information rights reasonably acceptable to the Required Consenting Noteholders (including annual audited financial statements, quarterly financial statements, and notice of events that would require a Form 8K filing if it were a reporting company) and (b) Reorganized Monitronics shall hold quarterly conference calls with stockholders (and reasonable prior notice and dial-in information will be made available to stockholders) to discuss the Company's results of operations and financial performance for the immediately preceding fiscal quarter and year-to-date, including a question and answer session consistent with Ascent's historical practice.

Corporate Opportunities:

The New Charter will include a provision pursuant to which the Company (a) acknowledges that Directors who are not employees of the Company or any of its subsidiaries ("Non-Employee Directors") may directly or indirectly engage in the same or similar lines of business as the Company and its subsidiaries and (b) renounces any interest, expectancy or right to participate that the Company might otherwise have with respect to any business opportunity that the Non-Employee Director becomes aware of and that may be a corporate opportunity for the Company or any of its subsidiaries, excluding any corporate opportunity expressly presented or offered to such Non-Employee Director solely in his or her capacity as a Director (including as a member of any committee of the Board or any Subsidiary Governing Body).

DGCL 203:

The Company shall, pursuant to the New Charter, affirmatively opt out of Section 203 of the DGCL.

Registration Rights:

On the Plan Effective Date, the Company and each Eligible Holder (as defined below) that desires to do so shall enter into the Registration Rights Agreement. The Registration Rights Agreement shall be in form

8

and substance reasonably satisfactory to the Company and the Eligible Holders party thereto, and shall, among other things, (a) require that the Company (i) file with the Securities and Exchange Commission (the "<u>SEC</u>"), as promptly as practicable after the Plan Effective Date (and in no event more than 45 days thereafter), a "shelf" registration statement to register all the shares of New Common Stock issued to such Eligible Holders as of the Plan Effective Date (such shares, the "<u>Registrable Securities</u>"), (ii) use reasonable best efforts to cause such registration statement (the "<u>Shelf Registration Statement</u>") to be declared effective by the SEC as promptly as practicable after such filing and (iii) maintain the effectiveness of the Shelf Registration Statement until all Registrable Securities have been sold thereunder or have otherwise ceased to be Registrable Securities, (b) provide Eligible Holders with customary rights to require underwritten take-downs of Registrable Securities, (c) provide Eligible Holders with customary "piggyback" and "demand" registration rights that can be exercised at any time after the one year anniversary of the Plan Effective Date, but only to the extent an effective Shelf Registration Statement is not available to sell the Registrable Securities proposed to be sold pursuant thereto and (d) include other customary provisions including, without limitation, with respect to indemnification, contribution and payment of registration expenses. As used herein, "<u>Eligible Holder</u>" means any holder of New Common Stock that that (together with its Affiliates) receives or is entitled to receive, as of the Plan Effective Date, at least 10.0% of Total Effective Date Shares.

9

## EXHIBIT B

**Rights Offering and Equity Commitment Term Sheet**

**RIGHTS OFFERING AND EQUITY COMMITMENT TERM SHEET**[1]

| Term | Description |
|------|-------------|
| **Rights Offering** | The Debtors shall conduct an offering (the "**Rights Offering**") of subscription rights (the "**Rights**") to purchase, in the aggregate, 44.80% of the total shares of New Common Stock to be issued and outstanding as of the Plan Effective Date, subject to dilution by the Post-Emergence Incentive Plan (the "**Rights Offering Shares**"), for an aggregate purchase price of $177 million (the "**Aggregate Rights Offering Amount**"), to all Cash Opt Out Noteholders (as defined in the Restructuring Term Sheet). Cash Opt Out Noteholders who timely and validly elect to participate in the Rights Offering by electing to exercise their Rights for their corresponding share of the Rights Offering Shares at the Exercise Price (as defined below) shall constitute the "**Rights Offering Participants**". <br><br> Rights shall be issued in respect of all outstanding Notes but may only be exercised by Cash Opt Out Noteholders. The Rights shall be issued to the Cash Opt Out Noteholders at no charge. The Rights may be exercised at a price per share (the "**Exercise Price**") that reflects an approximately 16.13% discount to Plan equity value, after giving effect to the Rights Offering. |
| **Rights Offering Procedures** | The Rights Offering Procedures shall: <br><br> 1.  contemplate that the Debtors will, subject to the prior entry of the Rights Offering Approval Order, commence the Rights Offering within five (5) Business Days of the Petition Date; <br><br> 2.  specify the deadline for exercising Rights as set forth in the Rights Offering Procedures, which shall be the first business day that is thirty (30) days after the commencement date of the Rights Offering, subject to extension (the "**Rights Offering Exercise Deadline**"); <br><br> 3.  include a mechanism whereby any Backstop Commitment Party that is also a First Lien Term Lender will have the ability to exercise its Rights by (a) (x) exchanging an aggregate principal amount of its Term Loans (excluding any Contributed Term Loans (as defined below)) in an amount not to exceed its ratable portion of the Effective Date Pay Down, on a dollar-for-dollar basis and (y) waiving such amount of its ratable portion of the Effective Date Paydown, in lieu of submitting cash to pay the Exercise Price for the shares it |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Restructuring Support Agreement (the "**RSA**") to which this Rights Offering and Equity Commitment Term Sheet is attached as Exhibit B, or the Restructuring Term Sheet attached to the RSA as Exhibit A, as applicable.

| Term | Description |
|------|-------------|
| | elects to purchase pursuant to the exercise of its Rights, and (b) paying cash for the remainder, if any, of such Exercise Price.  All other Rights Offering Participants (excluding the Backstop Commitment Parties) must pay the full amount of their respective aggregate Exercise Price in cash; |
| | 4. require that each Rights Offering Participant certify in a questionnaire that is included in the Rights Offering Solicitation Materials (the "**Questionnaire**") that it is either (a) an "accredited investor" (as defined in Regulation D of the Securities Act), a non U.S. person (as defined in Regulation S of the Securities Act) and not participating on behalf or on account of a U.S. person, or a "qualified institutional buyer" (as defined in Rule 144A of the Securities Act) (an "**Accredited Noteholder**") or (b) not an Accredited Noteholder (a "**Non-Accredited Noteholder**"); |
| | 5. provide for the exemptions for the Rights Offering to the registration requirements of the Securities Act to be based on Section 1145 of the Bankruptcy Code ("**Section 1145**") and Section 4(a)(2), Regulation D and/or Regulation S of the Securities Act (the "**Private Placement Exemption**") with respect to the issuance of Rights (and of the Rights Offering Shares issuable pursuant to the exercise of such Rights) based on an allocation mechanism that: |
| | • first, allocates Rights issued under Section 1145 to Rights Offering Participants who are Non-Accredited Noteholders, on a *pro rata* basis; and |
| | • second, allocates any remaining Rights issued under Section 1145 to Rights Offering Participants that are Accredited Noteholders on a *pro rata* basis and, to the extent necessary to preserve the availability of Section 1145 pursuant to applicable SEC guidance, any remaining Rights will be issued to such Accredited Noteholders under the Private Placement Exemption; |
| | 6. provide that there will be no over-subscription rights associated with the Rights Offering.  Any Rights Offering Shares that are not subscribed for and purchased by a Rights Offering Participant (excluding the Backstop Commitment Parties) by the Rights Offering Expiration Deadline (as defined below) (the "**Unsubscribed Shares**") will not be offered to other Rights Offering Participants but, rather, will be purchased by the Backstop Commitment Parties, subject to the terms and conditions set forth in the Put Option Agreement, in accordance with their respective Backstop |

| Term | Description |
|------|-------------|
| | Commitments (as defined below); |
| | 7.    contemplate, consistent with the "Funding of the Rights Offering and Equity Commitments" section hereof, that the cash proceeds of the Rights Offering and, to the extent applicable, the proceeds of the funding of the Backstop Commitments will be deposited into an escrow account subject to a customary escrow agreement (or a segregated bank account maintained by the subscription agent for the Rights Offering, the "**Subscription Agent**"), with funds released consistent with this Rights Offering and Equity Commitment Term Sheet as of the Plan Effective Date; |
| | 8.    include other terms, conditions and procedures as are customary for similar rights offerings by a debtor in a chapter 11 bankruptcy or an out-of-court restructuring where the shares to be issued in a rights offering are to be issued through the facilities of The Depository Trust Company; and |
| | 9.    provide that the Rights Offering will be conducted in accordance with the RSA, the Restructuring Term Sheet, this Rights Offering and Equity Commitment Term Sheet and the Put Option Agreement and shall otherwise be on terms and conditions acceptable to the Company Parties, the Required Consenting Noteholders, and the Backstop Commitment Parties, and reasonably acceptable to the Required Consenting Term Lenders, including with respect to the form and content of the Rights Offering Solicitation Materials (as defined below) and the Put Option Agreement. |
| | For the avoidance of doubt, the Rights Offering, in the full amount of the Aggregate Rights Offering Amount, together with the Ascent Default Amount or Net Cash Shortfall Amount, will be backstopped by the Backstop Commitment Parties in accordance with their respective Backstop Commitments. |
| **Equity Commitments** | The Equity Commitment Parties, severally and not jointly, agree to purchase 25.31% of the total shares of New Common Stock to be issued and outstanding as of the Plan Effective Date, subject to dilution by the Post-Emergence Incentive Plan (the "**Equity Commitment Shares**") for an aggregate purchase price of $100 million (at a per-share purchase price equal to the Exercise Price), payable by exchanging an aggregate principal amount of $100 million of Term Loans owned or controlled by such Equity Commitment Parties (the "**Contributed Term Loans**") in accordance with the terms and conditions of the RSA, the Restructuring Term Sheet, this Rights Offering and Equity |

3

| Term | Description |
|---|---|
| | Commitment Term Sheet, and the Put Option Agreement. |
| | For purposes of paying the purchase price for the Equity Commitment Shares, any Contributed Term Loans shall be treated as equal to cash on a dollar-for-dollar basis based on the aggregate principal amount of such Contributed Term Loans (it being understood and agreed that (a) the principal amount of all such Contributed Term Loans shall continue to accrue interest through the Plan Effective Date in the same manner as the remaining Term Loans and (b) all accrued and unpaid interest on such Contributed Term Loans as of the Plan Effective Date shall be paid consistently with the remaining Term Loans). The obligations of the Equity Commitment Parties with respect to the Equity Commitments shall be conditioned on the consummation of the Rights Offering. |
| **Funding of the Rights Offering and Equity Commitments** | By the date and time that is the Rights Offering Exercise Deadline, the Rights Offering Participants (other than the Backstop Commitment Parties and the Equity Commitment Parties) will be required to fund into escrow with the Debtors (or a segregated account maintained by the Subscription Agent) cash in an amount equal to the aggregate Exercise Price for Rights exercised by such Rights Offering Participants. |
| | The Backstop Commitment Parties will be required to fund into escrow with the Debtors (or a segregated account maintained by the Subscription Agent) their respective obligations with respect to the Rights Offering (including pursuant to the Backstop Commitments) on the date that is three (3) Business Days prior to the Plan Effective Date; and the Equity Commitment Parties will not be required to fund their respective obligations with respect to the Equity Commitments until the Plan Effective Date, but may be required to deliver into escrow with the Debtors, by the date that is one (1) Business Day prior to the Plan Effective Date, the instrument providing for the exchange of their Contributed Term Loans. |
| | For the avoidance of doubt, the Commitment Parties will be required to fund, or contribute (as applicable), in the aggregate, on the terms and conditions set forth in the Put Option Agreement, the Backstop Commitments and/or the Equity Commitments (as applicable). |
| | Notwithstanding anything contained in this Rights Offering and Equity Commitment Term Sheet, the RSA or the Restructuring Term Sheet, the obligations of the Commitment Parties with respect to the Backstop Commitments, the Equity Commitments and the Rights Offering shall in all respects be subject to the negotiation, completion, execution and delivery by the Commitment Parties and |

NY 77633073
US-DOCS\107368702.26

| Term | Description |
|------|-------------|
| | the other parties thereto of a definitive Put Option Agreement acceptable to the Commitment Parties. |
| **Use of Proceeds** | The proceeds of the Rights Offering and the Equity Commitments, together with either (i) the Net Cash Amount and, if applicable, the Net Cash Shortfall Amount, or (ii) the Ascent Default Amount, as applicable, shall, on the Plan Effective Date, be used to:<br><br>(a) pay down, in cash, $50 million of the revolving credit portion of the DIP Facility,<br><br>(b) pay down, in cash, $150 million of the Term Loan (excluding the Contributed Term Loans), and<br><br>(c) equitize $100 million of the Contributed Term Loans. |
| **New Common Stock Allocation** | On the Plan Effective Date, after giving effect to the consummation of the Rights Offering, the Backstop Commitments, the Equity Commitments and the other transactions contemplated by the Plan:<br><br>(a) the Cash Opt Out Noteholders, collectively, shall receive the Notes Shares on account of their Notes Claims;<br><br>(b) solely to the extent that the Non-Ascent Restructuring Toggle has not occurred and the Merger is in fact consummated, the holders of Ascent's common stock shall receive the Ascent Share Distribution;<br><br>(c) the Equity Commitment Parties shall receive the Equity Commitment Shares on account of the purchase of New Common Stock pursuant to the Equity Commitments (in accordance with the schedules annexed to the Put Option Agreement);<br><br>(d) the Rights Offering Participants shall receive Rights Offering Shares on account of their participation in the Rights Offering;<br><br>(e) the Commitment Parties shall receive the Put Option Premium Shares on account of their Backstop Commitments or Equity Commitments, as applicable; and<br><br>(f) to the extent applicable, the Backstop Commitment Parties shall receive (i) the Unsubscribed Shares, if any, and (ii) the Ascent Default Shares or Net Cash Shortfall Shares (each as defined below), if applicable, pursuant to the Backstop Commitments (in accordance with their respective Backstop Commitment Percentages). |
| **U.S. Federal Securities Law** | The issuance of the Notes Shares shall be exempt from the registration requirements of U.S. federal securities laws pursuant to |

| Term | Description |
|---|---|
| **Exemptions and Registration** | Section 1145. |
| | The issuance of the Rights and the issuance of the Rights Offering Shares upon the exercise thereof shall be exempt from the registration requirements of the Securities Act pursuant, in part, to Section 1145 and, in part, to the Private Placement Exemption as contemplated above under "Rights Offering Procedures". |
| | The issuance of the Equity Commitment Shares, the Put Option Premium Shares and the Backstop Commitment Shares (as defined below) shall be exempt from the registration requirements of the securities laws pursuant to a Private Placement Exemption. |
| | The issuance of the Ascent Share Distribution (if applicable) shall be registered under the Securities Act pursuant to a Form S-4 registration statement to be initially filed with the SEC within five (5) Business Days following the Agreement Effective Date, by Monitronics. |
| **Certain Definitions** | "**Adjusted Commitment Percentage**" means, with respect to any Non-Defaulting Backstop Commitment Party (as defined below) that elects to purchase Backstop Commitment Shares not purchased by Defaulting Backstop Commitment Parties (as defined below), a fraction, expressed as a percentage, the numerator of which is the Backstop Commitment of such Non-Defaulting Backstop Commitment Party and the denominator of which is the aggregate Backstop Commitments of all Non-Defaulting Backstop Commitment Parties that elect to purchase Backstop Commitment Shares not purchased by Defaulting Backstop Commitment Parties. |
| | "**Backstop Commitment**" means, with respect to any Backstop Commitment Party, the right, on the terms and conditions set forth herein and in the Put Option Agreement, of the Debtors to require such Backstop Commitment Party to (i) purchase the Unsubscribed Shares (which, for the avoidance of doubt, shall result in an aggregate purchase price for all Rights Offering Shares equal to the Aggregate Rights Offering Amount), (ii) solely in the event that the Non-Ascent Restructuring Toggle occurs, purchase a number of shares equal to the quotient of $23,000,000 divided by the Exercise Price ("**Ascent Default Shares**") for an aggregate purchase price equal to $23 million (the "**Ascent Default Amount**") and (iii) solely in the event that the Non-Ascent Restructuring Toggle shall not have occurred and the Net Cash Amount is less than $23 million (but not less than $20 million), purchase a number of shares equal to the quotient of (x) $23 million less the Net Cash Amount (such amount, the "**Net Cash Shortfall Amount**"), divided by (y) the Exercise Price (the "**Net Cash Shortfall Shares**") for an |

| Term | Description |
|---|---|
|  | aggregate purchase price equal to the Net Cash Shortfall Amount, in each case, in a proportion based on a percentage that shall be set forth opposite the name of such Backstop Commitment Party on a schedule to be annexed to the Put Option Agreement (the "**Backstop Commitment Percentage**").  The aggregate Backstop Commitments shall total $200 million.  The Backstop Commitments of the Backstop Commitment Parties are several, not joint, obligations of the Backstop Commitment Parties, such that no Backstop Commitment Party shall be liable or otherwise responsible for the Backstop Commitment of any other Backstop Commitment Party.  Backstop Commitment Parties shall not be entitled to transfer, directly or indirectly, all or any portion of their Backstop Commitments other than (a) to any other Commitment Party, (b) to any controlled Affiliate of a Commitment Party (other than a portfolio company of such Commitment Party or any of its Affiliates or Related Funds), (c) to any Related Fund of a Commitment Party or (d) with the prior written consent of Monitronics and the Requisite Commitment Parties, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that in the event of any such transfer, and for any such transfer to be valid, the transferee will be required to execute and deliver a joinder that has the effect of such transferee's joining the Put Option Agreement, in the form contemplated in the Put Option Agreement. |
|  | "**Backstop Commitment Shares**" means, collectively, the Unsubscribed Shares and, if applicable, the Ascent Default Shares or the Net Cash Shortfall Shares. |
|  | "**Equity Commitment**" means, with respect to any Equity Commitment Party, the right, on the terms and conditions set forth herein and in the Put Option Agreement, of the Debtors to cause such Equity Commitment Party to purchase the Equity Commitment Shares by exchanging the Contributed Term Loans, in a proportion based on a percentage that shall be set forth opposite the name of such Equity Commitment Party on a schedule to be annexed to the Put Option Agreement.  The aggregate Equity Commitments shall be $100 million.  The Equity Commitment obligations of the Equity Commitment Parties are several, not joint, obligations of the Equity Commitment Parties, such that no Equity Commitment Party shall be liable or otherwise responsible for the Equity Commitment of any other Equity Commitment Party.  Equity Commitment Parties shall not be entitled to transfer, directly or indirectly, all or any portion of their Equity Commitments other than (a) to an Affiliate or Related Fund of the transferring Equity Commitment Party (other than a portfolio company of the Equity Commitment |

| Term | Description |
|---|---|
| | Party, its Affiliates or Related Funds), (b) to any other Commitment Party, or (c) with the prior written consent of Monitronics and the Requisite Commitment Parties, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that in the event of any such transfer, and for any such transfer to be valid, the transferee will be required to execute and deliver a joinder that has the effect of such transferee's joining the Put Option Agreement, in the form contemplated in the Put Option Agreement. |
| | "**Related Fund**" means, with respect to any Commitment Party, any fund, account or investment vehicle that is controlled or managed by (a) such Commitment Party, (b) a controlled Affiliate of such Commitment Party or (c) the same investment manager or advisor as such Commitment Party or an Affiliate of such investment manager or advisor. |
| | "**Requisite Commitment Parties**" means, as of any date of determination, (a) Non-Defaulting Backstop Commitment Parties as of such date whose Backstop Commitment Percentages constitute more than 50.0% of the Backstop Commitment Percentages of all Non-Defaulting Backstop Commitment Parties as of such date of determination and (b) Non-Defaulting Equity Commitment Parties as of such date whose Equity Commitment Percentages constitute more than 50.0% of the Equity Commitment Percentages of all Non-Defaulting Equity Commitment Parties as of such date of determination. |
| | "**Rights Offering Solicitation Materials**" means the offering document for the Rights Offering (which may be the Disclosure Statement), the Rights Offering Procedures, together with the subscription form, the Questionnaire and other documents to be provided to Cash Opt Out Noteholders in connection with the Rights Offering. |
| **Backstop Commitment Percentages** | The initial Backstop Commitment Percentages shall be as set forth on **Schedule 1** annexed hereto; provided, however, that if one or more Backstop Commitment Parties acquires additional Notes on or before the date that is seven (7) days after the Agreement Effective Date, the Requisite Commitment Parties may, by written notice delivered to Monitronics and the other Commitment Parties within ten (10) days after the Agreement Effective Date, require that (a) the initial Backstop Commitment Percentages of such Backstop Commitment Parties (each, an "**Additional Backstop Note Party**") shall be increased proportionally to reflect the net principal amount of the additional Notes that it acquired (as compared to its Initial Backstop Notes), and (b) the initial Backstop Commitment Percentages of the other Backstop Commitment Parties shall be |

8

| Term | Description |
|---|---|
|  | correspondingly decreased *pro rata* as necessary to provide for such increases to the Backstop Commitment Percentages of the Additional Backstop Note Parties. Such Backstop Commitment Percentages, as adjusted (if applicable), shall be set forth as the initial Backstop Commitment Schedule to the Put Option Agreement (as the same may be updated or modified as provided in the Put Option Agreement). For the avoidance of doubt, a Backstop Commitment Party's sale of all or any portion of its Initial Backstop Notes during such seven (7)-day period shall not result in any decrease in such Backstop Commitment Party's initial Backstop Commitment Percentage. As used herein, "**Initial Backstop Notes**" means, with respect to any Backstop Commitment Party, the aggregate principal amount of Notes held by it on the Agreement Effective Date. |

NY 77633073
US-DOCS\107368702.26

| Term | Description |
|---|---|
| **Backstop Commitments** | Each of the Backstop Commitment Parties, severally and not jointly, will be required to fully exercise (or cause to be exercised) all of the Rights issued to it in the Rights Offering, on the other terms and conditions set forth in this Rights Offering and Equity Commitment Term Sheet, the Rights Offering Procedures, and the Put Option Agreement. |
| | Upon exercise of the put option by Monitronics, each of the Backstop Commitment Parties, severally and not jointly, will be required to purchase its Backstop Commitment Percentage of the Unsubscribed Shares, at the Exercise Price, on the other terms and conditions set forth in this Rights Offering and Equity Commitment Term Sheet, and the Put Option Agreement. |
| | Upon exercise of the put option by Monitronics, each of the Backstop Commitment Parties, severally and not jointly, will be required to purchase its Backstop Commitment Percentage of (i) Ascent Default Shares, solely in the event of a Non-Ascent Restructuring Toggle, for an aggregate purchase price equal to the Ascent Default Amount, or (ii) Net Cash Shortfall Shares, solely in the event the Non-Ascent Restructuring Toggle has not occurred, for an aggregate purchase price equal to the Net Cash Shortfall Amount, in each case, on the terms and conditions set forth in this Rights Offering and Equity Commitment Term Sheet, and the Put Option Agreement. |
| | In the event that a Backstop Commitment Party defaults on its obligation to purchase Backstop Commitment Shares (a "**Defaulting Backstop Commitment Party**"), then each Backstop Commitment Party that is not a Defaulting Backstop Commitment Party (each, a "**Non-Defaulting Backstop Commitment Party**") shall have the right, but not the obligation, to purchase, at the Exercise Price and on the other terms set forth in this Rights Offering Term Sheet, and the Put Option Agreement, its Adjusted Commitment Percentage of such Backstop Commitment Shares. |
| **Debtors' Representations and Warranties** | The Put Option Agreement shall contain representations and warranties made by the Debtors that are customary for transactions of this nature, including without limitation a representation regarding no material adverse effect. |
| **Debtors' Covenants** | The Put Option Agreement shall contain covenants to be performed or complied with by the Debtors that are customary for transactions of this nature, including, without limitation, covenants (i) to carry on their business in the ordinary course and use commercially reasonable efforts to preserve intact their current material business organizations and their material relationships with customers, suppliers, licensors, licensees, distributors and others having |

| Term | Description |
|---|---|
| | business dealings with the Debtors, taking into account the Restructuring, and (ii) not to enter into any transactions that are material to the Debtors (including any transactions with Ascent), other than transactions in the ordinary course of business that are consistent with prior business practices or in accordance with the parameters set forth in the Put Option Agreement, the RSA or the Plan. |
| **Conditions to Commitments** | The Put Option Agreement shall provide that the Backstop Commitments of the Backstop Commitment Parties and the Equity Commitments of the Equity Commitment Parties are subject to the satisfaction or waiver of conditions that are customary for transactions of this nature, including, without limitation, that there has been no material adverse effect that is continuing. |
| **Termination Rights** | The Put Option Agreement shall contain termination rights of the Backstop Commitment Parties and the Equity Commitment Parties that are customary for transactions of this nature and consistent with the termination rights set forth in the RSA. |
| **Put Option Premium** | In consideration for granting the Debtors the right to (i) sell and cause the Backstop Commitment Parties to purchase the Backstop Commitment Shares in exchange for the Backstop Commitment Parties' funding their Backstop Commitments and (ii) sell and cause the Equity Commitment Parties to purchase the Equity Commitment Shares in exchange for the Equity Commitment Parties' funding their Equity Commitments, in each case pursuant to the terms and conditions of the Put Option Agreement, the Debtors shall be required to issue to the Commitment Parties a put option premium (the "**Put Option Premium**"), which Put Option Premium shall be payable on the Plan Effective Date in the form of New Common Stock at a discount to Plan value (but without any need for further payment for such New Common Stock by the Commitment Parties), representing 6.07% of the total shares of New Common Stock to be issued and outstanding as of the Plan Effective Date, subject to dilution by the Post-Emergence Incentive Plan (the "**Put Option Premium Shares**"). Upon entry of the Backstop Approval Order, the Put Option Premium shall be deemed earned in full on the date on which the Debtors duly execute and deliver to each of the Commitment Parties a countersigned copy of the Put Option Agreement.<br><br>The Put Option Premium: (a) shall not be refundable under any circumstance or creditable against any fee or other amount paid in connection with the Put Option Agreement (or the transactions contemplated thereby) or otherwise; (b) shall be paid on the Plan Effective Date to the Commitment Parties on a *pro rata* basis (based |

11

| Term | Description |
|---|---|
|  | on their respective Backstop Commitments and Equity Commitments) in the form of the Put Option Premium Shares; and (c) shall be paid without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim. |
| **Registration Rights** | Each of the Commitment Parties and each other Noteholder that receives, in the aggregate, 10% or more of the total shares of New Common Stock to be issued and outstanding as of the Plan Effective Date, subject to dilution by the Post-Emergence Incentive Plan (collectively, the "**Registration Rights Agreement Parties**"), shall enter into a registration rights agreement, as of the Plan Effective Date, with Reorganized Monitronics (the "**Registration Rights Agreement**") pursuant to which Reorganized Monitronics is required to (a) file a shelf registration statement to register all shares held by the Registration Rights Agreement Parties at emergence and (b) maintain the effectiveness of the shelf registration statement until all the shares registered thereunder are sold, with customary rights to require underwritten take-downs. |
|  | The Registration Rights Agreement shall be in form and substance acceptable to the Commitment Parties that will be parties thereto. |
| **Court Approval** | On the Petition Date, the Debtors shall file a motion, in form and substance acceptable to the Commitment Parties and reasonably acceptable to the Required Consenting Term Lenders, seeking approval of the Put Option Agreement, the Rights Offering Procedures and any other Backstop Commitment Documents (the "**Backstop Approval Motion**"). |
|  | Upon or before entry of the Confirmation Order, but in any event no later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall enter an order, in form and substance acceptable to the Commitment Parties and reasonably acceptable to the Required Consenting Term Lenders, approving the relief requested in the Backstop Approval Motion on a final basis (the "**Backstop Approval Order**"), which Backstop Approval Order shall be in accordance with the RSA and which, for the avoidance of doubt, may be the same order as the Confirmation Order. |
| **Commitment Party Professional Fees** | The Debtors will pay all fees and expenses of Stroock & Stroock & Lavan LLP, Houlihan Lokey, Inc. and Mike R Meyers LLC (collectively, the "**Commitment Party Professionals**"), as advisors to the Commitment Parties, on a current basis, in accordance with the Put Option Agreement and in accordance with any letter agreements entered into between the Debtors and the Commitment |

| Term | Description |
|------|-------------|
| | Party Professionals, including, without limitation, any "success", "transaction", "deferred" or similar fees (such fees and expenses collectively, the "**Commitment Party Professional Fees**"), in each case, without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval.<br><br>The Commitment Party Professional Fees shall constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code pursuant to the Backstop Approval Order. |
| **Indemnification** | The Put Option Agreement shall contain indemnification provisions in favor of the Commitment Parties and their respective related parties (in their capacities as such) that are customary for transactions of this nature, including indemnification for (a) losses of the Commitment Parties and their respective related parties (in their capacities as such) arising out of or relating to the Rights Offering, the Backstop Commitments, the Equity Commitments, the Put Option Agreement or the transactions contemplated by any of the foregoing and (b) losses of the Commitment Parties and their respective related parties arising out of or relating to any breaches by the Debtors of representations, warranties and/or covenants set forth in the Put Option Agreement; provided, however, that the foregoing indemnity will not apply to: (i) losses, claims, damages, liabilities or expenses to the extent that they result from a material breach by the Commitment Parties of the Commitment Parties' obligations under the Rights Offering Term Sheet, or the Put Option Agreement, or any act by the Commitment Parties of bad faith, gross negligence or willful misconduct, each as determined by a final, non-appealable decision by a court of competent jurisdiction; and (ii) any punitive, exemplary or special damages unless such indemnified party is required to pay such damages to a third party, as determined by a final, non-appealable decision by a court of competent jurisdiction. |

**Schedule 1**

Initial Backstop Commitment Percentages

[to be supplied]

## **EXHIBIT C**

**DIP/Exit Facility Commitment**

EXECUTION VERSION

**KKR CREDIT ADVISORS (US) LLC**
555 California Street, 50th Floor
San Francisco, California 94104

<u>**PERSONAL AND CONFIDENTIAL**</u>

May 20, 2019

Mr. Fred Graffam
Chief Financial Officer
Monitronics International, Inc.
1990 Wittington Place
Farmers Branch, Texas 75234

<u>Commitment Letter</u>

Dear Mr. Graffam:

You have advised KKR Credit Advisors (US) LLC, on behalf of itself and certain of its affiliates and its or their managed funds and accounts ("***KKR***", "***us***" or "***we***") that we have been exclusively authorized by Monitronics International, Inc. (the "***Company***" or "***you***") to act as structuring advisor (in such capacity, "***Structuring Advisor***") and that KKR Capital Markets LLC ("***KCM***") has been exclusively authorized by the Company to act as sole lead arranger and bookrunner in connection with the financing for, certain transactions described herein, in each case on the terms and subject to the conditions set forth in this letter and in the attached <u>Annexes A</u> and <u>B</u> hereto (collectively, the "***Commitment Letter***"). On the basis of such terms and conditions, we are hereby pleased to provide you with a commitment to provide such financing.

You have (i) advised KKR that the Company and each of its subsidiaries (collectively, the "***Companies***") intend to file petitions commencing cases (the "***Bankruptcy Cases***") under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (Houston Division) (the "***Bankruptcy Court***"), and thereafter refinance their existing prepetition revolving credit facility (the "***Existing Prepetition Revolving Credit Facility***") under that certain Amended and Restated Credit Agreement, dated as of March 23, 2012 (as amended through the date hereof, the "***Existing Prepetition Credit Agreement***"), among the Company, the guarantors party thereto from time to time, the lenders party thereto from time to time and Bank of America, N.A., as administrative agent, and (ii) requested that KKR provide (A) credit facilities consisting of up to $245 million of commitments under a debtor-in-possession revolving loan financing facility (the "***DIP Revolving Credit Facility***" or the "***DIP Facilities***"), which will be used (w) to refinance the Existing Prepetition Revolving Credit Facility as described above, (x) to pay related transaction fees and expenses, (y) for working capital and general corporate purposes and (z) to fund Chapter 11 expenses, and (B) in the event a plan of reorganization for the Companies (the "***Plan of Reorganization***") is confirmed under the Bankruptcy Code and upon Companies' election, (1) an exit term loan credit facility (the "***Exit Term Loan Facility***") in an aggregate principal amount equal to $150 million and (2) an exit revolving credit facility (the "***Exit Revolving Credit Facility***"), with commitments in an aggregate principal amount equal to $145 million (the Exit Revolving Facility, together with the Exit Term Loan Facility, the "***Exit Facilities***" and

Monitronics International, Inc.
May 20, 2019
Page 2

collectively with the DIP Facilities, the "***Credit Facilities***"), in each case substantially on the terms and conditions set forth in the Summary of Terms and Conditions of the Credit Facilities attached hereto as <u>Annex B</u> (the "***Term Sheet***"). Each of KKR and KCM understands that the Bankruptcy Code requires the entry of interim and final orders by the Bankruptcy Court approving the DIP Facilities, such orders to be in form and substance reasonably satisfactory to the Required Lenders and the Company (the "***DIP Orders***").

KCM is pleased to confirm its commitment to act as sole lead arranger for the Credit Facilities on the terms and subject to the conditions contained in this Commitment Letter and the Term Sheet. KKR is pleased to confirm its commitment to act as structuring advisor for the Credit Facilities and to provide the Company 100% of the Credit Facilities, in each case, on the terms and subject to the conditions contained in this Commitment Letter and the Term Sheet. You hereby appoint KCM and KKR to act in each such role. The obligations of KKR to provide its portion of the Credit Facilities shall be, to the extent Additional Lenders (as defined below) provide commitments to provide portions of the Credit Facilities, several, not joint and several. KKR's commitment to provide the Credit Facilities is subject in all respects to the satisfaction of the terms and conditions contained in this Commitment Letter. Our fees for our services related to the Credit Facilities are set forth in a separate fee letter (the "***Fee Letter***"), dated as of the date hereof, entered into by the Company and KKR. You acknowledge and agree that KKR may share or assign any portion of such fees with any Additional Lenders.

Our commitments to fund the DIP Facilities and the Exit Facilities on the applicable Closing Date are subject to the satisfaction or waiver by KKR (or, if there are Additional Lenders, a majority of the commitments to fund the DIP Facilities and the Exit Facilities held by KKR and such Additional Lenders (KKR alone or such majority, as the case may be, the "***Required Lenders")***) of the conditions set forth in the "Conditions to All Borrowings" section of the Term Sheet and Exhibits B or C to the Term Sheet, as applicable, and upon satisfaction or waiver of such conditions, the initial funding of the applicable Credit Facility shall occur.

By executing this Commitment Letter, the Company, on behalf of itself, its subsidiaries, affiliates and Parent, agrees that from the date hereof until June 30, 2019, (i) it will cease any discussion with other potential debtor-in-possession financing providers and will not engage in any discussion or provide any information or pay any commitment fee, arrangement fee or any other similar fee or pay any expense deposit to any person or persons other than KKR, KCM, and, if applicable, each Additional Lender, in connection with soliciting from such financing provider, person or persons a proposal or commitment to provide debtor-in-possession debt financing in lieu of the DIP Facilities and (ii) that it will not enter into any definitive agreement for a debtor-in-possession debt financing (including any modification, extension, or continuation of existing credit facilities) in lieu of the DIP Facilities if KKR and, if applicable, each Additional Lender, are ready, willing and able to provide the proceeds of the DIP Facilities on the terms and conditions substantially as set forth in this Commitment Letter. For the avoidance of doubt, this paragraph shall not prohibit the Companies from amending or otherwise modifying the Existing Prepetition Credit Agreement and the other Loan Documents (as defined in the Existing Prepetition Credit Agreement) with respect to the loans thereunder to effect necessary waivers or forbearances with respect to existing or future defaults under the Existing Prepetition Credit Agreement, reflect the payment in full of the Existing Prepetition Revolving Credit Facility and otherwise in connection with the transactions contemplated herein.

KKR (together with certain of its affiliates and its or their managed funds and accounts) is underwriting the full amount of their respective commitments of the Credit Facilities. However, KCM may syndicate the commitments with respect to the Credit Facilities to financial institutions and/or other lenders

Monitronics International, Inc.
May 20, 2019
Page 3

who are members of the Ad Hoc Lender Group ("**Additional Lenders**"). You acknowledge and agree that, with respect to the Exit Facilities, syndication to any Additional Lender will occur only to the extent such Additional Lender agrees to provide commitments for both the Exit Term Loan Facility and the Exit Revolving Credit Facility, pro rata with respect to the total principal amounts of each. You also acknowledge and agree that any Additional Lender shall provide both commitments and loans under the DIP Facilities and the Exit Facilities which shall be no less than such Ad Hoc Group Lender's Pro Rata Share (unless otherwise agreed by KKR and such Additional Lender), but shall not exceed the maximum commitment amount that such Additional Lender indicates in its commitment (such maximum amount, the "**Additional Lender's Maximum Amount**"). By way of example, if less than all of the Ad Hoc Group Lenders commit to be Additional Lenders, the allocations of each such Additional Lender shall be increased on a pro rata basis across KKR and such Additional Lenders until each Additional Lender's Maximum Amount has been reached. If all Additional Lenders' Maximum Amounts have been reached, and there are excess commitments to be allocated, KKR will be allocated such commitments. For purposes hereof: "**Ad Hoc Lender Group**" shall have the meaning assigned thereto in the Restructuring Support Agreement, dated as of May 20, 2019. "**Ad Hoc Group Lender**" means an Additional Lender who is a member of the Ad Hoc Lender Group; and "**Pro Rata Share**" means, with respect to any Ad Hoc Group Lender, (i) the percentage of such Ad Hoc Group Lender's share of commitments and loans under the Existing Prepetition Credit Agreement, as of the date hereof, *divided by* (ii) 0.60.

So long as no event of default has occurred and is continuing under the applicable Credit Facility, unless you agree in writing, we will not syndicate our commitments to (i) those banks, financial institutions and other lenders and persons and any controlled affiliate of such person reasonably identifiable by name (excluding (x) any affiliate that is a person that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business and (y) subject to clause (i) of the final sentence of this paragraph, any person that is a lender under the Existing Prepetition Credit Agreement), in all cases to the extent identified by name in writing by you to us prior to the date hereof or (ii) those persons who are competitors of the Companies and any controlled affiliate of such competitor reasonably identifiable by name (in each case, excluding (x) their respective financial investors that are not operating companies, and (y) any person that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business) that are separately identified by name in writing by you to us prior to the date hereof and as such written notice may be updated from time to time with our written approval (such persons above, collectively, the "**Disqualified Lenders**"); provided that no such written notice shall apply retroactively to disqualify any person that has acquired an assignment or participation interest in the loans or commitments under the applicable Credit Facility prior to the delivery of such notice. Notwithstanding anything to the contrary contained in this Commitment Letter (i) unless you agree in writing, no person that is a lender under the Existing Prepetition Credit Agreement that is not a party to the Restructuring Support Agreement shall be permitted to be a lender under either Credit Facility and (ii), neither the commencement nor the completion of any such syndication of the Credit Facilities shall constitute a condition precedent to the availability and funding of any Credit Facility.

In addition, the Company represents (it being understood that the accuracy of such representation shall not be a condition to the commitments hereunder or the funding of the Credit Facilities) and covenants (it being understood that compliance with such covenant shall not be a condition to the commitments hereunder or the funding of the Credit Facilities) that (i) all written information, other than Projections (as defined below) and information of a general economic or industry specific nature, which has been or is hereafter provided directly or indirectly by the Company or any of its representatives to KKR, KCM or the Lenders (as defined in the Term Sheet) in connection with the transactions contemplated hereby

Monitronics International, Inc.
May 20, 2019
Page 4

(the "*Information*"), as and when furnished, is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading, taken as a whole, in light of the circumstances under which such Information is provided (after giving effect to all supplements and updates thereto) and (ii) all financial projections concerning the Companies that have been or will be made available to KKR, KCM or the Lenders by the Company or any of its representatives (the "*Projections*") have been and will be prepared in good faith based upon assumptions that are believed by you to be reasonable at the time made and at the time any such Projections are delivered to KKR and KCM (it being understood that any such Projections are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond your control, that no assurance can be given that any particular Projections will be realized, that actual results may differ and that such differences may be material). You agree that if at any time prior to the applicable Closing Date, any of the representations in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations were being made, at such time, then you will promptly supplement, or cause to be supplemented, the Information and Projections so that such representations will be correct in all material respects under those circumstances.

By executing this Commitment Letter, you agree to reimburse KKR, KCM and, if there are Additional Lenders, the Ad Hoc Lender Group, on each Closing Date (or if this Commitment Letter terminates in accordance with the terms hereof, on demand) for all reasonable and documented out-of-pocket fees and expenses (including, but not limited to, (i) the reasonable fees, disbursements and other charges of (x) Proskauer Rose, LLP, as counsel to KKR and KCM, (y) Jones Day as counsel to the Lenders (other than KKR) and Ad Hoc Lender Group, and (z) a single local counsel to the Lenders, KKR and KCM for each applicable jurisdiction, and, solely in the case of an actual or potential conflict of interest, one additional counsel to each group of similarly situated persons taken as a whole and (ii) search fees, due diligence expenses, transportation expenses and insurance consultant costs and expenses and fees and expenses incurred by KKR and KCM in connection with background checks) incurred in connection with the Credit Facilities, the syndication thereof, the preparation of the definitive documentation therefor and the other transactions contemplated hereby (collectively, the "*Expenses*"), regardless of whether any of the transactions contemplated hereby are consummated.

Within one business day after the execution of this Commitment Letter, the Company shall pay to KKR an additional expense deposit of $100,000 (the "*Expense Deposit*"), to fund Expenses incurred by or on behalf of KKR and KCM. Prior to the termination of this Commitment Letter, KKR may request in writing (with such request to be accompanied, upon the Company's request, by a reasonably detailed description (but not an itemized list) of (x) disbursements from the Expense Deposit to date and (y) expected future disbursements from the Expense Deposit), and the Company shall promptly pay to KKR, in immediately available funds, an additional expense deposit if the amount of Expenses incurred or expected to be incurred by KKR and KCM in connection with the Credit Facilities exceeds or are expected to exceed the amount of the Expense Deposit being held by KKR. The Expense Deposit will not be segregated and may be commingled with other funds and the Company will not be entitled to receive interest on the Expense Deposit. Upon the earlier of (i) termination of this Commitment Letter and (ii) the Exit Facilities Closing Date, any unused portion of the Expense Deposit (other than amounts reasonably expected to be incurred as a result of any post-closing matters under the Exit Loan Documents) shall be promptly returned to the Company.

In addition, in connection with arrangements such as this, it is KKR's and KCM's policy to receive indemnification. The Company agrees to indemnify and reimburse KKR, KCM and, if applicable,

Monitronics International, Inc.
May 20, 2019
Page 5

each Additional Lender, in accordance with the provisions set forth in <u>Annex A</u>, which is incorporated by reference into this Commitment Letter.

      Please note that this Commitment Letter, the Term Sheet and the Fee Letter and any written or oral advice provided by us in connection with this arrangement are exclusively for the information of the board of directors and senior management of the Company and may not be disclosed to any third party or circulated or referred to publicly without our prior written consent; <u>provided</u>, <u>however</u>, that we hereby consent to your disclosure of (i) this Commitment Letter, the Term Sheet and the Fee Letter on a confidential and "need to know" basis, to your or the Parent's (as defined in the Term Sheet) respective directors, officers, employees, accountants, attorneys and other professional advisors retained by you or the Parent in connection with the transactions contemplated hereby, (ii) this Commitment Letter and the Term Sheet (but not the Fee Letter) (A) to the agents under the Existing Prepetition Credit Agreement, the Ad Hoc Lender Group, the indenture trustee under the Senior Unsecured Note Indenture (as defined in the Existing Prepetition Credit Agreement), the adhoc group of holders of the Senior Unsecured Notes (as defined in the Existing Prepetition Credit Agreement), and on a confidential and "need to know" basis, each of their respective directors, officers, employees, accountants, attorneys and other professional advisors, (B) after your acceptance of this Commitment Letter and the Fee Letter, in any proxy statement or other public filing in connection with the transactions contemplated hereby (including filings with the Securities and Exchange Commission and other applicable regulatory authorities and stock exchanges) and (C) in the Plan of Reorganization or in a Bankruptcy Court filing in order to implement the transactions as contemplated hereby (in which case you agree to inform us promptly thereof to the extent not prohibited by law, rule or regulation); <u>provided</u> that at the request of KKR or KCM, certain parts shall be redacted and not filed publicly, (iii) the Fee Letter, to any Additional Lender, (iv) the aggregate amount of the fees (including any upfront fees and original issue discount) payable under the Fee Letter either as part of (A) a generic disclosure regarding sources and uses (but without disclosing any specific fees set forth therein) as part of a disclosure of overall transaction fees and expenses (not limited to fees associated with the Credit Facilities) or (B) to the attorneys and other professional advisors to the adhoc group of the Existing Term Loan Lenders and the adhoc group of holders of the Senior Unsecured Notes, in each case, on a confidential and "need to know" basis, (v) upon granting of a motion to file the Fee Letter under seal, (A) unredacted copies of the Fee Letter may be filed under seal with the Bankruptcy Court and disclosed to such other persons or entities determined by KKR in our sole discretion on a confidential basis and (B) a redacted version of the Fee Letter to the extent required in motions, in form and substance satisfactory to KKR, to be filed with the Bankruptcy Court solely in connection with obtaining the entry and order approving your execution, delivery and performance of this Commitment Letter, the Fee Letter or other agreements necessary to approve the transactions contemplated hereby, (vi) the Term Sheet only, to each of Standard & Poor's Ratings Group, a Standard & Poor's Financial Services Business and Moody's Investors Service, Inc., on a confidential basis, in connection with obtaining ratings for the Exit Facilities and (vii) as required to be disclosed by applicable law or compulsory legal process (in which case you agree to inform us promptly thereof to the extent not prohibited by law, rule or regulation) (including in connection with the Bankruptcy Cases). Each of KKR and KCM agrees to treat any Evaluation Material (as defined in the NDA referenced below) in accordance with the terms of the letter agreement, dated as of February 27, 2019, between the Company, Ascent Capital Group, Inc. and KKR Credit Advisors (US) LLC (the "***NDA***").

      KKR, KCM, each Additional Lender, if applicable, and each of their respective affiliates may have economic interests that conflict with those of the Company. You agree that each of KKR, KCM and, each Additional Lender, if applicable, will act under this Commitment Letter as an independent contractor and that nothing in this Commitment Letter, the Term Sheet or the Fee Letter or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between

Monitronics International, Inc.
May 20, 2019
Page 6

KKR, KCM or, if applicable, any Additional Lender, on the one hand, and the Company, its stockholders or its affiliates, on the other hand. You acknowledge and agree that (i) the transactions contemplated by this Commitment Letter, the Term Sheet and the Fee Letter are arm's-length commercial transactions between KKR, KCM or, if applicable, any Additional Lender,, on the one hand, and the Company and its affiliates, on the other, (ii) in connection with the transactions contemplated hereby, and with the process leading thereto, each of KKR, KCM or, if applicable, any Additional Lender, is acting solely as a principal and not the agent or fiduciary of the Company, its management, stockholders, affiliates, creditors or any other person, (iii) none of KKR, KCM or, if applicable, any Additional Lender has assumed an advisory or fiduciary responsibility in favor of the Company and its affiliates with respect to the transactions contemplated hereby or the process leading thereto (irrespective of whether KKR, KCM or, if applicable, any Additional Lender, or any of their respective affiliates has advised or is currently advising the Company and its affiliates on other matters) or any other obligation to the Company and its affiliates except the obligations expressly set forth in this Commitment Letter, the Term Sheet and the Fee Letter and (iv) the Company has consulted its own legal and financial advisors to the extent it deemed appropriate. The Company further acknowledges and agrees that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. The Company, on behalf of itself and its affiliates, agrees that it will not claim that either KKR, KCM or, if applicable, any Additional Lender, or any of their respective affiliates has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the Company and its affiliates, in connection with such transactions or the process leading thereto. In addition, each of KKR, KCM or, if applicable, any Additional Lender may employ the services of their respective affiliates in providing certain services hereunder and subject to the terms of the NDA, may exchange with such affiliates information concerning the Company and other companies that may be the subject of this Commitment Letter, the Term Sheet and the Fee Letter, and such affiliates shall be entitled to the benefits afforded to KKR, KCM or, if applicable, such Additional Lender hereunder.

The provisions of the immediately preceding three paragraphs shall remain in full force and effect regardless of whether any definitive documentation for the Credit Facilities shall be executed and delivered, and notwithstanding the termination of this Commitment Letter or any commitment or undertaking hereunder; provided that your obligations under this Commitment Letter with respect to indemnification shall automatically terminate and be superseded by the corresponding provisions of the Credit Facilities upon the initial funding thereunder and you shall be released from all liability in connection therewith at such time.

In the event the closing of the DIP Facilities does not occur by June 30, 2019 (the "**_DIP Commitment Termination Date_**"), our commitment to provide the DIP Facilities shall automatically expire on such date unless extended by KKR and any Additional Lender in writing. In the event that our commitment to provide the DIP Facilities expires or the closing of the Exit Facilities does not occur within 150 days of the Filing Date (as defined below) (such date, the "**_Exit Commitment Termination Date_**"), our commitment to provide the Exit Facilities shall automatically expire on such date unless extended by KKR and any Additional Lender in writing; provided, however, that the Exit Commitment Termination Date shall be automatically extended to the date that the Exit Milestone (as defined in Exhibit A to Annex B hereto) is extended in accordance with the terms set forth on such Exhibit A.

This Commitment Letter may not be assigned by the Company without KKR's and KCM's prior written consent (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto. KKR may assign its commitments hereunder, in whole or in part (including, for example, our commitment to provide the Credit Facilities), to

Monitronics International, Inc.
May 20, 2019
Page 7

any of its affiliates or to any Lender (it being understood that any such assignment will not relieve KKR, as applicable, of any of its commitments to extend the Credit Facilities hereunder on the applicable Closing Date (as defined below), subject to the provisions hereof. Unless you agree in your sole discretion in writing to the contrary, KKR shall retain exclusive control over all rights and obligations with respect to its commitment in respect of each Credit Facility including all rights with respect to consents, modifications, waivers, supplements and amendments, until after the initial funding under such Credit Facility has occurred. Neither this Commitment Letter (including the Term Sheet) nor the Fee Letter may be amended or any term or provision hereof or thereof waived or modified except by an instrument in writing signed by each of the parties hereto or thereto.

KKR hereby notifies you that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act") and other applicable law relating to money laundering and terrorist financing, KKR and each other Lender under the proposed Credit Facilities may be required to obtain, verify and record information that identifies the Company and each other Credit Party, which information includes the name, address and taxpayer identifying number of the Company and each other Credit Party and other information that will allow KKR and each other Lender to the proposed Credit Facilities to identify the Company and each other Credit Party in accordance with the Act and such other applicable law. This notice is given in accordance with the requirements of the Act and is effective for KKR and each other the Lender.

This Commitment Letter may be executed in any number of counterparts, each of which when executed shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

Please confirm that the foregoing is in accordance with your understanding by signing and returning the enclosed copy of this Commitment Letter to KKR and KCM and the Fee Letter to KKR, accompanied by the relevant fees described in the Fee Letter and the Expense Deposit by wiring the amounts thereof to KKR or its designee as described in an invoice or letter which will be separately provided to you, in each case, on or before 5:00 p.m. (New York time) on May 21, 2019, whereupon this Commitment Letter shall become a binding agreement among KKR, KCM and the Company and the Fee Letter shall become a binding agreement between KKR and the Company, in each case, as of the date hereof. If not signed and returned, together with the delivery of the Expense Deposit, as described in the preceding sentence by such date and time, this offer will terminate on such date and time. In addition, if the Bankruptcy Cases are commenced prior to the execution and delivery of this Commitment Letter and the Fee Letter, together with the delivery of the fees described in this paragraph and the Expense Deposit, in each case, as described in the preceding sentence, this offer will terminate upon the commencement of the Bankruptcy Cases.

THIS COMMITMENT LETTER AND THE FEE LETTER REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

If this Commitment Letter or the Fee Letter becomes the subject of a dispute, each of the parties hereto hereby waives trial by jury. The Company agrees that any suit or proceeding arising in respect to this Commitment Letter or the Fee Letter or any matter referred to in this Commitment Letter or the Fee Letter will be tried exclusively in the Bankruptcy Court or, if that court does not have subject matter

Monitronics International, Inc.
May 20, 2019
Page 8

jurisdiction, then the U.S. District Court for the Southern District of New York or, if that court does not have subject matter jurisdiction, then in any state court located in the County of New York in the State of New York, and the Company agrees to submit to the exclusive jurisdiction of, and to venue in, such courts.

This Commitment Letter, the Term Sheet and the Fee Letter (i) supersedes all prior discussions, agreements (other than the NDA), commitments, arrangements, negotiations and understandings, whether oral or written, of the parties with respect thereto, (ii) shall be governed by the law of the State of New York, without giving effect to the conflict of laws provisions thereof, (iii) shall be binding upon the parties and their respective successors and assigns, and (iv) may not be relied upon or enforced by any other person or entity other than the parties hereto or any Additional Lender.

[Remainder of page intentionally left blank]

Very truly yours,

**KKR CREDIT ADVISORS (US) LLC**, in its capacity as Structuring Advisor

By: _____
Name:        Philip S. Davidson
Title:         Authorized Signatory

**KKR CREDIT ADVISORS (US) LLC**, on behalf of itself and certain of its affiliates and its or their managed funds and accounts

By: _____
Name:        Philip S. Davidson
Title:         Authorized Signatory

*[Signature Page to Commitment Letter]*

ACCEPTED AS OF THE DATE ABOVE:

**MONITRONICS INTERNATIONAL, INC.**

By: _____

Name: Jeffery R. Gardner

Title: President and CEO

## *Annex A*

In the event that KKR, KCM and/or any Additional Lender becomes involved in any capacity in any action, proceeding or investigation brought by or against any person, including stockholders, partners, or other equity holders of the Company, in connection with or as a result of either this arrangement or any matter referred to in this Commitment Letter or the Fee Letter (together, the "***Letters***"), the Company agrees to periodically reimburse KKR, KCM and such Additional Lender for their reasonable and documented legal and other expenses (in the case of legal expenses limited to fees, disbursements and other charges of one primary counsel to KKR and one primary counsel for the Lenders selected by the Ad Hoc Lender Group, single local counsel to KKR and a single local counsel for the Lenders selected by the Ad Hoc Lender Group for each applicable jurisdiction, and, solely in the case of an actual or potential conflict of interest, one additional counsel to each group of similarly situated persons taken as a whole) (including the cost of any investigation and preparation) incurred in connection therewith. The Company also agrees to indemnify and hold each of KKR, KCM and any Additional Lender harmless against any and all losses, claims, damages or liabilities to any such person in connection with or as a result of either this arrangement or any matter referred to in the Letters, and without regard to the exclusive or contributory negligence of KKR, KCM, such Additional Lender or their respective affiliates, or the partners, directors, agents, employees and controlling persons (if any), as the case may be, of KKR, KCM, any Additional Lender and any such affiliate, except to the extent that such have been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of KKR, KCM or such Additional Lender, as applicable. If for any reason the foregoing indemnification is unavailable to KKR, KCM or such Additional Lender, or is insufficient to hold them harmless, then the Company shall contribute to the amount paid or payable by KKR, KCM or such Additional Lender, as applicable, as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative economic interests of the Company and its stockholders, partners, or other equity holders on the one hand and KKR, KCM and such Additional Lender, as applicable, on the other hand in the matters contemplated by the Letters as well as the relative fault of the Company and KKR, KCM and such Additional Lender, as applicable, with respect to such loss, claim, damage or liability and any other relevant equitable considerations. The reimbursement, indemnity and contribution obligations of the Company under this paragraph shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any affiliate of KKR, KCM, any Additional Lender and the partners, directors, agents, employees and controlling persons (if any), as the case may be, of KKR, KCM, any Additional Lender and any such affiliate, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company, KKR, KCM, such Additional Lender, any such affiliate and any such person. The Company also agrees that neither any indemnified party nor any of such affiliates, partners, directors, agents, employees or controlling persons shall have any liability based on its or their exclusive or contributory negligence or otherwise to the Company or any person asserting claims on behalf of or in right of the Company or any other person in connection with or as a result of either this arrangement or any matter referred to in the Letters; except in the case of the Company to the extent that any losses, claims, damages, liabilities or expenses incurred by the Company or its affiliates, stockholders, partners or other equity holders have been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such indemnified party in performing the services that are the subject of the Letters; provided, however, that in no event shall such indemnified party or such other parties have any liability for any indirect, consequential or punitive damages in connection with or as a result of such indemnified party's or such other parties' activities related to the Letters. The provisions of this Annex A shall survive any termination or completion of the arrangement provided by the Letters.

Annex A-1

## *Annex B*

### Monitronics International, Inc.

Summary of Terms and Conditions of the Credit Facilities

Capitalized terms used in this Annex B but not defined herein shall have the meanings given to them in the Commitment Letter to which this Annex B is attached.

| | |
|---|---|
| Borrower: | <u>DIP Facilities</u>: Monitronics International, Inc., a Texas corporation ("***Monitronics***"), as debtor-in-possession in the Bankruptcy Cases to be filed (the date of such filings referred to herein as the "***Filing Date***") under the Bankruptcy Code in the Bankruptcy Court. |
| | <u>Exit Facilities</u>: Monitronics, as reorganized pursuant to the Bankruptcy Cases ("***Reorganized Monitronics***"). |
| | "***Borrower***" or "***Company***" shall mean (i) Monitronics prior to the Exit Facilities Closing Date and (ii) Reorganized Monitronics on and after the Exit Facilities Closing Date. "***Reorganized Companies***" shall mean the Companies, as reorganized pursuant to the Bankruptcy Cases. |
| Guarantors: | Each of Borrower's existing and future direct and indirect subsidiaries (excluding any foreign subsidiary to the extent that the Borrower and the Agent determine that any change to the U.S tax laws after the Closing Date would result in materially adverse tax consequences to the Credit Parties taken as a whole) (collectively, such subsidiaries are the "***Guarantors***", and, collectively with the Borrower, the "***Credit Parties***" or each individually a "***Credit Party***") shall guaranty (the "***Guaranty***") all obligations under the Credit Facilities. All guarantees shall be guarantees of payment and not of collection. |
| Administrative Agent and Collateral Agent: | Cortland Capital Market Services LLC or another third party designated by the Structuring Advisor and reasonably acceptable to the Borrower (in such capacity, the "***Agent***"). |
| Structuring Advisor: | KKR Credit Advisors (US) LLC ("***KKR***") (in such capacity, the "***Structuring Advisor***"). |
| Sole Lead Arranger and Bookrunner: | KKR Capital Markets LLC ("***KCM***") (in such capacity, the "A***rranger***"). |
| Lenders: | KKR and certain of its affiliates and its or their managed funds and accounts and/or, subject to the applicable provisions of the DIP Loan Documents (as defined below) or the Exit Loan Documents (as defined below) and the Additional Lenders (each, a "***Lender***" and, collectively, the "**Lenders**"). During the effectiveness of the DIP |

Annex B-1

Facilities, Lenders shall refer to the Lenders under the DIP Facilities (the "***DIP Lenders***"), and during the effectiveness of the Exit Facilities, Lenders shall refer to the Lenders under the Exit Facilities (the "***Exit Lenders***").

| | |
|---|---|
| DIP Facilities: | <u>DIP Revolving Credit Facility</u>: A senior secured revolving credit facility of up to $245 million, which shall include a $10 million subfacility for the issuance of letters of credit (each a "***Letter of Credit***"), which shall be issued by a third party financial institution reasonably acceptable to the Borrower, and whom the parties shall use commercially reasonable efforts to engage on or prior to the Filing Date; *provided* that to the extent that a letter of credit issuer is not engaged by the date of the entry of the interim order, any undrawn letters of credit outstanding under the Existing Prepetition Credit Facility shall be cash collateralized with proceeds of DIP Revolving Loans. |
| Exit Facilities: | <u>Exit Revolving Credit Facility</u>: An aggregate principal amount equal to $145 million (the "***Exit Revolving Credit Facility***") |
| | <u>Exit Term Loan Facility</u>: An aggregate principal amount equal to $150 million (the "***Exit Term Loan Facility***"). |
| Availability: | <u>DIP Revolving Credit Facility</u>: Subject to the terms of the DIP Orders, revolving loans under the DIP Revolving Credit Facility (the "***DIP Revolving Loans***") may be borrowed, repaid and re-borrowed on and after the DIP Facilities Closing Date until the DIP Facilities Maturity Date. Under the DIP Revolving Credit Facility, Agent (at the direction of the Structuring Advisor) will have the right to establish a reserve against availability under the commitments under the DIP Revolving Credit Facility and the Borrowing Base (as defined below) in the amount of the Carve-Out Expenses (as hereinafter defined). |
| | The DIP Lenders shall provide a portion of the DIP Revolving Credit Facility in an aggregate amount not less than the sum of (1) the amount necessary to retire the Existing Prepetition Revolving Credit Facility in full and cash collateralized any letters of credit thereunder, if so required, and (2) $45 million as the Bankruptcy Court may approve (the "***Interim DIP Facility***") on terms and conditions set forth in, and to the extent permitted by, the Interim Order and on terms and conditions set forth in the DIP Loan Documents. The Interim DIP Facility will have a final maturity of not more than 45 days from the date of the Interim Order (the "***Interim Facility Maturity Date***"). The portion of the DIP Facilities made under the Interim DIP Facility will be due and payable on the Interim Facility Maturity Date unless the Final DIP Order (as defined below) shall have been entered by the Bankruptcy Court on or before such date. The Interim DIP Facility shall have substantially the same terms and conditions as the DIP Facilities, except to the extent set forth in this paragraph. "***Final DIP Order***" means a Final Order (as defined below), in form and substance reasonably acceptable to the Required Lenders, approving the DIP |

Facilities. "*Final Order*" means an order of the Bankruptcy Court, the operation and effect of which has not been vacated, stayed, amended, reversed or modified, and as to which (a) the time to appeal, petition for certiorari, or motion for argument or rehearing has expired and as to which no appeal, petition for certiorari, or motion for re-argument or rehearing shall then be pending, or (b) in the event that an appeal, writ for certiorari, re-argument or rehearing thereof has been sought, such order shall have been affirmed as originally entered by the Bankruptcy Court by the highest court to which an appeal, petition for certiorari or re-argument or rehearing was sought and the time to take any further appeal, petition for certiorari, or motion for re-argument or rehearing shall have expired.

Exit Revolving Credit Facility: Revolving loans under the Exit Revolving Credit Facility (the "*Exit Revolving Loans*" and together with the DIP Revolving Loans, the "*Revolving Loans*") may be borrowed, repaid and re-borrowed on and after the Exit Facilities Closing Date (as defined below) until the Exit Facilities Maturity Date (as defined below).

Exit Term Loan Facility: The term loan under the Exit Term Loan Facility (the "*Exit Term Loan*" and together with the Exit Revolving Loans, the "*Exit Loans*") shall be fully drawn on the Exit Facilities Closing Date.

In each Revolving Credit Facility, the aggregate amount of Revolving Loans and Letters of Credit shall not exceed the lesser of (i) the total commitment under the applicable Revolving Credit Facility and (ii) the amount of the Borrowing Base minus with respect solely to the Exit Revolving Credit Facility, the aggregate principal amount of the Term Loans outstanding.

"*Borrowing Base*" means ten (10) times the Eligible RMR (as defined below) balance of the Credit Parties for the month most recently ended for which financial statements and a borrowing base certificate were required to be delivered under the applicable Loan Documents.

"*Eligible RMR*" means, as of any time, 100% of the aggregate amount of (a) RMR subject to billing under Monitoring Contracts between customers and the Credit Parties and (b) 14.6/28 of RMR under agreements to provide wholesale monitoring services (provided, that the amount under this clause (b) shall not exceed 5% of total Eligible RMR), in each case, in effect in which no person other than the Credit Parties or any of their Subsidiaries and the Agent has any interest (other than (x) Liens permitted under the applicable Loan Document to the extent junior to the Liens of the Agent and (y) Liens on Monitoring Contracts acquired from new Approved Alarm Dealers that secure residual contingent obligations to previous buyers of Monitoring Contracts from such Approved Alarm Dealers that will be terminated in the ordinary course of business; provided that not more than 5% of Eligible RMR shall be derived from Monitoring Contracts subject to such Liens), provided, however, that Eligible RMR will not include any revenue:

US-DOCS\107830796.11107992649v22

(i) from customers whose balances are more than ninety (90) days past due;

(ii) that is not periodic in nature, but rather relates to installation purchase payments or onetime assessments or charges;

(iii) from stand alone service agreements and extended repair service, maintenance or inspection agreements that are not provided in conjunction with alarm monitoring;

(iv) from Monitoring Contracts that (A) do not have FICO Scores (unless such Monitoring Contracts are for commercial accounts with acceptable credit reviews pursuant to customary credit criteria for commercial subscribers) or (B) have FICO Scores less than 625; provided that notwithstanding the foregoing, (x) not more than 2% of Eligible RMR can be comprised of Monitoring Contracts that have FICO Scores of less than 600, (y) not more than 15% of Eligible RMR can be comprised of Monitoring Contracts that have FICO Scores of greater than 599, but less than 625 and (z) not more than 6% of Eligible RMR (other than from commercial accounts with acceptable credit reviews pursuant to customary credit criteria for commercial subscribers) can be comprised of Monitoring Contracts that do not have FICO Scores;

(v) reimbursement for or payment of any taxes, fees or other charges imposed by any Governmental Authority relative to the furnishing of alarm services or maintenance services; and

(vi) late fees or fees for not sufficient fund checks.

Capitalized terms in the definition of Eligible RMR shall have the meanings given such terms in the Existing Prepetition Credit Agreement (subject to the Documentation Principles).

| | |
|---|---|
| DIP Facilities Closing Date: | The DIP Facilities shall close on the first date on which all of the conditions precedent set forth in "Conditions to All Borrowings" section of this Term Sheet and Exhibit B hereto are satisfied (the "***DIP Facilities Closing Date***"). |
| Exit Facilities Closing Date: | The Exit Facilities shall close on the first date on which all of the conditions precedent set forth in "Conditions to All Borrowings" section of this Term Sheet and Exhibit C hereto are satisfied (the "***Exit Facilities Closing Date***" and together with the DIP Facilities Closing Date, each, a "***Closing Date***"). |
| Conditions to All Borrowings: | In the case of each Credit Facility: (i) prior written notice of borrowing (which must be received by the Agent no later than 1:00 p.m. (A) three (3) business days prior |

Annex B-4

to the requested date of any borrowing or, or conversion to or continuation of, loans bearing interest at LIBOR or of any conversion of loans bearing interest at LIBOR to loans bearing interest at the Base Rate, and (B) on the requested date of any borrowing of loans bearing interest at the Base Rate); (ii) the accuracy of representations and warranties as of the date of each borrowing; (iii) a pro forma calculation of borrowing base utilization, in form and substance reasonably satisfactory to the Structuring Advisor; and (iv) the absence of any default or event of default.

| | |
|---|---|
| DIP Facilities Maturity Date: | The earliest of (a) the Interim Facility Maturity Date, if the Final DIP Order has not been entered by the Bankruptcy Court on or prior to such date, (b) the date that is 12 months after the Filing Date, (c) the effective date with respect to any Plan of Reorganization, (d) the filing of a motion by the Credit Parties seeking dismissal of any Bankruptcy Cases, the dismissal of any of the Bankruptcy Cases, the filing of a motion by the Credit Parties seeking to convert any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code or the conversion of any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code, (e) the date a sale of all or substantially all of the Credit Parties' assets is consummated under Section 363 of the Bankruptcy Code, (f) the acceleration of the obligations under the DIP Facilities following the occurrence of an event of default under the DIP Loan Documents, and (g) the appointment of a Chapter 11 Trustee (such earliest date, the "***DIP Facilities Maturity Date***"). Unless the Companies elect to convert the DIP Facilities into Exit Facilities, all amounts outstanding under the DIP Facilities shall be due and payable in full on the DIP Facilities Maturity Date. Unless the DIP Facilities Maturity Date shall occur in connection with a refinancing pursuant to the Exit Facilities, any Letters of Credit outstanding on the DIP Facilities Maturity Date shall be cash collateralized in an amount equal to 105% of the face amount thereof or backed by letter(s) of credit reasonably acceptable to issuing bank. |
| Exit Facilities Maturity Date: | The 5th anniversary of the DIP Facilities Closing Date (the "***Exit Facilities Maturity Date***"). |
| Amortization: | None. |
| Interest Rates: | Calculated on a 360-day basis:<br>Current Rate:   With respect to each Credit Facility:<br><br>         A floating rate equal to LIBOR + 5.00% or Base Rate + 4.00%.<br><br>Default Rate: 2.00% in addition to the Current Rate, payable on demand.<br><br>As used herein, the terms "***Base Rate***" and "***LIBOR***" shall have meanings customary and appropriate for financings of this type, and the basis for calculating |

Annex B-5

accrued interest and the interest periods for loans bearing interest based on LIBOR shall be customary and appropriate for financings of this type; *provided* that at no time would LIBOR be less than 1.50% and at no time would the Base Rate be less than 4.50%. There shall be no more than ten (10) outstanding interest periods in effect in respect of the Credit Facilities.

| | |
|---|---|
| Unused Line Fee: | A commitment fee of 0.75% per annum on the average daily unused portion of each of the DIP Revolving Credit Facility and Exit Revolving Credit Facility, as applicable, payable quarterly in arrears commencing with the first full fiscal quarter following the DIP Facilities Closing Date or the Exit Facilities Closing Date, as applicable, Such fees shall be distributed to each Lender under such facility pro rata in accordance with the amount of each such Lender's commitment under such facility. |
| Letter of Credit Fees: | Letter of Credit fees equal to the margin included in the Current Rate from time to time on the Revolving Credit Facility for LIBOR advances on a per annum basis will be payable quarterly in arrears and shared proportionately by the Lenders under the Revolving Credit Facility. In addition, a fronting fee will be payable to the issuing bank for such Letters of Credit for its own account, in an amount equal to 0.25% per annum of the aggregate face amount under each Letter of Credit, payable quarterly in arrears. Such issuing bank will also receive such documentary and processing charges for any issuance, amendment, transfer or payment of a Letter of Credit as are in accordance with the Letter of Credit issuer's standard schedule for such charges and as in effect at the time of such issuance, amendment, transfer or payment, as the case may be. All Letter of Credit fees will be calculated on a 360-day basis and may be modified by the applicable third party financial institution providing such Letters of Credit as agreed to by such institution and the Borrower. |
| Payment Schedule: | Interest at the Current Rate is due monthly for borrowings bearing interest with reference to the Base Rate, on the last day of selected interest periods (which shall be one, two or three months) for borrowings bearing interest with reference to LIBOR and upon prepayment, in each case, payable in arrears. |
| | Upon the occurrence and during the continuance of an event of default, at the election of the Required Lenders, all obligations owed under the applicable Loan Documents shall bear interest at the Default Rate from the date such event of default occurred until the date such event of default is waived in accordance with the terms of the Loan Documents. Notwithstanding the foregoing, no election of the Required Lenders shall be required in connection with any payment or insolvency default, and upon a payment or insolvency default, all obligations owed under the applicable Loan Documents shall bear interest at the Default Rate automatically from the date of the occurrence of such event of default. Interest at the Default Rate shall be payable on demand. |

Annex B-6

| | |
|---|---|
| Documentation Principles: | The terms of the Credit Facilities shall be generally consistent with, and based on, those set forth in (a) the Existing Prepetition Credit Agreement and (b) the other Loan Documents (as defined in the Existing Prepetition Credit Agreement), in each case, with such changes as are necessary or appropriate (i) for debtor-in-possession financings (in the case of the DIP Facilities), (ii) to address terms of the Credit Facilities as set forth in the Commitment Letter, this Term Sheet and the Fee Letter, (iii) to reflect the changes in the capital structure and the credit profile of the Companies since the date of the Existing Prepetition Credit Agreement (which shall include, without limitation, the changes set forth in Exhibit D hereto), and (iv) such other changes to the extent agreed by the Company and the Required Lenders; *provided*, that the borrowing mechanics (including provisions related to the Letters of Credit) and other operational provisions applicable to the Credit Facilities will be reasonably satisfactory to the Required Lenders and agency provisions applicable to the Credit Facilities will be reasonably satisfactory to the Required Lenders. Notwithstanding the foregoing, representations and warranties, covenants (other than financial covenants) and other terms and conditions under the Loan Documents may conform to the Amended Existing Prepetition Credit Agreement as reasonably determined by the Required Lenders. The provisions of this paragraph are referred to herein as the "***Documentation Principles***". |

The Collateral securing the Credit Facilities shall be subject to the Intercreditor Agreement (as defined below). "***Intercreditor Agreement***" means (i) prior to the Exit Facilities Closing Date, the existing Intercreditor and Collateral Agency Agreement, dated as of September 30, 2016 (as such agreement may be modified by the Interim Order, the "***Existing Intercreditor Agreement***") and (ii) on and after the Exit Facilities Closing Date, an intercreditor agreement in form and substance reasonably satisfactory to the Structuring Advisor and the Agent (the "***Exit Intercreditor Agreement***"). The Exit Intercreditor Agreement shall (a) provide that the Credit Facilities and the term loans under the Amended Existing Prepetition Credit Agreement (such term loans, the "***Term B-2 Loans***") will be secured on a pari passu basis, (b) set forth the superpriority nature of the Credit Facilities and (iii) require that all enforcement actions (other than certain enforcement actions to be agreed) shall require the consent of both a majority of the Lenders under the Credit Facilities and a majority of the holders of the Term B-2 Loans.

| | |
|---|---|
| Mandatory Prepayments: | Consistent with the Existing Prepetition Credit Agreement but subject to the Documentation Principles and shall also require a permanent reduction and full termination of the commitments under the Exit Revolving Credit Facility to the extent the Exit Term Loan Facility is prepaid in full and/or refinanced in its entirety. For the avoidance of doubt, the Loan Documents will include each mandatory prepayment included in the Amended Existing Prepetition Credit Agreement. |

Prepayment

Application:

In the DIP Facilities, all mandatory prepayments shall be applied as directed by the Borrower to the DIP Facilities (without a permanent reduction in the revolving commitments under the DIP Revolving Credit Facility).

In the Exit Facilities, all optional prepayments shall be applied in the following order: (i) first, to the outstanding principal balance of the Revolving Loans under the Exit Revolving Credit Facility (without a permanent reduction in the revolving commitments under the Exit Revolving Credit Facility, except as provided above under "Mandatory Prepayments") and (ii) second, to the Term Loans under the Exit Term Loan Facility until paid in full.

In the Exit Facilities, a Specified Mandatory Prepayment (as defined in Exhibit D) shall be applied in the following order: (i) first, to the outstanding principal balance of the Revolving Loans under the Exit Revolving Credit Facility (without a permanent reduction in the revolving commitments under the Exit Revolving Credit Facility); (ii) second, to cash collateralize any Letters of Credit then outstanding in an amount equal to 105% of the face amount thereof to the extent that the aggregate principal balance of the Revolving Loans and the Letters of Credit under the Exit Revolving Credit Facility exceed the Borrowing Base and (iii) third, to the Exit Term Loans.

In the Exit Facilities, all mandatory prepayments (other than the Specified Mandatory Prepayment) shall be applied in the following order: (i) first, to the Exit Term Loans until paid in full; (ii) second, to the Exit Revolving Loans (without a permanent reduction in the revolving commitments under the Exit Revolving Credit Facility) and (iii) third, following the occurrence and during the continuation of an Event of Default, to cash collateralize any Letters of Credit then outstanding in an amount equal to 105% of the face amount thereof.

Any Lender (a "*Declining Lender*") may elect not to accept its pro rata portion of any mandatory prepayment (other than the Specified Mandatory Prepayment) (such portion of mandatory prepayment, the "*Declined Amount*"). The Declined Amount shall be applied to the loans held by the non-Declining Lenders, at their election, and to the extent there is any excess of the Declined Amount remaining after such application, it may be applied as a mandatory prepayment under the Amended Existing Prepetition Credit Agreement to the extent the mandatory prepayment declined by the Declining Lenders is a required mandatory prepayment under the Amended Existing Prepetition Credit Agreement.

Prepayment Premium:

All (i) voluntary prepayments of Exit Term Loans, (ii) mandatory prepayments of Exit Term Loans (excluding (x) mandatory prepayments required in connection with Extraordinary Receipts (as defined in the Existing Prepetition Credit Agreement), (y) mandatory prepayments described in Section 2.04(b)(i) of the Existing Prepetition Credit Agreement, and (z) Specified Mandatory Prepayments), (iii) voluntary prepayments of the Exit Revolving Loans (up to any permanent reduction of the commitments under the Exit Revolving Facility) and

(iv) any Insolvency Event (to be defined in the Exit Loan Documents) or acceleration of the Exit Loans, in each case of the foregoing clauses (i)-(iii), shall be accompanied by a premium (expressed as a percentage of the principal amount of such Exit Loans to be prepaid) equal to (a) on and prior to the first anniversary of the DIP Facilities Closing Date, 2.00% and (b) following the first anniversary of the DIP Facilities Closing Date but on and prior to the second anniversary of the DIP Facilities Closing Date, 1.00% and (c) thereafter, 0%; provided, however, that in the event that a Lender or Lenders, whose commitments individually or in the aggregate account for at least 10% of the Exit Revolving Credit Facility, fail to timely fund a borrowing request under the Exit Revolving Credit Facility ("Defaulting Lenders"), within ten (10) Business Days after the borrowing date set forth in such borrowing request (such period the "Exit Loan Option Period"), the non-Defaulting Lenders have an option, but not an obligation, to either (A) assume such Defaulting Lender's interests, rights and obligations under the Exit Facility by way of an assignment and fund such request or (B) assign such Defaulting Lender's interests, rights and obligations under the Exit Facility to another financial institution, reasonably acceptable to the Borrower, which financial institution, upon execution of an assignment agreement, shall fund such borrowing; provided further, that in the event that the non-Defaulting Lenders fail or opt not to exercise their option to assume or assign such Defaulting Lender's interests, rights and obligations under the Exit Facility within the Exit Loan Option Period, the Borrower may voluntarily prepay and terminate the Exit Revolving Loans (provided that, if the Borrower opts to voluntarily prepay the Exit Revolving Loans and terminate the Exit Revolving Credit Facility, (a) from and after the first day after the Exit Loan Option Period has expired and up to the date which is ninety (90) days thereafter, no prepayment premium shall be owed with respect to the repayment and termination of the Exit Revolving Loans; and (b) no consent of the Required Lenders or any other Person or group, under the Intercreditor Agreement or otherwise, shall be required to prepay the Exit Revolving Loans and terminate the Exit Revolving Credit Facility , if so prepaid and terminated by the Borrower during the period set forth in the immediately preceding clause (a)).

| | |
|---|---|
| Use of Proceeds: | DIP Facilities: To refinance the Existing Prepetition Revolving Credit Facility, to pay related transaction fees and expenses and for working capital and general corporate purposes. |
| | Exit Facilities: To refinance the DIP Facilities, to pay related transaction fees and expenses and for working capital and general corporate purposes. |
| Collateral for DIP Facilities: | All obligations and liabilities under the DIP Facilities shall be secured by a first priority perfected lien and security interest pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code in substantially all of the Credit Parties' assets and property of the estate (as defined in the Bankruptcy Code), whether real, personal, tangible, or intangible, and wherever located (all such |

Annex B-9

security being the "**DIP Collateral**"), including but not limited to, collateral assignment of all Material Contracts (as defined in the Existing Prepetition Credit Agreement) (provided that no third party consents to such assignment will be required), the proceeds of all leasehold interests, purchase options, if any, and further all cash and cash equivalents, deposit accounts, accounts receivable, contract rights, equipment, inventory, and owned and leased real property, fixtures, general intangibles, payment intangibles, contract rights, chattel paper, instruments, investment property, commercial tort claims, causes of action under Chapter 5 of the Bankruptcy Code (subject to entry of the Final DIP Order), trademarks, copyrights, patents and other intellectual property and all other tangible and intangible assets of every type and nature, whether now existing or hereafter created, acquired, or arising, and all proceeds thereof. DIP Collateral shall also include a pledge of 100% of the issued and outstanding ownership interests in each Credit Party (including, until the merger of Ascent Capital Group, Inc. (the "**Parent**") with the Borrower (the "**Proposed Merger**"), a non-recourse pledge of the ownership interest in the Borrower from the Parent), but excluding more than 66 2/3% of the equity of any foreign subsidiary to the extent that the Borrower and the Required Lenders reasonably determine that any change in U.S. tax law after the Closing Date would result in materially adverse tax consequences to the Credit Parties taken as a whole. The Interim Order and the Final DIP Order shall provide that the first priority security interests and liens granted in favor of the Agent and the DIP Lenders shall "prime" the liens on all of the assets of the Credit Parties (including all liens securing obligations under the Credit Parties' prepetition credit facilities), other than permitted liens under the DIP Credit Agreement.

In addition, the obligations under the DIP Facilities shall constitute claims entitled to super-priority administrative expense claim status in accordance with Sections 364(c)(1) and 507(b) of the Bankruptcy Code, with priority in payment over any and all other administrative expenses in the Bankruptcy Cases of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, subject only to (A) the payment of allowed professional fees and disbursements incurred by the Companies and any official committees appointed in the Bankruptcy Cases, in an aggregate amount not to exceed an amount to be agreed (the "**Professional Expense Cap**"), provided that (x) during the continuance of an event of default under the DIP Loan Documents or a default by any Credit Party of its obligations under any DIP Order, any payments actually made to such professionals during such continuance shall reduce the Professional Expense Cap on a dollar-for-dollar basis and (y) for the avoidance of doubt, so long as no event of default under the DIP Loan Documents or default by any Company Party of its obligations under any DIP Order shall have occurred and be continuing, payments made to such professionals shall not reduce the Professional Expense Cap, and (B) the payment of fees pursuant to 28 U.S.C. § 1930 (collectively, the "**Carve-Out Expenses**").

| | |
|---|---|
| Collateral for Exit Facilities: | All obligations and liabilities under the Exit Facilities shall be secured by a first priority perfected lien and security interest in all of the Credit Parties' assets and property, whether real, personal, tangible, or intangible, and wherever located (all such security being the "***Exit Collateral***"), including but not limited to, collateral assignment of all Material Contracts (provided that no third party consents to such assignment will be required), the proceeds of all leasehold interests, purchase options, if any, and further all cash and cash equivalents, deposit accounts, accounts receivable, contract rights, equipment, inventory, owned and leased real property, fixtures, general intangibles, payment intangibles, contract rights, chattel paper, instruments, investment property, commercial tort claims, trademarks, copyrights, patents and other intellectual property and all other tangible and intangible assets of every type and nature, whether now existing or hereafter created, acquired, or arising, and all proceeds thereof. Exit Collateral shall also include a pledge of 100% of the issued and outstanding ownership interests in each Credit Party other than the Borrower (but excluding more than 66 2/3% of the equity of any foreign subsidiary to the extent that the Borrower and the Required Lenders reasonably determine that any change in U.S. tax law after the Closing Date would result in materially adverse tax consequences to the Credit Parties taken as a whole). |
| Cash Management: | At all times (but solely in the case of the DIP Facilities, on and after the 30th day following the Filing Date), all collections of the Credit Parties shall be deposited in deposit accounts subject to deposit account control agreements reasonably satisfactory to the Agent and Structuring Advisor (collectively, the "***Blocked Accounts***"); <u>provided</u> that the Credit Parties shall not be required to enter into any control agreement in respect of (a) payroll and similar accounts, (b) deposit or securities accounts the balance of which individually and in the aggregate at all times are less than an amount to be agreed or (c) other accounts to be agreed (collectively, the "***Excluded Accounts***"). Upon the occurrence and during the continuance of an event of default, all funds deposited in the Blocked Accounts shall be transferred to a deposit account designated by the Structuring Advisor on each business day and applied to repay the outstanding obligations under the Credit Facilities in the order and manner to be determined. The cash management system of the Credit Parties shall be otherwise maintained in a manner reasonably satisfactory to the Structuring Advisor. |
| Representations and Warranties: | In the case of each Credit Facility, substantially consistent with the Existing Prepetition Credit Agreement but subject to the Documentation Principles. |
| Affirmative Covenants: | In the case of each Credit Facility, substantially consistent with the Existing Prepetition Credit Agreement but subject to the Documentation Principles. In the case of the DIP Facilities, covenants to include an obligation to deliver certain items (including copies of pleadings, motions, applications and other documents |

Annex B-11

filed with the Bankruptcy Court or distributed to any official committee appointed in the Chapter 11 Cases).

| | |
|---|---|
| Negative Covenants: | In the case of each Credit Facility, substantially consistent with the Existing Prepetition Credit Agreement but subject to the Documentation Principles. |

In addition, the DIP Loan Documents will include, among other covenants: reporting with respect to financial matters (including, without limitation, from and after the Filing Date, updates to the Budget (such updates to the approved by the Structuring Advisor)), limitations on payment of any pre-petition indebtedness other than payments set forth in the Budget which have been approved by the Bankruptcy Court, the Budget Covenant (as defined below) and covenants requiring periodic updates as to the status of the milestones set forth on Exhibit A (the "***Reorganization Milestones***"). "***Budget***" means a budget (in form and substance reasonably acceptable to the Structuring Advisor), depicting on a weekly basis cash revenue, receipts, expenses, disbursements and other information for the first 13 weeks from the DIP Facilities Closing Date or the date any such updates to the Budget are delivered, as applicable.

| | |
|---|---|
| Budget Covenant: | The Companies shall not (a) pay any expenses or make any other operating disbursements (exclusive of (x) professional fees and restructuring charges arising on account of the Bankruptcy Cases (including Chapter 11 Trustee fees and professional fees and expenses incurred by the Agent, the Structuring Advisor and/or the DIP Lenders) and (y) disbursements made on account of prepetition claims pursuant to any customary first day orders) other than as set forth in the Budget (subject to a 15% aggregate variance during the period ending with the third full calendar week after the Filing Date, and thereafter for any rolling four-week period) or (b) permit aggregate cash receipts, for any time period, to be less than the levels set forth in the Budget for the corresponding period (subject to a 15% aggregate variance during the period ending with the third full calendar week after the Filing Date, and thereafter for any rolling four-week period). Such covenant shall be measured weekly (i) for the 3 consecutive full week period ending on the third Friday following the Filing Date and (ii) for each week ending thereafter, on a rolling four-week basis. |

| | |
|---|---|
| Events of Default: | In the case of each Credit Facility, consistent with the Existing Prepetition Credit Agreement but subject to the Documentation Principles. |

In addition, in the case of the DIP Facilities, the following events of default, among others, shall be included:

    (a)  unless consented to by the Required Lenders, payment of any pre-petition indebtedness other than payments in compliance with the Budget Covenant and which have been approved by the Bankruptcy Court or pursuant to any confirmed Plan of Reorganization;

Annex B-12

(b)        the filing of a motion by the Credit Parties seeking dismissal of any Bankruptcy Cases, the dismissal of any of the Bankruptcy Cases, the filing of a motion by the Credit Parties seeking to convert any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code or the conversion of any of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code;

(c) the filing of any Credit Party of a motion seeking the appointment in any of the Bankruptcy Cases of (i) a Chapter 11 trustee or (ii) an examiner with expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) or the entry of any order of the Bankruptcy Court granting such relief;

(d) except with respect to the Carve-Out, the grant of any super-priority administrative expense claim or any lien which is *pari passu* with or senior to those of the Agent and the DIP Lenders, or the authorization to use cash collateral without the consent of the DIP Lenders;

(e) the grant of relief from the automatic stay to permit enforcement of rights by any other party with respect to any assets of any Credit Party having a value in an amount equal to or exceeding an amount to be agreed upon;

(f) any Credit Party's board of directors shall authorize the liquidation of such Credit Party's business pursuant to one or more Section 363 sales or otherwise, or shall file any motion under Section 363 of the Bankruptcy Code seeking approval to liquidate all or substantially all of the assets of the Credit Parties, other than as consented to by the Required Lenders;

(g) failure of any Credit Party to comply with the terms of the Interim Order or the Final DIP Order;

(h) failure of the Final DIP Order to be entered in the Bankruptcy Cases within 45 days after the Filing Date;

(i) failure to timely achieve any Reorganization Milestone (subject to any agreed upon cure period);

(j) the (A) amendment, modification, reversal, revocation, issuance of a stay or order to vacate or supplementing of the Interim Order, the Final DIP Order, or any other order of the Bankruptcy Court, in any way adversely affecting or relating to the DIP Facilities or the claims of Agent, the Structuring Advisor and the DIP Lenders, in a manner not acceptable to the Structuring Advisor and DIP Lenders, (B) material amendment, modification or supplementing of the Plan Documentation

(as defined below) in any manner not reasonably acceptable to the Structuring Advisor or the DIP Lenders to the extent any such material amendment, modification or supplement adversely affects any Credit Facility or the claims of the Agent, the Structuring Advisor, the DIP Lenders or the Exit Lenders, or (C) waiver of any condition precedent to confirmation of the Plan of Reorganization or effective date of the Plan of Reorganization in any manner not reasonably acceptable to the Structuring Advisor or any DIP Lender to the extent that any such waiver adversely affects any Credit Facility or the claims of the Agent, the Structuring Advisor, the DIP Lenders or the Exit Lenders;

(k) the solicitation, filing and/or seeking of confirmation by the Borrower of any Plan of Reorganization and disclosure statement that does not provide for repayment in full, in cash, of all outstanding amounts under the DIP Facilities at the time of the consummation of such Plan of Reorganization;

(l) if any Plan Documentation is executed, filed or delivered which is not (i) in form and substance reasonably acceptable to the Required Lenders in respect of the treatment of the claims of the Agent, the Structuring Advisor and the DIP Lenders or (ii) otherwise in form and content reasonably acceptable to the Required Lenders; and

(m) if the Confirmation Order is entered in form and substance which is not (i) reasonably acceptable to the Required Lenders in respect of the treatment of the claims of the Agent and the DIP Lenders or (ii) otherwise reasonably acceptable to the Structuring Advisor.

| | |
|---|---|
| Assignments: | The Lenders may sell, transfer, negotiate or assign to one or more of their affiliates or one or more banks, financial institutions, or other entities that are eligible assignees (as defined in the applicable Loan Documents) (other than Disqualified Lenders absent an event of default) a portion of its loans, rights and obligations under the Loan Documents, subject to the prior written consent of the Structuring Advisor and, unless an event of default has occurred and is continuing, the Borrower, and compliance with other limitations to be set forth in the applicable Loan Documents. The Lenders will also have rights to sell participations to persons (other than Disqualified Lenders absent an event of default), subject to customary limits on voting rights. Assignments to affiliates of the Company shall not be permitted. |
| Voting: | Amendments and waivers of each of the DIP Revolving Credit Facility, Exit Term Loan Facility and Exit Revolving Credit Facility, will require the approval of Lenders holding more than 50% of the aggregate amount of the loans and commitments under the facilities; *provided* that agent, all lender, or affected lender consent shall be required for certain customary amendments and waivers, including but not limited to, (a) the consent of each Lender directly and adversely affected |

Annex B-14

thereby shall be required with respect to (i) increases in commitments, (ii) reductions of principal (it being understood that a waiver of any condition precedent or the waiver of any default, event of default or mandatory prepayment shall not constitute a reduction in principal), interest (other than a waiver of default interest) or fees, (iii) extensions of scheduled amortization or final maturity of loans or commitments or extensions of time of payment for interest or fees and (iv) changes in pro rata sharing provisions and the "waterfall" and (b) the consent of 100% of the Lenders shall be required with respect to (i) modifications to any of the voting percentages and (ii) a release of all or substantially all of the guarantees or collateral.

|  |  |
|---|---|
| **Funding Protection:** | Customary for transactions of this type, including breakage costs, gross-up for withholding, compensation for increased costs and compliance with capital adequacy and other regulatory restrictions. |
| **Taxes, Reserve Requirements and Indemnities:** | All payments are to be made free and clear of any taxes (other than franchise taxes and taxes on overall net income), imposts, assessments, withholdings or other deductions whatsoever. Foreign Lenders shall furnish to the Agent appropriate certificates or other evidence of exemption from U.S. federal tax withholding. The Company will indemnify the Lenders against all increased costs of capital resulting from reserve requirements or otherwise imposed, in each case subject to customary increased costs, capital adequacy and similar provisions to the extent not taken into account in the calculation of the Base Rate or LIBOR. |
| **Brokers' Fees:** | The Company will agree to assume obligations to pay broker fees (to the extent applicable), and the Company will agree to indemnify KKR and any Additional Lender and hold KKR or such Additional Lender harmless from and against any claim of any other broker or finder arising out of any transaction or any commitment issued to the Company. |
| **Indemnification; Expenses:** | Substantially consistent with the Existing Prepetition Credit Agreement, subject to the Documentation Principles. |
| **Choice of Law; Jurisdiction:** | The Loan Documents will be governed by and construed in accordance with the laws of the State of New York, except (i) with respect to security documents, to the extent the creation and/or perfection of a security interest is governed by the laws of a different state of the United States, the Interim Order or the Final DIP Order and (ii) as governed by the Bankruptcy Code. The Credit Parties will submit to the non-exclusive jurisdiction and venue of the federal and state courts of the State of New York and shall waive any right to trial by jury. To the extent that the Bankruptcy Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction related any disputes related to the Credit Facilities. |

Annex B-15

| | |
|---|---|
| Counsel to the Structuring Advisor: | Proskauer Rose LLP |
| Counsel to the Lenders (other than KKR) and the Ad Hoc Lender Group: | Jones Day |
| Counsel to the Agent: | To be determined |
| Public Announcement: | Upon closing, the Structuring Advisor may, at its own expense, issue news releases and publish "tombstone advertisements" and other customary announcements in newspapers, trade journals, and other appropriate media (collectively, "***Trade Announcements***") and disclose such other information in accordance with the confidentiality provisions of the Loan Documents and no Credit Party shall issue any Trade Announcement prior to or after the DIP Facilities Closing Date except (i) to the extent required by applicable law, regulation, legal process or the rules of a national securities exchange or (ii) with the prior consent of the Structuring Advisor (such consent not to be unreasonably withheld or delayed); <u>provided</u>, that the Credit Parties may issue a Trade Announcement that announces the closing of the Credit Facilities without identifying the names of the Agent, the Structuring Advisor and the Lenders or any economic terms of the Credit Facilities. |

Exhibit A

**Milestones for Reorganization Plan and Disclosure Statement**

| Date | Milestone |
|---|---|
| Filing Date | Filing by the Borrower of the Plan of Reorganization and related disclosure statement requiring payment in full of the obligations under the DIP Facilities in cash (including cash collateralization of Letters of Credit if applicable) upon the effectiveness of such Plan of Reorganization, and otherwise in form and substance reasonably acceptable to and the Required Lenders. |
| Earlier of (i) the date set for the Plan Milestone in the Restructuring Support Agreement and (ii) the date that is 75 days following the Filing Date | Entry of an order confirming such Plan of Reorganization by the Bankruptcy Court (the "***Plan Milestone***") |
| Earlier of (i) the date set for the Exit Milestone in the Restructuring Support Agreement and (ii) the date that is 120 days following the Filing Date | Effectiveness of such Plan of Reorganization (the "***Exit Milestone***") |
| | * Any of the above mentioned dates may be extended with the prior written consent of the Required Lenders. |

Exhibit A-1

Exhibit B

Conditions Precedent to the DIP Facilities Closing Date

The fulfillment, to the satisfaction of the Required Lenders, of each of the following conditions precedent:

A)   The Filing Date shall have occurred on or prior to June 30, 2019;

B)   The Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the Required Lenders approving the transactions and fees outlined in the Commitment Letter and the Fee Letter and granting the priority liens and administrative expense claims referred to therein (as amended, modified or otherwise supplemented from time to time in accordance with the terms hereof, the "*Interim Order*"), which Interim Order shall (i) be in full force and effect and shall not have been vacated, modified, amended (without the express written consent of the Required Lenders), reversed, overturned or stayed in any respect, and (ii) provide for the payment in full, in cash of all obligations under the Existing Prepetition Revolving Credit Facility;

C)   All amounts due under the Existing Prepetition Revolving Credit Facility shall have been paid in full, in cash, and all commitments relating thereto shall have been terminated;

D)   All filed "first day" pleadings and "first day" orders filed on the Filing Date which relate to the DIP Facilities shall be reasonably acceptable in form and substance to the Required Lenders. All other filed "first day" pleadings and "first day" orders filed on the Filing Date shall not be adverse to the Agent's or the DIP Lenders' interests or inconsistent, in any material respect, with the terms of the DIP Loan Documents;

E)   The Interim Order shall provide that all obligations of the Credit Parties with respect to the DIP Loan Documents are secured by valid, enforceable and non-avoidable first priority liens and security interests in the DIP Collateral subject only to Permitted Liens (to be defined in the DIP Loan Documents) and the Carve-Out on the terms set forth in the DIP Loan Documents;

F)   The Plan of Reorganization and all documentation, including without limitation any amendments, any subsequent plans of reorganization, the Plan Documents (as defined in the Plan of Reorganization or such other similar term used in the Plan of Reorganization), the Plan Supplement (as defined in the Plan of Reorganization or such other similar term used in the Plan of Reorganization) and/or the Confirmation Order (as defined below) (all of the foregoing being collectively referred to as, the "*Plan Documentation*"), to be executed, delivered or filed pursuant thereto shall be in form and substance reasonably acceptable to the Required Lenders. Prior to the DIP Facilities Closing Date, Borrower shall have solicited acceptances of the Plan of Reorganization from the term loan lenders under the Existing Prepetition Credit Agreement (the "*Existing Term Loan Lenders*") and certain holders of the Senior Unsecured Notes (as defined in the Existing Prepetition Credit Agreement) to accept the Plan of Reorganization. The Borrower shall have received the requisite number of votes accepting the Plan of Reorganization under Section 1126 of the Bankruptcy Code from the Existing Term Loan Lenders, and the holders of the Senior Unsecured Notes holding, in the aggregate, in excess of 66⅔% of the principal amount outstanding of all Senior Unsecured Notes shall have voted to accept the Plan of Reorganization under Section 1126 of the Bankruptcy Code.

G)   The Restructuring Support Agreement, which shall be in form and substance reasonably

Exhibit B-1

satisfactory to the Required Lenders, shall be in full force and effect and shall not have been amended, modified or supplemented in a manner materially adverse to the interests of the Agent or the DIP Lenders, and no Plan Support Party (as defined in the Plan of Reorganization or such other similar term used in the Plan) shall have withdrawn its support for or refused to abide by the terms of the Restructuring Support Agreement;

H)  The negotiation, execution and delivery of definitive documentation evidencing the DIP Facilities, a joinder to the Existing Intercreditor Agreement, the Guaranties and the security interests in the DIP Collateral (collectively, the "***DIP Loan Documents***"), which DIP Loan Documents shall be prepared by counsel to KKR and shall be in form and substance satisfactory to the Agent and the DIP Lenders, subject to the Documentation Principles;

I)  The Agent and the Structuring Advisor shall have received (i) a certificate of status with respect to each Credit Party, dated within a recent date of the DIP Facilities Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of such Credit Party, which certificate shall indicate that such Credit Party is in good standing in such jurisdiction and (ii) certificates of status (to the extent applicable) with respect to each Credit Party, dated within a recent date from the DIP Facilities Closing Date, such certificates to be issued by the appropriate officer of the jurisdictions (other than the jurisdiction of organization of such Credit Party) in which its failure to be duly qualified or licensed would constitute a Material Adverse Effect (as defined in the Existing Prepetition Credit Agreement), which certificates shall indicate that such Credit Party is in good standing in such jurisdictions;

J)  The Agent and the Structuring Advisor shall have received certificates from the Secretary of each Credit Party (i) attesting to the resolutions of such Credit Party's Board of Directors authorizing its execution, delivery, and performance of the DIP Loan Documents to which such Credit Party is a party, (ii) authorizing specific officers of such Credit Party to execute the same, (iii) attesting to the incumbency and signatures of such specific officers of such Credit Party and (iv) certifying such Credit Party's governing documents as in effect or contemplated to be in effect as of the DIP Facilities Closing Date;

K)  The Agent and the DIP Lenders shall have received opinion(s) of Credit Parties' counsel with respect to certain customary corporate housekeeping matters, enforceability of the DIP Loan Documents, no conflicts with organizational documents and federal, Texas or New York law, no required consents or approvals under federal, Texas or New York law or Delaware organizational statutes, based upon a review of the Bankruptcy Court docket, the Interim Order has been entered by the Bankruptcy Court, and that no order amending, granting re-argument with respect to, staying, vacating, rescinding or reversing the Interim Order has been entered by the Bankruptcy Court, creation and perfection of lien on UCC collateral and certificated securities and no required registration under the Investment Company Act of 1940, and otherwise in form and substance reasonably satisfactory to the Agent and the Required Lenders;

L)  The Agent shall have received certificates of insurance indicating the Credit Parties' compliance with the terms of the DIP Loan Documents, the form and substance of which shall be satisfactory to the Agent and the Structuring Advisor;

M)  Since the date of the Commitment Letter, no change, occurrence or development shall have occurred or become known to the Companies that has had or could reasonably be expected to have a Material Adverse Effect other than the filing of the Bankruptcy Cases and the events that typically result from the filing of a case under Chapter 11 of the Bankruptcy Code;

N)  The Agent, the Structuring Advisor and the DIP Lenders shall have received all necessary Patriot Act compliance information, the results of which are reasonably satisfactory to the Structuring Advisor, the Agent and the DIP Lenders in their sole discretion, in each case requested by the Structuring Advisor, the Agent or such DIP Lender in writing at least five (5) business days prior to the DIP Closing Date;

O)  The Agent and the DIP Lenders shall have received the Budget, and the Required Lenders shall have approved the Budget;

P)  Borrower shall have paid all fees and expenses of the Structuring Advisor, the Agent and DIP Lenders required to be paid under the Fee Letter and the DIP Loan Documents; and

Q)  The DIP Facilities Closing Date shall have occurred on or before the date that is three business days after the date of entry of the Interim Order.

Exhibit B-3

Exhibit C

Conditions Precedent to the Exit Facilities Closing Date

The fulfillment, to the satisfaction of the Required Lenders, of each of the following conditions precedent:

A)  The Exit Facilities Closing Date shall have occurred on or prior to the due date for the Exit Milestone;

B)  Any amendment, modification or supplement to the Plan Documentation shall be on terms and conditions reasonably satisfactory to the Required Lenders and all Plan Documentation to be executed, delivered or filed pursuant to the Plan of Reorganization shall be in form and substance reasonably acceptable to the Required Lenders and such Plan Documentation shall have been executed, delivered or filed, as the case may be;

C)  (i) The Plan of Reorganization shall have been confirmed by the Bankruptcy Court pursuant to a confirmation order, in form and substance reasonably satisfactory to the Required Lenders (the "**Confirmation Order**"); (ii) the Confirmation Order shall be a Final Order and shall not have been modified or vacated on appeal and, unless otherwise agreed to by the Required Lenders (such consent not to be unreasonably withheld), at least 10 days shall have passed since the entry of the Confirmation Order, the Confirmation Order shall have been entered upon proper notice to all parties to be bound by the Plan of Reorganization, all as may be required by the United States Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and any applicable local bankruptcy rules, and the Confirmation Order shall have become a Final Order; (iii) all conditions precedent to the effectiveness of the Plan of Reorganization shall have been satisfied (or, with the prior written consent of the Required Lenders, waived) in the reasonable judgment of the Required Lenders and (iv) except as consented to by the Required Lenders, the Bankruptcy Court's retention of jurisdiction under the Confirmation Order shall not govern the enforcement of the Exit Loan Documents or any rights or remedies related thereto;

D)  All pre-petition indebtedness and other claims against the Borrower shall have been paid as provided for in the Plan of Reorganization, and all amounts due under the DIP Facilities shall have been paid in full, in cash (other than with respect to letters of credit which shall be deemed issued under the Exit Revolving Credit Facility), and all commitments relating to the DIP Facilities shall have been terminated;

E)  All obligations of the Credit Parties with respect to the Exit Loan Documents are secured by valid, enforceable and non-avoidable first priority liens and security interests in the Exit Collateral, subject only to Permitted Liens (to be defined in the Exit Loan Documents);

F)  The capital structure of the Reorganized Companies shall be substantially consistent with the capital structure set forth in the Plan of Reorganization and Plan Supplement;

G)  The negotiation, execution and delivery of definitive documentation evidencing the Exit Facilities, the Exit Intercreditor Agreement in form and substance reasonably satisfactory to the Required Lenders, the Guaranties and the security interests in the Exit Collateral (collectively, the "**Exit Loan Documents**" and together with the DIP Loan Documents, the "**Loan Documents**"), which Exit Loan Documents shall be prepared by counsel to KKR and shall be in form and substance satisfactory to the Structuring Advisor, the Agent and the Exit Lenders, subject to the Documentation Principles.

Exhibit C-1

H)  Agent and the Structuring Advisor shall have received (i) a certificate of status with respect to each Credit Party, dated within a recent date from the Exit Facilities Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of such Credit Party, which certificate shall indicate that such Credit Party is in good standing in such jurisdiction and (ii) certificates of status with respect to each Credit Party, dated within a recent date from the Exit Facilities Closing Date, such certificates to be issued by the appropriate officer of the jurisdictions (other than the jurisdiction of organization of such Credit Party) in which its failure to be duly qualified or licensed would constitute a Material Adverse Effect, which certificates shall indicate that such Credit Party is in good standing in such jurisdictions;

I)  Agent and the Structuring Advisor shall have received certificates from the Secretary of each Credit Party (i) attesting to the resolutions of such Credit Party's Board of Directors authorizing its execution, delivery, and performance of the Exit Loan Documents to which such Credit Party is a party, (ii) authorizing specific officers of such Credit Party to execute the same, (iii) attesting to the incumbency and signatures of such specific officers of such Credit Party and (iv) certifying such Credit Party's Governing Documents as in effect or contemplated to be in effect as of the Exit Facilities Closing Date;

J)  Agent and the Structuring Advisor shall have received opinion(s) of Credit Parties' counsel in form and substance reasonably satisfactory to the Required Lenders;

K)  All actions, authorizations, filings, consents and regulatory approvals required, if any, shall have been obtained, effected or executed in a manner reasonably acceptable to the Required Lenders;

L)  The Exit Facilities shall have received public ratings (but no specific rating) from each of Standard & Poor's Ratings Group, a Standard & Poor's Financial Services Business and Moody's Investors Service, Inc.;

M)  Agent and the Structuring Advisor shall have received certificates of insurance indicating the Credit Parties' compliance with the terms of the Exit Loan Documents, the form and substance of which shall be reasonably satisfactory to the Required Lenders;

N)  The Agent shall have completed its updated UCC and tax lien searches, in each case, the results of which, in each case, shall be reasonably satisfactory to the Required Lenders;

O)  The Agent and KKR shall have received (i) completed reference checks with respect to all new members of each Credit Party's senior management, the results of which are reasonably satisfactory to the Agent and the Required Lenders, and (ii) all necessary Patriot Act compliance information and reports with respect to all new members of each Credit Party's senior management, the results of which are satisfactory to Agent and the Exit Lenders in their sole discretion;

P)  Since the date of the Commitment Letter, no change, occurrence or development shall have occurred or become known to the Companies that has had or could reasonably be expected to have a Material Adverse Effect other than the filing of the Bankruptcy Cases and the events that typically result from the filing of a case under Chapter 11 of the Bankruptcy Code;

Q)  A Final Order, which may be the Confirmation Order, shall have been entered by the Bankruptcy Court authorizing and approving the assumption by the Company of each Material Contract;

Exhibit C-2

US-DOCS\107830796.11107992649v22

R)   Borrower shall have paid all fees and expenses of the Structuring Advisor, the Agent and Exit Lenders required to be paid under the Fee Letter and the Exit Loan Documents; and

S)   Agent and the Structuring Advisor shall have received duly executed copies of an amendment to the Existing Prepetition Credit Agreement, an amended and restated agreement thereof or any other agreement replacing or refinancing such agreement, in form and substance reasonably satisfactory to the Structuring Advisor (the "***Amended Existing Prepetition Credit Agreement***").

Exhibit C-3

<u>Exhibit D</u>

<u>Changes to the Existing Prepetition Credit Agreement</u>

| **Provision of the Existing Prepetition Credit Agreement** | **Changes to be made to each Credit Facility** |
| --- | --- |
| Definition of Permitted Holders | The definition of "***Permitted Holders***" for purposes of a Change of Control (as defined in the Existing Prepetition Credit Agreement) shall include any person that beneficially owns greater than 15% of the Equity Interests (as defined in the Existing Prepetition Credit Agreement) of the Borrower as of the Exit Facilities Closing Date. |
| Mandatory Prepayments: | Section 2.04(b)(ii) - Reinvestment right capped at $50 million per fiscal year and $100 million in the aggregate<br><br>In addition to the mandatory prepayment events in the Existing Prepetition Credit Agreement, the following mandatory prepayment (the "***Specified Mandatory Prepayment***") shall be required:<br><br>• Borrowing Base: Prepayments in an amount equal to the extent that the aggregate principal balance of the applicable Term Loan and Revolving Loans and the Letters of Credit exceed the Borrowing Base. |
| Sections 2.15-2.19 | To be deleted in their entirety along with related definitions and other related provisions in the Existing Prepetition Credit Agreement |
| Representations and warranties, covenants and events of default | Materiality thresholds to be agreed by the Company and the Required Lenders |
| Covenants | Covenants regarding the following to be added to the Loan Documents:<br><br>• Restrictions on amendments and termination of any material alarm monitoring contracts, material alarm monitoring purchase agreements and other Material Contracts, in each case, that are materially adverse to the Agent, the Structuring Advisor and the Lenders.<br><br>• Restrictions on amendments to the Amended Existing Prepetition Credit Agreement that are materially adverse to the Agent, the Structuring Advisor and the Lenders.<br><br>• The Borrower shall not enter into or acquire any alarm monitoring agreement for which the monitoring services provided to the customers thereunder are not freely assignable and transferrable to a third-party; <u>provided</u> that the foregoing restriction shall not apply to (i) alarm monitoring agreements generated under the Master Sales and Services Agreement, dated as of July 14, 2017, between |

Exhibit D-1

| Provision of the Existing Prepetition Credit Agreement | Changes to be made to each Credit Facility |
|---|---|
| | the Company and Nest Labs, Inc. (as amended, restated, amended and restated, replaced (with Nest Labs, Inc. or any other affiliate of Alphabet Inc.), supplemented or otherwise modified from time to time, the "***Nest Agreement***") and (ii) alarm monitoring agreements (excluding, for the avoidance of doubt, alarm monitoring agreements generated under the Nest Agreement) that represent, in the aggregate, less than 5% of the Eligible RMR.<br><br>• Quarterly lender calls and annual lender meetings upon request of the Required Lenders.<br><br>• The Borrower shall use commercially reasonable efforts to deliver within 60 days of the Exit Facilities Closing Date executed copies of access agreements with Iron Mountain and DocuSign (and any other party that stores the alarm monitoring contracts of the Credit Parties).<br><br>• At all times, the Liquidity (defined as availability under the applicable Revolving Credit Facility plus Qualified Cash (as defined below)) of the Credit Parties shall not be less $25,000,000. The Loan Documents shall not contain any other financial covenant.<br><br>"***Qualified Cash***" means the amount of unrestricted cash and cash equivalents of the Credit Parties that is in deposit accounts or in securities accounts, or any combination thereof, which such deposit account or securities account is subject to a control agreement and is maintained by a branch office of the bank or securities intermediary located within the United States. |
| Section 6.01(b) | Quarterly financials to be delivered for each fiscal quarter (including the last fiscal quarter). Quarterly financials for the last fiscal quarter of each fiscal year shall be delivered within 60 days of the end of such fiscal quarter; provided, that, for the last fiscal quarter of 2019, such financials shall be delivered within 75 days of the end of such quarter. |
| Section 6.02 | Borrowing Base certificates to be delivered on a monthly basis, as of the end of the month immediately following the month of determination. |
| Section 7.02(d) | Existing Section 7.02(d) shall be deleted and replaced with the |

| Provision of the Existing Prepetition Credit Agreement | Changes to be made to each Credit Facility |
|---|---|
| | following: |
| | Unsecured indebtedness; <u>provided</u>, <u>that</u>, after giving effect to the incurrence of such indebtedness the total debt to EBITDA ratio (to be defined in the Loan Documents) shall not be greater than the Specified Ratio (as defined below). |
| | "*Specified Ratio*" shall mean (A) on or prior to December 31, 2020, 4.50:1.00, (B) on and after January 1, 2021 through and including December 31, 2021, 4.25:1.00 and (C) thereafter, 4.00:1.00; <u>provided</u>, <u>that</u>, if the total debt to EBITDA covenant level then in effect under the Amended Existing Prepetition Credit Agreement is lower than the applicable ratio set forth above, the Specified Ratio shall mean the total debt to EBITDA covenant level then in effect under the Amended Existing Prepetition Credit Agreement. |
| Section 7.02(l) | Deleted in its entirety along with related definitions and other related provisions in the Existing Prepetition Credit Agreement |
| Section 7.03(g) | Permitted Acquisitions to be subject to a $25,000,000 pro forma Liquidity test. |
| Section 7.03(h) | Permitted Portfolio Purchases to be subject to a $25,000,000 pro forma Liquidity test |
| Section 7.06(f) | Change "$25,000,000" to "$15,000,000"; such cap to be an aggregate cap shared under Section 7.06(f) and new Section 7.18 set forth below<br><br>Also subject to a $50,000,000 pro forma Liquidity test |
| Sections 7.11-7.12 | To be deleted in their entirety along with related definitions and other related provisions in the Existing Prepetition Credit Agreement |
| Section 7.18 | Existing Section 7.18 to be replaced with a covenant restricting principal payments of indebtedness (other than (x) the Credit Facilities and (y) capital leases); <u>provided</u>, that, the following payments shall be permitted: (i) scheduled payments of principal under the Amended Existing Prepetition Credit Agreement[1] in an aggregate amount not to exceed $2,056,250 in any quarter and (ii) optional prepayments of such indebtedness (each such optional prepayment subject to (x) a pro forma minimum Liquidity test of |

---

[1] Note to draft – Will be a new facility, not an amendment and restatement.

Exhibit D-3

| Provision of the Existing Prepetition Credit Agreement | Changes to be made to each Credit Facility |
|---|---|
| | $25,000,0000, and (y) no Event of Default before or after giving effect to such payment). Restrictions on optional prepayments of such indebtedness shall not apply to prepayments made with proceeds of equity issuances or refinancings with permitted refinancing debt.<br><br>For the avoidance of doubt, no mandatory prepayment shall be made under the Amended Existing Prepetition Credit Agreement other than with the Declined Amount. |
| Section 8.01 | Delivery of borrowing base certificates shall not be subject to any grace period.<br><br>The following events of defaults to be added:<br><br>• Cross-default to the Term B-2 Loans under the Amended Existing Prepetition Credit Agreement; provided, that, the occurrence of any event of default under the Amended Existing Prepetition Credit Agreement resulting solely from a breach of a financial covenant thereunder shall only result in an event of default under the Loan Documents if such event of default under the Amended Existing Prepetition Credit Agreement has occurred and is continuing for more than 30 days.<br><br>• (i) Any Credit Party or any of its subsidiaries is enjoined, restrained or in any way prevented by the order of any court or any governmental authority from conducting all or any material part of its business for more than 15 days; (ii) any Credit Party or any of its subsidiaries is not able to provide a material portion of their subscribers with central monitoring services for a period to be agreed upon; or (iii) any material portion of their subscribers are not able due to an act of God to receive central monitoring services for a period to be agreed upon, in each case of clauses (ii) and (iii), to the extent such inability could reasonably be expected to have a Material Adverse Effect<br><br>• There shall occur and be continuing any "Event of Default" (or any comparable term) under, and as defined in the documents evidencing or governing any subordinated indebtedness, (ii) any of the obligations under the Credit Facilities for any reason shall cease to be "Senior Indebtedness" or "Designated Senior Indebtedness" (or any comparable terms) under, and as defined in the documents |

| Provision of the Existing Prepetition Credit Agreement | Changes to be made to each Credit Facility |
|---|---|
| | evidencing or governing any subordinated indebtedness, (iii) any indebtedness other than the obligations under the Credit Facilities shall constitute "Designated Senior Indebtedness" (or any comparable term) under, and as defined in, the documents evidencing or governing any subordinated indebtedness, (iv) any holder of subordinated indebtedness shall fail to perform or comply with any of the subordination provisions of the documents evidencing or governing such subordinated indebtedness (including, without limitation, any subordination agreement), or (v) the subordination provisions of the documents (including, without limitation, any subordination agreement) evidencing or governing any subordinated indebtedness shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable subordinated indebtedness |

Exhibit D-5

**<u>EXHIBIT D</u>**

**Takeback Exit Term Loan Facility Term Sheet**

**MONITRONICS INTERNATIONAL, INC.**
**Takeback Exit Term Loan Facility Term Sheet[1]**

### Summary of Principal Terms and Conditions

| | |
|---|---|
| **Borrowers** | Monitronics International, Inc. (the "**Borrower**"). |
| **Guarantors** | The Borrower's existing and future direct and indirect subsidiaries and each other party that executes a guaranty  (excluding any foreign subsidiary to the extent that the Borrower and the Administrative Agent determine that any change to the U.S tax laws after the Closing Date would result in materially adverse tax consequences to the Credit Parties taken as a whole) (collectively, the "**Guarantors**" and together with the Borrower, the "**Credit Parties**"). |
| **Administrative Agent** | A third party designated by the Required Consenting Term Lenders and reasonably acceptable to the Borrower (the "**Administrative Agent**"). |
| **Credit Facility** | Secured term loan facility (the "**Takeback Exit Term Loan Facility**"), the holders thereof referred to as the "**Takeback Term Lenders**", comprised of term loans (the "**Takeback Exit Term Loan**") converted on a dollar-for-dollar basis from the "Term Loans" under that certain Amended and Restated Credit Agreement, dated as of March 23, 2012 (as amended through the date hereof, the "**Existing Prepetition Credit Agreement**"), among the Borrower, the guarantors party thereto from time to time, the lenders party thereto from time to time and Bank of America, N.A., as administrative agent, on the effective date of the Takeback Exit Term Loan Facility (the "**Effective Date**"), in the principal amount of $822,500,000.00. Takeback Exit Term Loans that are prepaid may not be reborrowed. |
| **Use of Proceeds** | The Takeback Exit Term Loan Facility will be used to refinance a portion of the "Term Loans" under the Existing Prepetition Credit Agreement on the Effective Date. |
| **Maturity** | March 31, 2024 (the "**Maturity Date**"). |
| **Collateral** | A first priority perfected lien on substantially all assets of the Credit Parties, including, without limitation, a pledge of 100% of the issued and outstanding ownership interests in each Credit Party other than the Borrower (but excluding more than 66 2/3% of the equity of any foreign subsidiary to the extent that the Borrower and the Administrative Agent reasonably determine that any change in U.S. tax law after the Closing Date would result in materially adverse tax |

---

[1] Capitalized terms used herein but not defined herein shall have the meaning ascribed thereto in the Restructuring Term Sheet.

consequences to the Credit Parties taken as a whole), collateral assignments of all Material Contracts (provided that no third party consents to such assignment will be required) and deposit account control agreements, other than certain baskets and exclusions substantially consistent with the Existing Prepetition Credit Agreement and the New Exit Facilities and with any modifications reasonably satisfactory to the Required Consenting Term Lenders and the Borrower (the "**Collateral**"), secured on a *pari passu* basis with the New Exit Facilities, which shall be satisfied on a "first-out" basis, subject to the Intercreditor Agreement (hereafter defined). As used herein, "**Intercreditor Agreement**" shall mean an intercreditor agreement establishing ranking and intercreditor arrangements with respect to the Collateral reasonably satisfactory to the Required Consenting Term Lenders, which shall provide for, among other things, all enforcement actions shall require the consent of both a majority of the Takeback Exit Term Lenders and a majority of the lenders under the New Exit Facility.

|                          |                          |
|--------------------------|--------------------------|
| **Conditions to Effectiveness** | Usual and customary for facilities of this type, including, without limitation, the following: |

A.    Customary definitive documentation in connection with the New Exit Facility and the Intercreditor Agreement, all of which shall be subject to the reasonable satisfaction of the Required Consenting Term Lenders. The negotiation, execution and delivery of definitive documentation in respect of the Takeback Exit Term Loan Facility consistent with the terms set forth herein, and as otherwise reasonably satisfactory to the Required Consenting Term Lenders, the Borrower and the Administrative Agent (the "**Takeback Exit Term Loan Financing Documentation**").

B.    The Restructuring shall have been consummated in accordance with the Restructuring Support Agreement (the "RSA") (all conditions set forth therein having been satisfied or waived in accordance with the terms of the RSA), and substantial consummation of the RSA in accordance with its terms shall have occurred contemporaneously with the closing of the Takeback Exit Term Loan Facility and such closing shall have occurred not later than the Outside Date (as defined in the RSA).

C.    The Required Consenting Term Lenders shall be reasonably satisfied that, on the Effective Date, immediately after giving effect to the consummation of the Restructuring, the conversion of the Term Loans to occur on the Effective Date and any other transactions to occur on the Effective Date, the Credit Parties and their subsidiaries shall have outstanding no indebtedness other than (i) indebtedness outstanding under the Takeback Exit Term

Loan Facility, (ii) the New Exit Facility, (iii) capital leases and other ordinary course indebtedness and (iv) any additional indebtedness on terms and conditions (including as to amount) reasonably satisfactory to the Required Consenting Term Lenders and, if such additional indebtedness is secured, subject to intercreditor arrangements reasonably satisfactory to the Required Consenting Term Lenders.

D.    Delivery of evidence that all required insurance policies are in force and that the Administrative Agent has been named as lender's loss payee or additional insured, as applicable.

E.    Accuracy of representations and warranties contained in the Takeback Exit Term Loan Financing Documentation in all material respects (or, in the case of representations and warranties that are qualified by materiality, in all respects) and absence of default and event of default under the Takeback Exit Term Loan Financing Documentation.

F.    Compliance with customary documentation conditions, including the delivery of customary legal opinions and closing certificates (including a customary solvency certificate), certification regarding beneficial ownership, good standing certificates and certified organizational documents, in each case, in form and substance reasonably satisfactory to the Required Consenting Term Lenders and the Administrative Agent.

G.    The Administrative Agent shall have a first priority perfected lien on all assets of the Credit Parties constituting Collateral, other than Permitted Liens, subject in priority of payment to the New Exit Facility which shall be subject to the Intercreditor Agreement.

H.    Receipt by the Administrative Agent of reasonably satisfactory results of customary lien searches.

I.    All requisite governmental and third party approvals shall have been obtained, and there shall be no litigation, governmental, administrative or judicial action against the Credit Parties that could reasonably be expected to restrain, prevent or impose materially burdensome restrictions on the Restructuring or the Takeback Exit Term Loans.

J.    Delivery of all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act and delivery of beneficial ownership certification for all "legal entity customers"

under 31 C.F.R. § 1010.230 to the extent requested in writing at least 5 business days prior to the Effective Date.

K.      Payment by the Borrower on the Effective Date of all reasonable and documented out-of-pocket expenses due and payable on the Effective Date pursuant to the Takeback Exit Term Loan Financing Documentation and invoiced no fewer than 2 business days prior to the Effective Date.

L.      The Borrower shall use commercially reasonable efforts to obtain a private corporate credit rating from S&P and a private corporate family rating from Moody's; provided, that this condition shall not require any specific rating.

M.      The Required Consenting Term Lenders and the Administrative Agent shall be reasonably satisfied with the flow of funds in connection with the closing.

N.      Such other conditions precedent as the Required Consenting Term Lenders and the Administrative Agent shall reasonably require.

| | |
|---|---|
| **Interest Rate** | Interest shall be paid in cash ("**Cash Interest**"). |
| | Cash Interest on the Loans will accrue at LIBOR plus the Applicable Margin.  As used herein, the Applicable Margin means "6.50% *per annum*". |
| | As used herein, the term "LIBOR" will have a meaning customary and appropriate for financings of this type, and the basis for calculating accrued interest and the interest periods for loans bearing interest at LIBOR will be customary and appropriate for financings of this type (which in no event shall be less than 1.25%). |
| | Automatically during the continuance of a payment or bankruptcy event of default, and at the request of the Required Consenting Term Lenders during the continuance of any other event of default, the loans and all other outstanding obligations will bear interest at an additional 2.00% *per annum* above the interest rate otherwise applicable. |
| **Scheduled Amortization** | Commencing on the last day of the first full fiscal quarter ended after the Effective Date, the Takeback Exit Term Loans shall be repayable in equal quarterly installments in aggregate annual amounts equal to 1.0% per annum of the original principal amount of the Takeback Exit Term Loans, with the balance payable on the Maturity Date. |
| **Optional Prepayments** | The Takeback Exit Term Loans may be optionally prepaid at any time in whole or in part from time to time at the option of the Borrower at |

par with no prepayment premium, subject to customary breakage costs if applicable.

| | |
|---|---|
| **Mandatory Prepayments** | Subject to the terms of the Intercreditor Agreement while the New Exit Facility is outstanding, the Takeback Exit Term Loans shall be prepaid with: |

(i) 100% of the net cash proceeds of any asset sales or casualty or condemnation events (subject to reinvestment rights, baskets and other customary exclusions substantially consistent with the terms of the Existing Prepetition Credit Agreement and with any modifications as reasonably satisfactory to the Required Consenting Term Lenders and the Borrower);

(ii) 50% of Excess Cash Flow (to be defined in the Takeback Exit Term Loan Financing Documentation substantially the same as the Existing Prepetition Credit Agreement), no later than 5 business days after delivery of the financial statements for each fiscal year of the Borrower (commencing with the fiscal year ended 2020); provided, that, at the option of the Borrower, the amount of such Excess Cash Flow prepayment shall be reduced on a dollar-for-dollar basis by the amount of voluntary prepayments at or below par (as permitted pursuant to the Takeback Exit Term Loan Financing Documentation) of the Term Loans; and

(iii) 100% of the proceeds of debt incurrences (other than debt permitted under the Takeback Exit Term Loan Financing Documentation).

| | |
|---|---|
| **Representations and Warranties** | To be substantially consistent with the terms of the Existing Prepetition Credit Agreement and with any modifications as reasonably satisfactory to the Required Consenting Term Lenders. |
| **Affirmative Covenants** | To be substantially consistent with the terms of the Existing Prepetition Credit Agreement and with any modifications as reasonably satisfactory to the Required Consenting Term Lenders. |
| **Negative Covenants** | To be substantially consistent with the terms of the Existing Prepetition Credit Agreement and the New Exit Facility, including without limitation, a prohibition on additional senior or pari debt, restricted payment, debt incurrence and other covenants to be sized to address operational requirements, in each case to reflect the changes in the capital structure and the credit profile of the Borrower and its subsidiaries since the date of the Existing Prepetition Credit Agreement (which shall be no less favorable to the Lenders than the covenants set forth in the New Exit Facility), subject to customary baskets and exclusions, and with any other modifications as reasonably satisfactory to the Required Consenting Term Lenders. |

| | |
|---|---|
| **Financial Covenants** | The Takeback Exit Term Loan Financing Documentation will contain the following financial covenants: |
| | (a) Maximum Senior Secured Debt to RMR Ratio of 30.0x; |
| | (b) Maximum Total Debt to EBITDA Ratio of 4.5x for each fiscal quarter ending on or prior to December 31, 2020. with a stepdown to 4.25x for the fiscal quarters ending on March 31, 2021 through December 31, 2021 and 4.0x beginning with the fiscal quarter ending on March 31 2022 and for each fiscal quarter thereafter; and |
| | (c) Minimum Liquidity: $25.0 million |
| | Financial Covenant definitions (including the definition of EBITDA) to be substantially consistent with the terms of the Existing Prepetition Credit Agreement (and shall be no less favorable than the New Exit Facility, if applicable) and with any modifications as reasonably satisfactory to the Required Consenting Term Lenders; *provided* that revenue recognition and capital leases shall be determined in accordance with GAAP as in effect as of September 30, 2016. |
| **Events of Default** | To be substantially consistent with the terms of the Existing Prepetition Credit Agreement (and shall be no less favorable than the New Exit Facility, if applicable) and with any modifications as reasonably satisfactory the Required Consenting Term Lenders. |
| **Financial and Other Reporting** | To be substantially consistent with the terms of the Existing Prepetition Credit Agreement and with any modifications as reasonably satisfactory to the Required Consenting Term Lenders; provided, that no Default or Event of Default shall result from delivery of an audit opinion with qualification relating to upcoming maturities. |
| **Amendments and Voting** | To be substantially consistent with the terms of the Existing Prepetition Credit Agreement and with any modifications as reasonably satisfactory to the Required Consenting Term Lenders. |
| **Expenses and Indemnification** | To be substantially consistent with the terms of the Existing Prepetition Credit Agreement and with any modifications as reasonably satisfactory to the Required Consenting Term Lenders. |
| **Other Provisions** | The Takeback Exit Term Loan Financing Documentation will include customary provisions regarding increased costs, illegality, tax indemnities, waiver of trial by jury and other similar provisions. |
| **Assignments and Participations** | Customary for facilities of this type. |
| **Governing Law** | State of New York. |

## EXHIBIT E

### Form of Joinder

The undersigned ("*Joinder Party*") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "*Agreement*")[1] by and among Monitronics International, Inc., ("*Monitronics*") and certain of its subsidiaries bound thereto, Ascent Capital Group, Inc. ("*Ascent*") and the Consenting Creditors and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a "Consenting Creditor" and [a "Consenting Noteholder"] [a "Consenting Term Lender"] under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement, a copy of which is attached to this Joinder as **Annex 1** (as the same has been or may hereafter be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof).

The Joinder Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joinder Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to the Notes, Revolving Credit Loans, and/or Term Loans identified below its name on the signature page hereto, and (b) makes, as of the date hereof, the representations and warranties contained in the Agreement as of the date hereof.

This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

All notices and other communications given or made pursuant to the Agreement shall be sent to the Joinder Party at:

_____

_____

_____

Email: _____

The Joinder Party shall deliver a copy of this Agreement to counsel to the Company Parties, counsel to the Ad Hoc Noteholder Group, counsel to the Ad Hoc Lender Group, and counsel to Ascent.

---

[1]   Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

Date Executed:

_____

Name:

Title:

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Notes | |
| Revolving Credit Loans | |
| Term Loans | |

## <u>EXHIBIT F</u>

### Provision for Transfer Agreement

The undersigned ("***Transferee***") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "***Agreement***"),[1] by and among Monitronics International Inc., ("***Monitronics***") and certain of its subsidiaries bound thereto, Ascent Capital Group, Inc. ("***Ascent***") and the Consenting Creditors, including the transferor to the Transferee of any Company Claims (each such transferor, a "***Transferor***"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Creditor" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement, a copy of which is attached to this Transfer Agreement as **Annex 1** (as the same has been or may hereafter be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof).

The Transferee hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Transferee (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to the Notes, Revolving Credit Loans, and/or Term Loans identified below its name on the signature page hereto, and (b) makes, as of the date hereof, the representations and warranties contained in the Agreement as of the date hereof, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

This Transfer Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

All notices and other communications given or made pursuant to the Agreement shall be sent to the Transferee at:

_____

_____

_____

Email: _____

The Transferee shall deliver a copy of this Transfer Agreement to counsel to the Company Parties, counsel to the Ad Hoc Noteholder Group, counsel to the Ad Hoc Lender Group, and counsel to Ascent.

---

[1]     Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

Date Executed:

_____

Name:

Title:

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| Notes | |
| Revolving Credit Loans | |
| Term Loans | |

**AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT**

This amendment, dated as of June 1, 2019 (as may be amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms hereof, this "Amendment") to that certain Restructuring Support Agreement dated as of May 20, 2019 (together with all exhibits, schedules and attachments thereto, and as may be further amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms thereof, the "***Restructuring Support Agreement***"), is entered into by and among (i) the Company Parties, (ii) the Required Consenting Noteholders, (iii) the Required Consenting Term Lenders and (iv) Ascent.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Restructuring Support Agreement.

**WHEREAS**, the Company Parties have requested that the Consenting Noteholders and the Consenting Term Lenders agree to the extension of certain of the RSA Milestones under the Restructuring Support Agreement; and

**WHEREAS,** pursuant to Section 16 of the Restructuring Support Agreement, except as otherwise expressly provided for therein, the Restructuring Support Agreement may be modified, amended, or supplemented in a writing signed by the Company Parties, the Required Consenting Noteholders, the Required Consenting Term Lenders and Ascent; and

**WHEREAS**, pursuant to Section 17.20 of the Restructuring Support Agreement, such written consent, acceptance or approval shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance or approval, it is conveyed in writing (including electronic mail) between counsel to each of the relevant Parties without representations or warranties of any kind on behalf of such counsel; and

**WHEREAS**, on June 1, 2019, in accordance with the terms and conditions of Section 17.20 of the Restructuring Support Agreement, the Company Parties, the Required Consenting Noteholders, the Required Consenting Term Lenders and Ascent agreed (by electronic mail among counsel to each of the Company Parties, the Required Consenting Noteholders, the Required Consenting Term Lenders and Ascent) to extend certain of the RSA Milestones and otherwise amend certain deadlines under the Restructuring Support Agreement as set forth herein;

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      Amendments to the Restructuring Support Agreement.

(a)     Schedule 1 to the Restructuring Support Agreement shall hereby be replaced in its entirety by Schedule 1 to this Amendment.

(b)     The definition of "Merger Approval Outside Date" in Section 1.01 of the Restructuring Support Agreement shall hereby be amended and restated in its entirety to read as follows:

""**Merger Approval Outside Date**" means the date that is no later than sixty-three (63) days after the Petition Date."

(c)     The definition of "Outside Date" in Section 1.01 of the Restructuring Support Agreement shall hereby be amended and restated in its entirety to read as follows:

""**Outside Date**" means the date that is no later than eighty (80) days after the Petition Date, which date may not be extended without the written consent of the Company Parties, the Required Consenting Noteholders, the Required Consenting Term Lenders, and prior to the occurrence of the Non-Ascent Restructuring Toggle, Ascent."

2.     <u>Agreement to be Bound</u>.  Each of the Parties hereby agrees to be bound by all of the terms of the Restructuring Support Agreement not inconsistent with the terms hereof.

3.     <u>Miscellaneous</u>.

(a)     Except as expressly provided herein, this Amendment shall not, by implication or otherwise, alter, modify, amend or in any way affect any of the obligations, covenants or rights contained in the Restructuring Support Agreement, all of which are ratified and confirmed in all respects by the Parties and shall continue in full force and effect.

(b)     THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION (EXCEPT TO THE EXTENT IT MAY BE PREEMPTED BY THE BANKRUPTCY CODE).

(c)     This Amendment, together with the Restructuring Support Agreement, constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings among the Parties with respect to such subject matter.  Each reference to the Restructuring Support Agreement hereafter made in any document, agreement, instrument, filing, pleading, notice or communication shall mean and be a reference to the Restructuring Support Agreement as amended and modified hereby.

(d)     In the event the terms and conditions as set forth in the Restructuring Support Agreement and this Amendment are inconsistent, the terms and conditions of this Amendment shall control.

(e)     If any term, condition or other provision of this Amendment is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Amendment shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any Party.  Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Amendment so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

2

## **Schedule 1**

### **RSA Milestones**

1.  The Company Parties shall commence solicitation of votes to accept or reject the Plan on or before June 3, 2019 (the "***Prepetition Solicitation Commencement Date***").

2.  The Put Option Agreement shall be entered into and an executed copy shall be delivered to all Parties by the date that is no later than five (5) Business Days after the Agreement Effective Date.

3.  The prepetition solicitation of votes to accept or reject the Plan shall be completed by the date that is no later than twenty-one (21) days after the Prepetition Solicitation Commencement Date (the "***Prepetition Solicitation Deadline***").

4.  A final agreement with respect to the material terms of the DIP Facility shall be agreed upon by the Parties and the DIP Lenders by the date that is no later than one (1) day prior to the Petition Date.

5.  The Company Parties shall commence the Chapter 11 Cases by filing voluntary petitions under chapter 11 of the Bankruptcy Code with the Bankruptcy Court on or before June 30, 2019 (the "***Petition Date Milestone***").

6.  The Company Parties shall file on the Petition Date:

    a.  the First Day Pleadings,

    b.  the Plan and the Disclosure Statement, and one or more motions seeking (A) conditional approval of the Disclosure Statement and the other Solicitation Materials on an interim basis, (B) approval of the Rights Offering Procedures, (C) approval of the Backstop Commitment Documents, and (D) approval of the Disclosure Statement and the other Solicitation Materials on a final basis and confirmation of the Plan; and

    c.  a motion seeking approval of the DIP Facility and the use of cash collateral.

7.  The Bankruptcy Court shall have entered one or more orders conditionally approving the Disclosure Statement and the other Solicitation Materials on an interim basis and approving the Rights Offering Procedures by the date that is no later than three (3) days after the Petition Date.

8.  The Bankruptcy Court shall have entered the Final DIP Order (as defined in the Restructuring Term Sheet) by the date that is no later than forty-five (45) days after the Petition Date.

9.  The Bankruptcy Court shall have entered the Backstop Approval Order by the date that is no later than forty-five (45) days after the Petition Date.

10. The Bankruptcy Court shall have entered an order approving the Disclosure Statement and the other Solicitation Materials on a final basis by the date that is no later than sixty (60) days after the Petition Date.

11. The Bankruptcy Court shall have entered an order confirming the Plan by the date that is no later than sixty (60) days after the Petition Date.

12. The Plan shall become effective by the date that is no later than seventy-three (73) days after the Petition Date.

**Exhibit 2**

**Put Option Agreement**

*EXECUTION VERSION*

PUT OPTION AGREEMENT

AMONG

MONITRONICS INTERNATIONAL, INC.,

ASCENT CAPITAL GROUP, INC.,

CERTAIN AFFILIATES OF MONITRONICS INTERNATIONAL, INC.,

AND

THE COMMITMENT PARTIES HERETO

Dated as of May 28, 2019

*EXECUTION VERSION*

# TABLE OF CONTENTS

Page

1. Rights Offering and Commitments ...................................................................3
    1.1     The Rights Offering; Purchase Notices ...........................................3
    1.2     Primary Commitments ......................................................................4
    1.3     Backstop Commitments .....................................................................6
    1.4     Equity Commitment ..........................................................................9
    1.5     Closing ..............................................................................................9
    1.6     Put Option Premium .......................................................................10
    1.7     Transaction Expenses ......................................................................11
2. Representations and Warranties of the Company Parties ...........................11
    2.1     Organization of the Company Parties .............................................11
    2.2     Authority; No Conflict ....................................................................12
    2.3     Proceedings .....................................................................................13
    2.4     Brokers or Finders ..........................................................................13
    2.5     Exemption from Registration ..........................................................13
    2.6     Issuance ...........................................................................................13
    2.7     No Violation or Default ...................................................................14
    2.8     Intellectual Property .......................................................................14
    2.9     Licenses and Permits .......................................................................14
    2.10    Compliance With ERISA .................................................................14
    2.11    No Unlawful Payments ....................................................................16
    2.12    Absence of Certain Changes or Events ...........................................16
    2.13    Title to Real and Personal Property ................................................16
    2.14    Financial Statements .......................................................................17
    2.15    Tax Matters .....................................................................................17
    2.16    Labor and Employment Compliance ...............................................18
    2.17    Product Liability .............................................................................19
    2.18    Company SEC Documents ...............................................................19
    2.19    Internal Control Over Financial Reporting .....................................20
    2.20    Disclosure Controls and Procedures ...............................................20
    2.21    Compliance with Money Laundering Laws......................................20
    2.22    Compliance with Sanctions Laws ....................................................20

US-DOCS\107845420.8NY 77634875

2.23    Investment Company Act ............................................................21

2.24    Arm's Length ............................................................................21

3.    Representations and Warranties of the Commitment Parties ............................21

3.1    Organization of Such Commitment Party ...........................................21

3.2    Authority; No Conflict ...............................................................21

3.3    Backstop Shares and Equity Commitment Shares Not Registered.................22

3.4    Acquisition for Own Account .......................................................23

3.5    Accredited Investor or Qualified Institutional Buyer ...........................23

3.6    Access to Information ...............................................................23

3.7    Brokers or Finders....................................................................23

3.8    Proceedings ..........................................................................23

3.9    Sufficiency of Funds, Contributed Term Loans ...................................23

3.10    Arm's Length ..........................................................................23

4.    Covenants of the Company Parties .......................................................24

4.1    Agreement Motion and Agreement Order .........................................24

4.2    Rights Offering .......................................................................25

4.3    Conditions Precedent .................................................................25

4.4    Notification ...........................................................................25

4.5    Use of Proceeds.......................................................................25

4.6    Access .................................................................................25

4.7    DIP Facility ...........................................................................26

4.8    Exit Facilities .........................................................................26

4.9    Specified Issuances ...................................................................26

4.10    Blue Sky; Form D ....................................................................27

4.11    Share Legend .........................................................................27

4.12    Registration Rights Agreement .....................................................28

4.13    Reorganized Company ...............................................................28

5.    Covenants of the Commitment Parties ...................................................28

6.    Conditions to Closing ...................................................................29

6.1    Conditions Precedent to Obligations of the Commitment Parties ..............29

6.2    Conditions Precedent to Obligations of Monitronics.............................32

7.    Termination...............................................................................33

8.    Indemnification ..........................................................................35

9.    Survival of Representations and Warranties.............................................36

US-DOCS\107845420.8NY 77634875

| 10. | | Amendments and Waivers | 36 |
| 11. | | Notices, etc. | 37 |
| 12. | | Miscellaneous | 39 |
| | 12.1 | Assignments | 39 |
| | 12.2 | Severability | 40 |
| | 12.3 | Entire Agreement | 40 |
| | 12.4 | Counterparts | 40 |
| | 12.5 | Governing Law | 40 |
| | 12.6 | Submission to Jurisdiction | 40 |
| | 12.7 | Waiver of Trial by Jury; Waiver of Certain Damages | 41 |
| | 12.8 | Further Assurances | 41 |
| | 12.9 | Specific Performance | 41 |
| | 12.10 | Headings | 41 |
| | 12.11 | Interpretation; Rules of Construction | 41 |
| | 12.12 | Several, Not Joint, Obligations | 42 |
| | 12.13 | Confidentiality and Publicity | 42 |
| | 12.14 | No Recourse Party | 43 |
| | 12.15 | Settlement Discussions | 43 |
| | 12.16 | No Third Party Beneficiaries | 43 |
| | 12.17 | Relationship Among Parties | 43 |
| 13. | | Definitions | 44 |
| | 13.1 | Certain Defined Terms | 44 |

**Schedules**

| 1.1 | Backstop Commitment Schedule |
| 1.2 | Equity Commitment Schedule |
| 2.2(c) | Consents |
| 2.10(a) | Benefit Plans |
| 2.10(c) | Payments |
| 2.16(e) | WARN Notices |

**Exhibits**

| A | Restructuring Support Agreement |
| B | Outline of Rights Offering Procedures |
| C | Form of Required Rights Joinder |

US-DOCS\107845420.8NY 77634875

This **PUT OPTION AGREEMENT** (as amended, amended and restated, supplemented or otherwise modified from time to time, together with all exhibits and schedules hereto, this "Agreement") is entered into as of May 28, 2019 (the "Execution Date"), by and among (a) Monitronics International, Inc., a Texas corporation (as in existence on the date hereof, as a debtor-in-possession in the Chapter 11 Cases (as defined below), and as Reorganized Monitronics, as applicable, "Monitronics"), (b) Ascent Capital Group, Inc., a Delaware corporation ("Ascent"), (c) each of the Affiliates (as defined below) of Monitronics listed on the signature pages hereto under the title "Other Debtors" (such Affiliates, each as in existence on the date hereof, as a debtor-in-possession in the Chapter 11 Cases and as a reorganized debtor, as applicable, together with Monitronics, each a "Debtor" and, collectively, the "Debtors"), (d) each of the undersigned entities and/or their investment advisors, managers, managed funds or accounts, intermediaries or nominees set forth on Schedule 1.1 hereto (each, a "Backstop Commitment Party" and, collectively, the "Backstop Commitment Parties"), and (e) each of the undersigned entities and/or their investment advisors, managers, managed funds or accounts, intermediaries or nominees set forth on Schedule 1.2 hereto (each, an "Equity Commitment Party" and, collectively, the "Equity Commitment Parties" and, together with the Backstop Commitment Parties, each, a "Commitment Party" and, collectively, the "Commitment Parties").  Each of the Company Parties and each Commitment Party is referred to herein, individually, as a "Party" and, collectively, as the "Parties".  Except as otherwise expressly provided herein, capitalized terms that are used but not otherwise defined in this Agreement shall have the meanings given to them in Section 13.1 hereof.

## RECITALS

**WHEREAS**, the Debtors, the Commitment Parties, the Consenting Creditors, and Ascent have entered into that certain Restructuring Support Agreement, dated as of May 20, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, together with the Term Sheets and all other exhibits and schedules thereto, the "Restructuring Support Agreement"), a copy of which (as in effect on the date hereof) is attached as Exhibit A hereto and which, among other things, (a) provides for a Restructuring of the Debtors pursuant to a partial prepackaged Plan to be filed in jointly administered voluntary cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"), implementing the terms and conditions of the Restructuring Support Agreement attached as Exhibit A to the Restructuring Support Agreement (the "Restructuring Term Sheet"), the Rights Offering and Equity Commitment Term Sheet attached as Exhibit B to the Restructuring Support Agreement (the "Rights Offering Term Sheet"), the DIP/Exit Facility Commitment attached as Exhibit C to the Restructuring Support Agreement (the "DIP/Exit Facility Commitment"), the Takeback Exit Term Loan Facility Term Sheet attached as Exhibit D to the Restructuring Support Agreement (the "Takeback Term Loan Term Sheet"), and the Governance Term Sheet attached as Exhibit 1 to the Restructuring Term Sheet (the "Governance Term Sheet"), and (b) requires that the parties thereto support the Restructuring in accordance with and subject to the terms thereof;

**WHEREAS**, in connection with the Restructuring, (a) solely in the event that the Non-Ascent Restructuring Toggle has not occurred, on the Plan Effective Date (as defined in the

Restructuring Support Agreement), (i) Ascent shall merge with and into Monitronics, with Reorganized Monitronics as the surviving entity and, as a result of the Merger, all assets of Ascent (including the Ascent Cash Amount) shall become assets of Reorganized Monitronics, (ii) the holders of Ascent's common stock shall receive, pursuant to the Merger, New Common Stock in the amount of the Ascent Share Distribution on the terms and conditions set forth in the Restructuring Term Sheet and (iii) if the Net Cash Amount is less than $23 million (but not less than $20 million), the Backstop Commitment Shares shall include the Net Cash Shortfall Shares (as defined below) for an aggregate purchase price equal to the Net Cash Shortfall Amount, or (b) solely in the event that the Non-Ascent Restructuring Toggle has occurred, on the Plan Effective Date, (i) the Restructuring shall be consummated without Ascent's participation and without consummation of the Merger, (ii) the holders of Ascent's common stock shall not receive the Ascent Share Distribution, and (iii) the Backstop Commitment Shares shall include the Ascent Default Shares for an aggregate purchase price equal to $23 million;

**WHEREAS**, pursuant to (and subject to the terms and conditions set forth in) the Plan and this Agreement, and in accordance with the Rights Offering Procedures (as defined below), Monitronics will conduct a rights offering (the "Rights Offering") in which Monitronics will issue to the holders of the Notes (on a *pro rata* basis based on each holder's percentage holdings of the total outstanding Notes), at no charge, rights (the "Rights") entitling Cash Opt Out Noteholders to subscribe for and purchase (on a *pro rata* basis based on each Cash Opt Out Noteholder's percentage holdings of the total outstanding Rights), in the aggregate, 44.80% of the total shares of New Common Stock to be issued as of the Plan Effective Date, subject to dilution by the Post-Emergence Incentive Plan (the "Rights Offering Shares"), for an aggregate purchase price equal to $177 million (the "Aggregate Rights Offering Amount") and at a per-share purchase price equal to the Exercise Price;

**WHEREAS**, in order to facilitate the Rights Offering and the Restructuring, pursuant to this Agreement, and subject to the terms, conditions and limitations set forth herein, (a) each of the Backstop Commitment Parties, severally and not jointly, has agreed (i) to fully honor such Backstop Commitment Party's commitments with respect to the Put Option and (ii) upon exercise of the Put Option by Monitronics, to purchase on the Plan Effective Date, at the Exercise Price, such Backstop Commitment Party's Backstop Commitment Percentage of the Backstop Commitment Shares, if any;

**WHEREAS**, in order to facilitate the Restructuring, pursuant to this Agreement, and subject to the terms, conditions and limitations set forth herein, each of the Equity Commitment Parties, severally and not jointly, has agreed to, on the Plan Effective Date, exchange an aggregate principal amount of Contributed Term Loans (as defined below) equal to such Equity Commitment Party's Equity Commitment Percentage of the Equity Commitment Amount into such Equity Commitment Party's Equity Commitment Percentage of the Equity Commitment Shares at the aggregate Exercise Price therefor.

**NOW, THEREFORE,** in consideration of the foregoing, and the representations, warranties and covenants set forth herein, and other good and valuable consideration, the Company Parties and the Commitment Parties agree as follows:

*EXECUTION VERSION*

1.      **Rights Offering and Commitments**.

1.1     **The Rights Offering; Purchase Notices**.

(a)     On the terms and subject to the conditions set forth in this Agreement and the Rights Offering Procedures, Monitronics will commence the Rights Offering promptly (and in any event, within five (5) Business Days) following the Petition Date as part of the postpetition solicitation process for the Plan.  The Rights Offering shall be conducted by Monitronics and consummated on the terms and subject to the conditions set forth in, and in accordance with, the procedures to be filed with the Bankruptcy Court, which procedures (the "Rights Offering Procedures") shall include the terms, conditions and provisions set forth in Exhibit B hereto, and shall otherwise be in form and substance acceptable to the Requisite Commitment Parties and consistent with the terms, conditions and provisions set forth in this Agreement and the Restructuring Support Agreement.  The total number of Rights Offering Shares to be offered for sale pursuant to the Rights Offering, and the total number of shares of New Common Stock to be issued as of the Plan Effective Date shall be mutually agreed by Monitronics and the Requisite Commitment Parties prior to commencement of the Rights Offering, provided that the aggregate Exercise Price for all Rights Offering Shares shall not be less than $177,000,000.

(b)     In the event the Merger Approvals are obtained, or the Ascent Stockholder Meeting is scheduled within the eight (8) Business Days prior to the anticipated Plan Effective Date, and the Company Parties, in their commercially reasonable judgment, determine that the Merger Approvals will be received, and the Non-Ascent Restructuring Toggle shall not have occurred, Ascent shall deliver (or cause to be delivered) to Monitronics, the Subscription Agent and each of the Backstop Commitment Parties, no later than the date that is eight (8) Business Days prior to the anticipated Plan Effective Date, a certificate, duly executed by the chief financial officer of Ascent and in form and substance reasonably acceptable to the Requisite Commitment Parties, that sets forth the actual Net Cash Amount as of such date (the "Net Cash Certificate") and includes a covenant from Ascent whereby it agrees to use reasonable best efforts to ensure that the actual Net Cash Amount upon consummation of the Merger shall not be less than the Net Cash Amount set forth in such certificate.

(c)     Monitronics hereby agrees and undertakes to deliver (or cause the Subscription Agent to deliver) a Backstop Purchase Notice (as defined below) to each of the Backstop Commitment Parties, as promptly as practicable after the Rights Offering Expiration Time and the first to occur of the following (and in no event later than the date that is seven (7) Business Days prior to the Anticipated Plan Effective Date): (i) the occurrence of the Non-Ascent Restructuring Toggle; (ii) if the Merger Approvals have been obtained, Ascent's delivery of the Net Cash Certificate to Monitronics or (iii) if the Merger Approvals have not been obtained and the Ascent Stockholder Meeting is scheduled within seven (7) Business Days prior to the anticipated Plan Effective Date, Ascent's delivery of the Net Cash Certificate to Monitronics and the Company Parties' determination, in their commercially reasonable judgment, that the Merger Approvals will be received.  As used herein, "Backstop Purchase Notice" means, with respect to any Backstop Commitment Party, a written notice that sets forth (i) the aggregate number of Rights Offering Shares that Rights Offering Participants validly elect to purchase in the Rights Offering and the aggregate Exercise Price therefor, (ii) if applicable,

-3-

the aggregate number of Unsubscribed Shares and the aggregate Exercise Price therefore, (iii) if applicable, the aggregate number of Ascent Default Shares and the aggregate Exercise Price therefor, (iv) if applicable, the aggregate number of Net Cash Shortfall Shares and the aggregate Exercise Price therefor, (v) if applicable, the aggregate number of Backstop Commitment Shares to be issued and sold by Monitronics to such Backstop Commitment Party (based on its respective Backstop Commitment Percentage) and the aggregate Exercise Price therefor (as calculated based on clauses (i) through (v), in the aggregate, such Backstop Commitment Party's "Backstop Commitment Share Purchase Price") and (vi) if applicable, wire instructions for the Backstop Escrow Account to which such Backstop Commitment Party shall deliver and pay its respective Backstop Commitment Share Purchase Price obligation.  The Company shall direct the Subscription Agent to promptly provide any written backup, information and documentation relating to the information contained in the applicable Backstop Purchase Notice as any Backstop Commitment Party may reasonably request.

(d)     Monitronics hereby agrees and undertakes to deliver (or cause the Subscription Agent to deliver) to each of the Equity Commitment Parties, simultaneously with its delivery of the Backstop Purchase Notice to the Backstop Commitment Parties, a written notice (an "Equity Commitment Purchase Notice") that (i) sets forth the aggregate number of Equity Commitment Shares to be issued and sold by Monitronics to such Equity Commitment Party (based on its respective Equity Commitment Percentage) and the aggregate Exercise Price therefor (such Equity Commitment Party's "Equity Commitment Share Purchase Price"), (ii) includes the form of the instrument of assignment and/or other documentation, in form and substance reasonably acceptable to Monitronics and the Equity Commitment Parties, to be used by each Equity Commitment Party to deliver Contributed Term Loans to Monitronics in satisfaction of its respective Equity Commitment Share Purchase Price obligation (the "Contributed Term Loan Exchange Documentation"), and (iii) instructions for such Equity Commitment Party's delivery into escrow (with the Subscription Agent or otherwise) of the Contributed Term Loan Documentation.

### 1.2   **Primary Commitments**.

(a)     On the terms, subject to the conditions, and in reliance on the representations and warranties set forth in this Agreement (including the entry of the Agreement Order by the Bankruptcy Court and its becoming a Final Order), each of the Backstop Commitment Parties hereby agrees, severally and not jointly, to (i) exercise (or cause to be exercised) in full all of the Rights issued in the Rights Offering in respect of all Notes held by such Backstop Commitment Party as of the close of business on the date of this Agreement (the "Required Rights"), in accordance with the terms and conditions of the Rights Offering Procedures; (ii) purchase (or cause to be purchased) all of the Rights Offering Shares issuable pursuant to the exercise of such Required Rights, in accordance with the terms and conditions of the Rights Offering Procedures; and (iii) if applicable, comply fully with Section 1.2(b) with respect to any Transfer of Required Rights by or to such Commitment Party.  The obligations of the Backstop Commitment Parties under this Section 1.2 are several, not joint, obligations of the Backstop Commitment Parties, such that no Backstop Commitment Party shall be liable or otherwise responsible for the Primary Commitment of any other Backstop Commitment Party.

NY 77634875

(b)     In the event that a Backstop Commitment Party or Required Rights Transferee (as defined below), in accordance with the terms and conditions set forth in the Rights Offering Procedures, proposes or purports to Transfer any Required Rights (including any Transfer of Notes to which Required Rights are attached) to any Person who is not a Backstop Commitment Party (a "<u>Required Rights Transferee</u>"), the Backstop Commitment Party or Required Rights Transferee, as applicable, shall not consummate such Transfer unless the Required Rights Transferee delivers to Monitronics and the Commitment Party Professionals a duly executed joinder, in substantially the form attached as <u>Exhibit C</u> hereto, or otherwise mutually acceptable to Monitronics and the Requisite Commitment Parties (a "<u>Required Rights Joinder</u>"), pursuant to which such transferee agrees to (i) exercise (or cause to be exercised) in full all such Required Rights, in accordance with the terms and conditions of the Rights Offering Procedures, (ii) purchase (or cause to be purchased) all of the Rights Offering Shares issuable pursuant to the exercise of such Required Rights in accordance with the terms and conditions of the Rights Offering Procedures and (iii) fully comply with this Section 1.2(b) with respect to any subsequent Transfer of any such Required Rights. Notwithstanding the foregoing, any Backstop Commitment Party or Required Rights Transferee may Transfer any of its Required Rights to an entity that is acting in its capacity as a Qualified Market-Maker (including to a Backstop Commitment Party acting in its capacity as a Qualified Market-Maker) without the requirement that the Qualified Market-Maker deliver a duly executed Required Rights Joinder; <u>provided</u>, <u>however</u>, that the Qualified Market-Maker subsequently Transfers all right, title and interest in such Required Rights to a transferee that deliver a duly executed Required Rights Joinder as provided above, and the Transfer documentation between the transferor Backstop Commitment Party or Required Rights Transferee, as applicable, and such Qualified Market-Maker shall contain a requirement that provides as such.  As used herein, "<u>Qualified Market-Maker</u>" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers Notes or Company Claims (as defined in the Restructuring Support Agreement), or enter with customers into long and/or short positions in Notes or Company Claims, in its capacity as a dealer or market maker in such Notes or Company Claims; and (ii) is in fact regularly in the business of making a market in claims, interests and/or securities of issuers or borrowers.  Notwithstanding the foregoing, any Backstop Commitment Party or Required Rights Transferee who Transfers its Required Rights to a Qualified Market-Maker pursuant to this <u>Section 1.2(b)</u> hereby agrees that if such Qualified Market-Maker fails to exercise and to pay the Exercise Price for such Transferred Required Rights or a portion thereof, that such Backstop Commitment Party or Required Rights Transferee who Transferred the Required Rights shall be deemed to have exercised the Required Rights or the unexercised portion thereof and shall be obligated to fund the Exercise Price for such Required Rights or the unfunded portion thereof.

(c)     Each Backstop Commitment Party shall have until the Deposit Deadline to fund, into the Backstop Escrow Account, the aggregate Exercise Price for all Rights Offering Shares that such Backstop Commitment Party subscribes for in the Rights Offering, and such funding shall be deemed timely notwithstanding any earlier funding deadline as the Rights Offering Procedures may require with respect to other Rights Offering Participants.  Any Backstop Commitment Party that is also a First Lien Term Lender may, instead of delivering cash to pay the full amount of the aggregate Exercise Price for the Rights Offering Shares that it elects to purchase pursuant to the exercise of its Rights, pay such aggregate Exercise Price by (i) (A) tendering to Monitronics an aggregate principal amount of its Term Loans (excluding any

Contributed Term Loans), in an amount not to exceed its ratable portion of the Effective Date Pay Down, on a dollar-for-dollar basis, in lieu of submitting cash to pay the Exercise Price for such Rights Offering Shares and (B) waiving its ratable portion of the Effective Date Pay Down, and (ii) paying cash for the remainder of the aggregate Exercise Price, if any, for such Rights Offering Shares.

### 1.3    **Backstop Commitments**.

(a)    On the terms, subject to the conditions, and in reliance on the representations and warranties set forth in this Agreement (including the entry of the Agreement Order by the Bankruptcy Court and its becoming a Final Order), each of the Backstop Commitment Parties hereby agrees, severally and not jointly, upon exercise of the Put Option to purchase on the Plan Effective Date, at the aggregate Exercise Price therefor, its Backstop Commitment Percentage of (i) all Unsubscribed Shares, (ii) solely in the event that the Non-Ascent Restructuring Toggle occurs, a number of shares equal to the quotient (rounded to the nearest whole share) of $23,000,000 divided by the Exercise Price (the "Ascent Default Shares") for an aggregate purchase price equal to $23 million and (iii) solely in the event that the Non-Ascent Restructuring Toggle shall not have occurred and the Net Cash Amount is less than $23,000,000 (but not less than $20,000,000), a number of shares equal to the quotient (rounded to the nearest whole share) of (x) $23,000,000 less the Net Cash Amount, divided by (y) the Exercise Price (the "Net Cash Shortfall Shares") for an aggregate purchase price equal to the Net Cash Shortfall Amount.  The Backstop Commitments are several, not joint, obligations of the Backstop Commitment Parties, such that no Backstop Commitment Party shall be liable or otherwise responsible for the Backstop Commitment of any other Backstop Commitment Party. The Unsubscribed Shares, Ascent Default Shares and Net Cash Shortfall Shares, as applicable, that each of the Backstop Commitment Parties is required to purchase pursuant to this Section 1.3(a) are collectively referred to herein as such Backstop Commitment Party's "Backstop Commitment Shares".

(b)    At least two (2) Business Days prior to the Plan Effective Date (the "Deposit Deadline"), each Backstop Commitment Party shall, severally and not jointly, deposit into the Backstop Escrow Account (as defined below), by wire transfer of immediately available funds pursuant to wire instructions set forth in the Backstop Purchase Notice, an amount equal to such Backstop Commitment Party's Backstop Commitment Share Purchase Price. As used herein, "Backstop Escrow Account" means an escrow account established with a bank or trust company approved by Monitronics and each of the Backstop Commitment Parties (the "Backstop Escrow Agent"), pursuant to an escrow agreement to be entered into between Monitronics, the Backstop Commitment Parties and the Backstop Escrow Agent, in form and substance reasonably satisfactory to the Requisite Commitment Parties and Monitronics (the "Backstop Escrow Agreement"); provided, however, that in lieu of such an escrow account with a bank or trust company, Monitronics and the Requisite Commitment Parties may mutually agree to use a segregated bank account established by the Subscription Agent, in which event such segregated account shall constitute the "Backstop Escrow Account" and the Subscription Agent shall constitute the "Backstop Escrow Agent" for all purposes of this Agreement.

(c)    In the event that a Backstop Commitment Party defaults (a "Backstop Default") on its obligation to deposit its Backstop Commitment Share Purchase Price into the

NY 77634875

Backstop Escrow Account by the Deposit Deadline pursuant to <u>Section 1.3(b)</u> hereof or materially breaches any other covenant made by such Backstop Commitment Party in this Agreement, or any representation or warranty made by a Backstop Commitment Party in this Agreement is materially incorrect when made or deemed to be made (each such Backstop Commitment Party, a "<u>Defaulting Backstop Commitment Party</u>"), then each Backstop Commitment Party that is not a Defaulting Backstop Commitment Party (each, a "<u>Non-Defaulting Backstop Commitment Party</u>") shall have the right (the "<u>Default Purchase Right</u>"), but not the obligation, to commit to purchase, at the aggregate Exercise Price therefor, up to its Adjusted Commitment Percentage of all Backstop Commitment Shares required to be purchased by the Defaulting Backstop Commitment Party pursuant to <u>Section 1.3(a)</u> but with respect to which such Defaulting Backstop Commitment Party did not make the required deposit in accordance with <u>Section 1.3(b)</u>.  As soon as practicable after a Backstop Default, but in any event, within one (1) Business Day after the Deposit Deadline, Monitronics shall send a written notice to each Non-Defaulting Backstop Commitment Party, specifying (i) the number of Backstop Commitment Shares subject to any Backstop Default (the "<u>Default Shares</u>") and (ii) the maximum number of Default Shares such Non-Defaulting Backstop Commitment Party is entitled to purchase (determined in accordance with the first sentence of this <u>Section 1.3(c)</u>). Each Non-Defaulting Backstop Commitment Party will have one (1) Business Day after receipt of such notice to elect to exercise its Default Purchase Right by notifying Monitronics in writing of its election and specifying the maximum number of Default Shares that it is electing to purchase (up to the maximum number of Default Shares such Non-Defaulting Backstop Commitment Party is entitled to purchase pursuant to the first sentence of this <u>Section 1.3(c)</u>).  If any Non-Defaulting Backstop Commitment Party elects to purchase less than the maximum number of Default Shares such Non-Defaulting Backstop Commitment Party is entitled to purchase pursuant to the first sentence of this <u>Section 1.3(c)</u> (or does not timely elect to purchase any such Default Shares), then the Default Shares that such Non-Defaulting Backstop Commitment Party does not elect to purchase shall be allocated among the Non-Defaulting Backstop Commitment Parties who wish to commit to purchase such Default Shares on a *pro rata* basis based on the respective Adjusted Commitment Percentages of such Non-Defaulting Backstop Commitment Parties (such allocation and commitment to purchase to be made by utilizing the same procedures set forth in the two immediately preceding sentences, and repeated until there are no Default Shares remaining to be purchased or until there are no Non-Defaulting Backstop Commitment Party who wish to commit to purchase such Default Shares).  Each Non-Defaulting Backstop Commitment Party hereby agrees, severally and not jointly, to deposit into the Backstop Escrow Account pursuant to the Backstop Escrow Agreement, by wire transfer of immediately available funds, an amount equal to the product of (x) the Exercise Price and (y) the Default Shares that such Non-Defaulting Backstop Commitment Party commits to purchase in accordance with this <u>Section 1.3(c)</u>, if any, no later than 2:00 p.m., New York City time on the date prior to the Plan Effective Date.  The Default Shares with respect to which each of the Backstop Commitment Parties deposits funds into the Backstop Escrow Account pursuant to this <u>Section 1.3(c)</u>, if any, are referred to herein as such Backstop Commitment Party's "<u>Additional Shares</u>" and, together with its Backstop Commitment Shares, such Backstop Commitment Party's "<u>Backstop Shares</u>".  For the avoidance of doubt, notwithstanding anything to the contrary set forth in this <u>Section 1.3(c)</u>, no provision of this Agreement shall relieve any Defaulting Backstop Commitment Party from liability hereunder, or limit the availability of the remedies set forth in <u>Section 12.9</u>, in connection with any such Defaulting Backstop

Commitment Party's Commitment Party Default. Any Defaulting Backstop Commitment Party shall be liable to each Backstop Commitment Party that is not a Defaulting Backstop Commitment Party, and to the Company Parties, as a result of any breach of its obligations hereunder.

(d)     Notwithstanding anything to the contrary in this Agreement (but without limiting the provisions of Section 12.1 hereof), any Backstop Commitment Party, in its sole discretion, may designate by written notice to Monitronics no later than two (2) Business Days prior to the Closing that some or all of the Backstop Shares be issued in the name of, and delivered to, one or more of its controlled Affiliates or Related Funds. Such written notice of designation shall (i) be addressed to the Monitronics and signed by such Backstop Commitment Party and such controlled Affiliate or Related Fund, (ii) specify the number of Backstop Shares to be delivered to or issued in the name of such controlled Affiliate or Related Fund and (iii) contain a confirmation by such controlled Affiliate or Related Fund of the accuracy of the representations set forth in Sections 3.3 through 3.5 as applied to such controlled Affiliate or Related Fund; provided, that no such designation pursuant to this Section 1.3(d) shall relieve such Backstop Commitment Party from its obligations under this Agreement.

(e)     The Backstop Commitment Parties agree and acknowledge that the initial Backstop Commitment Percentages set forth in the Backstop Commitment Schedule as in effect on the Execution Date were generally calculated based on the relative amounts of Notes held by each of the Backstop Commitment Parties as of the RSA Effective Date (for each Backstop Commitment Party, its "Initial Backstop Notes").  In the event that on or prior to the date that is seven (7) days after the RSA Effective Date, one or more Backstop Commitment Parties acquires additional Notes (for each Backstop Commitment Party, its "Additional Backstop Notes"), the Requisite Commitment Parties may, by written notice given to the Debtors and the Commitment Party Professionals within ten (10) Business Days after the RSA Effective Date, require that (i) the Backstop Commitment Percentages for such Backstop Commitment Parties (each, an "Additional Backstop Note Party") be increased proportionally (to reflect the net principal amount of the additional Notes that it acquired as compared to its Initial Backstop Notes) and (ii) the initial Backstop Commitment Percentages of the other Backstop Commitment Parties shall be correspondingly decreased pro rata as necessary to provide for such increases to the Backstop Commitment Percentages of the Additional Backstop Note Parties, in which case the Backstop Commitment Schedule shall thereupon be revised accordingly and a copy of such revised Backstop Commitment Schedule shall be delivered promptly to Monitronics and each of the Backstop Commitment Parties. For the avoidance of doubt, a Backstop Commitment Party's sale of all or any portion of its Initial Backstop Notes during such seven (7)-day period shall not result in any decrease in such Backstop Commitment Party's initial Backstop Commitment Percentage.  Any revisions to the Backstop Commitment Schedule pursuant to this Section 1.3(e) shall not be deemed an amendment to this Agreement and shall not be subject to Section 10 hereof. As used herein, "Initial Backstop Notes" means, with respect to any Backstop Commitment Party, the aggregate principal amount of Notes held by it on the RSA Effective Date.

1.4     **Equity Commitment**.

(a)     On the terms, subject to the conditions, and in reliance on the representations and warranties set forth in this Agreement (including the entry of the Agreement Order by the Bankruptcy Court and its becoming a Final Order), each of the Equity Commitment Parties hereby agrees, severally and not jointly, that (i) it shall deliver the Contributed Term Loan Exchange Documentation into escrow, in accordance with the Equity Commitment Purchase Notice, at least one (1) Business Day prior to the Plan Effective Date and (ii) on the Plan Effective Date, an aggregate principal amount of Term Loans held by such Equity Commitment Party and/or one or more of its Affiliates or Related Funds (which shall equal $100 million in Term Loans for all Equity Commitment Parties) (the "Contributed Term Loans") equal to such Equity Commitment Party's respective Equity Commitment Share Purchase Price shall, without any further action on the part of such Equity Commitment Party, mandatorily be exchanged for a number of Equity Commitment Shares equal to the quotient of such Equity Commitment Share Purchase Price divided by the Exercise Price. The Contributed Term Loans shall be treated as equal to cash on a dollar-for-dollar basis based on the aggregate principal amount of such Contributed Term Loans (it being understood and agreed that (A) the principal amount of all such Contributed Term Loans shall continue to accrue interest, at the applicable rate, through the Plan Effective Date and (B) all accrued and unpaid interest, at the applicable rate, on such Contributed Term Loans as of the Plan Effective Date shall be paid in full in cash on the Plan Effective Date pursuant to the Plan).  The per share purchase price for the Equity Commitment Shares shall be the same as the Exercise Price.  The Equity Commitments of the Equity Commitment Parties are several, not joint, obligations of the Equity Commitment Parties, such that no Equity Commitment Party shall be liable or otherwise responsible for the Equity Commitment of any other Equity Commitment Party.

(b)     Notwithstanding anything to the contrary in this Agreement (but without limiting the provisions of Section 12.1 hereof), any Equity Commitment Party, in its sole discretion, may designate by written notice to Monitronics no later than two (2) Business Days prior to the Closing that some or all of the Equity Commitment Shares be issued in the name of, and delivered to, one or more of its controlled Affiliates or Related Funds. Such written notice of designation shall (i) be addressed to Monitronics and signed by such Equity Commitment Party and such controlled Affiliate or Related Fund, (ii) specify the number of Equity Commitment Shares to be delivered to or issued in the name of such controlled Affiliate or Related Fund and (iii) contain a confirmation by such controlled Affiliate or Related Fund of the accuracy of the representations set forth in Sections 3.3 through 3.5 as applied to such controlled Affiliate or Related Fund; provided, that no such designation pursuant to this Section 1.4(b) shall relieve such Equity Commitment Party from its obligations under this Agreement.

1.5     **Closing**.  The closing of the purchase and sale of Rights Offering Shares (including with respect to the Backstop Shares) and the exchange of Contributed Term Loans for Equity Commitment Shares hereunder (the "Closing") will occur at 10:00 a.m., New York City time (or at such other time as is mutually agreed by the Company Parties and the Requisite Commitment Parties), on the Plan Effective Date.  At the Closing, (i) the Backstop Escrow Agent shall distribute the funds held in the Backstop Escrow Account to Monitronics in accordance with the terms of the Backstop Escrow Agreement by wire transfer of immediately available funds to an account designated by Monitronics pursuant to wire instructions previously

NY 77634875

provided by Monitronics to the Backstop Escrow Agent no later than at least two (2) Business Days prior to the anticipated Plan Effective Date, (ii) Monitronics shall issue the Rights Offering Shares (including the Rights Offering Shares that Backstop Commitment Parties subscribe for pursuant to their Primary Commitments) in accordance with the Rights Offering Procedures, and (iii) Monitronics shall deliver to each Commitment Party the Backstop Shares and/or Equity Commitment Shares, as applicable, to be issued to such Commitment Party by Monitronics pursuant to this Agreement and such other certificates, counterparts to agreements, documents or instruments that Monitronics is required to deliver to such Commitment Party pursuant to <u>Section 6.1</u> hereof.   The agreements, instruments, certificates and other documents to be delivered on the Plan Effective Date by or on behalf of the Company Parties will be delivered to the Commitment Parties at the offices of Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038.

   1.6 **Put Option Premium**.  The Debtors and the Commitment Parties hereby acknowledge that, (a) as consideration for the Put Option, the Debtors shall issue to the Backstop Commitment Parties (or their designees) on the Plan Effective Date their ratable shares, based on the Backstop Commitment Parties' respective Backstop Commitment Percentages on the Plan Effective Date, of New Common Stock representing 4.05% of the total shares of New Common Stock to be issued as of the Plan Effective Date, subject to dilution by the Post Emergence Incentive Plan (the "<u>Backstop Put Option Premium</u>", and such shares, the "<u>Backstop Put Option Premium Shares</u>"), and (b) as consideration for the granting to Monitronics of the right to sell and cause the Equity Commitment Parties to purchase the Equity Commitment Shares in exchange for the Equity Commitment Parties funding their Equity Commitments pursuant to the terms of this Agreement, subject to the below, the Debtors shall issue to the Equity Commitment Parties (or their designees) on the Plan Effective Date their ratable shares, based on the Equity Commitment Parties' respective Equity Commitment Percentages on the Plan Effective Date, of New Common Stock representing 2.02% of the total shares of New Common Stock to be issued as of the Plan Effective Date, subject to dilution by the Post Emergence Incentive Plan (the "<u>Equity Put Option Premium</u>" and, together with the Backstop Put Option Premium, the "<u>Put Option Premium</u>", and such shares, the "<u>Equity Put Option Premium Shares</u>" and, together with the Backstop Put Option Premium Shares, the "<u>Put Option Premium Shares</u>")); <u>provided</u>, <u>however</u>, that (i) no Defaulting Backstop Commitment Party shall be entitled to receive any Backstop Put Option Premium Shares and (ii) any Non-Defaulting Backstop Commitment Party that purchases Default Shares of a Defaulting Backstop Commitment Party shall be entitled to receive a number of additional Backstop Put Option Premium Shares equal to the product (rounded down to the nearest whole shares) of (x) the number of Backstop Put Option Premium Shares that would have been issued to such Defaulting Backstop Commitment Party if such Defaulting Backstop Commitment Party had not committed a Backstop Default and (y) a fraction, the numerator of which is the number of Default Shares of such Defaulting Backstop Commitment Party which such Non-Defaulting Backstop Commitment Party purchases and the denominator of which is the aggregate number of Default Shares of such Defaulting Backstop Commitment Party.  The Debtors hereby further acknowledge and agree that the Put Option Premium Shares (i) shall be, upon entry of the Agreement Order, fully earned as of the Execution Date (but to be issued only at the Closing), (ii) shall not be refundable under any circumstance or creditable against any other amount paid or to be paid in connection with this Agreement or any of the Contemplated Transactions or otherwise, (iii) shall be issued without setoff or recoupment and shall not be subject to defense or offset on account of any claim, defense or counterclaim,

(iv) shall be issued free and clear of any withholding or deduction for any applicable Taxes, and (vi) shall be treated for U.S. federal income Tax purposes as a premium for an option to (x) sell and cause the Backstop Commitment Parties to purchase the Backstop Commitment Shares and (y) sell and cause the Equity Commitment Parties to purchase the Equity Commitment Shares.

      1.7   **Transaction Expenses.**  Whether or not the transactions contemplated by this Agreement or any of the other Contemplated Transactions are consummated unless the Commitment Parties are in breach of this Agreement, the Debtors shall reimburse or pay, as the case may be, the Transaction Expenses as follows:  (a) all accrued and unpaid Transaction Expenses incurred up to (and including) the Execution Date (the "Initial Transaction Expenses") shall be paid in full on the Execution Date, (b) prior to the Petition Date and after the Execution Date, all accrued and unpaid Transaction Expenses shall be paid in full on a regular and continuing basis promptly (but in any event within five (5) Business Days) after invoices are presented to the Debtors, (c) after the Petition Date, all accrued and unpaid Transaction Expenses incurred up to (and including) the date of the entry by the Bankruptcy Court of the Agreement Order shall be paid in full within five (5) Business days of the date of the entry by the Bankruptcy Court of the Agreement Order, (d) after the date of the entry by the Bankruptcy Court of the Agreement Order, all accrued and unpaid Transaction Expenses shall be paid in full on a regular and continuing basis promptly (but in any event within five (5) Business Days) after invoices are presented to the Debtors without Bankruptcy Court review or further Bankruptcy Court order, and (e) upon termination of this Agreement, all accrued and unpaid Transaction Expenses incurred up to (and including) the date of such termination shall be paid in full promptly (but in any event within five (5) Business Days) after invoices are presented to the Debtors without Bankruptcy Court review or further Bankruptcy Court order; provided, however, that the payment of the Transaction Expenses under the circumstances set forth in clauses (c), (d) and (after the Petition Date) (e) above shall be subject to the terms of the Agreement Order.  All such Transaction Expenses of a Commitment Party shall be paid by the Debtors to such Commitment Party (or its designee) by wire transfer of immediately available funds to the account(s) specified by such Commitment Party.  The Transaction Expenses shall constitute allowed administrative expenses against the Debtors' estates under the Bankruptcy Code.  The terms set forth in this Section 1.7 shall survive termination of this Agreement and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement or any of the other Contemplated Transactions are consummated.  The obligations set forth in this Section 1.7 are in addition to, and do not limit, the Debtors' obligations under Sections 1.5 and 8 hereof.

      2.   **Representations and Warranties of the Company Parties**.  Each of the Company Parties hereby, jointly and severally, represent and warrant to the Commitment Parties as set forth below.  Except for representations and warranties that are expressly limited as to a particular date, each representation and warranty is made as of the date hereof and as of the Plan Effective Date:

      2.1   **Organization of the Company Parties.**  Each Company Party is a duly organized and validly existing corporation, limited liability company or partnership, as the case may be, and, if applicable, in good standing (or the equivalent thereof) under the Laws of the jurisdiction of its incorporation or organization.  Each Company Party is duly qualified or registered to do business as a foreign corporation, limited liability company or partnership (as the

case may be) and is in good standing under the Laws of each jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification or registration, except where the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

2.2 **Authority; No Conflict**.

(a)     Each Company Party (i) has the requisite corporate, partnership or limited liability company (as applicable) power and authority (A) to enter into, execute and deliver this Agreement, and to enter into, execute and file with the Bankruptcy Court the Plan and (B) subject to the entry by the Bankruptcy Court of the Agreement Order and the Confirmation Order, to perform and consummate the Contemplated Transactions and the transactions contemplated under the Plan, and (ii) has taken all necessary corporate, partnership or limited liability company (as applicable) action required for (A) the due authorization, execution and delivery of this Agreement, (B) the due authorization, execution and filing with the Bankruptcy Court of the Plan and (C) the performance and consummation of the Contemplated Transactions and the transactions contemplated under the Plan.  This Agreement has been duly executed and delivered by each Company Party.  Subject to the entry of the Agreement Order, this Agreement constitutes the legal, valid and binding obligation of each Company Party, enforceable against such Company Party in accordance with its terms.  Subject to entry of the Confirmation Order and the expiration or waiver by the Bankruptcy Court of the fourteen (14)-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), the Plan constitutes the legal, valid and binding obligation of each Company Party, enforceable against such Company Party in accordance with its terms.

(b)     Neither the execution and delivery by the Company Parties of this Agreement, the execution or filing with the Bankruptcy Court of the Plan nor the performance or consummation by the Company Parties of any of the Contemplated Transactions or any of the transactions contemplated under the Plan will, directly or indirectly (with or without notice or lapse of time or both):

(i)     contravene, conflict with or result in a violation of any provision of the Organizational Documents of any Company Party;

(ii)     contravene, conflict with or result in a violation of any existing Law or Order as in effect on the Execution Date and/or as in effect on the Plan Effective Date to which any Company Party or any of its Subsidiaries, or any of the properties, assets, rights or interests owned or used by any Company Party or any of its Subsidiaries, may be subject;

(iii)     contravene, conflict with or result in a violation or breach of any provision of, or give rise to any right of termination, acceleration or cancellation under, any Contract to which any Company Party or any of its Subsidiaries is a party or which any Company Party's or any of its Subsidiaries' properties, assets, rights or interests are bound as in effect immediately prior to the Closing; or

-12-

(iv)    result in the imposition or creation of any Encumbrance upon or with respect to any of the assets, properties, rights, interests or businesses owned or used by any Company Party or any of its Subsidiaries that will not be released and discharged pursuant to the Plan;

except, in the case of clauses (ii), (iii) and (iv) above, where such occurrence, event or result (x) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, or (y) arises as a result of the filing of the Chapter 11 Cases or the discharge or compromise of claims as a result thereof.

(c)    Subject to the Approvals and except as set forth on Schedule 2.2(c), none of the Company Parties will be required to give any notice to, make any filing with or obtain any Consent from, any Person in connection with the execution and delivery of this Agreement or the Backstop Escrow Agreement, or the execution and filing with the Bankruptcy Court of the Plan, or the performance or consummation of any of the Contemplated Transactions or any of the transactions contemplated under the Plan, except any of the foregoing that are required to be given, made or obtained under Law in connection with the Chapter 11 Cases or would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

2.3    **Proceedings.**   There are no pending, outstanding or, to the Knowledge of Monitronics, threatened Proceedings to which any Company Party or any of its Subsidiaries is a party or to which any properties, assets, rights or interests of any of them are subject, except for (a) following the Petition Date, claims of creditors or parties in interest in the Chapter 11 Cases and (b) Proceedings that if adversely determined to such Company Party or any of its Subsidiaries would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

2.4    **Brokers or Finders.**   Neither any Company Party nor any of its Subsidiaries has incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement, the Backstop Escrow Agreement, the Plan or any of the Contemplated Transactions or any of the transactions contemplated under the Plan.

2.5    **Exemption from Registration.**   Each of the Specified Issuances will be exempt from the registration and prospectus delivery requirements of the Securities Act.

2.6    **Issuance.**   As of the Closing Date, all issued and outstanding Equity Securities shall have been duly authorized and validly issued and shall be fully paid and non-assessable, and such Equity Securities shall be available for issuance to each Commitment Party by all necessary corporate action and, when issued in accordance with the terms of this Agreement and the other applicable Definitive Documents, shall be validly issued and shall be fully paid and non-assessable and free and clear of any Encumbrance or charge of any kind, or an agreement, arrangement or obligation to create any Encumbrance or taxes and (except as set forth in the Registration Rights Agreement and the Governance Documents) the issuance of such Equity Securities will not be subject under any other agreement to the preemptive or other similar rights of any security holder of Monitronics.

NY 77634875

2.7     **No Violation or Default**.  Neither any Company Party nor any of its Subsidiaries is in violation of its Organizational Documents.  Neither any Company Party nor any of its Subsidiaries is:  (a) as of the Execution Date, and except for any defaults arising as a result of the Chapter 11 Cases and except for the Specified Defaults (as defined in the Forbearance Agreements), in default, and no event has occurred that, with notice or lapse of time or both, would constitute a default, in the performance or observance of any term, covenant or condition contained in any Contract to which such Company Party or any of its Subsidiaries is a party or by which such Company Party or any of its Subsidiaries is bound or to which any of the properties, assets, rights or interests of such Company Party or any of its Subsidiaries is subject; or (b) in violation of any Law or Order, except, in the case of clauses (a) and (b) above, for any such default or violation that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

2.8     **Intellectual Property**.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) each of the Company Parties owns, or possesses the right to use, all of the patents, patent rights, trademarks, service marks, trade names, copyrights, mask works, domain names, and any and all applications or registrations for any of the foregoing (collectively, "IP Rights") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person, (b) to the Knowledge of Monitronics, none of the Company Parties, nor any IP Right, proprietary right, product, process, method, substance, part, or other material now employed, sold or offered by or contemplated to be employed, sold or offered by such Person, is interfering with, infringing upon, misappropriating or otherwise violating any valid IP Rights of any Person, and (c) no claim or litigation regarding any of the foregoing is pending or, to the Knowledge of Monitronics, threatened.

2.9     **Licenses and Permits**.  (a) Each Company Party and its Subsidiaries possess all licenses, certificates, permits, and other authorizations issued by, have made all declarations and filings with, and have given all notices to, the appropriate Governmental Bodies that are necessary or required for the ownership or lease of their respective properties or assets, or the conduct or operation of their respective businesses, as owned, leased, conducted or operated as of the Execution Date and as of the Plan Effective Date, except where the failure to possess, make or give any of the foregoing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and (b) as of the Execution Date and the Plan Effective Date, neither any Company Party nor any of its Subsidiaries has received notice of any revocation or modification of any such license, certificate, permit, or authorization, or has any reason to believe that any such license, certificate, permit, or authorization will not be renewed in the ordinary course, or that any such renewal will be materially impeded, delayed, hindered or burdensome to obtain, except to the extent that any of the foregoing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

2.10    **Compliance With ERISA**.

(a)     Schedule 2.10(a) hereto sets forth a complete and accurate list of all employee benefit, compensation and incentive plans, practices, programs, arrangements and agreements (including, but not limited to, employee benefit plans within the meaning of Section 3(3) of ERISA), whether cash or equity, written or unwritten, maintained, administered or

contributed to by any Company Party or any of its Affiliates, for or on behalf of any employees or former employees of such Company Party or any of its Affiliates, or for which any Company Party or any of its Affiliates has or could reasonably be expected to have liabilities (all such plans, practices, programs, arrangements and agreements, the "Benefit Plans" and each a "Benefit Plan").  The Company Parties and their Affiliates have provided the Commitment Parties with true, correct and complete copies (or, to the extent no such copy exists or the Benefit Plan is not in writing, an accurate written description) of each Benefit Plan and, as requested by the Commitment Parties, all material documentation relating thereto.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each Benefit Plan has been maintained in compliance in all material respects with its terms and the requirements of any applicable Laws or Orders, including, but not limited to, ERISA and the Internal Revenue Code of 1986, as amended (the "Code").  Except as would not reasonably be expected, individually or in the aggregate, have a Material Adverse Effect, none of the Benefit Plans are, and neither the Company Parties, any of their respective Subsidiaries nor any of their respective ERISA Affiliates maintain, contribute to, or have an obligation to contribute to, or in the past six (6) years has maintained, contributed to, or had an obligation to contribute to, or has or could reasonably be expected to have any liability with respect to, (i) a plan subject to Title IV of ERISA or Sections 412 of the Code, (ii) a multiemployer plan (within the meaning of Section 4001(3) of ERISA or 413(c) of the Code), (iii) any employee welfare benefit plan within the meaning of Section 3(1) of ERISA that provides for benefits following termination of service, other than as required by the law known as COBRA (at the sole cost of the participant or eligible dependent), (iv) a plan maintained by more than one employer within the meaning of Section 413(c) of the Code, (v) a plan subject to Sections 4063 or 4064 of ERISA, or (vi) a "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA.

(b)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, neither the Company Parties, nor their Subsidiaries or ERISA Affiliates nor, to the Knowledge of Monitronics, any other "party in interest" or "disqualified person" with respect to any Benefit Plan has engaged in a non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code involving such Benefit Plan which, individually or in the aggregate, could reasonably be expected to result in a tax or penalty imposed by Section 4975 of the Code or Sections 501, 502 or 510 of ERISA. To the Knowledge of Monitronics, no fiduciary has any liability for breach of fiduciary duty or any other failure to act or comply with the requirements of ERISA, the Code or any other applicable laws in connection with the administration or investment of the assets of any Benefit Plan.

(c)     Except for as provided in Schedule 2.10(c), neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby (including the Rights Offering and the Restructuring) may (either alone or in combination with another event) (i) result in any payment becoming due, or increase the amount of any compensation due, to any current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) of the Company Parties and their Affiliates; (ii) increase any compensation or benefits otherwise payable under any Benefit Plan; (iii) result in the acceleration of the time of payment or vesting of any such compensation or benefits; (iv) result in a non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code, or (v) result in the payment of any amount that could, individually or

-15-

in combination with any other such payment, constitute an "excess parachute payment," as defined in Section 280G(b)(1) of the Code. No current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) has or will obtain a right to receive a gross-up payment from the Company Parties or their Affiliates with respect to any excise taxes that may be imposed upon such individual pursuant to Section 409A of the Code, Section 4999 of the Code or otherwise.

(d)     All liabilities or expenses of the Company Parties, and their Affiliates, in respect of any Benefit Plan (including workers compensation) which have not been paid, have been properly accrued on their respective most recent financial statements in compliance with GAAP. All contributions (including all employer contributions and employee salary reduction contributions) or premium payments required to have been made under the terms of any Benefit Plan, or in accordance with applicable law, as of the date hereof have been timely made or reflected on the applicable company's financial statements in accordance with GAAP.

2.11     **No Unlawful Payments**.  Since January 1, 2017, to the Knowledge of Monitronics, neither any Company Party nor any of its Subsidiaries, nor any current or former director, officer or management employee of any Company Party or any of its Subsidiaries has, directly or indirectly:  (a) offered, paid, delivered or otherwise used any funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (b) offered, delivered or made any direct or indirect unlawful payment to any official or employee of a Governmental Body; (c) violated any provision of the U.S. Foreign Corrupt Practices Act of 1977 or (d) offered, delivered, made or received any bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

2.12     **Absence of Certain Changes or Events**.  Since March 31, 2019,  (a) each Company Party and its Subsidiaries have conducted their respective businesses in the ordinary course of business consistent with past practices; (b) except as otherwise required by Law or GAAP (as defined below), there has not been any change with respect to any finance or tax accounting elections, methods, principles or practices of any Company Party or any of its Subsidiaries; (c) each of the Company Parties (and each of the Company Parties shall cause Ascent to) file the Company SEC Documents within the time periods required under the Exchange Act, in each case in accordance with ordinary course practices and (d) neither any Company Party nor any of its Subsidiaries has incurred any damage, destruction, loss or casualty (not covered by insurance) to its property or assets with a value, individually or in the aggregate, in excess of $1,000,000.  Since March 31, 2019, there has not been any Material Adverse Effect.

2.13     **Title to Real and Personal Property**.

(a)     *Real Property*.  Each of the Company Parties has good and defensible title to its respective real properties, in each case, except for Permitted Encumbrances and except for defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes, and except where the failure (or failures) to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  To the Knowledge of Monitronics, all such properties and assets are free and clear of Encumbrances, except for Permitted Encumbrances

-16-

and except for such Encumbrances as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)      *Leased Real Property*.  Each of the Company Parties is in compliance with all obligations under all leases to which it is a party that have not been rejected in the Chapter 11 Cases, except where the failure to comply would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and none of such Persons has received written notice of any good faith claim asserting that such leases are not in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Each of the Company Parties enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to materially interfere with its ability to conduct its business as currently conducted or have, individually or in the aggregate, a Material Adverse Effect.

(c)      *Personal Property*.  Except to the extent such failure would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, each of the Company Parties have good title to, free and clear of any and all Encumbrances, or a valid leasehold interest in, all personal properties, machinery, equipment and other tangible assets of the business necessary for the conduct of the business as presently conducted and such properties, (i) are in the possession or control of the applicable Company Party, as appropriate; and (ii) are in good and operable condition and repair, reasonable wear and tear excepted.

2.14      **Financial Statements**.  Each of the audited consolidated balance sheet of Monitronics and its Subsidiaries as of December 31, 2018, and the related consolidated statements of operations, stockholders' (deficiency) equity and cash flows for the twelve-month period then ended (the "Financial Statements"), (i) have been prepared in accordance with United States generally accepted accounting principles ("GAAP") applied on a consistent basis throughout the periods covered thereby; and (ii) fairly present in all material respects the consolidated financial condition, stockholders' equity and results of operations and cash flows of Monitronics and its Subsidiaries as of the respective dates thereof and for the periods referred to therein.

2.15      **Tax Matters**.

(a)      (i) All material tax returns required to be filed by or on behalf of any Company Party or any of its Subsidiaries, or any Affiliated Group of which any Company Party or any of its Subsidiaries is or was a member, have been properly prepared and duly and timely filed with the appropriate taxing authorities in all jurisdictions in which such tax returns are required to be filed (after giving effect to any valid extensions of time in which to make such filings); (ii) all material taxes payable by or on behalf of any Company Party or any of its Subsidiaries either directly, as part of the consolidated tax return of another taxpayer, or otherwise, have been fully and timely paid, and adequate reserves or accruals for taxes have been provided in the balance sheet included as part of the 2018 Financial Statements in respect of any period for which tax returns have not yet been filed or for which taxes are not yet due and owing; and (iii) no agreement, waiver or other document or arrangement extending or having the effect of extending the period for assessment or collection of a material amount of taxes (including any

applicable statute of limitations) has been executed or filed with the IRS or any other Governmental Body by or on behalf of any Company Party or any of its Subsidiaries and no power of attorney in respect of any tax matter is currently in force.

(b)    Each Company Party and its Subsidiaries have complied in all material respects with all applicable Laws relating to the payment and withholding of taxes and have duly and timely withheld from employee salaries, wages, and other compensation and have paid over to the appropriate taxing authorities or other applicable Governmental Bodies all amounts required to be so withheld and paid over for all periods under all applicable Laws.

(c)    (i) All material deficiencies asserted or assessments made as a result of any examinations by the IRS or any other Governmental Body of the tax returns of or covering or including any Company Party or any of its Subsidiaries have been fully paid, and there are no other material audits or investigations by any taxing authority or any other Governmental Body in progress, nor has any Company Party or any of its Subsidiaries received notice from any taxing authority or other applicable Governmental Body that it intends to conduct such an audit or investigation; (ii) no issue has been raised by a federal, state, local, or foreign taxing authority or other applicable Governmental Body in any current or prior examination that, by application of the same or similar principles, could reasonably be expected to result in a proposed deficiency for any subsequent taxable period; and (iii) there are no Encumbrances for taxes with respect to any Company Party or any of its Subsidiaries, or with respect to the assets or business of any Company Party or any of its Subsidiaries, nor is there any such Encumbrance that is pending or threatened, other than Permitted Encumbrances.

(d)    None of the tax returns of any Company Party contain any position that is, or would be, subject to penalties under Section 6662 of the Code (or any corresponding provisions of state, local or foreign tax Law).  No Company Party has entered into any "listed transactions" as defined in Treasury Regulation Section 1.6011-4(b)(2) or comparable provision of state Law.

2.16    **Labor and Employment Compliance**.

(a)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each Company Party and each of its Subsidiaries is in compliance with all applicable Laws or Orders respecting employment and employment practices, including all Laws and Orders regulating the terms and conditions of employment, wages and hours, fair labor standards, workers compensation, disability, immigration, labor and equal employment opportunity.

(b)    There is no material Proceeding pending before any Governmental Body or, to the Knowledge of Monitronics, threatened against any Company Party or any of its Subsidiaries alleging any employment-related claim, including unfair labor practices, employment discrimination, harassment, retaliation, equal pay, wage and hour or any other employment related matter arising under applicable Laws or Orders.

(c)    Neither the Company Parties nor any of their Subsidiaries is a party to or bound by any material labor agreement, union contract or collective bargaining agreement

respecting the employees of the Company Parties or any of its Subsidiaries; there is no material union organizing, labor strike, dispute, slow-down or work stoppage actually pending or, to the Knowledge of Monitronics, threatened against or involving any employees of any Company Party or any of its Subsidiaries.  None of the employees of any Company Party or any of its Subsidiaries is covered by any collective bargaining agreement, and no collective bargaining agreement is currently being negotiated by any Company Party or any of its Subsidiaries.

(d)     Each individual currently providing services to any of the Company Parties or their Subsidiaries, or who have provided services to the Company Parties or any of their Subsidiaries in the preceding three years have been properly classified as an employee or an independent contractor, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  The Company Parties and their Affiliates have no direct or indirect material liability, whether absolute or contingent, with respect to any misclassification of any person as an independent contractor rather than as an employee, or with respect to any employee leased from another employer.

(e)     Except as provided on Schedule 2.16(e) hereto, neither the Company Parties nor any of their Subsidiaries have effectuated an event giving rise to a notice obligation including a "plant closing" or "mass layoff," as those terms are defined in the WARN Act, or any analogous state or local Law, affecting, in whole or in part, any site of employment, facility or operating unit of the Company Parties or any of their Subsidiaries.

(f)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, to the Knowledge of Monitronics, no employees of the Company Party or any of its Subsidiaries are, in any material respect, in violation of any term of any employment contract, non-disclosure agreement, or non-competition agreement with the Company Party or any of its Subsidiaries.  To the Knowledge of Monitronics, no employee of the Company Party or any of its Subsidiaries is, in any material respect, in violation of the terms of any restrictive covenant with any third party, including any former employer relating to the right of any such employee to be employed by the Company Party or any of its Subsidiaries or to the use of trade secrets or proprietary information of others and, to the Knowledge of Monitronics, no such claims are threatened, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

2.17     **Product Liability**.  Neither any Company Party nor any of its Subsidiaries has received any notice relating to any claim involving use of or exposure to any of the products (or any part or component) designed, manufactured, serviced or sold, or services performed, by such Company Party or any of its Subsidiaries, including for negligence, strict liability, design or manufacturing defect, conspiracy, failure to warn, or breach of express or implied warranties of merchantability or fitness for any purpose of use, or from any alleged breach of implied warranties or representations, or any alleged noncompliance with any applicable Laws pertaining to products liability matters, other than any such notice relating to claim that would not, individually or in the aggregate with other notices of claims, reasonably be expected to have a Material Adverse Effect.

2.18     **Company SEC Documents**.  Since December 31, 2018, each of Ascent and Monitronics has filed all required reports, schedules, forms and statements with the SEC.  As

of their respective dates, and giving effect to any amendments or supplements thereto filed prior to the date of this Agreement, each of the Company SEC Documents that have been filed as of the date of this Agreement complied in all material respects with the requirements of the Securities Act or the Exchange Act applicable to such Company SEC Documents. Each of Ascent and Monitronics has filed with the SEC all Material Contracts that are required to be filed as exhibits to the Company SEC Documents that have been filed as of the date of this Agreement. No Company SEC Document that has been filed prior to the date of this Agreement, after giving effect to any amendments or supplements thereto and to any subsequently filed Company SEC Documents, in each case filed prior to the date of this Agreement, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

2.19   **Internal Control Over Financial Reporting**.   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each of Ascent and Monitronics has established and maintains a system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act) that complies with the requirements of the Exchange Act and has been designed to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP and to the Knowledge of Monitronics, there are no weaknesses in the Ascent's or Monitronics' internal control over financial reporting as of the date hereof.

2.20   **Disclosure Controls and Procedures**.   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each of Ascent and Monitronics maintains disclosure controls and procedures (within the meaning of Rules 13a-15(e) and 15d-15(e) promulgated under the Exchange Act) designed to ensure that information required to be disclosed by Ascent or Monitronics in the reports that it files and submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, including that information required to be disclosed by Ascent or Monitronics in the reports that it files and submits under the Exchange Act is accumulated and communicated to management of Ascent or Monitronics as appropriate to allow timely decisions regarding required disclosure.

2.21   **Compliance with Money Laundering Laws**.   The operations of the Company Parties are and, since December 31, 2018 have been at all times, conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, the money laundering statutes of all jurisdictions in which the Company Parties operate (and the rules and regulations promulgated thereunder) and any related or similar Laws (collectively, the "Money Laundering Laws") and no material Legal Proceeding by or before any Governmental Body or any arbitrator involving any of the Company Parties with respect to Money Laundering Laws, which is (or would be) reasonably expected to have a Material Adverse Effect, is pending or, to the Knowledge of Monitronics, threatened.

2.22   **Compliance with Sanctions Laws**.   None of the Company Parties nor, to the Knowledge of Monitronics, any of their respective directors, officers, employees or other

-20-

Persons acting on their behalf with express authority to so act is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department. The Company Parties will not directly or indirectly use the proceeds of the Rights Offering, or lend, contribute or otherwise make available such proceeds to any other Company Party, joint venture partner or other Person, for the purpose of financing the activities of any Person that, to the Knowledge of Monitronics, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.

2.23    **Investment Company Act**.    None of the Company Parties is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended (the "Investment Company Act"), and this conclusion is based on one or more bases or exclusions other than Sections 3(c)(1) and 3(c)(7) of the Investment Company Act, including that none of the Company Parties comes within the basic definition of 'investment company' under section 3(a)(1) of the Investment Company Act.

2.24    **Arm's Length.**    Each Company Party acknowledges and agrees that the Commitment Parties are acting solely in the capacity of arm's length contractual counterparties to the Company Parties with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering) and not as financial advisors or fiduciaries to, or agents of, the Company Parties or any other Person.    Additionally, the Commitment Parties are not advising the Company Parties or any other Person as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. Each Company Party shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby and the other Contemplated Transactions, and the Commitment Parties shall have no responsibility or liability to any Company Party with respect thereto.    Any review by the Commitment Parties of the Company Parties, the Contemplated Transactions or other matters relating to the Contemplated Transactions will be performed solely for the benefit of the Commitment Parties and shall not be on behalf of the Company Parties.

3.    **Representations and Warranties of the Commitment Parties**.    Each Commitment Party, in each case severally and not jointly and solely with respect to itself, hereby represents and warrants to the Company Parties as set forth below.    Except for representations and warranties that are expressly limited as to a particular date, each representation and warranty is made as of the date hereof and as of the Plan Effective Date:

3.1    **Organization of Such Commitment Party.**    Such Commitment Party is duly organized or formed (as applicable), validly existing and in good standing under the Laws of its jurisdiction of incorporation or formation (as applicable), with full corporate, partnership or limited liability company (as applicable) power and authority to conduct its business as it is now conducted.

3.2    **Authority; No Conflict**.

(a)    Such Commitment Party (i) has the requisite corporate, partnership or limited liability company (as applicable) power and authority (A) to enter into, execute and deliver this Agreement, and (B) to perform and consummate the transactions contemplated

hereby, and (ii) has taken all necessary corporate, partnership or limited liability company (as applicable) action required for (A) the due authorization, execution and delivery of this Agreement and (B) the performance and consummation of the transactions contemplated hereby. This Agreement has been duly executed and delivered by such Commitment Party.  This Agreement constitutes the legal, valid and binding obligation of such Commitment Party, enforceable against such Commitment Party, as applicable, in accordance with its terms.

(b)     Neither the execution and delivery by such Commitment Party of this Agreement nor the performance or consummation by such Commitment Party, of any of the transactions contemplated hereby will, directly or indirectly (with or without notice or lapse of time or both):

(i)     contravene, conflict with, or result in a violation of any provision of the Organizational Documents of such Commitment Party;

(ii)     contravene, conflict with, or result in a violation of, any pending or existing Law or Order to which such Commitment Party, or any of the properties, assets, rights or interests owned or used by such Commitment Party may be subject; or

(iii)     contravene, conflict with or result in a violation or breach of any provision of, or give rise to any right of termination, acceleration or cancellation under, any Contract to which such Commitment Party is a party or which any of such Commitment Party's properties, assets, rights or interests are bound;

except, in the case of clauses (ii) and (iii) above, where such occurrence, event or result would not reasonably be expected to prohibit, materially delay or materially and adversely impact such Commitment Party's performance or consummation of its obligations under this Agreement.

Except (x) for Consents which have been obtained, notices which have been given and filings which have been made and (y) where the failure to give any notice, obtain any Consent or make any filing would not reasonably be expected to prevent or materially delay the consummation of any of the transactions contemplated by this Agreement, such Commitment Party is not and will not be required to give any notice to, make any filing with or obtain any Consent from, any Person in connection with the execution and delivery by such Commitment Party of this Agreement or the consummation or performance by such Commitment Party of any of the transactions contemplated hereby or thereby.

3.3     **Backstop Shares and Equity Commitment Shares Not Registered.** Such Commitment Party understands that the Backstop Shares or the Equity Commitment Shares, as applicable, have not been registered under the Securities Act.  Such Commitment Party also understands that the Backstop Shares and the Equity Commitment Shares are being offered and sold pursuant to an exemption from registration provided under Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder and/or Regulation S promulgated under the Securities Act, based in part upon such Commitment Party's representations contained

-22-

in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available.

3.4     **Acquisition for Own Account.**  Such Commitment Party is acquiring the Backstop Shares or Equity Commitment Shares, as applicable, for its own account (or for the accounts for which it is acting as investment advisor or manager) for investment and not with a present view toward distribution, within the meaning of the Securities Act.

3.5     **Accredited Investor or Qualified Institutional Buyer.**  Such Commitment Party is (a) an "accredited investor" (as defined in Regulation D promulgated under the Securities Act), "qualified institutional buyer" (as defined in Rule 144A under the Securities Act), or "a non-U.S. person" (as defined in Regulation S promulgated under the Securities Act) and is not participating on behalf or on account of a U.S. person and (b) has such knowledge and experience in financial and business matters that such Commitment Party is capable of evaluating the merits and risks of its investment in the Backstop Shares or Equity Commitment Shares, as applicable.  Such Commitment Party understands and is able to bear any economic risks of such investment.

3.6     **Access to Information.**  Such Commitment Party acknowledges that it has been afforded the opportunity to ask questions and receive answers concerning the Debtors and to obtain additional information that it has requested to verify the accuracy of the information contained herein.

3.7     **Brokers or Finders.**   Such Commitment Party has not, and its Representatives have not, incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement, for which the Debtors may be liable.

3.8     **Proceedings.**  There is no pending, outstanding or, to the knowledge of such Commitment Party threatened Proceedings against such Commitment Party that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the transactions contemplated by this Agreement, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of such Commitment Party to consummate the transactions contemplated by this Agreement.

3.9     **Sufficiency of Funds, Contributed Term Loans.**  On the Plan Effective Date, (a) such Backstop Commitment Party will have available funds sufficient to pay the aggregate Exercise Price for the Backstop Commitment Shares to be purchased by such Backstop Commitment Party hereunder and (b) such Equity Commitment Party will have available Contributed Term Loans sufficient to exchange for the Equity Commitment Shares to be received by such Equity Commitment Party hereunder at the aggregate Exercise Price therefor.

3.10    **Arm's Length**.  Each Commitment Party acknowledges and agrees that the Debtors are acting solely in the capacity of arm's length contractual counterparties to the Commitment Parties, with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering) and not as financial advisors or

fiduciaries to, or agents of, the Commitment Parties, or any other Person. Additionally, the Debtors are not advising the Commitment Parties or any other Person as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. The Commitment Parties shall consult with their own advisors concerning such matters and shall be responsible for making their own independent investigation and appraisal of the transactions contemplated hereby and the other Contemplated Transactions, and, except for the indemnification provisions set forth in Section 8 hereof, the Debtors shall have no responsibility or liability to the Commitment Parties with respect thereto. Any review by the Debtors of the Contemplated Transactions or other matters relating to the Contemplated Transactions will be performed solely for the benefit of the Debtors and shall not be on behalf of the Commitment Parties.

Anything herein to the contrary notwithstanding, nothing contained in any of the representations, warranties or acknowledgments made by any Commitment Party in this Section 3 or elsewhere in this Agreement will operate to modify or limit in any respect the representations and warranties of the Debtors or to relieve the Debtors from any obligations to the Commitment Parties for breach thereof or the making of misleading statements or the omission of material facts in connection with the transactions contemplated herein.

4. **Covenants of the Company Parties.** Each of the Company Parties hereby, jointly and severally, covenants and agrees with the each of the Commitment Parties as set forth in this Section 4.

4.1 **Agreement Motion and Agreement Order.** On the Petition Date, the Debtors shall file a motion and supporting papers (the "Agreement Motion") seeking an order of the Bankruptcy Court which, for the avoidance of doubt, may be the same order as the Confirmation Order, in form and substance acceptable to each of the Commitment Parties, approving the Debtors' execution and delivery of this Agreement , the Debtors' assumption of this Agreement pursuant to Section 365 of the Bankruptcy Code, and the consummation of the transactions contemplated hereby and thereby (the "Agreement Order"), including the Rights Offering, the Rights Offering Procedures, and the payment by the Debtors of the Put Option Premium and the Transaction Expenses on the terms set forth herein and therein, and the indemnification provisions in favor of the Indemnified Parties set forth herein and therein; provided, that the signature pages, exhibits and schedules to any copy of this Agreement that is filed with the Bankruptcy Court shall, subject to Bankruptcy Court approval, be subject to redaction as the Commitment Parties determine to be reasonably necessary and appropriate, including redacting the names of the Commitment Parties, the Backstop Commitment and the Backstop Commitment Percentage of each Backstop Commitment Party and the Equity Commitment Percentage of each Equity Commitment Party; provided, further, however, the Debtors shall be permitted, subject to Section 12.13, to disclose unredacted signature pages, exhibits and schedules of this Agreement to the extent required by the Bankruptcy Court, but with respect to any Backstop Commitment Percentages, Equity Commitment Percentages and Commitment amounts, the Debtors shall use reasonable best efforts to limit any such disclosure to filing such information under seal with the Bankruptcy Court or otherwise providing for it to be disclosed in a manner that does not result in its becoming publicly available. The Debtors shall provide drafts of the Agreement Motion to the Commitment Parties for their review and comment at least five (5) days prior to the Petition Date. The Debtors agree that they shall use their commercially reasonable efforts to (a) obtain a waiver of Bankruptcy Rule 6004(h) and

-24-

request that the Agreement Order be effective immediately upon its entry by the Bankruptcy Court, which Agreement Order shall not be revised, modified, or amended by the Confirmation Order or any other further order of the Bankruptcy Court, (b) fully support the Agreement Motion and any application seeking Bankruptcy Court approval and authorization to pay the fees and expenses under this Agreement, including the Transaction Expenses, as an administrative expense of the Debtors' estates, and (c) obtain approval of the Agreement Order, which, for the avoidance of doubt, may be the same order as the Confirmation Order, as soon as practicable after the Petition Date.

4.2     **Rights Offering.**  The Debtors shall promptly (and in any event, at least five (5) days prior to the Petition Date) provide copies of all documents, instruments, agreements and other materials to be entered into, delivered, distributed or otherwise used in connection with the Rights Offering, including the Rights Offering Procedures (collectively, the "Rights Offering Documentation") for review and comment by the Backstop Commitment Parties and all such Rights Offering Documentation shall be in form and substance consistent with this Agreement and the Restructuring Support Agreement and otherwise reasonably acceptable to the Requisite Commitment Parties.

4.3     **Conditions Precedent.**   The Debtors shall use their commercially reasonable efforts to satisfy or cause to be satisfied all the conditions precedent set forth in Section 6.1 hereof (including procuring and obtaining all Consents, authorizations and waivers of, making all filings with, and giving all notices to, third parties (including Governmental Bodies) which may be necessary or required on its part in order to effect the transactions contemplated herein).

4.4     **Notification.**  The Debtors shall: (a) on request by any of the Backstop Commitment Parties, notify such Backstop Commitment Party, or cause the applicable subscription agent for the Rights Offering (the "Subscription Agent") to notify such Backstop Commitment Party, of the aggregate number of Rights known by the Debtors or the Subscription Agent to have been exercised pursuant to the Rights Offering as of the close of business on the preceding Business Day or the most recent practicable time before such request, as the case may be, and (b) following the Rights Offering Expiration Time, timely comply with its obligations under Section 1.1(c) hereof.

4.5     **Use of Proceeds.**  The Debtors shall use the Proceeds received from the Commitment Parties to, among other things, fund the payment of distributions to be made on the Plan Effective Date pursuant to the Plan and in accordance with the Restructuring Support Agreement and the Term Sheets.

4.6     **Access**.  Promptly following the Execution Date, each of the Debtors will, and will use commercially reasonable efforts to cause its employees, officers, directors, accountants, attorneys and other advisors (collectively, "Representatives") to, provide each of the Commitment Parties and its Representatives with reasonable access, upon reasonable prior notice, during normal business hours, and without any material disruption to the conduct of the Debtors' business, to officers, management and key employees and other Representatives of any of the Debtors and to assets, properties, contracts, books, records and any other information

NY 77634875

concerning the business and operations of any of the Debtors as any of the Commitment Parties or any of its Representatives may reasonably request.

4.7    **DIP Facility.**  The Debtors shall promptly provide copies of all drafts and final execution copies of all DIP Documentation, if any, for review and comment by the Commitment Parties and the Consenting Creditors.  Any comments received by the Debtors from the Commitment Parties, the Consenting Creditors, or their respective Representatives with respect to the DIP Documentation shall be considered by them in good faith and, to the extent the Debtors disagree with any such comments, they shall inform the Commitment Parties and the Consenting Creditors thereof and discuss the same with the Commitment Parties and the Consenting Creditors prior to entering into, delivering or using any such DIP Documentation.  The Debtors shall not file with the Bankruptcy Court or enter into any DIP Documentation unless such DIP Documentation is consistent in all material respects with the DIP/Exit Facility Commitment and otherwise reasonably acceptable to the Requisite Commitment Parties, the Required Consenting Noteholders and the Required Consenting Term Lenders.  The Debtors shall comply, in a timely manner, with all of the terms, conditions and covenants contained in the DIP Documentation.

4.8    **Exit Facilities**.  The Debtors shall promptly provide copies of all drafts and final execution copies of all documents, instruments, agreements and other materials to be entered into, delivered or otherwise used in connection with the Exit Facilities (the "Exit Facility Documentation") for review and comment by the Commitment Parties and the Consenting Creditors.  Any comments received by the Debtors from the Commitment Parties, the Consenting Creditors or their respective Representatives with respect to the Exit Facility Documentation shall be considered by them in good faith and, to the extent the Debtors disagree with any such comments, they shall inform the Commitment Parties and the Consenting Creditors thereof and discuss the same with the Commitment Parties and the Consenting Creditors prior to entering into, delivering or using any such Exit Facility Documentation.  The Debtors shall not file with the Bankruptcy Court or enter into any Exit Facility Documentation unless such Exit Facility Documentation is reasonably acceptable to the Requisite Commitment Parties, the Required Consenting Noteholders and the Required Consenting Term Lenders.  The Debtors shall comply, in a timely manner, with all of the terms, conditions and covenants contained in the Exit Facility Documentation.

4.9    **Specified Issuances**.  The Debtors shall (a) consult with Stroock with respect to the steps (the "Specified Issuance Steps") to be taken by the Debtors to ensure that (i) each of the Specified Issuances described in clauses (a) and (b)(i) of the definition of Specified Issuances are exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act pursuant to Section 1145, (ii) the Specified Issuances described in clauses (c) through (f) of the definition of Specified Issuances are exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act pursuant to (x) Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder or (y) Regulation S promulgated under the Securities Act, and (iii) the Specified Issuances described in clause (b)(ii) of the definition of Specified Issuances are exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act pursuant to Section 1145, Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, and/or Regulation S promulgated under the Securities Act and (b) promptly provide copies of all documents, instruments, questionnaires,

agreements and other materials to be entered into, delivered, distributed or otherwise used in connection with the Specified Issuances (the "Specified Issuance Documentation") for review and comment by the Commitment Parties. Any comments received by the Debtors from the Commitment Parties or their respective Representatives with respect to the Specified Issuance Steps or the Specified Issuance Documentation shall be considered by them in good faith and, to the extent the Debtors disagree with any such comments, they shall inform the Commitment Parties thereof and discuss the same with the Commitment Parties prior to taking such Specified Issuance Steps or entering into, delivering, distributing or using any such Specified Issuance Documentation. The Debtors shall not file with the Bankruptcy Court or enter into any Specified Issuance Documentation without the prior written consent of the Requisite Commitment Parties.

      4.10   **Blue Sky; Form D**. The Company Parties shall, on or before the Closing, take such action as the Company Parties shall reasonably determine is necessary in order to obtain an exemption for, or to qualify the Backstop Shares and Equity Commitment Shares issued hereunder for, sale to the Commitment Parties at the Closing pursuant to this Agreement under applicable securities and "Blue Sky" Laws of the states of the United States (or to obtain an exemption from such qualification) and any applicable foreign jurisdictions, and shall provide evidence of any such action so taken to the Commitment Parties on or prior to the Closing. The Company Parties shall timely make all filings and reports relating to the offer and sale of the Backstop Shares and Equity Commitment Shares issued hereunder required under applicable securities and "Blue Sky" Laws of the states of the United States following the Closing. Following the Closing, the Company Parties shall timely file a Form D with the SEC with respect to the Backstop Shares and Equity Commitment Shares issued hereunder to the extent required under Regulation D of the Securities Act and shall provide, upon request, a copy thereof to each Commitment Party. The Company Parties shall pay all fees and expenses in connection with satisfying their obligations under this Section 4.10.

      4.11   **Share Legend.** Except for any Backstop Shares being issued pursuant to Section 1145, if any, each certificate evidencing Backstop Shares or Equity Commitment Shares issued hereunder, and each certificate evidencing Rights Offering Shares that were not pursuant to Section 1145, and each certificate issued in exchange for or upon the Transfer of any such shares, shall be stamped or otherwise imprinted with a legend (the "Legend") in substantially the following form:

      "THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

      In the event that any such shares are uncertificated, such shares shall be subject to a restrictive notation substantially similar to the Legend in the stock ledger or other appropriate records maintained by Monitronics or its transfer agent and the term "Legend" shall include such restrictive notation. Monitronics shall remove the Legend (or restrictive notation, as applicable) set forth above from the certificates evidencing any such shares (or the share register or other

appropriate Monitronics records, in the case of uncertificated shares), upon request, at any time after the restrictions described in such Legend cease to be applicable, including, as applicable, when such shares may be sold under Rule 144 of the Securities Act. Monitronics may reasonably request such opinions, certificates or other evidence that such restrictions no longer apply as a condition to removing the Legend.

4.12 **Registration Rights Agreement**.  The Plan shall provide that from and after the Closing each Commitment Party (or any Affiliate or Related Fund thereof) that receives shares of New Common Stock pursuant to the Restructuring and that are "control" or "restricted" securities shall be entitled to registration rights pursuant to a registration rights agreement with Reorganized Monitronics, which agreement shall be consistent with the terms set forth in the "Registration Rights" section of the Rights Offering Term Sheet and otherwise be in form and substance reasonably acceptable to the Requisite Commitment Parties and Monitronics (the "Registration Rights Agreement").  A form of the Registration Rights Agreement shall be filed with the Bankruptcy Court as part of the Plan or an amendment or supplement thereto.

4.13 **Reorganized Company**.

(a)    If the Non-Ascent Restructuring Toggle shall not have occurred and the Merger is consummated on or prior to the Plan Effective Date, the Company Parties shall cause the New Common Stock to be registered under Section 12(g) of the Exchange Act as promptly as practicable after the Closing (including, if the Registration Statement is then effective, by filing a Form 8-A with the SEC on the Plan Effective Date).  If the Non-Ascent Restructuring Toggle occurs, the Company Parties shall, if requested in writing by the Requisite Commitment Parties, cause the New Common Stock to be registered under Section 12(g) of the Exchange Act as promptly as practicable after the Closing.

(b)    The Company Parties shall cause all shares of New Common Stock that are issued pursuant to this Agreement or the Plan or that are issued in the Rights Offering (excluding shares that require or are subject to the Legend) to be eligible for deposit with The Depository Trust Company ("DTC") and issued through the facilities of DTC on the Plan Effective Date or as promptly as practicable thereafter.  With respect to any Backstop Shares, Equity Commitment Shares or Rights Offering Shares that were issued with the Legend and are owned by a Commitment Party or any of its Affiliates or Related Funds, Monitronics shall, upon request, in connection with the removal of the Legend or at any time thereafter, provide such cooperation as may be reasonably requested by the Commitment Party (or Affiliate or Related Fund, as applicable) in connection with having such shares registered in the name of Cede & Co., as DTC's nominee, and evidenced by shares held on behalf of a DTC participant as nominee for such Commitment Party (or Affiliate or Related Fund, as applicable).

(c)    The Company Parties shall cause Reorganized Monitronics to be redomiciled as a Delaware corporation, pursuant to a statutory conversion or otherwise, on the Plan Effective Date (or prior to the Plan Effective Date if mutually agreed by the Debtors and the Requisite Commitment Parties) prior to the issuance of the New Common Stock.

5.    **Covenants of the Commitment Parties**.  Each of the Commitment Parties hereby agrees, severally and not jointly, with the Debtors that it shall use its commercially

reasonable efforts to satisfy or cause to be satisfied all the conditions precedent applicable to such Commitment Party set forth in <u>Section 6.2</u> hereof; <u>provided</u>, <u>however</u>, that nothing contained in this <u>Section 5</u> shall obligate the Commitment Parties to waive any right or condition under this Agreement.

6. **<u>Conditions to Closing</u>**.

6.1 **<u>Conditions Precedent to Obligations of the Commitment Parties</u>**. The obligations of the Backstop Commitment Parties to exercise their Required Rights pursuant to their respective Primary Commitments and to purchase Backstop Shares pursuant to their respective Backstop Commitments, and the obligations of the Equity Commitment Parties to exchange their Contributed Term Loans for Equity Commitment Shares are, in each case, subject to the satisfaction (or waiver by the Requisite Commitment Parties) of each of the following conditions prior to or on the Plan Effective Date:

(a) <u>Restructuring Support Agreement</u>. The Restructuring Support Agreement shall not have been terminated.

(b) <u>Plan</u>. The Plan, as confirmed by the Bankruptcy Court, shall be consistent in all material respects with the Restructuring Support Agreement and otherwise reasonably acceptable to the Requisite Commitment Parties.

(c) <u>Disclosure Statement</u>. The Disclosure Statement shall be consistent in all material respects with the Restructuring Support Agreement and otherwise reasonably acceptable to the Requisite Commitment Parties.

(d) <u>Disclosure Statement Order</u>. The Bankruptcy Court shall have entered the Disclosure Statement Order, the Disclosure Statement Order shall be in form and substance reasonably acceptable to the Requisite Commitment Parties, and the Disclosure Statement Order shall be a Final Order.

(e) <u>Agreement Order</u>. The Bankruptcy Court shall have entered the Agreement Order, the Agreement Order shall be consistent with this Agreement and otherwise be in form and substance reasonably acceptable to the Requisite Commitment Parties, and the Agreement Order shall be a Final Order.

(f) <u>Confirmation Order</u>. The Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Order shall be in form and substance consistent with this Agreement, the Restructuring Support Agreement and the Plan and otherwise reasonably acceptable to the Requisite Commitment Parties, and the Confirmation Order shall be a Final Order.

(g) <u>Conditions to Confirmation</u>. The conditions to confirmation of the Plan and the conditions to the Plan Effective Date set forth in the Plan shall have been satisfied (or waived with the prior written consent of the Requisite Commitment Parties) in accordance with the Plan, and the Plan Effective Date shall have occurred or shall occur simultaneously with the Closing.

(h)    <u>Rights Offering</u>.  All conditions to consummation of the Rights Offering set forth in the Rights Offering Procedures shall have been satisfied and the Rights Offering shall have been conducted and consummated in accordance with the Plan, the Rights Offering Procedures and this Agreement.

(i)    <u>Definitive Documents</u>.    All Definitive Documents (including the Governance Documents, the Registration Rights Agreement, and all documents relating to the Exit Facilities) shall have been duly approved and adopted and, as applicable, duly executed and delivered by the parties thereto, and such Definitive Documents shall be materially consistent with the terms set forth in this Agreement and the Restructuring Support Agreement and otherwise reasonably acceptable to the Requisite Commitment Parties and shall  be in full force and effect.

(j)    <u>No Injunctions or Restraints; Illegality</u>.  No temporary restraining order, preliminary or permanent injunction, judgment or other Order preventing the consummation of the transactions contemplated by this Agreement or any of the other Contemplated Transactions shall have been entered, issued, rendered or made, nor shall any Proceeding seeking any of the foregoing be commenced, pending or threatened; nor shall there be any Law promulgated, enacted, entered, enforced or deemed applicable to the Commitment Parties or the Debtors which prevents, prohibits or otherwise makes illegal the consummation of the transactions contemplated by this Agreement or any of the other Contemplated Transactions.

(k)    <u>Notices and Consents</u>.  All governmental and third party notifications, filings, waivers, authorizations and Consents necessary or required for the consummation of the transactions contemplated by this Agreement or any of the other Contemplated Transactions, if any, shall have been made or received and shall be in full force and effect.

(l)    <u>Representations and Warranties</u>.  (i) Each of the representations and warranties of the Debtors in this Agreement, the Backstop Escrow Agreement and the Restructuring Support Agreement, and if the Non-Ascent Restructuring Toggle has not occurred, each of the representations of Ascent in the Restructuring Support Agreement,  shall be true and correct in all material respects (other than those representations and warranties that are qualified by "materiality" or "Material Adverse Effect", which shall be true and correct in all respects) at and as of the Execution Date (or the date of the Backstop Escrow Agreement or the Restructuring Support Agreement) (except for representations and warranties expressly made as of a specified date, which shall be true and correct only as of the specified date) and (ii) each of (A) the representations and warranties of the Debtors in <u>Sections 2.1</u>, <u>2.2(a)</u>, <u>2.4</u> and <u>2.5</u> hereof shall be true and correct in all material respects (other than those representations and warranties that are qualified by "materiality" or "Material Adverse Effect", which shall be true and correct in all respects) and (B) the other representations and warranties of the Debtors in this Agreement, the Backstop Escrow Agreement and the Restructuring Support Agreement, and if the Non-Ascent Restructuring Toggle has not occurred, the representations of Ascent in the Restructuring Support Agreement, shall be true and correct in all respects (without regard for any "materiality" or "Material Adverse Effect" qualifiers set forth therein) except where the failure of such representations and warranties referred to in this clause (B) to be so true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, in each case of clauses (A) and (B), at and as of the Plan Effective Date as if made at and as of the

NY 77634875

Plan Effective Date (except for representations and warranties expressly made as of a specified date, which shall be true and correct only as of the specified date).

(m)     <u>Covenants</u>.  Each of the Debtors shall have complied in all material respects with all covenants in this Agreement, the Backstop Escrow Agreement and the Restructuring Support Agreement and, if the Non-Ascent Restructuring Toggle has not occurred, Ascent shall have complied in all material respects with all covenants in the Restructuring Support Agreement.

(n)     <u>Transaction Expenses</u>.  The Debtors shall have paid all Transaction Expenses that have accrued and been invoiced in accordance with <u>Section 1.7</u> and remain unpaid as of the Plan Effective Date in accordance with the terms of this Agreement, and no Transaction Expenses shall be required to be repaid or otherwise disgorged to the Debtors or any other Person.

(o)     <u>Material Adverse Effect</u>.  Since March 31, 2019, there shall not have occurred any event, change, effect, occurrence, development, circumstance or change of fact that has had, or would reasonably be expected to have, a Material Adverse Effect.

(p)     <u>Purchase Notices</u>.  Each of the Backstop Commitment Parties shall have received a Backstop Purchase Notice in accordance with <u>Section 1.1(c)</u> hereof, certifying as to the number of Backstop Commitment Shares to be purchased by such Backstop Commitment Party, and the Backstop Commitment Share Purchase Price therefor, pursuant to <u>Section 1.3(a)</u> hereof, and each of the Equity Commitment Parties shall have received an Equity Commitment Purchase Notice in accordance with <u>Section 1.1(d)</u> hereof, certifying as to the number of Equity Commitment Shares to be purchased by such Equity Commitment Party, and the Equity Commitment Share Purchase Price therefor.

(q)     <u>Net Cash Amount</u>.  If a Non-Ascent Restructuring Toggle has not occurred, Ascent shall have delivered or shall cause to be delivered the Net Cash Certificate to Monitronics, the Subscription Agent and each of the Commitment Parties in accordance with <u>Section 1.1(b)</u> hereof.

(r)     <u>No Registration; Compliance with Securities Laws</u>.  No Proceeding shall be pending or threatened by any Governmental Body or other Person that alleges that (i) any of the Specified Issuances is not exempt from the registration requirements of Section 5 of the Securities Act or (ii) the offer and sale of shares in the Ascent Share Distribution does not comply with the registration requirements of Section 5 of the Securities Act; <u>provided</u> that clause (ii) shall not apply if the Non-Ascent Restructuring Toggle has occurred.

(s)     <u>Officer's Certificate</u>.  The Commitment Parties shall have received on and as of the Plan Effective Date (i) a certificate of the chief financial officer or chief executive officer of Monitronics confirming that the conditions set forth in <u>Sections 6.1(l)</u>, <u>6.1(m)</u> and <u>6.1(o)</u> hereof have been satisfied and (ii) if a Non-Ascent Restructuring Toggle has not occurred, a certificate of the chief financial officer or chief executive officer of Ascent confirming that, solely with respect to Ascent,  the conditions set forth in <u>Sections 6.1(l)</u>, <u>6.1(m)</u> and <u>6.1(o)</u> hereof have been satisfied.

-31-

(t)     Exit Facilities.  The Debtors shall have entered into and consummated the transactions contemplated by the Exit Facilities and the Exit Facility Documentation shall contain terms and conditions materially consistent with the terms and conditions set forth in Exhibits C and D attached to the Restructuring Support Agreement and shall otherwise be in form and substance reasonably satisfactory to the Requisite Commitment Parties.

(u)     Assumption of Contracts.  The assumption or rejection and/or amendment of certain material contracts and the liability of the Debtors with respect to such contracts shall be reasonably satisfactory to the Requisite Commitment Parties.

(v)     Backstop Escrow Agreement.  The Debtors shall have executed and delivered to the Backstop Commitment Parties the Backstop Escrow Agreement and each certificate, agreement or document (other than this Agreement) that any Debtor is required to execute and/or deliver pursuant to the terms of this Agreement, the Backstop Escrow Agreement or the Restructuring Support Agreement, and the Backstop Escrow Agreement and each such certificate, agreement or document shall be materially consistent with this Agreement and the Restructuring Support Agreement (including the Term Sheets) and otherwise reasonably acceptable to each of the Backstop Commitment Parties.

(w)     Merger Conditions.  Either (i) the Non-Ascent Restructuring Toggle shall have occurred or (ii) if the Non-Ascent Restructuring Toggle shall not have occurred, then either (A) the Merger shall have been consummated or (B) all closing conditions set forth in the Merger Agreement (other than conditions that by their nature are to be satisfied at closing) shall have been satisfied or waived in accordance with the Merger Agreement.

(x)     Interest on Contributed Term Loans.  With respect to the Equity Commitment Parties, such parties shall have received payment of all accrued and unpaid interest, at the applicable rate, on such Contributed Term Loans as of the Plan Effective Date in full in cash pursuant to the Plan.

6.2     **Conditions Precedent to Obligations of Monitronics**.  The obligations of Monitronics to issue and sell the Backstop Shares to each of the Backstop Commitment Parties pursuant to Section 1.3(d) hereof and issue the Equity Commitment Shares in exchange for the Contributed Term Loans of the Equity Commitment Parties are subject to the following conditions precedent, each of which may be waived in writing by Monitronics:

(a)     Confirmation Order.  The Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall be a Final Order.

(b)     Agreement Order.  The Bankruptcy Court shall have entered the Agreement Order and the Agreement Order shall be a Final Order.

(c)     Conditions to Confirmation.  The conditions to confirmation of the Plan and the conditions to the Plan Effective Date set forth in the Plan shall have been satisfied or waived in accordance with the Plan, and the Plan Effective Date shall have occurred or shall occur simultaneously with the Closing.

(d)     <u>Rights Offering</u>.   The Rights Offering shall have been consummated or shall be consummated simultaneously with the Closing in accordance with its terms and the Rights Offering Procedures.

(e)     <u>No Injunctions or Restraints; Illegality</u>.   No temporary restraining order, preliminary or permanent injunction, judgment or other Order restraining, enjoining or otherwise prohibiting any of the Contemplated Transactions shall have been entered, issued, rendered or made, nor shall any Proceeding seeking any of the foregoing be commenced, pending or threatened in writing; nor shall there be any Law in effect which makes consummation of the Contemplated Transactions illegal or otherwise prohibits or prevents the consummation of the Contemplated Transactions.

(f)     <u>Representations and Warranties and Covenants</u>.   (i) Each of the representations and warranties of each of the Commitment Parties in this Agreement shall be true and correct in all material respects at and as of the Execution Date and as of the Plan Effective Date as if made at and as of the Plan Effective Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date) and (ii) each of the Commitment Parties shall have complied in all material respects with all covenants in this Agreement, except, in each case, to the extent that Non-Defaulting Backstop Commitment Parties purchase any Default Shares as a result of any breach of representations, warranties or covenants by a Defaulting Backstop Commitment Party pursuant to <u>Section 1.3(c)</u> hereof.

7.     **<u>Termination</u>**.

(a)     Unless earlier terminated in accordance with the terms of this Agreement, this Agreement and the Commitments contemplated hereby shall terminate automatically and immediately, without a need for any further action on the part of (or notice provided to) any Person, upon the earliest to occur of:

(i)     September 20, 2019 (the "<u>Termination Date</u>");

(ii)     the termination of the Restructuring Support Agreement; and

(iii)     the Bankruptcy Court enters an order converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, appointing a trustee or custodian for any of the Debtors or dismissing the Chapter 11 Cases.

(b)     This Agreement and the Commitments contemplated hereby may be terminated and the transactions contemplated hereby may be abandoned at any time by the Requisite Commitment Parties upon written notice to the Company Parties upon or at any time after the existence or occurrence of any of the following:

(i)     if the Company does not file with the Bankruptcy Court (x) an executed copy of this Agreement, together with all of the exhibits and schedules hereto  and (y) the Agreement Motion within one (1) calendar day of the Petition Date;

-33-

(ii)     a material breach by any Debtor of any of its other obligations under this Agreement which (x) is not capable of being cured prior to the Termination Date or (y) if curable, remains uncured for five (5) Business Days following written notice from the Commitment Parties or their counsel;

(iii)     if a court of competent jurisdiction or other Governmental Body shall have issued   or entered a final non-appealable Order permanently restraining, enjoining or otherwise prohibiting any of the Contemplated Transactions, or any Law shall be in effect that makes consummation of the Contemplated Transactions illegal or otherwise prohibits or prevents the consummation of the Contemplated Transactions;

(iv)     any of the conditions set forth in Section 6.1 hereof become incapable of fulfillment prior to the Termination Date (other than through the failure of the Backstop Commitment Parties to comply with their obligations under this Agreement or the Restructuring Support Agreement); or

(v)     the occurrence of any of the termination events set forth in Section 15.01 the Restructuring Support Agreement (the "Noteholder Termination Events") without giving effect to any waivers of a Noteholder Termination Event provided under the Restructuring Support Agreement (all such Noteholder Termination Events being incorporated herein by reference with full force and effect as if fully set forth herein by applying the provisions thereof *mutatis mutandis* (such that all changes and modifications to the defined terms and other terminology used in the Noteholder Termination Events shall be made so that the Noteholder Termination Events can be applied in a logical manner in this Agreement)).

(c)     This Agreement and the Commitments contemplated hereby may be terminated at any time by written consent of the Debtors and the Requisite Commitment Parties.

(d)     Except as otherwise provided herein, upon any termination of this Agreement in accordance with this Section 7, this Agreement and the Commitments hereunder shall forthwith become void and of no further force or effect and there shall be no further obligations or liabilities hereunder on the part of any of the Parties; provided, however, that, (i) the obligations of the Debtors to pay or reimburse, as the case may be, the Transaction Expenses pursuant to and in accordance with Section 1.7 and to satisfy their indemnification obligations pursuant to and in accordance with Section 8 shall survive the termination of this Agreement and shall remain in full force and effect, in each case, until such obligations have been satisfied in full, (ii) the provisions set forth in this Section 7(d) and Sections 1.3, 1.4, 1.5, 10, 11, 12 and 13 hereof (and any defined terms used in any such Sections) shall survive the termination of this Agreement in accordance with their terms, and (iv) nothing in this Section 7(d) shall relieve any Party from liability for any willful or intentional breach of this Agreement prior to such termination, which shall in each case expressly survive any such termination.  For purposes of this Agreement, "willful or intentional breach" shall mean a breach of this Agreement that is a consequence of an act undertaken by the breaching party with the knowledge that the taking of such act would, or would reasonably be expected to, cause a breach of this Agreement.

(e)     Each Debtor hereby acknowledges and agrees and shall not dispute that after the Petition Date, the giving of notice of termination by the Commitment Parties pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and each Debtor hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

(f)     In the event of a termination of this Agreement in accordance with this Section 7 at a time after all or any portion of the purchase price for any Backstop Shares has been deposited with the Escrow Agent by any of the Backstop Commitment Parties, the Backstop Commitment Parties that have deposited such funds shall be entitled to the return of such funds.  In such a case, the Backstop Commitment Parties and the Debtors hereby agree to execute and deliver to the Escrow Agent, promptly after the effective date of any such termination (but in any event no later than two (2) Business Days after any such effective date), a letter instructing the Escrow Agent to pay to each applicable Backstop Commitment Party, by wire transfer of immediately available funds to an account designated by such Backstop Commitment Party, the funds that such Backstop Commitment Party is entitled to receive pursuant to this Section 7(f).

8.     **Indemnification**.

(a)     The Debtors hereby agree, jointly and severally, to indemnify and hold harmless each of the Commitment Parties and each of their respective Affiliates, stockholders, equity holders, members, partners, managers, officers, directors, employees, attorneys, accountants, financial advisors, consultants, agents, advisors and controlling persons (each, in such capacity, an "Indemnified Party") from and against any and all losses, claims, damages, liabilities and expenses, joint or several, imposed on, sustained, incurred or suffered by, or asserted against, any Indemnified Party as a result of or arising out of or related to this Agreement, the Commitments, the Plan, the Rights Offering and/or any of the transactions contemplated by this Agreement, the Commitments, or the Rights Offering, or any breach by any Debtor of any of its representations, warranties and/or covenants set forth in this Agreement, or any claim, litigation, investigation or Proceeding relating to any of the foregoing, regardless of whether any such Indemnified Party is a party thereto, and to reimburse each such Indemnified Party for the reasonable and documented legal or other out-of-pocket costs and expenses as they are incurred in connection with investigating, monitoring, responding to or defending any of the foregoing; provided, that the foregoing indemnification will not, as to any Indemnified Party, apply to (i) losses, claims, damages, liabilities or expenses to the extent that they result from a material breach by the Commitment Parties of the Commitment Parties' obligations under this Agreement, or any act by the Commitment Parties of bad faith, gross negligence or willful misconduct, each as determined by a final, non-appealable decision by a court of competent jurisdiction, and (ii) any punitive, exemplary or special damages unless such Indemnified Party is required to pay such damages to a third party, as determined by a final, non-appealable decision by a court of competent jurisdiction.  The terms set forth in this Section 8 shall survive termination of this Agreement and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement or any of the other Contemplated Transactions are consummated.  The indemnity and reimbursement obligations of the Debtors under this Section 8 are in addition to, and do not limit, the Debtors' obligations under Sections 1.4, and 1.5 hereof.

(b)     Promptly after receipt by an Indemnified Party of notice of the commencement of any claim, litigation, investigation, Proceeding or other action with respect to which such Indemnified Party may be entitled to indemnification hereunder ("Actions"), such Indemnified Party will, if a claim is to be made hereunder against the Debtors in respect thereof, notify the Debtors in writing of the commencement thereof; provided, that (i) the omission so to notify the Debtors will not relieve the Debtors from any liability that they may have hereunder except to the extent they have been actually and materially prejudiced by such failure and (ii) the omission so to notify the Debtors will not relieve the Debtors from any liability that they may have to an Indemnified Party otherwise than on account of this Section 8.  In case any such Actions are brought against any Indemnified Party and such Indemnified Party notifies the Debtors of the commencement thereof, the Debtors will be entitled to participate in such Actions, and, to the extent that Debtors elect by written notice delivered to such Indemnified Party, to assume the defense thereof, with counsel satisfactory to such Indemnified Party, provided, that (i) if the defendants in any such Actions include both such Indemnified Party and the Debtors and such Indemnified Party shall have concluded that there may be legal defenses available to it that are different from or additional to those available to the Debtors, such Indemnified Party shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Actions on behalf of such Indemnified Party and (ii) if multiple Indemnified Parties have different legal defenses, each one shall be entitled to separate counsel at the expense of the Debtors.  Following the date of receipt of such indemnification commitment from the Debtors and notice from the Debtors to such Indemnified Party of its election so to assume the defense of such Actions and approval by such Indemnified Party of counsel, the Debtors shall not be liable to such Indemnified Party for expenses incurred by such Indemnified Party in connection with the defense thereof after such date (other than reasonable costs of investigation and monitoring) unless (x) such Indemnified Party shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence or (y) the Debtors shall have authorized in writing the employment of counsel for such Indemnified Party.

(c)     The Debtors shall not, without the prior written consent of an Indemnified Party, effect any settlement of any pending or threatened Actions in respect of which indemnity has been sought hereunder by such Indemnified Party unless (i) such settlement includes an unconditional release of such Indemnified Party in form and substance satisfactory to such Indemnified Party from all liability on the claims that are the subject matter of such Actions and (ii) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Party.

9.     **Survival of Representations and Warranties**.   Notwithstanding any investigation at any time made by or on behalf of any party hereto with respect to, or any knowledge acquired (or capable of being acquired) about, the accuracy or inaccuracy of or compliance with, any representation or warranty made by or on behalf of any party hereto, all representations and warranties contained in this Agreement and in the certificate delivered pursuant to Section 6.1(u) hereof shall survive the execution, delivery and performance of this Agreement.

10.     **Amendments and Waivers**.  Any term of this Agreement may be amended or modified and the compliance with any term of this Agreement may be waived (either generally

or in a particular instance and either retroactively or prospectively) only if such amendment, modification or waiver is signed, in the case of an amendment or modification, by the Requisite Commitment Parties and the Debtors, or in the case of a waiver, by the party waiving compliance; provided, however, that (i) the Backstop Commitment Schedule may be amended in accordance with the terms of Sections 1.3(e) and 12.1 hereof; (ii) the Equity Commitment Schedule may be amended in accordance with the terms of Section 12.1 hereof; (iii) any amendment or modification to this Agreement that would have the effect of changing the Backstop Commitment Percentage of any Non-Defaulting Backstop Commitment Party shall require the prior written consent of such Non-Defaulting Backstop Commitment Party unless otherwise expressly contemplated by this Agreement; (iv) any amendment or modification to this Agreement that would have the effect of changing the Equity Commitment Percentage of any Equity Commitment Party shall require the prior written consent of such Equity Commitment Party unless otherwise expressly contemplated by this Agreement; (v) any amendment or modification to (x) the definition of "Exercise Price" or (y) the allocation of the Put Option Premium Shares among the Commitment Parties as set forth in Section 1.6 shall require the prior written consent of each Backstop Commitment Party adversely affected thereby; (vi) any amendment, modification or waiver to this Agreement that would materially adversely affect the rights or increase the obligations of any Backstop Commitment Party under this Agreement in a manner that is disproportionate in any material respect to the comparable rights and obligations of the Requisite Commitment Parties under this Agreement shall require the prior written consent of such Backstop Commitment Party; and (vii) any amendment, modification or waiver to this Agreement that would materially adversely affect the rights or increase the obligations of any Equity Commitment Party under this Agreement in a manner that is disproportionate in any material respect to the comparable rights and obligations of the Requisite Commitment Parties under this Agreement shall require the prior written consent of such Equity Commitment Party. No delay on the part of any party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any party of any right, power or privilege pursuant to this Agreement, or any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement. The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

11.     **Notices, etc**.   Except as otherwise provided in this Agreement, all notices, demands and other communications hereunder shall be in writing or by written telecommunication (including by facsimile), and shall be deemed to have been duly given or provided if delivered personally or if mailed by certified mail, return receipt requested, postage prepaid, or if sent by overnight courier, or sent by written telecommunication (including by facsimile transmission), as follows:

(a)     if to a Commitment Party, to the mailing address, facsimile number or e-mail address set forth on the Backstop Commitment Schedule or the Equity Commitment Schedule, as applicable, or to such other mailing address, facsimile number or e-mail address as such Commitment Party shall have furnished to the Debtors in writing,

with a copy to:

*EXECUTION VERSION*

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY  10038

Attention:    Kristopher M. Hansen, Esq.
                Sayan Bhattacharyya, Esq.
                -and-
                Samantha L. Martin, Esq.
Fax:        (212) 806-6006
Email:     khansen@stroock.com
                sbhattacharyya@stroock.com
                smartin@stroock.com

(b)    If to the Debtors at:

Monitronics International, Inc.
1990 Wittington Place
Farmers Branch, TX 75234

Attention:    William E. Niles
                -and-
                Fred Graffam

Fax:
Email:      wniles@ascentcapitalgroupinc.com
                fgraffam@brinkshome.com
with a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022

Attention:    David A. Hammerman, Esq.
                -and-
                David J. Miller, Esq.
Fax:
Email:      David.Hammerman@lw.com
                David.Miller@lw.com

(c)    If to Ascent at:

Ascent Capital Group, Inc.
5251 DTC Parkway, Suite 1000
Greenwood Village, Colorado 80111

Attention:    William E. Niles

-38-

Fax:
Email:            wniles@ascentcapitalgroupinc.com
                 fgraffam@brinkshome.com
with a copy to:

Baker Botts L.L.P.
30 Rockefeller Plaza
New York, New York 10112

Attention:       Renee L. Wilm, Esq.
                 -and-
                 Emanuel. Grillo, Esq.

Any such notice, demand or other communication shall be effective (i) if delivered personally, when received, (ii) if sent by overnight courier, when receipted for, (iii) if mailed, three (3) days after being mailed as described above, and (iv) if sent by written telecommunication (including by facsimile transmission), when dispatched.

   12.   **Miscellaneous**.

        12.1   **Assignments.**  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned, delegated or transferred, in whole or in part, by any of the parties (whether by operation of Law or otherwise) without the prior written consent of the other parties.  Notwithstanding the immediately preceding sentence, any Commitment Party's rights, obligations or interests hereunder may be freely assigned, delegated or transferred, in whole or in part, by such Commitment Party, with prior written notice given to (but not the consent of) the Debtors and the Commitment Party Professionals, to (a) any other Commitment Party, (b) any controlled Affiliate of a Commitment Party (other than a portfolio company of such Commitment Party or any of its Affiliates or Related Funds) or (c) any Related Fund of a Commitment Party; provided, that any such assignee expressly assumes the obligations of the assigning Commitment Party hereunder and agrees in writing prior to such assignment to be fully bound as a Commitment Party by the terms of this Agreement in the same manner and to the same extent as the assigning Commitment Party with respect to such rights, obligations and interests; provided, further, that unless otherwise agreed in any instance by the Debtors and the Requisite Commitment Parties, no such assignment, delegation or transfer by a Commitment Party to any controlled Affiliate or Related Funds of such Commitment Party will relieve the assigning Commitment Party of its obligations hereunder if such controlled Affiliate or Related Fund fails to perform such obligations.  Following any assignment, delegation or transfer described in the immediately preceding sentence, the Backstop Commitment Schedule or the Equity Commitment Schedule, as applicable, shall be updated by the Debtors (in consultation with the assigning Commitment Party and the assignee) solely to reflect the name and address of the applicable assignee or assignees and the Commitment Percentage that shall apply to such assignee or assignees, and any changes to the Commitment Percentage applicable to the assigning Commitment Party.  Any

-39-

update to the Backstop Commitment Schedule or the Equity Commitment Schedule described in the immediately preceding sentence shall not be deemed an amendment to this Agreement. Other than as set forth in this <u>Section 12.1</u> and in <u>Section 1.2(b)</u>, no Commitment Party shall be permitted to assign, delegate or transfer all or any portion of its Commitment without the prior written consent of the Company and the Requisite Commitment Parties, which consent shall not be unreasonably withheld, conditioned or delayed.

12.2    **Severability.**  If any provision of this Agreement, or the application of any such provision to any person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto.  Upon any such determination of invalidity, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

12.3    **Entire Agreement.**  Except as expressly set forth herein, this Agreement and the Restructuring Support Agreement (including the Term Sheets) constitute the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof.

12.4    **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which will be an original, and all of which, when taken together, will constitute one agreement.  Delivery of an executed counterpart of this Agreement by facsimile or portable document format (PDF) will be effective as delivery of a manually executed counterpart of this Agreement.

12.5    **Governing Law**.  THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAW PRINCIPLES THEREOF THAT WOULD RESULT IN APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

12.6    **Submission to Jurisdiction.**  Each party to this Agreement hereby (a) consents to submit itself to the personal jurisdiction of the federal court of the Southern District of New York or any state court located in New York County, State of New York in the event any dispute arises out of or relates to this Agreement or any of the transactions contemplated by this Agreement, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, including, without limitation, a motion to dismiss on the grounds of forum non conveniens, and (c) agrees that it will not bring any action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the federal court of the Southern District of New York or any state court located in New York County, State of New York; <u>provided</u>,

however, that during the pendency of the Chapter 11 Cases, all such actions shall be brought in the Bankruptcy Court.

       12.7    **Waiver of Trial by Jury; Waiver of Certain Damages**.  EACH PARTY HERETO HEREBY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.  Except as prohibited by Law, each party hereto hereby waives any right which it may have to claim or recover in any action or claim referred to in the immediately preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages unless such party is required to pay such damages to a third party.  Each of the Debtors (a) certifies that none of the Commitment Parties nor any Representative of any of the Commitment Parties has represented, expressly or otherwise, that the Commitment Parties would not, in the event of litigation, seek to enforce the foregoing waivers and (b) acknowledges that, in entering into this Agreement, the Commitment Parties are relying upon, among other things, the waivers and certifications contained in this <u>Section 12.7</u>.

       12.8    **Further Assurances**.  From time to time after the Execution Date, the parties hereto will execute, acknowledge and deliver to the other parties hereto such other documents, instruments and certificates, and will take such other actions, as any other party hereto may reasonably request in order to consummate the transactions contemplated by this Agreement.

       12.9    **Specific Performance**.  The Company Parties and the Commitment Parties acknowledge and agree that (a) irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, and (b) remedies at law would not be adequate to compensate the non-breaching party.  Accordingly, the Company Parties and the Commitment Parties agree that each of them shall have the right, in addition to any other rights and remedies existing in its favor, to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce its rights and obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive and/or other equitable relief.  The right to equitable relief, including specific performance or injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement.  Each of the Company Parties and the Commitment Parties hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.

       12.10    **Headings**.  The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

       12.11    **Interpretation; Rules of Construction**.  When a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or Exhibit or Schedule to, this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (a) words of any gender include each other gender; (b) words using the singular or plural number also include the plural or singular number, respectively;

(c) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; and (d) the words "include", "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation". The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any regulation, holding, rule of construction or Law providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

12.12 **Several, Not Joint, Obligations**. The representations, warranties, covenants and other obligations of the Commitment Parties under this Agreement are, in all respects, several and not joint or joint and several, such that no Commitment Party shall be liable or otherwise responsible for any representations, warranties, covenants or other obligations of any other Commitment Party, or any breach or violation thereof.

12.13 **Confidentiality and Publicity**. Unless otherwise required by the Bankruptcy Court or applicable Law, the Company Parties shall not, without the prior written consent of such Commitment Party, disclose to any Person (including for the avoidance of doubt, any other Commitment Party), other than the Commitment Party Professionals and legal, accounting, financial and other advisors to the Company Parties (who are under obligations of confidentiality to the Company Parties with respect to such disclosure, and whose compliance with such obligations the Company Parties shall be responsible for), any of the information set forth on the Backstop Commitment Schedule and the Equity Commitment Schedule with respect to any Commitment Party or the name or the principal amount or percentage of the Company Claims held by such Commitment Party or any of its respective Affiliates or Related Funds). Notwithstanding the foregoing, the Commitment Parties hereby consent to the disclosure of the execution, terms and contents of this Agreement by the Company Parties in the Definitive Documents or as otherwise required by Law; provided, however, that (i) if any of the Company Parties determines that they are required to attach a copy of this Agreement, any Joinder or Transfer Agreement to any Definitive Documents or any other filing or similar document relating to the transactions contemplated hereby, they will omit the Backstop Commitment Schedule and the Equity Commitment Schedule and redact any reference to or identifying information concerning a specific Commitment Party and such Commitment Party's holdings (including before any filing thereof with the SEC or the Bankruptcy Court) and (ii) if disclosure of additional identifying information of any Commitment Party is required by the Bankruptcy Court or applicable Law, advance notice of the intent to disclose, if permitted by the Bankruptcy Court or applicable Law, shall be given by the disclosing Party to each Commitment Party (who shall have the right to seek a protective order prior to disclosure). The Company Parties further agree that such information shall be redacted from "closing sets" or other representations of the fully executed Agreement, any Joinder or Transfer Agreement. Notwithstanding the foregoing, the Company Parties will submit to the Commitment Party Professionals all press releases, public filings, public announcements or other communications with any news media, in each case, to be made by the Company Parties relating to this Agreement or the transactions contemplated hereby and any amendments thereof at least one (1) Business Day (it being understood that such period may be shortened to the extent there are exigent circumstances that require such public communication to be made to comply with the Bankruptcy Court or applicable law) in advance of release and will take such counsel's view with respect to such communications into account. Notwithstanding the foregoing, each Commitment Party hereby

-42-

agrees to permit disclosure in the Disclosure Statement and any filings by the Company Parties with the Bankruptcy Court regarding the aggregate amounts of the Backstop Commitments and the Equity Commitments, and the total principal amount (and percentage of the total outstanding) of the Notes held by all Commitment Parties on an aggregate basis.

12.14  **No Recourse Party**.  Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Commitment Parties and the Debtors may be partnerships or limited liability companies, the Debtors and the Commitment Parties covenant, agree and acknowledge that no recourse under this Agreement shall be had against any former, current or future directors, officers, agents, Affiliates, limited partners, general partners (other than general partners, if any, of the Commitment Parties, but not any other general partner of any other Person), members, managers, employees, stockholders or equity holders of any Commitment Party or the Debtors, or any former, current or future directors, officers, agents, Affiliates, employees, general or limited partners, members, managers, employees, stockholders or equity holders of any of the foregoing, as such (any such Person, a "No Recourse Party"), whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable Law, it being expressly agreed and acknowledged that no liability whatsoever shall attach to, be imposed on or otherwise be incurred by any No Recourse Party for any obligation of any Commitment Party or any Debtor under this Agreement for any claim based on, in respect of or by reason of such obligations or their creation; provided, that nothing in this Section 12.14 shall relieve the Debtors or the Commitment Parties of their obligations under this Agreement.

12.15  **Settlement Discussions**.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any Proceeding other than a Proceeding to enforce the terms of this Agreement.

12.16  **No Third Party Beneficiaries**.  This Agreement is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto and other than (a) the Indemnified Parties with respect to Section 8 hereof and (b) the No Recourse Parties with respect to Section 12.14 hereof.

12.17  **Relationship Among Parties**.  Notwithstanding anything to the contrary herein, the duties and obligations of the Commitment Parties under this Agreement shall be several, not joint. None of the Commitment Parties shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any Commitment Party, any Debtor, or any of the Debtors' respective creditors or other stakeholders, and there are no commitments among or between the Commitment Parties, in each case except as expressly set forth in this Agreement. No prior history, pattern or practice of sharing confidence among or between any of the Commitment Parties and/or the Debtors shall in any way affect or negate this understanding and agreement. The Parties have no agreement, arrangement or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any securities of any of the Company Parties and do not constitute a "group" within the meaning of Section 13(d)(3) of the Exchange Act or Rule 13d-5 promulgated thereunder. For the avoidance of doubt: (a) each Commitment Party is entering into this Agreement directly with the Debtors

and not with any other Commitment Party, (b) no other Commitment Party shall have any right to bring any action against any other Commitment Party with respect to this Agreement (or any breach thereof) and (c) no Commitment Party shall, nor shall any action taken by a Commitment Party pursuant to this Agreement, be deemed to be acting in concert or as any group with any other Commitment Party with respect to the obligations under this Agreement nor shall this Agreement create a presumption that the Commitment Parties are in any way acting as a group. All rights under this Agreement are separately granted to each Commitment Party by the Debtors and vice versa, and the use of a single document is for the convenience of the Debtors. The decision to commit to enter into the transactions contemplated by this Agreement has been made independently.

13. **Definitions**.

13.1 **Certain Defined Terms.** As used in this Agreement the following terms have the following respective meanings:

Accredited Noteholder:  means each Rights Offering Participant who certifies in the Questionnaire that it is an "accredited investor" (as defined in Regulation D of the Securities Act), a non US person (as defined in Regulation S of the Securities Act) and not participating on behalf or on account of a US person, or a "qualified institutional buyer" (as defined in Rule 144A of the Securities Act).

Actions:  has the meaning given to such term in Section 8(b) hereof.

Additional Backstop Note Party:  has the meaning given to such term in Section 1.3(e) hereof.

Additional Backstop Notes:  has the meaning given to such term in Section 1.3(e) hereof.

Additional Shares:  has the meaning given to such term in Section 1.3(c) hereof.

Adjusted Commitment Percentage:  means, with respect to any Non-Defaulting Backstop Commitment Party that elects to purchase Backstop Commitment Shares not purchased by Defaulting Backstop Commitment Parties, a fraction, expressed as a percentage, the numerator of which is the Backstop Commitment, of such Non-Defaulting Backstop Commitment Party and the denominator of which is the aggregate Backstop Commitments of all Non-Defaulting Backstop Commitment Parties that elect to purchase Backstop Commitment Shares not purchased by Defaulting Backstop Commitment Parties.

Affiliate:  means, with respect to any Person, any other Person that directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person (whether through ownership of securities or partnership or other ownership interests, by Contract or otherwise).

Affiliated Group:  has the meaning given to such term in Section 1504(a) of the Code.

Aggregate Rights Offering Amount:  has the meaning given to such term in the recitals hereof.

Agreement:  has the meaning given to such term in the preamble hereof.

Agreement Motion:  has the meaning given to such term in Section 4.1 hereof.

Agreement Order:  has the meaning given to such term in Section 4.1 hereof.

Approvals:   means all approvals and authorizations that are required under the Bankruptcy Code for the Debtors to take corporate action.

Ascent:  has the meaning given to such term in the preamble hereof.

Ascent Cash Amount:  has the meaning given to such term in the Restructuring Support Agreement.

Ascent Share Distribution:  means the issuance of shares of New Common Stock on the Plan Effective Date pursuant to the Merger, whereby the holders of Ascent's issued and outstanding shares of common stock (including equity compensation award holders whose awards are accelerated and settled in such common stock) shall receive, in the aggregate, approximately 5.82% of the total shares of New Common Stock (assuming the Net Cash Amount is $23 million and the Ascent Share Distribution shall be adjusted to reflect the actual Net Cash Amount of up to $23 million at the Plan Effective Time by dividing the Net Cash Amount by $395,111,580) to be issued and outstanding as of the Plan Effective Date, subject to dilution by the Post-Emergence Incentive Plan with such shares to be allocated *pro rata* among such Ascent stockholders and equity compensation award holders pursuant to the Registration Statement.

Ascent Default Amount:  means an amount equal to the product of the Ascent Default Shares and the Exercise Price.

Ascent Default Shares:  has the meaning given to such term in Section 1.3(a).

Ascent Stockholder Meeting:  means a meeting or meetings of the Ascent stockholders of record entitled to vote upon the Merger.

Backstop Commitment:  means, with respect to any Backstop Commitment Party, the commitment of such Backstop Commitment Party, subject to the terms and conditions set forth in this Agreement, to purchase Backstop Commitment Shares pursuant to, and on the terms set forth in, Section 1.3(a) hereof.

Backstop Commitment Percentage:  means, with respect to any Backstop Commitment Party, the percentage set forth opposite the name of such Backstop Commitment Party under the heading "Backstop Commitment Percentage" on the Backstop Commitment Schedule, as such percentages may be modified from time to time in accordance with the terms hereof.

Backstop Commitment Schedule:  means Schedule 1.1 hereto, as such schedule may be modified from time to time in accordance with the terms hereof.

Backstop Commitment Shares:  has the meaning given to such term in Section 1.3(a) hereof.

Backstop Commitment Share Purchase Price:  has the meaning given to such term in Section 1.1(c) hereof.

Backstop Default:  has the meaning given to such term in Section 1.3(c) hereof.

Backstop Commitment Party(ies):  has the meaning given to such term in the preamble hereof.

Backstop Escrow Account:  has the meaning given to such term in Section 1.3(b) hereof.

Backstop Escrow Agent:  has the meaning given to such term in Section 1.3(b) hereof.

Backstop Escrow Agreement:  has the meaning given to such term in Section 1.3(b) hereof.

Backstop Purchase Notice:  has the meaning given to such term in Section 1.1(c) hereof.

Backstop Put Option Premium:  has the meaning given to such term in Section 1.6 hereof.

Backstop Put Option Premium Shares:  has the meaning given to such term in Section 1.6 hereof.

Backstop Shares:  has the meaning given to such term in Section 1.3(c) hereof.

Bankruptcy Code:  has the meaning given to such term in the recitals hereof.

Bankruptcy Court:  has the meaning given to such term in the recitals hereof.

Bankruptcy Rules:  means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases and/or the transactions contemplated by this Agreement, and any Local Rules of the Bankruptcy Court.

Benefit Plan(s):  has the meaning given to such term in Section 2.11(a) hereof.

Business Day:  means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

Cash Opt Out Noteholder:  has the meaning given to such term in the Restructuring Support Agreement.

Chapter 11 Cases:  has the meaning given to such term in the recitals hereof.

Closing:  has the meaning given to such term in Section 1.5 hereof.

*EXECUTION VERSION*

<u>Code</u>:  has the meaning given to such term in <u>Section 2.11</u> hereof.

<u>Commitment Party(ies)</u>:  has the meaning given to such term in the preamble hereof.

<u>Commitment Party Professionals</u>:  means Stroock, Houlihan Lokey, Inc. and Mike R Meyers LLC, as advisors to the Commitment Parties.

<u>Commitments</u>:  means, collectively, the Primary Commitments, the Backstop Commitments and the Equity Commitments.

<u>Company Parties</u>:  means, each of Ascent, the Debtors and Reorganized Monitronics.

<u>Company SEC Documents</u>:  means all of the reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) filed with the SEC by the Ascent and Monitronics.

<u>Confirmation Order</u>:  has the meaning given to such term in the Restructuring Support Agreement.

<u>Consent</u>:  means any consent, waiver, approval, order or authorization of, or registration, declaration or filing with or notice to, any Governmental Body or other Person.

<u>Consenting Creditors</u>:  has the meaning given to such term in the Restructuring Support Agreement.

<u>Contemplated Transactions</u>:  means the transactions contemplated by this Agreement and the Restructuring Support Agreement (including the Term Sheets).

<u>Contract</u>:  means any agreement, contract or instrument, including any loan, note, bond, mortgage, indenture, guarantee, deed of trust, license, franchise, commitment, lease, franchise agreement, letter of intent, memorandum of understanding or other obligation, and any amendments thereto, whether written or oral, but excluding the Plan.

<u>Contributed Term Loan Exchange Documentation</u>:  has the meaning given to such term in <u>Section 1.1(d)</u> hereof.

<u>Contributed Term Loans</u>:  has the meaning given to such term in <u>Section 1.4(a)</u> hereof.

<u>Debtor(s)</u>:  has the meaning given to such term in the preamble hereof.  For the avoidance of doubt, Reorganized Monitronics shall be a Debtor for all purposes under this Agreement.

<u>Default Purchase Right</u>:  has the meaning given to such term in <u>Section 1.3(c)</u> hereof.

<u>Default Shares</u>:  has the meaning given to such term in <u>Section 1.3(c)</u> hereof.

<u>Defaulting Backstop Commitment Party</u>:  has the meaning given to such term in <u>Section 1.3(c)</u> hereof.

-47-

Definitive Documents:  has the meaning given to such term in the Restructuring Support Agreement.

Deposit Deadline: has the meaning given to such term in Section 1.3(b) hereof.

DIP Documentation:  has the meaning given to such term in the Restructuring Support Agreement.

DIP/Exit Facility Commitment:  has the meaning given to such term in the recitals hereof.

DIP Facility:  has the meaning given to such term in the Restructuring Term Sheet.

Disclosure Statement:  has the meaning given to such term in the Restructuring Support Agreement.

Disclosure Statement Order:  has the meaning given to such term in the Restructuring Support Agreement.

DTC:  has the meaning given to such term in Section 4.11 hereof.

Effective Date Pay Down:  has the meaning given to such term in the Restructuring Term Sheet.

Encumbrance:  means any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

Equity Commitment:  means, with respect to any Equity Commitment Party, the commitment of such Equity Commitment Party, subject to the terms and conditions set forth in this Agreement, to exchange Contributed Term Loans for Equity Commitment Shares pursuant to, and on the terms set forth in, Section 1.4(a) hereof.

Equity Commitment Amount:  means $100.0 million.

Equity Commitment Party(ies):  has the meaning given to such term in the preamble hereof.

Equity Commitment Percentage:  means, with respect to any Equity Commitment Party, the percentage set forth opposite the name of such Equity Commitment Party under the heading "Equity Commitment Percentage" on the Equity Commitment Schedule, as such percentage may be modified from time to time in accordance with the terms hereof.

Equity Commitment Purchase Notice:  has the meaning given to such term in Section 1.1(d) hereof.

-48-

Equity Commitment Schedule:  means Schedule 1.2 hereto, as such schedule may be modified from time to time in accordance with the terms hereof.

Equity Commitment Shares:  means 25.31% of the total shares of New Common Stock to be issued as of the Plan Effective Date, subject to dilution by the Post-Emergence Incentive Plan.

Equity Commitment Share Purchase Price:  has the meaning given to such term in Section 1.1(d) hereof.

Equity Put Option Premium:  has the meaning given to such term in Section 1.6 hereof.

Equity Put Option Premium Shares:  has the meaning given to such term in Section 1.6 hereof.

Equity Securities:  means any common stock, other equity securities or voting interests in Monitronics.

ERISA:  means the Employee Retirement Income Security Act of 1974, as amended.

ERISA Affiliate(s):  means any entity which is a member of any Company Parties or its Subsidiaries' controlled group, or under common control with any Company Parties or its Subsidiaries, within the meaning of Section 414 of the Code or is treated as a single employer with the foregoing under ERISA.

Exchange Act:  means the Securities Exchange Act of 1934, as amended.

Execution Date:  has the meaning given to such term in the preamble hereof.

Exercise Price:  means $17.56 per share of New Common Stock, which shall also be the per-share purchase price at which the Rights Offering Shares are offered in the Rights Offering.

Exit Facilities:  means the Exit Revolving Facility and the Exit Term Loan Facility.

Exit Facility Documentation:  has the meaning given to such term in Section 4.8 hereof.

Exit Revolving Facility:  has the meaning given to such term in the Restructuring Term Sheet.

Exit Term Loan Facility:  has the meaning given to such term in the Restructuring Term Sheet.

Final Order:  means an Order issued by the Bankruptcy Court in the Chapter 11 Cases which (a) is in full force and effect, (b) is not stayed, and (c) is no longer subject to review, reversal, modification or amendment, by appeal or writ of certiorari or otherwise; provided, however, that the possibility that a motion under Rule 50 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Civil Procedure or Bankruptcy Rules, may be filed relating to such Order shall not cause such Order not to be deemed a Final Order.

Financial Statements:  has the meaning given to such term in Section 2.14 hereof.

First Lien Term Lender:  has the meaning given to such term in the Restructuring Support Agreement.

Forbearance Agreements:  means the Lender Forbearance Agreement and the Noteholder Forbearance Agreement (each, as defined in the Restructuring Support Agreement).

GAAP:  has the meaning given to such term in Section 2.14 hereof.

Governance Documents:  has the meaning given to such term in the Restructuring Support Agreement.

Governance Term Sheet:  has the meaning given to such term in the recitals hereof.

Governmental Body:  means any federal, national, supranational, foreign, state, provincial, local, county, municipal or other government, any governmental, regulatory or administrative authority, agency, department, bureau, board, commission or official or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority, or any court, tribunal, judicial or arbitral body.

Indemnified Party:  has the meaning given to such term in Section 8(a) hereof.

Initial Backstop Notes:  has the meaning given to such term in Section 1.3(e) hereof.

Initial Transaction Expenses:  has the meaning given to such term in Section 1.7 hereof.

Investment Company Act:  has the meaning given to such term in Section 2.24 hereof.

IP Rights:  has the meaning given to such term in Section 2.8 hereof.

IRS:  means the Internal Revenue Service and any Governmental Body succeeding to the functions thereof.

Knowledge of Monitronics:  means the actual knowledge, after reasonable inquiry of their direct reports, of the chief executive officer, chief financial officer, chief operating officer and general counsel of Monitronics (or of Ascent, with respect to the applicable representations and warranties by Ascent with respect to itself).  As used herein, "actual knowledge" means information that is personally known by the listed individual(s).

Law:  means any federal, national, supranational, foreign, state, provincial, local, county, municipal or similar statute, law, common law, writ, injunction, decree, guideline, policy, ordinance, regulation, rule, code, Order, constitution, treaty, requirement, judgment or judicial or administrative doctrines enacted, promulgated, issued, enforced or entered by any Governmental Body.

Legal Proceeding:  means any legal, governmental, administrative, judicial or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters, claims, notices of noncompliance or violations, or proceedings.

Legend:  has the meaning given to such term in Section 4.10 hereof.

Material Adverse Effect:  means any event, change, effect, occurrence, development, circumstance or change of fact occurring after the date hereof that has had, or would reasonably be expected to have, a material adverse effect on the business, results of operations, condition (financial or otherwise), assets or liabilities of the Debtors (or, if the Non-Ascent Restructuring Toggle has not occurred, the Company Parties), taken as a whole; provided, however, that "Material Adverse Effect" shall not include any event, change, effect, occurrence, development, circumstance or change of fact the occurrence of which is expressly disclosed in the Company SEC Documents prior to the RSA Effective Date, or any event, change, effect, occurrence, development, circumstance or change of fact to the extent arising out of or resulting from (a) conditions or effects that generally affect Persons engaged in the industries and markets in which the Debtors or Company Parties, as applicable, operate, (b) general economic conditions in the United States or globally, (c) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the U.S., or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the U.S., (d) financial, banking, securities, credit or commodities markets, prevailing interest rates, or general capital markets conditions in the United States or globally, (e) changes in U.S. generally accepted accounting principles, (f) changes in laws, rules, regulations, orders, or other binding directives issued by any Governmental Body, (g) the taking of any action (including consummation of the transactions contemplated hereby and thereby) expressly contemplated by this Agreement and the Restructuring Support Agreement, including the filing and pendency of the Chapter 11 Cases, (h) changes in the market price or trading volume of the claims or equity or debt securities of the Company Parties (but not the underlying facts giving rise to such changes unless such facts are otherwise excluded pursuant to the clauses contained in this definition), or (i) the departure of officers or directors of any of the Company Parties not in contravention of the terms and conditions of the Definitive Documents (but not the underlying facts giving rise to such departure unless such facts are otherwise excluded pursuant to the clauses contained in this definition), except in each of clauses (a), (b), (c) and (d) above, if any of the Debtors or Company Parties, as the case may be, is disproportionately affected thereby relative to other Persons engaged in the industry in which such Debtor or Company Party operates.

Material Contracts:  means (a) all "plans of acquisition, reorganization, arrangement, liquidation or succession" and "material contracts" (as such terms are defined in Items 601(b)(2) and 601(b)(10) of Regulation S-K under the Exchange Act) to which Ascent, Monitronics or any of their Subsidiaries is a party and (b) any Contracts to which the Ascent, Monitronics or any of their Subsidiaries is a party that is likely to reasonably involve consideration of more than $5,000,000, in the aggregate, over a twelve-month period.

Merger:  means the merger of Ascent with and into Monitronics, with Monitronics as the surviving corporation, as a result of which all assets of Ascent at the time of the Merger

(including the Ascent Cash Amount) shall become assets of Reorganized Monitronics and the holders of Ascent's common stock shall receive New Common Stock in the amount of the Ascent Share Distribution on the terms and conditions set forth in the Restructuring Term Sheet.

Merger Agreement:   means the Agreement and Plan of Merger, dated as of May 24, 2019, by and between Ascent and Monitronics, that sets forth the terms and conditions of the Merger.

Merger Approvals:  means all requisite approvals to consummate the Merger (including, for the avoidance of doubt, all third-party and regulatory approvals required to consummate the Merger, including approvals from the SEC and stockholder approvals).

Money Laundering Laws:  has the meaning given to such term in Section 2.23 hereof.

Monitronics:  has the meaning given to such term in the preamble hereof.

New Common Stock:  has the meaning given to such term in the Restructuring Support Agreement.

Net Cash Amount:  has the meaning given to such term in the Restructuring Support Agreement.

Net Cash Certificate:  has the meaning given to such term in Section 1.1(b) hereof.

Net Cash Shortfall Amount:  means an amount equal to the product of the Net Cash Shortfall Shares and the Exercise Price.

Net Cash Shortfall Shares:  has the meaning given to such term in Section 1.3(a) hereof.

No Recourse Party:  has the meaning given to such term in Section 12.14 hereof.

Non-Accredited Noteholder:  means each Rights Offering Participant who certifies in the Questionnaire that it is not an Accredited Noteholder.

Non-Ascent Restructuring Toggle:   has the meaning given to such term in the Restructuring Support Agreement.

Non-Defaulting Backstop Commitment Party:  has the meaning given to such term in Section 1.3(c) hereof.

Note Claims:  has the meaning given to such term in the Restructuring Term Sheet.

Noteholder Termination Events:  has the meaning given to such term in Section 7(b)(v) hereof.

Notes:  has the meaning given to such term in the Restructuring Support Agreement.

Order:  means any order, writ, judgment, injunction, decree, rule, ruling, directive, stipulation, determination or award made, issued or entered by or with any Governmental Body, whether preliminary, interlocutory or final.

Organizational Documents:  means, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of formation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) or which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability or members agreement).

Party(ies):  has the meaning given to such term in the preamble hereof.

Permitted Encumbrances:  means (a) Encumbrances for utilities and current taxes not yet due and payable or that are due but may not be paid as a result of the commencement of the Chapter 11 Cases, (b) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the purchased assets which do not, individually or in the aggregate, adversely affect the operation of the business, (c) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Law), (d) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the ordinary course of business for sums not yet due and payable or that are due but may not be paid as a result of the commencement of the Chapter 11 Cases and do not result from a breach, default or violation by a Company Party or any of its Subsidiaries of any Contract or Law, (e) such other Encumbrance or title exceptions as the Commitment Parties may approve in writing in their sole discretion or which do not, individually or in the aggregate, materially adversely affect the operation of the business in any material respect and (f) any obligations, liabilities or duties created by this Agreement.

Person:  means an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization or a Governmental Body.

Petition Date:  has the meaning given to such term in the Restructuring Support Agreement.

Plan:  has the meaning given to such term in the Restructuring Support Agreement.

Plan Effective Date:  has the meaning given to such term in the Restructuring Support Agreement.

Post-Emergence Incentive Plan:  has the meaning given to such term in the Restructuring Term Sheet.

Primary Commitment:  means, with respect to any Backstop Commitment Party, the commitment of such Backstop Commitment Party, subject to the terms and conditions set forth in this Agreement, to fully exercise its Required Rights pursuant to, and on the terms set forth in, Section 1.2 hereof.

-53-

Proceeds:  means the net cash proceeds from the sale of the Rights Offering Shares from the Rights Offering pursuant to this Agreement.

Proceeding:  means any action, arbitration, audit, change, hearing, investigation, inquiry, litigation or suit (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

Purchase Notice:  means any Backstop Purchase Notice or Equity Commitment Purchase Notice.

Put Option:  means the right of Monitronics to sell and cause the Backstop Commitment Parties to purchase the Backstop  Commitment Shares pursuant to (and subject to the terms and conditions set forth in) this Agreement.

Put Option Premium:  has the meaning given to such term in Section 1.6 hereof.

Put Option Premium Shares:  has the meaning given to such term in Section 1.6 hereof.

Qualified Market Maker:  has the meaning given to such term in Section 1.2(b) hereof.

Questionnaire:  means the Questionnaire to be included in the Rights Offering Solicitation Materials, in which each Rights Offering Participant will be required to certify whether it is an Accredited Noteholder or a Non-Accredited Noteholder.

Registration Rights Agreement:  has the meaning given to such term in Section 4.12 hereof.

Registration Statement:  means the Form S-4 registration statement filed with the SEC on May 24, 2019 by Monitronics and/or the newly formed Delaware corporation that that will be surviving entity in the Merger, to register the Ascent Share Distribution under the Securities Act, as the same may be amended or supplemented from time to time.

Related Fund:  means, with respect to any Commitment Party, any fund, account or investment vehicle that is controlled or managed by (a) such Commitment Party, (b) a controlled Affiliate of such Commitment Party or (c) the same investment manager or advisor as such Commitment Party or an Affiliate of such investment manager or advisor.

Reorganized Monitronics:  has the meaning given to such term in the Restructuring Support Agreement.

Representatives:  has the meaning given to such term in Section 4.6 hereof.

Required Consenting Term Lenders:  has the meaning given to such term in the Restructuring Support Agreement.

Required Consenting Noteholders:  has the meaning given to such term in the Restructuring Support Agreement.

-54-

<u>Required Rights</u>:  has the meaning given to such term in in <u>Section 1.2(a)</u> hereof.

<u>Required Rights Joinder</u>:  has the meaning given to such term in <u>Section 1.2(b)</u> hereof.

<u>Required Rights Transferee</u>:  has the meaning given to such term in <u>Section 1.2(b)</u> hereof.

<u>Requisite Commitment Parties</u>:  means, as of any date of determination, (a) Non-Defaulting Backstop Commitment Parties as of such date whose Backstop Commitment Percentages constitute more than 50.0% of the Backstop Commitment Percentages of all Non-Defaulting Backstop Commitment Parties as of such date of determination and (b) Non-Defaulting Equity Commitment Parties as of such date whose Equity Commitment Percentages constitute more than 50.0% of the Equity Commitment Percentages of all Non-Defaulting Equity Commitment Parties as of such date of determination.

<u>Restructuring</u>:  has the meaning given to such term in the Restructuring Support Agreement.

<u>Restructuring Support Agreement</u>:  has the meaning given to such term in the recitals hereof.

<u>Restructuring Term Sheet</u>:  has the meaning given to such term in the recitals hereof.

<u>Rights</u>:  has the meaning given to such term in the recitals hereof.

<u>Rights Offering</u>:  has the meaning given to such term in the recitals hereof.

<u>Rights Offering Documentation</u>:  has the meaning given to such term in <u>Section 4.2</u> hereof.

<u>Rights Offering Expiration Time</u>:  has the meaning given to such term in the Rights Offering Procedures.

<u>Rights Offering Participants</u>:  means those Cash Opt Out Noteholders who duly subscribe for Rights Offering Shares in accordance with the Rights Offering Procedures.

<u>Rights Offering Procedures</u>:  has the meaning given to such term in <u>Section 1.1(a)</u> hereof.

<u>Rights Offering Shares</u>:  has the meaning given to such term in the recitals hereof.

<u>Rights Offering Solicitation Materials</u>:  means the offering document for the Rights Offering (which may be the Disclosure Statement), the Rights Offering Procedures, together with the subscription form, the Questionnaire and other documents to be provided to Noteholders in connection with the Rights Offering.

<u>Rights Offering Term Sheet</u>:  has the meaning given to such term in the recitals hereof.

<u>RSA Effective Date</u>:  has the meaning ascribed to "Agreement Effective Date" in the Restructuring Support Agreement.

*EXECUTION VERSION*

<u>SEC</u>:  means the U.S. Securities and Exchange Commission.

<u>Section 1145</u>:  means Section 1145 of the Bankruptcy Code.

<u>Securities Act</u>:  means the Securities Act of 1933, as amended, and the rules promulgated pursuant thereto.

<u>Specified Issuance Documentation</u>:  has the meaning given to such term in <u>Section 4.9</u> hereof.

<u>Specified Issuance Steps</u>:  has the meaning given to such term in <u>Section 4.9</u> hereof.

<u>Specified Issuances</u>:  means, collectively, (a) the issuance by Reorganized Monitronics of New Common Stock to Cash Opt Out Noteholders on account of their Note Claims pursuant to the Plan, (b) the issuance by Monitronics of the Rights (and the Rights Offering Shares issuable upon the exercise thereof) to (i) the Rights Offering Participants who are Non-Accredited Noteholders and (ii) the Rights Offering Participants who are Accredited Noteholders, pursuant to the Plan and in accordance with the Rights Offering Procedures, (c)   the issuance by Monitronics of the Backstop Commitment Shares to the Backstop Commitment Parties pursuant to this Agreement, (d) the issuance by Monitronics of the Equity Commitment Shares to the Equity Commitment Parties pursuant to this Agreement, (e) if applicable, the issuance by Monitronics of the Ascent Share Distribution pursuant to the Plan and the Merger, and (f) the issuance by Monitronics of the Put Option Premium Shares to the Commitment Parties pursuant to this Agreement.

<u>Stroock</u>: means Stroock & Stroock & Lavan LLP, as counsel to the Commitment Parties.

<u>Subsidiary</u>:  means, with respect to any Person (the "<u>Owner</u>"), any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred), are held by the Owner or one or more of its Subsidiaries.

<u>Subscription Agent</u>:  has the meaning given to such term in <u>Section 4.4</u> hereof.

<u>Takeback Term Loan Term Sheet</u>:  has the meaning given to such term in the recitals hereof.

<u>Term Loans</u>:   has the meaning given to such term in the Restructuring Support Agreement.

<u>Term Sheets</u>:  means, collectively, the Restructuring Term Sheet, the Rights Offering Term Sheet, the DIP/Exit Facility Commitment, the Takeback Term Loan Term Sheet, and the Governance Term Sheet.

<u>Termination Date</u>:  has the meaning given to such term in <u>Section 7(a)(i)</u> hereof.

<u>Transaction Expenses</u>:  means the reasonable and documented fees, costs, expenses, disbursements and charges of the Commitment Party Professionals, in accordance with their respective engagement letters, incurred in connection with or relating to the diligence, negotiation, preparation and/or implementation of the Term Sheets, the Backstop Commitments, the Rights Offering, the Equity Commitments, this Agreement and/or any of the transactions contemplated by any of the foregoing or by the Plan, and the enforcement, attempted enforcement or preservation of any rights or remedies under this Agreement.

<u>Transfer</u>:  has the meaning given to such term in the Restructuring Support Agreement.

<u>Unsubscribed Shares</u>:  means any Rights Offering Shares that have not been duly purchased in the Rights Offering by the Rights Offering Participants.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

*EXECUTION VERSION*

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

**MONITRONICS INTERNATIONAL, INC.**

By: _____
     Name:
     Title:

**<u>OTHER DEBTORS:</u>**

**SECURITY NETWORKS LLC**

By: _____
     Name:
     Title:

**MIBU SERVICER INC.**

By: _____
     Name:
     Title:

**LIVEWATCH SECURITY, LLC**

By: _____
     Name:
     Title:

**PLATINUM SECURITY SOLUTIONS, INC.**

By: _____
     Name:
     Title:

*[Signature Page to Put Option Agreement]*

*EXECUTION VERSION*

**MONITRONICS CANADA, INC.**


By: _____
        Name:
        Title:


**MI SERVICER LP, LLC**


By: _____
        Name:
        Title:


**MONITRONICS SECURITY LP**


By: _____
        Name:
        Title:


**MONITRONICS FUNDING LP**


By: _____
        Name:
        Title:

*[Signature Page to Put Option Agreement]*

*EXECUTION VERSION*

**ASCENT CAPITAL GROUP, INC.**

By: _____
    Name:
    Title:

*[Signature Page to Put Option Agreement]*

*EXECUTION VERSION*

## **BACKSTOP COMMITMENT PARTIES:**

### **[NAME]**

By: _____
     Name:
     Title:

*[Signature Page to Put Option Agreement]*

*EXECUTION VERSION*

## SCHEDULE 1.1

**Backstop Commitment Parties**

| Name of Backstop Commitment Party | Backstop Commitment Percentage | Mailing Address Fax Number and E-mail Address |
|---|---|---|
| | | |

*EXECUTION VERSION*

## SCHEDULE 1.2

### Equity Commitment Parties

| Name of Equity Commitment Party | Equity Commitment Percentage | Mailing Address Fax Number and E-mail Address |
|---|---|---|

*EXECUTION VERSION*

# EXHIBIT A

**Restructuring Support Agreement**

*EXECUTION VERSION*

## **EXHIBIT B**

### **Outline of Rights Offering Procedures[1]**

The Rights Offering Procedures shall:

1. contemplate that the Debtors will, subject to the prior entry of the Agreement Order, commence the Rights Offering within five (5) Business Days of the Petition Date;

2. specify the deadline for exercising Rights as set forth in the Rights Offering Procedures, which shall be the first Business Day that is thirty (30) days after the commencement date of the Rights Offering, subject to extension (the "Rights Offering Exercise Deadline");

3. include a mechanism whereby any Backstop Commitment Party that is also a First Lien Term Lender will have the ability to exercise its Rights by (a) (x) exchanging an aggregate principal amount of its Term Loans (excluding any Contributed Term Loans) in an amount not to exceed its ratable portion of the Effective Date Pay Down, on a dollar-for-dollar basis and (y) waiving such amount of its ratable portion of the Effective Date Paydown, in lieu of submitting cash to pay the Exercise Price for the shares it elects to purchase pursuant to the exercise of its Rights, and (b) paying cash for the remainder, if any, of such Exercise Price. All other Rights Offering Participants (excluding the Backstop Commitment Parties) must pay the full amount of their respective aggregate Exercise Price in cash;

4. require that each Rights Offering Participant certify in the Questionnaire that it is either (a) an Accredited Noteholder (to be defined in the Rights Offering Procedures as including any noteholder who can qualify as a Qualified Institutional Buyer under Rule 144A under the Securities Act, a non-U.S. Person, as defined under Regulation S under the Securities Act or an "accredited investor" as defined under Regulation D of the Securities Act) or (b) a Non Accredited Noteholder (to be defined in the Rights Offering Procedure as any noteholder who does not fall under the definition of "Accredited Investor");

5. provide for the exemptions for the Rights Offering to the registration requirements of the Securities Act to be based on Section 1145 and/or Rule 144A, Section 4(a)(2), Regulation D or Regulation S of the Securities Act (the "Private Placement Exemption") with respect to the issuance of Rights (and of the Rights Offering Shares issuable pursuant to the exercise of such Rights) based on an allocation mechanism that:

   a. first, allocates Rights issued under Section 1145 to Rights Offering Participants who are Non-Accredited Noteholders, on a pro rata basis; and

   b. second, allocates any remaining Rights issued under Section 1145 to Rights Offering Participants that are Accredited Noteholders on a pro rata basis and, to

---

[1] Capitalized terms that are used but not otherwise defined in herein shall have the meanings given to them in the Put Option Agreement (the "Put Option Agreement") to which this Exhibit B is attached.

Exhibit B

the extent necessary to preserve the availability of Section 1145 pursuant to applicable SEC guidance, any remaining Rights will be issued to such Accredited Noteholders under the Private Placement Exemption;

6.    provide that there will be no over-subscription rights associated with the Rights Offering.  Any Unsubscribed Shares will not be offered to other Rights Offering Participants but, rather, will be purchased by the Backstop Commitment Parties, subject to the terms and conditions set forth in the Put Option Agreement, in accordance with their respective Backstop Commitments;

7.    contemplate, consistent with the Rights Offering Term Sheet, that the cash proceeds of the Rights Offering and, to the extent applicable, the proceeds of the funding of the Backstop Commitments will be deposited into an escrow account subject to a customary escrow agreement (or a segregated bank account maintained by the Subscription Agent), with funds released consistent with this Rights Offering Term Sheet as of the Plan Effective Date;

8.    include other terms, conditions and procedures as are customary for similar rights offerings by a debtor in a chapter 11 bankruptcy or an out-of-court restructuring where the shares to be issued in a rights offering are to be issued through the facilities of DTC; and

9.    provide that the Rights Offering will be conducted in accordance with the Restructuring Support Agreement, the Term Sheets and the Put Option Agreement, and shall otherwise be on terms and conditions acceptable to the Company Parties, the Required Consenting Noteholders, and the Backstop Commitment Parties, and reasonably acceptable to the Required Consenting Term Lenders, including with respect to the form and content of the Rights Offering Solicitation Materials (and the Put Option Agreement.

## EXHIBIT C

### Form of Required Rights Joinder[2]

The undersigned ("***Joinder Party***") hereby acknowledges that it is acquiring from [TRANSFEROR] Rights to subscribe for and purchase in the Rights Offering, in accordance with the Rights Offering Procedures and subject to the terms and conditions set forth in the Rights Offering Procedures and the Plan, up to [__] shares of Reorganized Monitronics common stock, and that such Rights constitute "Required Rights" under the Put Option Agreement, dated as of May 28, 2019 (the "***Agreement***") by and among Monitronics International, Inc., ("***Monitronics***") and certain of its subsidiaries bound thereto, Ascent Capital Group, Inc. ("***Ascent***") and the Commitment Parties, and are subject to the provisions of Section 1.2 of the Put Option Agreement.  The undersigned has read and understand the Put Option Agreement provisions applicable to Required Rights, including without limitation Section 1.2(b), and agrees to (i) exercise (or cause to be exercised) in full all such Required Rights, in accordance with the terms and conditions of the Rights Offering Procedures, (ii) purchase (or cause to be purchased) all of the Rights Offering Shares issuable pursuant to the exercise of such Required Rights in accordance with the terms and conditions of the Rights Offering Procedures and (iii) fully comply with Section 1.2(b) of the Put Option Agreement (including the Required Rights Joinder requirements) with respect to any subsequent Transfer of any such Required Rights.

This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

All notices and other communications given or made pursuant to the Agreement shall be sent to the Joinder Party at:

_____

_____

_____

Email: _____

The Joinder Party shall deliver a copy of this Agreement to counsel to the Debtors, counsel to Ascent, and counsel to the Commitment Parties.

[NAME]

---

[2]     Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement (as defined below).

By: _____

      Name:

      Title:

      Date:

**Exhibit 3**

**Amended Organizational Documents**

*To be Filed with Plan Supplement*

**<u>Exhibit 4</u>**

**New Exit Facilities Credit Agreement**

*To be Filed with Plan Supplement*

**Exhibit 5**

**Takeback Exit Term Loan Facility Credit Agreement**

*To be Filed with Plan Supplement*

**<u>Exhibit 6</u>**

**Registration Rights Agreement**

*To be Filed with Plan Supplement*

**Exhibit 7**

**Director Nomination Agreement**

*To be Filed with Plan Supplement*

**<u>Exhibit 8</u>**

**Board Observer Agreement**

*To be Filed with Plan Supplement*

**Exhibit 9**

**Information Sharing Agreement**

*To be Filed with Plan Supplement*

**Exhibit 10**

**Merger Agreement**

EXECUTION VERSION

## AGREEMENT AND PLAN OF MERGER
### of
### ASCENT CAPITAL GROUP, INC.,
**a Delaware corporation,**
**with and into**
### MONITRONICS INTERNATIONAL, INC.,
**a Texas corporation**

This AGREEMENT AND PLAN OF MERGER, dated as of May 24, 2019 (this "Agreement"), is entered into by and between Monitronics International, Inc., a Texas corporation ("Monitronics"), and Ascent Capital Group, Inc., a Delaware corporation ("Ascent"). Monitronics and Ascent are sometimes referred to collectively as the "Parties" and individually as a "Party."

## RECITALS

WHEREAS, Ascent is the sole stockholder of Monitronics and, as of the date hereof, holds all of the issued and outstanding shares of capital stock of Monitronics;

WHEREAS, pursuant to that certain Restructuring Support Agreement, dated as of May 20, 2019 (the "RSA"), by and among Monitronics, certain subsidiaries of Monitronics party thereto, Ascent, certain noteholders and term lenders of Monitronics and its subsidiaries, and the other parties thereto, Monitronics and its subsidiaries intend to commence voluntary reorganization cases under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") to consummate a restructuring of Monitronics' and its subsidiaries' indebtedness pursuant to a partial prepackaged chapter 11 plan of reorganization substantially on the terms set forth in the RSA (such partial prepackaged chapter 11 plan, as it may be amended, restated, amended and restated, supplemented, or otherwise modified, the "Plan"), and the consummation of the transactions contemplated under the Plan, the "Reorganization");

WHEREAS, the Parties desire, following the satisfaction or waiver of the conditions set forth in ARTICLE III, including the confirmation of the Plan by the Bankruptcy Court, for each of the following transactions to occur on the Closing Date (as defined below):

(a) the merger of Ascent with and into Monitronics, with Monitronics as the surviving company (the "Merger"), on the terms and subject to the conditions set forth herein; and

(b) the conversion of Monitronics from a Texas corporation to a Delaware corporation (the "Conversion"), on the terms and subject to the conditions set forth herein and in the Plan of Conversion set forth on Exhibit A hereto (the "Plan of Conversion");

WHEREAS, the respective Boards of Directors of each of the Parties have unanimously (1) determined that this Agreement and the transactions contemplated hereby, including, without limitation, the Merger, the Conversion and the other transactions contemplated by this Agreement (collectively, the "Transactions"), are advisable, fair to and in the best interests of each of the respective Parties and their respective stockholders and that it is in the best interests of each of the

respective Parties and their respective stockholders to enter into this Agreement, (2) approved and declared advisable this Agreement and such Party's execution, delivery and performance of this Agreement and the consummation of the Transactions and (3) resolved to submit this Agreement to their respective stockholders and to recommend approval of the adoption of this Agreement by their respective stockholders;

WHEREAS, Ascent, in its capacity as the sole stockholder of Monitronics, will act by written consent to approve the adoption of this Agreement following the execution of this Agreement;

WHEREAS, for United States federal income tax purposes, it is intended that each of the Merger and the Conversion shall qualify as a "reorganization" within the meaning of Section 368(a) of the United States Internal Revenue Code of 1986, as amended (the "Code"), and this Agreement is intended to be and is adopted as a "plan of reorganization" for purposes of Section 368(a) of the Code and within the meaning of Treasury Regulation Section 1.368-2(g); and

WHEREAS, the Parties desire to make certain representations, warranties, and agreements in connection with the Merger and also to prescribe certain conditions to the Merger.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties, and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

# ARTICLE I
# THE MERGER AND RE-DOMESTICATION

**1.1    The Merger**.  Upon the terms and subject to the satisfaction or (to the extent permitted by law) waiver of the conditions of this Agreement, and in accordance with the Texas Business Organization Code (the "TBOC") and the General Corporation Law of the State of Delaware (the "DGCL"), at the Merger Effective Time (as defined below), Ascent shall merge with and into Monitronics.  Monitronics shall be the surviving company in the Merger (the "Surviving Corporation") and shall continue its corporate existence under the laws of the State of Texas.  As of the Merger Effective Time, the separate corporate existence of Ascent shall cease.

**1.2    The Conversion**.  Upon the terms and subject to the satisfaction or (to the extent permitted by law) waiver of the conditions set forth in the Plan of Conversion, and in accordance with the TBOC and the DGCL, following the consummation of the Merger and in connection with the Reorganization, the Surviving Corporation shall consummate the Conversion in accordance with the Plan of Conversion. The Surviving Corporation following the Conversion shall be referred to herein as the "Converted Corporation."

**1.3    Closing**.  Upon the terms and subject to the satisfaction or waiver of the conditions of this Agreement, the closing of the Merger and the Conversion (the "Closing") shall take place (a) at the offices of Latham & Watkins LLP, 811 Main Street, Suite 3700, Houston, Texas, 77002 on the date on which all conditions to consummation of the Plan have been satisfied in full or waived, in accordance with the terms of the Plan, and the Plan becomes effective (such date, the "Plan Effective Date"), or (b) at such other

place, time or date as the Parties may otherwise mutually agree. The date upon which the Closing actually occurs is referred to herein as the "Closing Date."

1.4    **Effective Time**.

(a)    The Merger shall become effective at such time as set forth in each of the certificate of merger (the "Texas Certificate of Merger") that shall be filed with the Secretary of State of the State of Texas in accordance with the TBOC and the certificate of merger (the "Delaware Certificate of Merger," and together with the Texas Certificate of Merger, the "Certificates of Merger") that shall be filed with the Secretary of State of the State of Delaware in accordance with the DGCL, and the term "Merger Effective Time" shall be the date and time when the Certificates of Merger become effective as set forth in such Certificates of Merger.

(b)    The Conversion shall become effective at such time as set forth in each of the certificate of conversion (the "Texas Certificate of Conversion") that shall be filed with the Secretary of State of the State of Texas in accordance with the TBOC and the certificate of conversion (the "Delaware Certificate of Conversion," and together with the Texas Certificate of Conversion, the "Certificates of Conversion") that shall be filed with the Secretary of State of the State of Delaware in accordance with the DGCL, and the term "Conversion Effective Time" shall be the date and time when the Certificates of Conversion become effective as set forth in such Certificates of Conversion.

1.5    **Effects of the Merger**.  At and after the Merger Effective Time, the Merger shall have the effects set forth in this Agreement and in the applicable provisions of the TBOC and DGCL. Without limiting the generality of the foregoing, at the Merger Effective Time, except as otherwise provided herein, all the property, rights, privileges, powers, and franchises of Ascent and Monitronics shall vest in the Surviving Corporation, and all debts, liabilities, and duties of Ascent and Monitronics shall become the debts, liabilities, and duties of the Surviving Corporation.

1.6    **Directors and Officers**.  The directors and officers of Monitronics immediately prior to the Merger Effective Time shall be the directors and officers of the Surviving Corporation until their successors shall have been duly elected and qualified, or their earlier death, resignation or removal.

1.7    **Certificate of Formation; Bylaws**.

(a)    At the Merger Effective Time, the certificate of formation of Monitronics as in effect immediately prior to the Merger Effective Time shall be the certificate of formation of the Surviving Corporation until thereafter amended in accordance with its terms and as provided by applicable law.

(b)    At the Merger Effective Time, the bylaws of Monitronics as in effect immediately prior to the Merger Effective Time shall be the bylaws of the Surviving Corporation until thereafter amended in accordance with its terms and as provided by applicable law.

1.8    **Tax Matters**.  It is intended that (i) the Merger shall qualify as a "reorganization" within the meaning of Section 368(a) of the Code, (ii) the Conversion shall qualify as a "reorganization" within

3

the meaning of Section 368(a)(1)(F) of the Code, and (iii) this Agreement shall constitute, and is adopted as, a "plan of reorganization" with respect to the Merger for purposes of Section 368(a) of the Code and within the meaning of Treasury Regulation Section 1.368-2(g). Each of the Parties shall use its reasonable best efforts to cause (i) the Merger to qualify as a "reorganization" within the meaning of Section 368(a) of the Code and (ii) the Conversion to qualify as a "reorganization" within the meaning of Section 368(a)(1)(F) of the Code.  Both Parties shall provide tax representation letters to Ascent's counsel, as may be reasonably requested by Ascent's counsel, in connection with any tax opinion regarding the U.S. federal income tax consequences of the Merger that may be contained or set forth in the Registration Statement (as defined below) or delivered to Ascent pursuant to <u>Section 3.1(g)</u>, and shall reasonably cooperate with Ascent's counsel in providing such tax opinion. Each Party shall use commercially reasonable efforts (and cause its subsidiaries, as applicable, to use commercially reasonable efforts) not to take or cause to be taken any action that would cause to be untrue (or fail to take or cause not to be taken any action which would cause to be untrue) any of the certifications and representations included in the representation letters described in this Section. Except for actions specifically contemplated by this Agreement, none of the Parties shall (and each of the Parties shall cause their respective subsidiaries not to) take any action, or fail to take any action, that could reasonably be expected to cause (i) the Merger to fail to qualify as a "reorganization" within the meaning of Section 368(a) of the Code or (ii) the Conversion to fail to qualify as a "reorganization" within the meaning of Section 368(a)(1)(F) of the Code. The Parties shall not take any position on any federal, state, local or foreign tax return, or take any other tax reporting position, that is inconsistent with the treatment of (i) the Merger as a "reorganization" within the meaning of Section 368(a) of the Code  and (ii) the Conversion as a "reorganization" within the meaning of Section 368(a)(1)(F) of the Code, in each case unless otherwise required by a "determination" (as defined in Section 1313(a) of the Code) or by applicable state, local or foreign law.

## ARTICLE II
## CONVERSION OF SECURITIES; EXCHANGE OF SHARES

**2.1     Conversion of Ascent Common Stock**.  At the Merger Effective Time, by virtue of the Merger and without any action on the part of either Party or the holder of any of the securities described in the following subsections:

(a)     Each share of (i) the Series A common stock, par value $0.01 per share, of Ascent issued and outstanding immediately prior to the Merger Effective Time ("<u>Ascent Series A Common Stock</u>") (other than any Dissenting Shares (as defined below) and any shares to be cancelled in accordance with <u>Section 2.1(b)</u>), and (ii) the Series B common stock, par value $0.01 per share, of Ascent issued and outstanding immediately prior to the Merger Effective Time ("<u>Ascent Series B Common Stock</u>" and, together with the Ascent Series A Common Stock, the "<u>Ascent Common Stock</u>") (other than any Dissenting Shares and any shares to be cancelled in accordance with <u>Section 2.1(b)</u>) shall, in each case, be converted into the right to receive a number of fully paid and non-assessable shares of common stock, par value $0.01 per share ("<u>Monitronics Common Stock</u>"), of the Converted Corporation (the "<u>Merger Consideration</u>") equal to the Exchange Ratio.

(b)     Any shares of Ascent Common Stock issued and outstanding and owned by Monitronics, or issued and held by Ascent as treasury shares, immediately prior to the Merger Effective Time shall be cancelled and shall cease to exist, and no consideration shall be delivered in exchange therefor.

4

(c)     All of the shares of Ascent Common Stock converted into the Merger Consideration or cancelled pursuant to this <u>Section 2.1</u> shall no longer be outstanding and shall automatically be cancelled and shall cease to exist as of the Merger Effective Time.

(d)     For purposes of this Agreement, the following terms shall have the meanings ascribed below:

"<u>Discounted Equity Value</u>" shall equal $395,111,570.00, pursuant to the terms of the RSA.

"<u>Exchange Ratio</u>" shall mean the quotient of (a) (i) the Net Cash Amount of up to $23,000,000, divided by the Discounted Equity Value, multiplied by (ii) Outstanding New Monitronics Shares; divided by (b) the Outstanding Ascent Shares. By way of illustration, as of the date hereof, the Exchange Ratio would be 0.1040865 based on the assumptions contained in the defined terms used in the calculation thereof, and (x) for each $100,000 increase or decrease in Net Cash Amount at the Merger Effective Time, the Exchange Ratio would increase or decrease, as applicable, by 0.00045, and (y) for each increase or decrease of 25,000 Outstanding Ascent Shares at the Merger Effective Time, the Exchange Ratio would increase or decrease, as applicable, by 0.00020.

"<u>Net Cash Amount</u>" shall have the meaning ascribed in and be determined in accordance with the RSA. For purposes of the illustrative calculation of the Exchange Ratio above, as of the date of this Agreement, the Net Cash Amount was assumed to be equal to $23,000,000.00; provided however that the actual Net Cash Amount shall be determined as of the Merger Effective Time.

"<u>Outstanding Ascent Shares</u>" shall be the number of shares of Ascent Common Stock outstanding immediately prior to the Merger Effective Time, which for purposes of the illustrative calculation of the Exchange Ratio above, as of the date of this Agreement, was assumed to be equal to 12,583,352 total issued and outstanding shares of Ascent Common Stock, assuming the outstanding net Ascent Restricted Shares (as defined below) and the Ascent RSUs (as defined below) described in Section 2.3(c)(i) are accelerated as of the date hereof. It is understood and agreed that Ascent shall not issue any shares of Ascent Common Stock (or any instrument or security exchangeable or convertible with or into Ascent Common Stock) from the date hereof through and including the Merger Effective Time (except as contemplated by Section 2.3).

"<u>Outstanding New Monitronics Shares</u>" shall mean 22,500,000 shares, pursuant to the terms of the RSA.

**2.2     Cancellation of Existing Monitronics Stock**.  As a result of the Merger and without any action on the part of either Party or the holders thereof, at the Merger Effective Time, each share of common stock, par value $0.01 per share, of Monitronics issued and outstanding immediately prior to the Merger Effective Time ("<u>Old Monitronics Common Stock</u>") shall be cancelled and shall cease to exist and no consideration shall be delivered in exchange therefor.

**2.3**     **Ascent Equity and Equity-Based Awards**.

(a)     <u>Ascent Stock Options</u>.  Effective as of the Merger Effective Time, by virtue of the Merger and without any action on the part of the holders thereof, each then outstanding and unexercised option to purchase shares of Ascent Common Stock (each an "<u>Ascent Stock Option</u>"), whether vested or unvested, issued by Ascent under any equity-based compensation plan of Ascent, including the Ascent 2015 Omnibus Incentive Plan (the "<u>Ascent Stock Plan</u>") granted to any current or former employee or director of, or consultant to, Ascent or any subsidiary of Ascent will be canceled for no consideration.

(b)     <u>Ascent Restricted Shares</u>.  Effective as of immediately prior to the Merger Effective Time, each outstanding restricted share of Ascent Common Stock granted to any employee or director of Ascent, any subsidiary of Ascent or any of Ascent's predecessors under the Ascent Stock Plan (collectively, the "<u>Ascent Restricted Shares</u>") shall vest in full immediately prior to the Merger Effective Time and, after any reduction in shares for applicable withholding, shall be treated in the same manner as other issued and outstanding shares of Ascent Common Stock for the purposes of this Agreement, including but not limited to <u>Section 2.1</u>.

(c)     <u>Ascent Restricted Stock Units</u>.  Effective as of immediately prior to the Merger Effective Time, by virtue of the Merger and without any action on the part of the holders thereof, (i) each outstanding restricted stock unit granted to any employee or director of Ascent, any subsidiary of Ascent or any of Ascent's predecessors under the Ascent Stock Plan (collectively, the "<u>Ascent RSUs</u>") that remains subject to only time-based vesting shall vest in full immediately prior to the Merger Effective Time and shall be settled in shares of Ascent Common Stock, which, after any reduction in shares for applicable withholding, shall be treated in the same manner as other issued and outstanding shares of Ascent Common Stock for the purposes of this Agreement, including but not limited to Section 2.1 and (ii) each Ascent RSU subject to performance-based vesting requirements that have not been satisfied as of the Merger Effective Time, shall be canceled for no consideration.

(d)     <u>Other actions</u>. Prior to the Merger Effective Time, the Board of Directors of Ascent shall adopt appropriate resolutions to cause each Ascent Stock Option, Ascent Restricted Share and Ascent RSU to vest or be canceled, as applicable, in each case, in accordance with this <u>Section 2.3</u>.  As of the Merger Effective Time, the Ascent Stock Plan shall terminate.

**2.4**     **Treatment of Shares**.

(a)     <u>Exchange Agent and Exchange Fund</u>.  Prior to the Merger Effective Time, Monitronics shall appoint a commercial bank or trust company or such other party as is reasonably satisfactory to Ascent (the "<u>Exchange Agent</u>") to act as exchange agent for the purpose of exchanging for the Merger Consideration (A) certificates representing shares of Ascent Common Stock ("<u>Certificated Ascent Shares</u>") and (B) uncertificated shares of Ascent Common Stock ("<u>Uncertificated Ascent Shares</u>"), including any cash in lieu of fractional shares. Concurrent with the Conversion and the consummation of the

6

Reorganization, the Converted Corporation shall authorize and deposit with or otherwise make available to the Exchange Agent, in trust for the benefit of holders of shares of Ascent Common Stock, shares of Monitronics Common Stock in book-entry form sufficient to deliver the aggregate Merger Consideration pursuant to <u>Section 2.1</u> (the "<u>Exchange Fund</u>"). The Converted Corporation shall make available to the Exchange Agent, from time to time after the Closing as needed, any dividends or distributions to which such holder is entitled pursuant to <u>Section 2.4(g)</u>.

(b) <u>Exchange Procedures for Ascent Common Stock</u>. Promptly after the Merger Effective Time (but in no event later than five business days following the Merger Effective Time), the Converted Corporation shall send, or shall cause the Exchange Agent to send, to each holder of record of shares of Ascent Common Stock at the Merger Effective Time a letter of transmittal and instructions (which shall specify that the delivery shall be effected, and risk of loss and title shall pass, only upon proper surrender of the Certificated Ascent Shares to the Exchange Agent and which shall otherwise be in customary form and shall include customary provisions with respect to delivery of an "agent's message" or other customary evidence, if any, regarding the transfer of Uncertificated Ascent Shares for use in such exchange). Each holder of record of Ascent Common Stock whose shares have been converted into the right to receive the Merger Consideration pursuant to <u>Section 2.1</u> shall be entitled to receive, upon (i) surrender to the Exchange Agent of one or more Certificated Ascent Shares, together with a letter of transmittal properly completed and validly executed in accordance with the instructions thereto, or (ii) receipt of an "agent's message" by the Exchange Agent (or such other evidence, if any, of transfer as the Exchange Agent may reasonably request) in the case of a book-entry transfer of Uncertificated Ascent Shares, (A) the whole shares of Monitronics Common Stock to which such holder of Ascent Common Stock shall have become entitled pursuant to the provisions of this <u>ARTICLE II</u> (after taking into account all shares of Ascent Common Stock then held by such holder) and (B) a check or checks representing the amount of cash paid in lieu of fractional shares in accordance with <u>Section 2.4(i)</u> and any dividends or distributions then payable to such holder of Ascent Common Stock pursuant to <u>Section 2.4(g)</u>, and the Certificated Ascent Shares and Uncertificated Ascent Shares so surrendered or transferred shall forthwith be cancelled. The shares of Monitronics Common Stock constituting such Merger Consideration shall be in uncertificated book-entry form. No interest will be paid or accrued on any unpaid dividends and distributions payable to holders of Certificated Ascent Shares or Uncertificated Ascent Shares. Until so surrendered or transferred, as the case may be, each such Certificated Ascent Share or Uncertificated Ascent Share shall represent after the Merger Effective Time for all purposes only the right to receive the applicable portion of the Merger Consideration and the right to receive any dividends or other distributions pursuant to <u>Section 2.4(g)</u>, if applicable.

(c) <u>Issuance or Payment to Persons Other Than the Registered Holder</u>. If any portion of the Merger Consideration is to be delivered to a Person other than the Person in whose name the surrendered Certificated Ascent Share or the transferred Uncertificated Ascent Share is registered, it shall be a condition to such payment that (i) either such Certificated Ascent Share shall be properly endorsed or shall otherwise be in proper form for transfer or such Uncertificated Ascent Share shall be properly transferred, and (ii) the

7

Person requesting such payment shall pay to the Exchange Agent any transfer or other taxes required as a result of such delivery to a Person other than the registered holder of such Certificated Ascent Share or Uncertificated Ascent Share, as applicable, or establish to the satisfaction of the Exchange Agent that such tax has been paid or is not payable. For purposes of this Agreement, the term "Person" means any individual, corporation, limited liability company, partnership, association, joint venture, trust, unincorporated organization, other entity or group (as defined in the Securities Exchange Act of 1934, as amended), including any governmental authority.

(d)      No Further Rights in Ascent Common Stock or Old Monitronics Common Stock.  All Merger Consideration delivered in accordance with the terms hereof shall be deemed to have been issued in full satisfaction of all rights pertaining to such surrendered or transferred shares of Ascent Common Stock. From and after the Merger Effective Time, the holders of Certificated Ascent Shares, Uncertificated Ascent Shares, and shares of Old Monitronics Common Stock shall cease to have any rights with respect to such shares of Ascent Common Stock or Old Monitronics Common Stock, as applicable, except as otherwise provided herein or by applicable law.

(e)      Termination of Exchange Fund.  Any portion of the Exchange Fund deposited with or otherwise made available to the Exchange Agent pursuant to Section 2.4(a) that remains unclaimed by the holders of Ascent Common Stock 12 months after the Merger Effective Time shall be returned to the Converted Corporation, upon demand, and any such holder who has not exchanged its shares of Ascent Common Stock for the Merger Consideration in accordance with this Section 2.4 prior to that time shall thereafter look only to the Converted Corporation for, and the Converted Corporation shall remain liable for, payment of the Merger Consideration, and any dividends and distributions with respect thereto pursuant to Section 2.4(g), in respect of such shares without any interest thereon. Notwithstanding the foregoing, the Converted Corporation shall not be liable to any holder of Ascent Common Stock for any amounts properly paid to a public official pursuant to applicable abandoned property, escheat or similar laws.

(f)      Lost Certificates.  If any Certificated Ascent Share shall have been lost, stolen, or destroyed, upon the making of an affidavit of that fact by the Person claiming such Certificated Ascent Share to be lost, stolen, or destroyed and, if required by the Converted Corporation, the posting by such Person of a bond, in such reasonable and customary amount as the Converted Corporation may direct, as indemnity against any claim that may be made against it with respect to such lost, stolen or destroyed Certificated Ascent Share and the payment of any ordinary and customary processing fees, the Exchange Agent will cause to be paid, in exchange for such lost, stolen, or destroyed Certificated Ascent Share, the Merger Consideration and any dividends or distributions with respect thereto pursuant to Section 2.4(g), in accordance with this Section 2.4(f).

(g)      Dividends and Distributions.  No dividends or other distributions with respect to securities of the Converted Corporation constituting part of the Merger Consideration shall be paid to the holder of any Certificated Ascent Shares not surrendered or of any Uncertificated Ascent Shares not transferred until such Certificated Ascent Shares or Uncertificated Ascent Shares, as applicable, are surrendered or transferred, as the case

8

may be, as provided in <u>Section 2.4(b)</u>. Following such surrender or transfer, there shall be paid, without interest, to the Person in whose name the securities of the Converted Corporation have been registered, (i) the amount of dividends or other distributions with a record date after the Merger Effective Time theretofore paid, without any interest thereon, with respect to the shares of Monitronics Common Stock represented by such Certificated Ascent Shares or Uncertificated Ascent Shares, as applicable, and (ii) at the appropriate payment date, the amount of dividends or other distributions with a record date after the Merger Effective Time but prior to surrender and a payment date subsequent to surrender, with respect to shares of Monitronics Common Stock represented by such Certificated Ascent Shares or Uncertificated Ascent Shares, as applicable.

(h)     <u>Withholding</u>.  Notwithstanding any provision contained herein to the contrary, each of the Exchange Agent, Ascent and the Converted Corporation shall be entitled to deduct or withhold from the consideration otherwise payable to any Person pursuant to this Agreement such amounts as it is required to deduct or withhold with respect to the making of such payment under any provision of federal, state, local, or foreign tax law.  If the Exchange Agent, Ascent or the Converted Corporation, as the case may be, so withholds amounts, such amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the shares of Ascent Common Stock in respect of which the Exchange Agent, Ascent or the Converted Corporation, as the case may be, made such deduction and withholding, and any such amounts shall be timely remitted to the applicable taxing authority.

(i)     <u>Fractional Shares</u>.    Notwithstanding any other provision hereof, no fractional shares of Monitronics Common Stock shall be issued, nor otherwise credited to book-entry accounts, no dividends or other distributions with respect to the Monitronics Common Stock shall be payable on or with respect to any fractional share interests, and such fractional share interests shall not entitle the owner thereof to vote or to any other rights of a stockholder of the Converted Corporation.  In lieu of the issuance of any fractional share, the Converted Corporation shall pay to each former stockholder of Ascent who otherwise would be entitled to receive a fractional share of Monitronics Common Stock an amount in cash (without interest), as provided in this paragraph. As soon as practicable after the Merger Effective Time, the Exchange Agent shall (a) determine the number of whole shares and fractional share interests of Monitronics Common Stock allocable to each holder of record or beneficial owner of Ascent Common Stock as of close of business on the date immediately prior to the Closing Date, (b) aggregate all such fractional share interests into whole shares and sell the whole shares obtained thereby in open market transactions, in each case, at then prevailing trading prices on behalf of holders who would otherwise be entitled to fractional share interests, and (c) distribute to each such holder, or for the benefit of each such beneficial owner, such holder or owner's ratable share of the net proceeds of such sale, based upon the average gross selling price per share of Monitronics Common Stock after making appropriate deductions for any amount required to be withheld for U.S. federal income tax purposes, for applicable transfer taxes and for the costs and expenses of such sale and distribution, including brokers fees and commissions. None of the Converted Corporation, Monitronics, Ascent, or the Exchange Agent will guarantee any minimum sale price for the fractional shares of the Monitronics Common Stock. None of the Converted Corporation, Monitronics or Ascent will pay any

9

interest on the proceeds from the sale of fractional shares. The Exchange Agent acting on behalf of the applicable Party will have the sole discretion to select the broker-dealers through which to sell the aggregated fractional shares and to determine when, how and at what price to sell such shares. Neither the Exchange Agent nor the broker-dealers through which the aggregated fractional shares are sold shall be affiliates of the Converted Corporation, Monitronics or Ascent.

(j)     Public Company Stock.   Monitronics shall have taken all reasonable actions to cause the shares of Monitronics Common Stock to be issued to the holders of Ascent Common Stock upon consummation of the Conversion and the Reorganization to be quoted, as promptly as practicable following the Merger Effective Time, on any tier of the OTC Markets Group (including, without limitation, the OTCQX, OTCQB or OTC Pink marketplaces) or any other similar national or international quotation service, in each case subject to official notice of issuance.

2.5     **Appraisal Rights**.  Notwithstanding any provision of this Agreement to the contrary, shares of Ascent Common Stock issued and outstanding immediately prior to the Merger Effective Time and held by a stockholder who is entitled to demand and properly demands appraisal of such shares pursuant to, and who complies in all respects with, the provisions of Section 262 of the DGCL (any such shares being referred to collectively as the "Dissenting Shares" until such time as such stockholder effectively withdraws, fails to perfect or otherwise loses such stockholder's appraisal rights under the DGCL with respect to such shares) shall not be converted into the Merger Consideration pursuant to Section 2.1. In lieu thereof, such stockholder shall be entitled to receive such consideration as is determined to be due with respect to such Dissenting Shares in accordance with Section 262 of the DGCL (and at the Merger Effective Time, such Dissenting Shares shall no longer be outstanding and shall automatically be cancelled and shall cease to exist, and such stockholder shall cease to have any rights with respect thereto, except the rights set forth in Section 262 of the DGCL); provided, however, that if, after the Merger Effective Time, any such stockholder fails to perfect or shall have effectively withdrawn or otherwise lost such stockholder's right to appraisal pursuant to Section 262 of the DGCL or if a court of competent jurisdiction shall otherwise determine that such stockholder is not entitled to the rights provided by Section 262 of the DGCL, such shares of Ascent Common Stock shall be treated as if they had been, as of the Merger Effective Time, converted into Merger Consideration in accordance with Section 2.1.

## ARTICLE III
## CONDITIONS PRECEDENT

3.1     **Conditions to Each Party's Obligation to Effect the Merger**.  The respective obligations of the Parties to effect the Merger and the other transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Merger Effective Time of the following conditions:

(a)     Ascent Stockholder Approval.   The affirmative vote of the holders a majority of the combined voting power of the outstanding shares of Ascent Common Stock entitled to vote, voting together as a single class, to approve the adoption of this Agreement (the "Ascent Stockholder Approval") shall have been obtained.

10

(b)     Monitronics Stockholder Approval. Ascent, as the sole stockholder of Monitronics shall have approved the adoption of this Agreement (the "Monitronics Stockholder Approval").

(c)     Effectiveness of the Plan.

(i)     The Plan shall be materially consistent with the RSA;

(ii)     the Plan shall have been confirmed by the Bankruptcy Court pursuant to a confirmation order materially consistent with the RSA (the "Confirmation Order");

(iii)     the Confirmation Order shall be in full force and effect and shall not have been stayed, modified, or vacated; and

(iv)     the Plan Effective Date shall occur contemporaneously with the Closing Date.

(d)     Public Company Stock. The shares of Monitronics Common Stock to be issued to the holders of Ascent Common Stock upon consummation of the Conversion and the Reorganization shall be quoted on any tier of the OTC Markets Group (including, without limitation, the OTCQX, OTCQB or OTC Pink marketplaces) or any other similar national or international quotation service, in each case subject to official notice of issuance.

(e)     Registration Statement. A registration statement on Form S-4 or other applicable form (the "Registration Statement") to be filed in connection with the issuance of Monitronics Common Stock pursuant to this Agreement shall have become effective under the Securities Act of 1933, as amended, and no stop order suspending the effectiveness of the Registration Statement shall have been issued and no proceedings for that purpose shall have been initiated or threatened by the Securities and Exchange Commission.

(f)     No Injunctions or Restraints; Illegality. No outstanding order, decision, judgment, writ, injunction, stipulation, award or decree ("Order") (whether temporary, preliminary, or permanent) issued by any court or agency of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the Merger or any of the other transactions contemplated by this Agreement shall be in effect. No statute, rule, regulation, or Order shall have been enacted, entered, promulgated or enforced by any governmental authority that prohibits or makes illegal the consummation of the Merger.

(g)     Tax Opinion. Ascent shall have received an opinion of Baker Botts L.L.P., tax counsel to Ascent, dated the Closing Date and based on facts, representations and assumptions set forth or described in such opinion, to the effect that the Merger should be treated as a "reorganization" within the meaning of Section 368(a) of the Code.

11

## ARTICLE IV
## TERMINATION

**4.1    Termination**.

      (a)    This Agreement may be terminated at any time prior to the Merger Effective Time, whether before or after Ascent Stockholder Approval or Monitronics Stockholder Approval has been obtained, by mutual consent of the Parties in a written instrument.

      (b)    This Agreement shall be terminated at any time prior to the Merger Effective Time, whether before or after Ascent Stockholder Approval or Monitronics Stockholder Approval has been obtained, without any further action by either of the Parties upon the earlier to occur of (i) the Non-Ascent Restructuring Toggle (as defined in the RSA) and (ii) the Outside Date (as defined in the RSA).

    **4.2    Effect of Termination**.  In the event of termination of this Agreement as provided in Section 4.1, this Agreement shall forthwith become void and have no effect, and neither Party nor any of their respective subsidiaries or any of the officers or directors of any of the foregoing shall have any liability of any nature whatsoever under this Agreement, or in connection with the transactions contemplated by this Agreement, except that (a) this Section 4.2 and ARTICLE V shall survive any termination of this Agreement, (b) this Section 4.2 shall not affect any liability either Party shall have to the other under the RSA, and (c) notwithstanding anything to the contrary contained in this Agreement, no Party shall be relieved or released from any liabilities or damages arising out of fraud or its willful breach of any provision of this Agreement.

## ARTICLE V
## GENERAL PROVISIONS

    **5.1    Non-Survival of Representations, Warranties and Agreements**.  None of the representations, warranties, covenants, or agreements set forth in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the Merger Effective Time, except for ARTICLE I, ARTICLE II, and this ARTICLE V.

    **5.2    Expenses**.  All costs and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the Party incurring such expense; *provided*, *however*, that the costs and expenses of printing and mailing the joint proxy statement/prospectus to be filed by Ascent in connection with soliciting the Ascent Stockholder Approval, and all filing and other fees paid to the Securities and Exchange Commission in connection with the Merger, shall be split equally by Monitronics and Ascent.

    **5.3    Counterparts**.  This Agreement may be executed in two or more counterparts (including by means of telecopied or electronically transmitted signature pages), all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each Party and delivered to the other Party, it being understood that each Party need not sign the same counterpart. The exchange of copies of this Agreement and of signature pages by facsimile or e-mail shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.

**5.4**     **Entire Agreement**.  This Agreement (including the documents and the instruments referred to in this Agreement, including the RSA and the Plan of Conversion) constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter of this Agreement.

**5.5**     **Governing Law**.  This Agreement shall be governed and construed in accordance with the internal laws of the State of Delaware applicable to contracts made and wholly performed within such state, without regard to any applicable conflicts of law principles which would require the application of any other state's laws.

**5.6**     **Assignment; Third Party Beneficiaries**.  Neither this Agreement nor any of the rights, interests, or obligations under this Agreement shall be assigned by either Party (whether by operation of law or otherwise) without the prior written consent of the other Party. Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit of and be enforceable by each Party and its respective successors and assigns. This Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any Person other than the Parties any rights or remedies under this Agreement. Notwithstanding the foregoing, after the Closing any holder of Ascent Common Stock shall be entitled to enforce the provisions of <u>ARTICLE II</u> solely to the extent necessary to receive the Merger Consideration to which such holder is entitled thereunder.

**5.7**     **Amendment**.  Subject to compliance with applicable law, this Agreement may be amended by the Parties, by action taken or authorized by their respective Boards of Directors, at any time before or after Ascent Stockholder Approval or Monitronics Stockholder Approval; *provided*, *however*, that after Ascent Stockholder Approval or Monitronics Stockholder Approval, there may not be, without further approval of such stockholders, any amendment of this Agreement that requires such further approval under applicable law. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the Parties.

**5.8**     **Extension; Waiver**.  At any time prior to the Merger Effective Time, each Party, by action taken or authorized by their respective Board of Directors, may, to the extent legally allowed, (a) extend the time for the performance of any of the obligations or other acts of the other Party, (b) waive any inaccuracies in the representations and warranties contained in this Agreement, or (c) waive compliance with any of the agreements or conditions contained in this Agreement; *provided*, *however*, that after any Ascent Stockholder Approval or Monitronics Stockholder Approval, there may not be, without further approval of such stockholders, any extension or waiver of this Agreement or any portion hereof that changes the amount or form of the consideration to be delivered to the holders of Ascent Common Stock under this Agreement, other than as contemplated by this Agreement. Any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of such Party, but such extension or waiver or failure to insist on strict compliance with an obligation, covenant, agreement, or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

**5.9**     **Specific Performance**.  The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof in any federal or state court located in the

state of Delaware in addition to any other remedy to which they are entitled at law or in equity. Any requirements for the securing or posting of any bond with such remedy are hereby waived.

**5.10    Severability**.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by virtue of any applicable law, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby are not affected in any manner adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible so that the transactions contemplated hereby are fulfilled to the extent possible.

[***Remainder of page intentionally left blank. Signature page follows.***]

14

DocuSign Envelope ID: 878BB644-D671-4586-9065-E01F8D05D0E8

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

ASCENT:

**ASCENT CAPITAL GROUP, INC.**

By: _____

Name: William E. Niles

Title:  Chief Executive Officer, General Counsel and Secretary

MONITRONICS:

**MONITRONICS INTERNATIONAL, INC.**

By: _____

Name: Jeff Gardner

Title:   President and Chief Executive Officer

*Signature page to Agreement and Plan of Merger*

**EXHIBIT A**

**PLAN OF CONVERSION**

This Plan of Conversion (this "Plan of Conversion"), dated as of [__], 2019, provides for the conversion of Monitronics International, Inc., a Texas corporation (the "Converting Corporation"), into Monitronics International, Inc., a Delaware corporation (the "Converted Corporation"), pursuant to Sections 10.101 through 10.105 of the Texas Business Organization Code (the "TBOC") and Section 265 of the General Corporation Law of the State of Delaware (the "DGCL").

WHEREAS, concurrently herewith, the Converting Corporation and Ascent Capital Group, Inc., a Delaware corporation ("Ascent") are entering into an Agreement and Plan of Merger (the "Merger Agreement"; capitalized terms used but not defined in this Plan of Conversion shall have the meanings ascribed to them in the Merger Agreement), pursuant to which (and upon the terms and subject to the conditions set forth therein) Ascent will be merged with and into the Converting Corporation, with the Converting Corporation continuing as the surviving corporation in the merger (the "Merger");

WHEREAS, the parties intend for the Conversion (as defined below) to be treated as a "reorganization" under Section 368(a)(1)(F) of the Code, and this Plan of Conversion to constitute a "plan of reorganization" for purposes of Section 368(a) of the Code and within the meaning of Treasury Regulation Section 1.368-2(g); and

WHEREAS, the Board of Directors of Monitronics has approved the Plan of Conversion and the Conversion (as defined below) in accordance with the TBOC and the DGCL and determined that the Conversion is advisable;

NOW, THEREFORE, the Converting Corporation hereby approves this Plan of Conversion and agrees as follows:

1.      Conversion and Continuing Existence. Immediately following the Merger Effective Time on the Closing Date, in accordance with this Plan of Conversion, and the TBOC and the DGCL, the Converting Corporation shall convert into a Delaware corporation, with the Converted Corporation as the resulting corporation (the "Conversion"), and the existence of the Converting Corporation shall continue in the organizational form of the Converted Corporation. The Converted Corporation shall be incorporated, formed and organized as a Delaware corporation pursuant to the DGCL.

2.      Conditions. The Conversion shall be conditioned upon this Plan of Conversion being approved by the sole stockholder of the Converting Corporation in accordance with the requirements of the TBOC and the DGCL, which shall occur prior to the Merger Effective Time.

3.      Conversion Effective Time. Upon the terms and subject to the provisions of this Plan of Conversion, immediately following the Merger Effective Time on the Closing Date, the Converting Corporation shall cause the Conversion to be consummated by filing (a) a certificate of conversion (the "Certificate of Conversion") and certificate of incorporation (the "Certificate of

*Exhibit A to Agreement and Plan of Merger*

Incorporation") with the Secretary of State of the State of Delaware, meeting the requirements of, and executed in accordance with, the relevant provisions of the DGCL, and (b) articles of conversion (the "Articles of Conversion") with the Secretary of State of the State of Texas, meeting the requirements of, and executed in accordance with, the relevant provisions of the TBOC. The Conversion shall become effective at the time the Certificate of Conversion and Certificate of Incorporation are duly filed with the Secretary of State of the State of Delaware and the time specified in the Articles of Conversion as duly filed with the Secretary of State of the State of Texas, which shall occur simultaneously, or at such later date and time as Ascent and the Converting Corporation shall agree in writing and shall specify in the Certificate of Conversion, the Certificate of Incorporation and the Articles of Conversion (the time the Conversion becomes effective being the "Conversion Effective Time").

4.     Effect of the Conversion. The Conversion shall have the effects set forth in this Plan of Conversion, the Merger Agreement and in the relevant provisions of the DGCL and TBOC. Pursuant to Section 265(f) of the DGCL, upon the Conversion Effective Time the Converted Corporation shall for all purposes of the laws of the State of Delaware be deemed to be the same entity as the Converting Corporation.

5.     Conversion of Capital Stock. At the Conversion Effective Time, by virtue of the Conversion and without any action on the part of the Converting Corporation, Converted Corporation, the holders of any shares of capital stock of the Converting Corporation or any other person, each share of common stock, par value $0.01 per share, of the Converting Corporation ("Converting Corporation Common Stock") issued and outstanding immediately prior to the Conversion Effective Time, shall thereupon be converted into and become one validly issued, fully paid and nonassessable share of common stock, par value $0.01 per share, of the Converted Corporation ("Converted Corporation Common Stock").

6.     Certificate of Incorporation; Bylaws.

(a)     At the Conversion Effective Time, the Certificate of Incorporation of the Converted Corporation shall be in the form attached to the first amendment to the registration statement on Form S-4 or other applicable form to be filed with the Securities and Exchange Commission in connection with the Merger, which amendment shall be (i) subject to the prior written consent of Ascent and (ii) filed prior to both the effectiveness of the registration statement in accordance with applicable law and the mailing of such registration statement to the stockholders of the Converting Corporation and Ascent, and such Certificate of Incorporation shall be the Certificate of Incorporation of the Converted Corporation until thereafter amended in accordance with its terms and as provided by applicable law.

(b)     At the Conversion Effective Time, the bylaws of the Converted Corporation shall be in the form attached to the first amendment to the registration statement on Form S-4 or other applicable form to be filed with the Securities and Exchange Commission in connection with the Merger, which amendment shall be (i) subject to the prior written consent of Ascent and (ii) filed prior to both the effectiveness of the registration statement in accordance with applicable law and the mailing of such registration statement to the stockholders of the Converting Corporation and Ascent, and such bylaws shall be the

*Exhibit A to Agreement and Plan of Merger*

bylaws of the Converted Corporation until thereafter amended in accordance with their terms, the Certificate of Incorporation of the Converted Corporation and as provided by applicable law.

7.      Directors and Officers. The directors and officers of the Converting Corporation immediately prior to the Conversion Effective Time shall be the directors and officers of the Converted Corporation until their successors shall have been duly elected and qualified, or their earlier death, resignation or removal.

8.      Equity Compensation Plans. All equity compensation plans of the Converting Corporation and all outstanding equity-based awards issued thereunder shall be assumed by the Converted Corporation and to the extent that any such plan or award provides for the issuance of Converting Corporation Common Stock, at the Conversion Effective Time, such plan or award shall be deemed to provide for the issuance of Converted Corporation Common Stock, as adjusted to reflect the transactions contemplated by the Merger Agreement and hereby.

9.      Stock Certificates. From and after the Conversion Effective Time, all of the outstanding certificates that prior to that time represented shares of the Converting Corporation Common Stock shall be deemed for all purposes to evidence ownership of and to represent shares of Converted Corporation Common Stock. The registered owner on the books and records of the Converted Corporation or its transfer agent of any such outstanding stock certificate shall, until such certificate shall have been surrendered for transfer or conversion or otherwise accounted for to the Converted Corporation or its transfer agent, have and be entitled to exercise any voting and other rights with respect to and to receive any dividend and other distributions upon the shares of the Converted Corporation evidenced by such outstanding certificate as provided above.

10.     Governing Law. This Plan of Conversion shall be governed and construed in accordance with the laws of the State of Delaware and, so far as applicable, the conversion provisions of the TBOC.

11.     Abandonment. At any time before the Conversion Effective Time, this Plan of Conversion may be terminated and the Conversion may be abandoned for any reason whatsoever by the Board of Directors of the Converting Corporation (with the prior written consent of Ascent), notwithstanding the approval of this Plan of Conversion by the sole stockholder of the Converting Corporation.

12.     Amendment. The Board of Directors of the Converting Corporation (with the prior written consent of Ascent) may amend this Plan of Conversion at any time prior to the filing of a Certificate of Conversion with the Secretary of State of the State of Delaware or the Articles of Conversion with the Secretary of State of the State of Texas.

13.     Tax Treatment. The parties intend for the Conversion to be treated as a "reorganization" under Section 368(a)(1)(F) of the Code, and this Plan of Conversion to constitute a "plan of reorganization" for purposes of Section 368(a) of the Code and within the meaning of Treasury Regulation Section 1.368-2(g).

[*Remainder of page intentionally left blank. Signature page follows.*]

*Exhibit A to Agreement and Plan of Merger*

IN WITNESS WHEREOF, this Plan of Conversion has been adopted as of the date first written above.

**MONITRONICS INTERNATIONAL, INC.,**
a Texas corporation

By: _____
Name: [_____]
Title:  [_____]

**<u>EXHIBIT B</u>**

**Notice of Confirmation**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| MONITRONICS INTERNATIONAL, | § | Case No. 19-33650 (DRJ) |
| INC., *et al.*,[1] | § | |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**NOTICE OF ENTRY OF ORDER APPROVING
DEBTORS' DISCLOSURE STATEMENT AND CONFIRMING
<u>DEBTORS' JOINT PARTIAL PREPACKAGED PLAN OF REORGANIZATION</u>**

**TO CREDITORS, EQUITY INTEREST HOLDERS AND OTHER PARTIES IN INTEREST:**

PLEASE TAKE NOTICE that on **[_____]**, 2019, the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") entered the *Order Approving Debtors' Disclosure Statement and Confirming Debtors' Joint Partial Prepackaged Plan of Reorganization* (the "**Confirmation Order**"). Among other things, the Confirmation Order confirmed the *Joint Partial Prepackaged Plan of Reorganization of Monitronics International, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated June 3, 2019 (as amended, modified, or supplemented from time to time, the "<u>Plan</u>")[2] as satisfying the requirements of the Bankruptcy Code, thereby authorizing Monitronics International, Inc. and its debtor affiliates (collectively, the "**Debtors**") to implement the Plan on the Effective Date.

PLEASE TAKE FURTHER NOTICE that copies of the Confirmation Order may be examined by any party in interest during normal business hours at the Clerk of the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street, Houston, Texas 77002. You may also obtain copies of the Confirmation Order or of any pleadings filed in these Chapter 11 Cases for a fee via PACER at: https://ecf.txsb.uscourts.gov or free of charge on the case information website of the Debtors' claims, balloting, and noticing agent, Prime Clerk LLC, at https://cases.primeclerk.com/monitronics.

PLEASE TAKE FURTHER NOTICE that the Plan and its provisions are binding on the Debtors, the Reorganized Debtors, any Holder of a Claim or Equity Interest, and such Holder's

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Monitronics International, Inc. (9343), Security Networks LLC (8893), MIBU Servicer Inc. (5978), LiveWatch Security, LLC (3274), Platinum Security Solutions, Inc. (3850), Monitronics Canada, Inc. (9545), MI Servicer LP, LLC (N/A), Monitronics Security LP (6524), and Monitronics Funding LP (6754). The location of the Debtors' corporate headquarters and the Debtors' service address is: 1990 Wittington Place, Farmers Branch, Texas 75234.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Confirmation Order, as applicable.

1

respective successors and assigns, whether or not the Claim or Equity Interest of such Holder is Impaired under the Plan and whether or not such Holder voted to accept the Plan.

Dated: [_____], 2019
      Houston, Texas

BY ORDER OF THE COURT

Timothy A. ("Tad") Davidson II (Texas Bar No. 240112503)
Ashley L. Harper (Texas Bar No. 24065272)
**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200
Houston, TX 77002
Tel:  713-220-4200
Fax: 713-220-4285
Email:  TadDavidson@HuntonAK.com
       AshleyHarper@HuntonAK.com

-and-

David A. Hammerman (*admitted pro hac vice*)
Annemarie V. Reilly (*admitted pro hac vice*)
Jeffrey T. Mispagel (*admitted pro hac vice*)
Liza L. Burton (*admitted pro hac vice*)
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
Tel:     212-906-1200
Fax:    212-751-4864
Email:  david.hammerman@lw.com
       annemarie.reilly@lw.com
       jeffrey.mispagel@lw.com
       liza.burton@lw.com

-and-

Roger G. Schwartz (*admitted pro hac vice*)
Sarah L. Primrose (*admitted pro hac vice*)
**KING & SPALDING LLP**
1185 Avenue of the Americas
New York, New York 10036
Tel:     212-556-2100
Fax:    212-556-2222
Email:   rschwartz@kslaw.com
       sprimrose@kslaw.com

*Co-Counsel for the Debtors and Debtors in Possession*

2

## **EXHIBIT C**

**Notice of Effective Date**

US-DOCS\109671198.8

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| MONITRONICS INTERNATIONAL, | § | Case No. 19-33650 (DRJ) |
| INC., *et al.*,[1] | § |  |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § |  |

**NOTICE OF:  (A) EFFECTIVE DATE AND (B) DEADLINE
FOR PROFESSIONALS TO FILE FINAL FEE APPLICATIONS**

**TO CREDITORS, EQUITY INTEREST HOLDERS AND OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that on **[_____]**, 2019, the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") entered the *Order Approving Debtors' Disclosure Statement and Confirming Debtors' Joint Partial Prepackaged Plan of Reorganization* (the "**Confirmation Order**").  Among other things, the Confirmation Order confirmed the *Joint Partial Prepackaged Plan of Reorganization of Monitronics International, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated June 3, 2019 (as amended, modified, or supplemented from time to time, the "Plan")[2] as satisfying the requirements of the Bankruptcy Code, thereby authorizing Monitronics International, Inc. and its debtor affiliates (collectively, the "**Debtors**") to implement the Plan on the Effective Date.

**PLEASE TAKE FURTHER NOTICE** that on **[_____]**, 2019, the Effective Date under the Plan occurred.

**PLEASE TAKE FURTHER NOTICE** that copies of the Confirmation Order may be examined by any party in interest during normal business hours at the Clerk of the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street, Houston, Texas 77002. You may also obtain copies of the Confirmation Order or of any pleadings filed in these Chapter 11 Cases for a fee via PACER at: https://ecf.txsb.uscourts.gov or free of charge on the case

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Monitronics International, Inc. (9343), Security Networks LLC (8893), MIBU Servicer Inc. (5978), LiveWatch Security, LLC (3274), Platinum Security Solutions, Inc. (3850), Monitronics Canada, Inc. (9545), MI Servicer LP, LLC (N/A), Monitronics Security LP (6524), and Monitronics Funding LP (6754).  The location of the Debtors' corporate headquarters and the Debtors' service address is:  1990 Wittington Place, Farmers Branch, Texas 75234.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Confirmation Order, as applicable.

information website of the Debtors' claims, balloting, and noticing agent, Prime Clerk LLC, at https://cases.primeclerk.com/monitronics.

**PLEASE TAKE FURTHER NOTICE** that all final requests for payment of Fee Claims, including Fee Claims incurred during the period from the Petition Date through the Effective Date, must be filed with the Bankruptcy Court and served on the Reorganized Debtors no later than [_____], 2019, which is the date that is 45 days after the Effective Date.

**PLEASE TAKE FURTHER NOTICE** that if the Debtors' rejection of an Executory Contract or Unexpired Lease pursuant to the Plan gives rise to a Claim against the Debtors by the non-Debtor party or parties to such contract or lease, such Claims shall be forever barred and shall not be enforceable against the Debtors, their respective Estates, or the Reorganized Debtors unless a proof of Claim is filed with the Court and served upon the Debtors or the Reorganized Debtors, and their respective counsel, no later than [_____], 2019, which is the date that is 30 days after the date of entry of the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that the Plan and its provisions are binding on the Debtors, the Reorganized Debtors, any Holder of a Claim or Equity Interest, and such Holder's respective successors and assigns, whether or not the Claim or Equity Interest of such Holder is Impaired under the Plan and whether or not such Holder voted to accept the Plan.

2

Dated: [_____], 2019          BY ORDER OF THE COURT
        Houston, Texas

Timothy A. ("Tad") Davidson II (Texas Bar No. 240112503)
Ashley L. Harper (Texas Bar No. 24065272)
**HUNTON ANDREWS KURTH LLP**
600 Travis Street, Suite 4200
Houston, TX 77002
Tel:  713-220-4200
Fax: 713-220-4285
Email:  TadDavidson@HuntonAK.com
        AshleyHarper@HuntonAK.com

-and-

David A. Hammerman (*admitted pro hac vice*)
Annemarie V. Reilly (*admitted pro hac vice*)
Jeffrey T. Mispagel (*admitted pro hac vice*)
Liza L. Burton (*admitted pro hac vice*)
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
Tel:      212-906-1200
Fax:     212-751-4864
Email:  david.hammerman@lw.com
        annemarie.reilly@lw.com
        jeffrey.mispagel@lw.com
        liza.burton@lw.com

-and-

Roger G. Schwartz (*admitted pro hac vice*)
Sarah L. Primrose (*admitted pro hac vice*)
**KING & SPALDING LLP**
1185 Avenue of the Americas
New York, New York 10036
Tel:      212-556-2100
Fax:     212-556-2222
Email:    rschwartz@kslaw.com
        sprimrose@kslaw.com

*Co-Counsel for the Debtors and*
*Debtors in Possession*

3